**38 PAGES**

Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Attorneys for MATHESON FLIGHT EXTENDERS, INC. AND MATHESON POSTAL SERVICES, INC. and proposed attorneys for MATHESON TRUCKING, INC.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | Case No.: 22-21148 |
| MATHESON FLIGHT EXTENDERS, INC., | Chapter 11 |
| Debtor. | **NH-22** |
| In re: | Case No.: 22-21149 |
| MATHESON POSTAL SERVICES, INC. | Chapter 11 |
| Debtor. | |
| In re: | Case No.: 22-21758 |
| MATHESON TRUCKING, INC. | Chapter 11 |
| Debtor. | |

X  Affects All Debtors
☐  Affects Matheson Flight Extenders Only
☐  Affects Matheson Postal Services Only
☐  Affects Matheson Trucking Only

**MOTION TO APPROVE STIPULATION EXTENDING BRIDGE POINT LONG BEACH LLC LETTER OF CREDIT, AND AMENDMENT TO BANK OF AMERICA, N.A. LOAN AGREEMENT**

*Order Shoring Time Pending*
Date:   August 26, 2022 **(requested)**
Time:   9:30 a.m.
Place:  United States Bankruptcy Court
        501 I Street, 6th Flr., Crtrm. 35
        Sacramento, CA 95814
Judge:  Hon. Christopher M. Klein

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

Matheson Flight Extenders, Inc. ("MFE"), Matheson Postal Services, Inc. ("MPS"), and Matheson Trucking, Inc. ("MTI"), the debtors and debtors in possession in the above-captioned cases (collectively, "Debtors"), hereby move the Court (the "Motion"), for entry of an order approving a certain Fifth Modification and Release ("Stipulation" or "Fifth Modification") between the Debtors and Bank of America, N.A. ("BofA") pursuant to which BofA will extend a $500,000.00 letter of credit it issued to Bridge Point Long Beach LLC ("Bridge Point") for the benefit of MTI and MFE. The Stipulation contemplates that MTI/MFE will pay certain fees to BofA for the extension, the loan agreement with BofA loan agreement will be amended to change the reference interest rate provided therein from LIBOR to BSBY. Certain non-debtor parties (but not the Debtors) will grant BofA releases of certain claims. In support hereof, the Debtors respectfully state as follows:

## I.     BACKGROUND

1.      On May 5, 2022 ("Petition Date"), MFE and MTI each filed a petition for relief under Chapter 11 of title 11 of the United States Bankruptcy Code ("Bankruptcy Code"). On July 14, 2022, MTI filed its Chapter 11 petition for relief.

2.      By orders dated May 13, 2022, and July 22, 022, the Debtors' estates were consolidated for administrative purposes (Doc. No. 42 and MTI Doc. No. 63).

3.      On May 25, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors for MFE and MPS("UCC") (Doc. No. 87), and on August 8, 2022, the UST appointed the same members of the UCC to also serve as the Official Committee of Unsecured Creditors for MTI (Doc. No. 297).

4.      MFE and MPS are in the business of sorting and transporting large volumes of mail across the United States under contracts with the United States Postal Service ("USPS") and other customers. MTI provides senior management, legal, accounting, human resources, administrative and other services essential to MFE and MPS's business operations.

5.      Before the filing of their Chapter 11 petitions, MFE, MPS, MTI and certain non-debtor affiliated companies as co-borrowers and guarantors obtained financing and other

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

financial accommodations from BofA, including a certain Loan Agreement dated as of November 15, 2016, as amended ("Loan Agreement").

6. As relevant here, the Loan Agreement obligated BofA to provide a letter of credit facility in the face amount of $9.5 million. The Loan Agreement also provided for a revolving line of credit in the amount of $2 million. BofA asserts that the Debtors' obligations under the Loan Agreement are secured by substantially all of the Debtors' assets.

7. On or about August 6, 2021, Bridge Point and MTI entered into a lease ("Bridge Point Lease") for certain premises commonly known as 2400 E. Artesia Blvd., Long Beach, CA 90805 ("Long Beach Facility"). MFE operates a Surface Transfer Center ("STC") at the Long Beach Facility that provides mail handling services to the USPS.

8. Pursuant to Article 21.1 of the Bridge Point Lease, MTI was obligated to deliver an irrevocable letter of credit from a qualified financial institution to Bridge Point in the amount of $500,000.00. Therefore, pursuant to the Loan Agreement, at MTI's request, on August 17, 2021, BofA issued Standby Letter of Credit No. 68177138 in the amount of $500,000.00 under which Bridge Point is beneficiary ("LOC"). The LOC expires by its own terms on September 30, 2022.

9. MTI is required under the Bridge Point Lease to deliver a replacement letter of credit to Bridge Point within sixty (60) days prior to the expiration of the LOC. *See* Bridge Point Lease, Art. 21.3.1. Should MTI fail to replace the LOC prior to 60 days before expiration, Bridge Point is entitled to draw the full amount of the LOC. *Id.*; LOC at pp. 1-2.

10. Article 21.3.2 of the Bridge Point Lease further purports to provide that if MTI does not timely replace the LOC, in addition to drawing the full amount of the LOC, Bridge Point is entitled to increase the base rent MTI is required to pay under the lease by 150% for the first ninety (90) days thereafter, and then to further increase base rent to 200% from the 91st day until the LOC is replaced.[1]

---

[1]      The Debtors believe that the provisions of Article 21.3.2 of the Bridge Point Lease and related provisions that purport to permit the landlord to vastly increase the rent due for failure to replace the LOC despite allowing Bridge Point to draw the entire $500,000.00 under the LOC is unreasonable at the time this lease was entered into, and therefore,

*...Continued*

- 3 -
MOTION TO APPROVE AGREEMENT EXTENDING BRIDGE POINT LETTER OF CREDIT

11. After MTI filed its Chapter 11 case, BofA tendered notice to MTI and Bridge Point that it would not renew or extend the LOC.

12. On July 26, 2022, MFE and USPS entered into an agreement (Doc. No. 276) that *inter alia* amended the pricing terms for the services provided to USPS at the Long Beach Facility through January 31, 2023. As a result of the July 26, 2022, agreement, MFE anticipates that it will operate the Long Beach STC profitably through at least January 31, 2023.

13. It is also anticipated that prior to January 31, 2023, MFE and USPS will negotiate the terms under which contracts MFE will continue to provide services to USPS on a long-term basis, including the Long Beach STC. However, if USPS determines to enter into a contract with an alternative service provider at the Long Beach STC after January 31, 2023, MTI/MFE will endeavor to assume and assign the Bridge Point Lease to the new operator of that facility.

14. In view of the pendency of the bankruptcy proceeding and MTI's other financial circumstances, MTI does not at present believe that it is possible for it to secure a replacement letter of credit for Bridge Point from another qualified financial institution as required by the Bridge Point Lease.

## II.     MATERIAL TERMS OF STIPULATION

15. Therefore, MTI after consultation with the UCC, negotiated an agreement with BofA to extend the LOC on the following terms:

   a. The expiry date of the LOC will be extended to March 1, 2023;

   b. All other terms of the LOC will remain in full force and effect, including but not limited to Bridge Point's right to draw the LOC if not timely extended or replaced;

   c. MTI/MFE will pay a renewal fee to BofA in the amount of $28,750.00. This sum represents the normal 1.75% renewal fee on the face amount of the LOC

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

these provisions are unenforceable pursuant to California Civil Code §1671. The Debtors reserve all rights to contest the validity and enforceability of any of the provisions of the Bridge Point Lease on any grounds.

($8,750.00), plus an additional 4% ($20,000.00) due to the fact BofA asserts

that MTI is in default under the Loan Agreement;

d.    The interest rate provisions of the Loan Agreement with BofA will be

amended to change the reference interest rate from LIBOR to Bloomberg

Short Term Bank Yield Index ("BSBY"); and

e.    Certain non-debtor parties (but not the Debtors) will grant BofA a release of

claims.

A true and correct copy of what is anticipated to be the final draft of the Fifth Amendment is

attached hereto as **Exhibit A**.  (It is possible that additional revisions will be made to the Fifth

Modification before it is executed by all of the parties and before the hearing on this Motion, but

any material modifications will be brought to the Court's attention at or prior to the hearing.)

### III.    ARGUMENT

Bankruptcy Code section 365(d)(3) obligates a debtor to timely perform all obligations of

an unexpired lease of real property until such lease is assumed or rejected.  11 U.S.C. §

365(d)(3).  Article 21.1 of the Bridge Point Lease requires MTI to deliver a letter of credit in the

amount of $500,000.00 issued by a qualified financial institution to Bridge Point, and to maintain

that LOC during the term of the lease.  Thus, the Bridge Point Lease obligates MTI to secure an

extension or renewal of said LOC within 60-days prior to its expiration, failing which Bridge

Point is entitled to draw the full amount of the LOC.  The LOC currently issued by BofA to

Bridge Point expires on September 30, 2022.  Consequently, in order to enable MTI to timely

perform its obligations with respect to the LOC required by the Bridge Point Lease, MTI must

arrange for an extension or replacement of the LOC in advance of September 30, 2022.

MTI does not believe that in view of the bankruptcy filing and its financial condition that

it is possible to obtain a replacement letter of credit from any qualified lender other than BofA.

MTI also believes that the terms under which BofA will extend the LOC until March 1, 2023, are

reasonable.  While the fee typically charged for issuance of a letter of credit is being increased by

the default interest rate otherwise provided for under the BofA Loan Agreement, MTI appears to

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

be in default, and the financial risks to BofA appear to be different than those presented when the LOC was originally issued in August 2021.

Moreover, the total amount of the increase over the normal extension fee ($20,000.00) is likely less than what MTI would incur in attorney's fees and other administrative costs if the LOC is not extended. As noted in footnote 1, the Debtors believe that the rent escalation provisions of the Bridge Point Lease triggered if the LOC is not extended or replaced are an unenforceable penalty. However, the cost of obtaining that determination would likely exceed $20,000.00. In addition, if the LOC is drawn, BofA will be entitled to charge interest (including at the default interest rate to the extent that it is oversecured).

With respect to the amendment of the Loan Agreement, the contemplated change in interest rate is reasonable under the circumstances. LIBOR has been phased out as of December 31, 2021. *See* Teala Volkamer, THE RACE TO REPLACE LIBOR: UNDERSTANDING SOFR AND BSBY, Journal of Business and Intellectual Property Law (February 2, 2022). http://ipjournal.law.wfu.edu/2022/02/the-race-to-replace-libor-understanding-sofr-and-bsby/, a true and correct copy of is attached hereto as **Exhibit B**. BSBY is one of two leading alternatives financial institutions use as a replacement reference rate for LIBOR. *Id*. The change in the reference interest rate from LIBOR to BSBY will not have a material financial impact on the amount of interest paid under the Loan Agreement. According to the article cited above:

> "The benefit of BSBY is that it establishes a benchmark for transactions through incorporated traded rates across a variety of bank issuers. BSBY also tracks closely with the historical rates of U.S. dollar LIBOR at each tenor." *Id*.

Finally, with respect to the release of claims, the only parties granting BofA a release are non-debtor entities. Accordingly, the Debtors do not believe that the release provisions of the Fifth Amendment will have any adverse impact the estates.

## IV.    NOTICE

The Debtors have served this Motion upon (i) the Office of the United States Trustee for the Eastern District of California; (ii) the UCC; (iii) all secured creditors in these cases, and (v) all parties requesting special notice of motions and other proceedings in these cases. The Debtors respectfully submits that no other or further notice need be given.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**WHEREFORE**, the Debtors respectfully requests that this Court enter an Order approving the Fifth Amendment to the Loan Agreement pursuant to which BofA will extend the Bridge Point LOC, and grant such other and further relief as may be just and proper.

Dated: August 22, 2022

NUTI HART LLP

By: _/s/ Kevin W. Coleman_
      Kevin W. Coleman
      Attorneys for Matheson Flight Extenders, Inc.
      and Matheson Postal Services, Inc. and
      proposed attorneys for Matheson Trucking,
      Inc.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

MOTION TO APPROVE AGREEMENT EXTENDING BRIDGE POINT LETTER OF CREDIT

**EXHIBIT C**

**(FIFTH MODIFICATION AGREEMENT AND RELEASE)**

## <u>FIFTH MODIFICATION AGREEMENT AND RELEASE</u>

This FIFTH MODIFICATION AGREEMENT AND RELEASE ("<u>Agreement</u>") is made and entered into as of the 4th day of August, 2022, by (i) BANK OF AMERICA, N.A. ("<u>Bank</u>"), on the one hand, and (ii) MATHESON TRUCKING, INC., a California corporation ("<u>Borrower</u>"), (iii) MATHESON HOLDINGS, a California general partnership ("<u>Holdings</u>"), (iv) MATHESON FLIGHT EXTENDERS, INC, a California corporation ("<u>MFE</u>"), (v) MATHESON POSTAL SERVICES, INC., a California corporation ("<u>MPS</u>," and together with Borrower and MFE, the "<u>Debtors</u>")), (vi) MATHESON MAIL TRANSPORTATION, INC., a California corporation ("<u>MMT</u>"), (vii) MATHESON PROPERTIES LLC, a California limited liability company ("<u>Matheson Properties</u>"), (viii) MARK B. MATHESON, an individual ("<u>Mark</u>"), and (ix) MARK B. MATHESON, as Trustee of THE MARK B. MATHESON 2009 IRREVOCABLE TRUST ("<u>Mark Trust</u>", and together with Holdings, MFE, MPS, MMT, Matheson Properties and Mark, in their respective capacities as guarantors, individually and collectively, "<u>Guarantor</u>") (at times hereinafter, Borrower and Guarantor shall be referred to, individually and collectively, as the "<u>Matheson Parties</u>"), on the other hand, with reference to the following facts:

## RECITALS

A. Bank has heretofore extended a Seven Million and No/100 Dollars ($7,000,000.00) letter of credit facility to Borrower (the "<u>LC Facility</u>"). The LC Facility was and/or is evidenced, secured and/or guaranteed, without limitation, as follows:

1. Loan Agreement dated as of November 15, 2016, as amended ("<u>Loan Agreement</u>"), executed by Borrower and Bank, governing the terms and conditions upon which Bank agreed to extend the LC Facility to Borrower.  Capitalized terms used but not expressly defined herein shall have the meanings ascribed to them in the Loan Agreement.

2. Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>Holdings LC Guaranty</u>"), executed by Holdings in favor of Bank, and pursuant to which, among other things, Holdings has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

3. Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>MFE LC Guaranty</u>"), executed by MFE in favor of Bank, and pursuant to which, among other things, MFE has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

4. Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>MPS LC Guaranty</u>"), executed by MPS in favor of Bank, and pursuant to which, among other things, MPS has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

5. Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>MMT LC Guaranty</u>"), executed by MMT in favor of Bank, and pursuant to which, among other things, MMT has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

6.    Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>Mark LC Guaranty</u>"), executed by Mark in favor of Bank, and pursuant to which, among other things, Mark has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

7.    Continuing and Unconditional Guaranty dated November 15, 2016 ("<u>Mark Trust LC Guaranty</u>"), executed by Mark Trust in favor of Bank, and pursuant to which, among other things, Mark Trust has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

8.    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated November 15, 2016 ("<u>Poplar Second Deed of Trust</u>"), whereby, Holdings, as trustor, granted to PRLAP, Inc., as trustee for the benefit of Bank, as beneficiary, a second priority trust deed lien encumbering the real property more particularly described in <u>Exhibit "A-1"</u> attached hereto and incorporated herein by this reference (the "<u>Poplar Property</u>").  The Poplar Second Deed of Trust was recorded in the Official Records of Alameda County, California, on November 30, 2016 in Book 20161130 Page 2302. The Poplar Second Deed of Trust secures, without limitation, payment and performance of Holdings' indebtedness and obligations under the Holdings LC Guaranty.

9.    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated November 15, 2016 ("<u>East 54th Deed of Trust</u>"), whereby, Holdings, as trustor, granted to the Public Trustee of Adams County, Colorado, as trustee for the benefit of Bank, as beneficiary, a first priority trust deed lien encumbering the real property more particularly described in <u>Exhibit "A-2"</u> attached hereto and incorporated herein by this reference (the "<u>East 54th Property</u>").  The East 54th Deed of Trust was recorded in the Official Records of Adams County, Colorado, on December 1, 2016 as Instrument No. 2016000103907. The East 54th Deed of Trust secures, without limitation, payment and performance of Holdings' indebtedness and obligations under the Holdings LC Guaranty.

10.    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated November 15, 2016 ("<u>Glen Carran Deed of Trust</u>"), whereby, Holdings, as trustor, granted to PRLAP, Inc., as trustee for the benefit of Bank, as beneficiary, a first priority trust deed lien encumbering the real property more particularly described in <u>Exhibit "A-3"</u> attached hereto and incorporated herein by this reference (the "<u>Glen Carran Property</u>").  The Glen Carran Deed of Trust was recorded in the Official Records of Washoe County, Nevada, on November 30, 2016 as Instrument No. 4657346. The Glen Carran Deed of Trust secures, without limitation, payment and performance of Holdings' indebtedness and obligations under the Holdings LC Guaranty.

11.    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated November 15, 2016 ("<u>Elk Grove Deed of Trust</u>"), whereby, Holdings, as trustor, granted to PRLAP, Inc., as trustee for the benefit of Bank, as beneficiary, a first priority trust deed lien encumbering the real property more particularly described in <u>Exhibit "A-4"</u> attached hereto and incorporated herein by this reference (the "<u>Elk Grove Property</u>", and together with the Poplar Property, the East 54th Property, the Glen Carran Property and the Goethe Property (as hereinafter defined), at times hereinafter referred to, individually and collectively,   as the

"Property"). The Elk Grove Deed of Trust was recorded in the Official Records of Sacramento County, California, on November 30, 2016 as Book No. 20161130, Page 2302. The Elk Grove Deed of Trust secured, without limitation, payment and performance of Holdings' indebtedness and obligations under the Holdings LC Guaranty.

12.     Security Agreement (Multiple Use) dated November 15, 2016 ("Borrower Security Agreement"), whereby Borrower has granted to Bank a security interest in any and all assets of Borrower (including, without limitation, the property described therein), as security for payment and performance of, without limitation, all present and future indebtedness and obligations of Borrower to Bank.

13.     Security Agreement (Multiple Use) dated November 15, 2016 ("MFE Security Agreement"), whereby MFE has granted to Bank a security interest in any and all assets of MFE (including, without limitation, the property described therein), as security for payment and performance of, without limitation, all present and future indebtedness and obligations of MFE to Bank.

14.     Security Agreement (Multiple Use) dated November 15, 2016 ("MPS Security Agreement"), whereby MPS has granted to Bank a security interest in any and all assets of MPS (including, without limitation, the property described therein), as security for payment and performance of, without limitation, all present and future indebtedness and obligations of MPS to Bank.

15.     Security Agreement (Multiple Use) dated November 15, 2016 ("MMT Security Agreement", and together with the Borrower Security Agreement, the MFE Security Agreement, the MPS Security Agreement and the Matheson Properties Security Agreement (as hereinafter defined), individually and collectively, the "Security Agreement"), whereby MMT has granted to Bank a security interest in any and all assets of MMT (including, without limitation, the property described therein), as security for payment and performance of, without limitation, all present and future indebtedness and obligations of MMT to Bank.

16.     Bank has caused to be filed with the California Secretary of State the following UCC Financing Statements:

i.      A UCC Financing Statement reflecting Borrower as the Debtor therein, filed on November 17, 2016 as Filing No. 16-7557187774, and continuation statement filed May 23, 2021, as Filing No. 21-0049008125.

ii.     A UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the East 54th Property, filed on November 17, 2016 as Filing No. 16-7557174962.

iii.    A UCC Financing Statement reflecting MFE as the Debtor therein, filed on November 17, 2016 as Filing No. 16-7557187916.

iv.     A UCC Financing Statement reflecting MPS as the Debtor therein, filed on November 17, 2016 as Filing No. 16-7557189817.

v.     A UCC Financing Statement reflecting MMT as the Debtor therein, filed on November 17, 2016 as Filing No. 16-7557187390.

vi.     A UCC Financing Statement reflecting MFE as the Debtor therein, filed on February 18, 2022, as Filing No. 22-0166318832.

vii.     A UCC Financing Statement reflecting MPS as the Debtor therein, filed on February 18, 2022, as Filing No. 22-0166323428.

viii.     A UCC Financing Statement reflecting MMT as the Debtor therein, filed on February 18, 2022, as Filing No. 22-0166320826.

ix.     A UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the East 54th Property, filed on February 18, 2022 as Filing No. 22-0166327629 ("East 54th UCC").

x.     A UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the Poplar Property, filed on February 18, 2022, as Filing No. 22-0166321525 (the "Poplar UCC").

xi.     A UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the Glen Carran Property, filed on February 18, 2022, as Filing No. 22-0166321121.

17.     Bank has caused to be filed with the Nevada Secretary of State a UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the Glen Carran Property, filed on November 18, 2016 as Filing No. 2016032625-7.

18.     Bank has caused to be filed with the Colorado Secretary of State a UCC Financing Statement reflecting Holdings as the Debtor therein, and relating to the East 54th Property, filed on February 17, 2022, as Filing No. 22-222017031.

B.     The Loan Agreement was amended pursuant to that certain Amendment No. 1 to Loan Agreement dated as of September 27, 2017 (the "First Amendment"), executed by Borrower and Bank (and with each Guarantor (except for Matheson Properties) executing a Consent and Reaffirmation of Guarantors with respect to the First Amendment). Without limitation, the following were executed, delivered, recorded and/or filed pursuant to or in connection with the First Amendment:

1.     Continuing and Unconditional Guaranty dated September 27, 2017 ("Matheson Properties LC Guaranty", and together with the Holdings LC Guaranty, MFE LC Guaranty, MPS LC Guaranty, MMT LC Guaranty, Mark LC Guaranty, and Mark Trust LC Guaranty, individually and collectively, the "Guaranty"), executed by Matheson Properties in favor of Bank, and pursuant to which, among other things, Matheson Properties has guaranteed to Bank the payment when due of, without limitation, any and all advances, debts, obligations and liabilities of Borrower to Bank.

2.     Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated September 27, 2017 ("Goethe Deed of Trust", and together with the Poplar Second Deed of Trust, the East 54th Deed of Trust, the Glen Carran Deed of Trust, and Elk Grove Deed of Trust, collectively, the "Deed of Trust"), whereby, Matheson Properties, as trustor, granted to PRLAP, Inc., as trustee for the benefit of Bank, as beneficiary, a first priority trust deed lien encumbering the real property more particularly described in Exhibit "A-5" attached hereto and incorporated herein by this reference (the "Goethe Property"). The Goethe Deed of Trust was recorded in the Official Records of Sacramento County, California, on October 2, 2017, as Document No. 201710020162. The Goethe Deed of Trust secures, without limitation, payment and performance of Matheson Properties' indebtedness and obligations under the Matheson Properties LC Guaranty.

3.     Subordination Agreement – Lease dated September 27, 2017 ("Goethe Subordination"), executed and delivered by Borrower and Matheson Properties to and in favor of Bank, encumbering the Goethe Property, and recorded in the Official Records of Sacramento County, California, on October 2, 2017, as Document No. 201710020163.

4.     Security Agreement (Multiple Use) dated September 27, 2017 ("Matheson Properties Security Agreement"), whereby Matheson Properties has granted to Bank a security interest in any and all assets of Matheson Properties (including, without limitation, the property described therein), as security for payment and performance of, without limitation, all present and future indebtedness and obligations of Matheson Properties to Bank.

5.     A UCC Financing Statement reflecting Matheson Properties as the Debtor therein, filed with the California Secretary of State's Office on October 3, 2017 as Filing No. 17-7608902131.

C.     Additionally, pursuant to the First Amendment, the Elk Grove Deed of Trust has been fully reconveyed, and the Elk Grove UCC has been terminated.

D.     Pursuant to the Loan Agreement, Borrower has executed that certain Application and Agreement for Standby Letter of Credit dated as of October 12, 2016 in favor of Bank, requesting Bank to issue a standby letter of credit for the benefit of Old Republic Insurance Company c/o Old Republic Risk Management, Inc. in the original stated amount of $200,000.00 (together with any and all amendments thereto and/or modifications thereof, the "First LC Agreement"). Pursuant to the First LC Agreement, Bank has issued for the account of Borrower its Irrevocable Standby Letter of Credit Number 68129136, dated December 1, 2016, in the original face amount of $200,000.00 (as amended to the stated amount of $100,000.00, pursuant to that certain Amendment Number 1 dated March 10, 2017, and further amended to the stated amount of $50,000.00, pursuant to that certain Amendment Number 2 dated March 1, 2019), for the benefit of Old Republic Insurance Company c/o Old Republic Risk Management, Inc. (together with any and all amendments thereto and/or modifications thereof, the "First Letter of Credit"). The beneficiary of the First Letter of Credit surrendered the First Letter of Credit to Bank, and the First Letter of Credit was thereupon cancelled by Bank, as of February 14, 2020. The First Letter of Credit is now null and void.

E.      Pursuant to the Loan Agreement, Borrower has executed that certain Application and Agreement for Standby Letter of Credit dated as of October 12, 2016 in favor of Bank, requesting Bank to issue a standby letter of credit for the benefit of Lumbermens Mutual Casualty Company, in Liquidation, American Motorists Insurance Company, in Liquidation, and American Manufacturers Mutual Insurance Company, in Liquidation, in the original stated amount of $179,632.13 (together with any and all amendments thereto and/or modifications thereof, the "Second LC Agreement"). Pursuant to the Second LC Agreement, Bank has issued for the account of Borrower its Irrevocable Standby Letter of Credit Number 68129135, dated December 1, 2016, in the original face amount of $179,632.13 (as amended to the stated amount of $147,561.69, pursuant to that certain Amendment Number 2 dated July 16, 2018, amended to the stated amount of $127,889.39, pursuant to that certain Amendment Number 3 dated May 24, 2019, and further amended to the stated amount of $100,672.34, pursuant to that certain Amendment Number 4 dated May 11, 2020), for the benefit of Lumbermens Mutual Casualty Company, in Liquidation (together with any and all amendments thereto and/or modifications thereof, the "Second Letter of Credit").

F.      Pursuant to the Loan Agreement, Borrower has executed that certain Application and Agreement for Standby Letter of Credit dated as of October 12, 2016 in favor of Bank, requesting Bank to issue a standby letter of credit for the benefit of XL Specialty Insurance Company, Greenwich Insurance Company, and XL Insurance America, Inc. in the original stated amount of $6,340,000.00 (together with any and all amendments thereto and/or modifications thereof, the "Third LC Agreement"). Pursuant to the Third LC Agreement, Bank has issued for the account of Borrower its Irrevocable Standby Letter of Credit Number 68129134 dated December 2, 2016, in the original face amount of $6,340,000.00 (as amended to the stated amount of $6,590,00.00, pursuant to that certain Amendment Number 1 dated March 29, 2019), for the benefit of XL Specialty Insurance Company, Greenwich Insurance Company XL, and Insurance America, Inc (together with any and all amendments thereto and/or modifications thereof, the "Third Letter of Credit").

G.      Pursuant to the Loan Agreement, Borrower has executed that certain Application and Agreement for Standby Letter of Credit dated as August 17, 2021, of in favor of Bank, requesting Bank to issue a standby letter of credit for the benefit of Bridge Point Long Beach, LLC C/O Bridge Development Partners, LLC. in the original stated amount of $500,000.00 (together with any and all amendments thereto and/or modifications thereof, the "Fourth LC Agreement", and together with the First LC Agreement the Second LC Agreement, and the Third LC Agreement, individually and collectively, the "LC Agreement"). Pursuant to the Fourth LC Agreement, Bank has issued for the account of Borrower its Irrevocable Standby Letter of Credit Number 68177138, dated August 17, 2021, in the original face amount of $500,000.00  for the benefit of Bridge Point Long Beach, LLC C/O Bridge Development Partners, LLC. (together with any and all amendments thereto and/or modifications thereof, the "Fourth Letter of Credit," and together with the First Letter of Credit, the Second Letter of Credit, and the Third Letter of Credit,  individually and collectively, the "Letter of Credit").

H.      Bank, Matheson Parties, and others, executed and entered into that certain Modification Agreement and Release dated January 2, 2018 ("First Modification") with respect to the LC Facility and certain other financial accommodations extended by Bank and/or its affiliates to certain of the Matheson Parties. Among other things, the First Modification

extended the Expiration Date of the LC Facility to March 1, 2019, and made certain other modifications to the Loan Agreement and other Loan Documents, all as more particularly set forth in the First Modification. A memorandum of the First Modification was recorded in Adams County, Colorado, on February 5, 2018, as Document No. 2018000010271 ("Memorandum of First Modification").

       I.    Bank and the Matheson Parties executed and entered into that certain Second Modification Agreement and Release dated October 31, 2018 ("Second Modification") with respect to the LC Facility and certain other financial accommodations extended by Bank to Borrower. Among other things, the Second Modification (i) further extended the Expiration Date of the LC Facility to March 1, 2020, (ii) extended to Borrower a new seasonal working capital line of credit in the maximum principal amount of $5,000,000.00 ("Line of Credit Facility"), and (iii) made certain other modifications to the Loan Agreement and other Loan Documents, all as more particularly set forth in the Second Modification.

       J.    Payment and performance of the Line of Credit Facility is also guaranteed by each Guaranty, and is secured by the Collateral (as herein defined) pursuant to the Deed of Trust and Security Agreement. In that regard, a Modification of Deed of Trust and Memorandum of Second Modification Agreement (individually and collectively, the "Memorandum of Second Modification") was executed by Borrower and Bank and recorded in each of Adams County, Colorado, on December 4, 2018, as Reception No. 2018000096998; in Alameda County, California, on November 28, 2018, as Document No. 2018225690; in Sacramento County, California, on November 27, 2018, as Document No. 201811271109; and in Washoe County, Nevada, on November 28, 2018, as Document No. 4869417.

       K.    Bank and the Matheson Parties executed and entered into that certain Third Modification Agreement and Release dated February 27, 2020 ("Third Modification") with respect to the LC Facility and Line of Credit Facility. Among other things, the Third Modification (i) further extended the Expiration Date of the LC Facility to June 1, 2021, (ii) increased the maximum principal amount of the LC Facility to $8,300,000.00, and (iii) made certain other modifications to the Loan Agreement and other Loan Documents, all as more particularly set forth in the Third Modification.

       L.    A Modification of Deed of Trust and Memorandum of Third Modification Agreement (individually and collectively, the "Memorandum of Third Modification") was executed by Borrower and Bank and recorded in each of Adams County, Colorado, on April 1, 2020, as Reception No. 2020000029506; in Alameda County, California, on April 1, 2020, as Document No. 2020073112; in Sacramento County, California, on April 10, 2020, as Document No. 202004100027; and in Washoe County, Nevada, on April 1, 2020, as Document No. 5015950.

       M.    Bank and the Matheson Parties executed and entered into that certain Fourth Modification Agreement and Release dated May 21, 2021 ("Fourth Modification") with respect to the LC Facility and Line of Credit Facility. Among other things, the Fourth Modification (i) further extended the Expiration Date of the LC Facility to June 1, 2022, (ii) increased the maximum principal amount of the LC Facility to $9,300,000.00, and (iii) made certain other

modifications to the Loan Agreement and other Loan Documents, all as more particularly set forth in the Fourth Modification.

N.      A Modification of Deed of Trust and Memorandum of Fourth Modification Agreement (individually and collectively, the "<u>Memorandum of Fourth Modification</u>") was executed by Borrower and Bank and recorded in each of Adams County, Colorado, on June 22, 2021, as Reception No. 2021000074379; in Alameda County, California, on June 22, 2021, as Document No. 2021; in Sacramento County, California, on June 16, 2021m as Document No. 2021, as Document No. 202106161678 and re-recorded June 28, 2021, as Document No. 202106280886; and in Washoe County, Nevada, on June 21, 2021, as Document No. 5194950.

O.      The agreements, instruments and other documents described in Recitals A through N above, inclusive, together with all other agreements, instruments and other documents evidencing, securing, guaranteeing or otherwise relating to the LC Facility and/or Line of Credit Facility (collectively, the "<u>Credit Facilities</u>"), shall at times hereinafter be referred to, individually and collectively, as the "<u>Loan Documents</u>".

P.      The Debtors filed petitions for relief under Chapter 11 of the United States Bankruptcy Court, Eastern District (Sacramento Division) (the "<u>Bankruptcy Court</u>") that are pending in the Bankruptcy Court under docket numbers 22-21148 (MFE), 22-21149 (MPS) and 22-21758 (Borrower) that are collectively referred to herein as the "<u>Bankruptcy Cases</u>").

Q.      Except with respect to the Debtors if a final order is entered in the Bankruptcy Cases avoiding any security interests granted to Bank pursuant to the Loan Document and the provisions of paragraph 10.f below, any and all security interests granted to Bank pursuant to the Loan Documents in any real and/or personal property have been and are duly perfected under any and all applicable laws, and constitute valid and enforceable liens against such real and/or personal property encumbered thereby (collectively, the "<u>Collateral</u>").

R.      The Matheson Parties have now requested that Bank agree to modify the Loan Agreement and the other Loan Documents to (i) extend the expiration date of the Fourth Letter of Credit as more particularly set forth herein.

S.      Bank is willing to agree to the foregoing request, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.      <u>Recitals</u>.    Recitals A through S, inclusive, are incorporated herein by this reference as are any and all other exhibits and schedules. The parties agree that the information recited above is true and correct. Except as specified herein, all of the terms and conditions of the Loan Documents, and each of them, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms, conditions and provisions of this Agreement and the Loan Documents, the terms, conditions and provisions of this Agreement shall prevail.

2. <u>Acknowledgment</u>. The Matheson Parties, and each of them, acknowledge as follows:

       a.        As of May 18, 2021, (i) the First Letter of Credit has been surrendered by the beneficiary, cancelled by the Bank, and is now null and void, (ii) the amount of $100,672.34 remains undrawn from the Second Letter of Credit, and no amounts have been drawn on the Second Letter of Credit, (iii) the amount of $6,590,000.00 remains undrawn from the Third Letter of Credit, and no amounts have been drawn on the Third Letter of Credit; and (iv) the amount of $500,000.00 remains undrawn from the Fourth Letter of Credit, and no amounts have been drawn on the Fourth Letter of Credit  Further, there are no other sums currently owing to Bank in connection with the LC Facility.

       b.        The $2,00,000 owed pursuant tto the Line of Credit Facility that was due in full on June 1, 2022, has not been paid and is due and owing in full .

       c.        In consideration of the financial accommodations set forth herein, subject with respect to the Debtors only on entry of a final order in the Bankruptcy Cases to the contrary and the provisions of paragraph 10.f below, the Matheson Parties, and each of them, specifically, expressly and forever waive and relinquish (i) any and all offsets or defenses to the total indebtedness of the Matheson Parties, and each of them, to Bank under the Loan Documents, (ii) any and all claims against Bank, and (iii) any and all rights or theories on which to invoke or obtain legal or equitable relief, whether injunctive relief or otherwise, in order to abate, postpone or terminate enforcement by Bank of repayment of the obligations of the Matheson Parties, and each of them, under the Loan Documents.

3. <u>Reaffirmation</u>. This Agreement is, in part, a reaffirmation of the obligations and indebtedness of the Matheson Parties, and each of them, to Bank as evidenced by the Loan Documents. Therefore, subject with respect to the Debtors only on entry of a final order to the contrary and the provisions of paragraph 10.f below, the Matheson Parties, and each of them, represent and warrant, covenant and agree, that except as specified herein, all of the terms and conditions of the Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever.

4. <u>Modification of Loan Agreement</u>. Subject to the timely and complete satisfaction of each and every one of the conditions set forth in Section 5 of this Agreement, the Loan Agreement is hereby modified as follows:

       a.        The expiration date of the Fourth Letter of Credit is extended to March 1, 2023.

       b.        The fee charged on the Fourth Letter of Credit pursuant to section 1(b) of the Loan Agreement (1.75 percent) shall be increased by the Default Rate of four percent (4%(i.e., resulting in a total fee of $28,750.00).

       c.        Section 1A.4  of the Loan Agreement is hereby deleted and replaced in its entirety to read as follows:

(a) The interest rate is a rate per year equal to the sum of (i) the greater of the BSBY Rate (Adjusted Periodically) or the Index Floor, plus (ii) 1.65 percentage points.  For purposes of this paragraph, "Index Floor" means 0.00 percent.

(b) The interest rate will be adjusted on the first day of every month (the "Adjustment Date") and remain fixed until the next Adjustment Date.  If the Adjustment Date in any particular month would otherwise fall on a day that is not a banking day then, at the Bank's option, the Adjustment Date for that particular month will be the first banking day immediately following thereafter.

(c) The "BSBY Rate (Adjusted Periodically)" is a rate of interest equal to the rate per annum equal to the BSBY Screen Rate as determined for each Adjustment Date two (2) banking days prior to the Adjustment Date (for delivery on the first day of such interest period) with a term of one month; provided that if such rate is not published on such determination date then the rate will be the BSBY Screen Rate on the first banking day. immediately prior thereto.  "BSBY Screen Rate" means the Bloomberg Short-Term Bank Yield Index rate ("BSBY") administered by Bloomberg Index Services Limited and published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time).  If at any time the BSBY Rate (Adjusted Periodically) is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

(d) If at any time an interest rate index provided for in this Agreement (a "Reference Rate") is not available at such time for any reason or the Bank makes the determination to incorporate or adopt a new interest rate index to replace such Reference Rate in credit agreements, then the Bank may replace such Reference Rate with an alternate interest rate index and adjustment, if applicable, as reasonably selected by the Bank, giving due consideration to any evolving or then existing conventions for such interest rate index and adjustment (any such successor interest rate index, as adjusted, the "Successor Rate"). In connection with the implementation of any Successor Rate, the Bank will have the right, from time to time, in good faith to make any conforming, technical, administrative or operational changes to this Agreement as may be appropriate to reflect the adoption and administration thereof and, notwithstanding anything to the contrary herein or in any other loan document, any amendments to this Agreement implementing such conforming changes will become effective upon notice to the Borrower without any further action or consent of the other parties hereto. If at any time any Successor Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement

d.        Section 2(g) of the LC Agreement is hereby deleted and replaced in its entirety as follows:

(g) Applicant shall pay interest, on demand, on any amount not paid when due under this Application and Agreement from the due date until payment in full at a rate per annum equal to the rate of interest provided for in section 1A.4 of the Loan Agreement, plus three percentage points (not to exceed the maximum rate permitted by applicable law) or as otherwise agreed by the Bank, Interest will be computed on the basis of a 360-day year and actual days elapsed

5.      Conditions Precedent.  The obligations of Bank hereunder are expressly conditioned upon the following having occurred, or Bank having received, all of the following documents and instruments in form and content satisfactory to Bank, in its sole and absolute discretion, opinion and judgment, and all amounts specified below:

a.      By no later than September 2,2022;

(a)      This Agreement is fully executed;

(b)      All required flood due diligence and related requirements are deemed satisfied in the Bank's sole discretion;

(c)      An order shall enter in the Bankruptcy Cases authorizing the Debtors to enter into and execute this Agreement and take all steps necessary to effectuate this Agreement; and

(d)      Such additional financing statements, assignments, agreements, reports, approvals, instruments, documents and consents as Bank may request, in its sole and absolute discretion, opinion and judgment in connection with this Agreement.

b.      By no later than September 16, 2022:

(a)      A memorandum of this Agreement and modification with respect to each Deed of Trust, in form and content acceptable to Bank (individually and collectively, the "Memorandum"), executed by such Matheson Parties as Bank may require, each of which shall have been recorded in the County where the Property described in such Memorandum is located;

(b)      At Borrower's expense, Bank shall have received such title insurance endorsements to its existing policies of title insurance as Bank may require to insure the continued validity, priority and enforceability of each Deed of Trust, with coverage in the aggregate amount of both the Facility No. 1 Commitment and Facility No. 2 Commitment, with only such exceptions as Bank may approve in its sole discretion;

(c)      The Matheson Parties shall reimburse to Bank (A) all title premiums, recording fees and other fees and costs incurred by Bank in connection with the issuance of such endorsements to Bank's policy or policies of title insurance as Bank may require, and the recording of the Memorandum, and (B) all fees and costs (including, but not limited to, reasonable attorneys' fees) incurred by Bank in the negotiation and preparation of this Agreement and any other documents prepared pursuant to or in connection with this Agreement; and

(d)     Such additional financing statements, assignments, agreements, reports, approvals, instruments, documents and consents as Bank may request, in its sole and absolute discretion, opinion and judgment in connection with this Agreement.

The documents and instruments referenced in Sections 5.a and Sections 5.b are referred to individually and collectively as the "Additional Loan Documents."

6.     Limitation on Increase in LC Facility and Further Advances Under Line of Credit. Notwithstanding anything in this Agreement, the Additional Loan Documents, the Loan Agreement and/or the other Loan Documents to the contrary, the Matheson Parties agree that Bank shall have no obligation to renew or increase any existing Letter of Credit, or issue any new letter of credit under the LC Facility, unless and until all conditions to this Agreement are satisfied in full (including, without limitation, all of the conditions set forth in Sections 5a. and 5b., above). In addition, Matheson Parties acknowledge and agree that all conditions set forth in Section 5b., above must be satisfied by no later September 16, 2022, and the failure by Matheson Parties to timely satisfy any one or more of the conditions set forth in Section 5b. above shall constitute an Event of Default under the Loan Agreement. The Matheson Parties further acknowledge that the Line of Credit has matured and that Bank shall have no obligation to renew the Line of Credit or issue a new Line of Credit under the Line of Credit Facility.

7.     Representations and Warranties. The Matheson Parties, and each of them, represent and warrant to Bank, and Bank is relying thereon, as follows:

a.     This Agreement and the Additional Loan Documents constitute legal, valid, and binding obligations of the Matheson Parties, and each of them, to Bank, provided however, that in respect of the Debtors only, this paragraph 7.a shall be subject to entry of an order by the Bankruptcy Court authorizing the Debtors entry into this Agreement ;

b.     Other than the Bankruptcy Cases, there are no actions, suits, or proceedings pending or, to the knowledge of the Matheson Parties, or any of them, threatened against or affecting the Matheson Parties, in relation to their obligations to Bank, or involving the validity or enforceability of this Agreement, the Loan Documents, or the Additional Loan Documents, the ability of any of them to perform their obligations to Bank under the Loan Documents or the Additional Loan Documents or the priority of any liens thereof, at law or in equity, or before or by any governmental entity;

c.     This Agreement and the releases contained herein are intended to be final and binding among the parties hereto, and Bank may expressly rely on the finality of this Agreement as a substantial, material factor inducing that party's execution of this Agreement;

d.     No event has occurred or is continuing that constitutes a default of this Agreement or a further default under the Loan Documents or that would constitute a default but for the requirement that notice be given or time elapse, or both;

e.     The Mark Trust (i) remains in existence as of the date of this Agreement first written above, (ii) continues to be evidenced by a trust agreement that has previously been provided to Bank, and (iii) has not been revoked, modified, or amended in any manner. Each

person executing this Agreement and the Additional Loan Documents in a representative capacity has been duly authorized to execute said documents and instruments by all appropriate action and is empowered to do so, provided however, that in respect of the Debtors only, this paragraph 7.e shall be subject to entry of an order by the Bankruptcy Court authorizing the Debtors entry into this Agreement ;

   f. Subject with respect to the Debtors to any final order that may enter in the Bankruptcy Cases to the contrary and the provisions of paragraph 10.f below, Bank's security interests in all of the Collateral for the obligations evidenced by the Loan Documents and Additional Loan Documents are valid, perfected and are not subject to avoidance, elimination or reduction in any manner whatsoever; and

   g. The representations, warranties and agreements set forth herein shall be cumulative and in addition to any and all other representations, warranties and agreements which the Matheson Parties, or any of them, give or cause to be given to Bank, either now or hereafter.

   8. <u>Reservation of Rights</u>.  Except as provided in this Agreement, Bank specifically reserves all of its rights, interests and remedies at law and in equity, or otherwise, with respect to, in connection with or relating to the Loan Documents, Additional Loan Documents and any other agreements, instruments, facts or matters relating to any of the foregoing.  This reservation of rights is not intended and shall not be construed as exclusive.

   9. <u>No Joint Venture, Management and Control</u>.  Notwithstanding any provision of this Agreement, the Additional Loan Documents and/or of the Loan Documents, by entering into this Agreement:

   a. Bank is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of the Matheson Parties, or any of them, or any other person;

   b. Bank shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of the Matheson Parties, or any of them; and

   c. The Matheson Parties, and each of them, do not have any claims, causes of action or defenses to their obligations to Bank based on any allegations of management or control exercised by Bank.  The Matheson Parties, and each of them, acknowledge and agree that Bank does not manage or control them in any way.

   10. <u>Release of Bank</u>.

   a. Except for the obligations of Bank under this Agreement, Holdings, MMT, Matheson Properties, Mark, and the Mark Trust (for purposes of this Section 10 only, Holdings, MMT, Matheson Properties, Mark, and the Mark Trust individually and collectively referred to herein as "<u>Releasor</u>"), and each of them, for themselves, and Releasor's successors, assigns heirs and affiliates, and each of them, shall and do hereby forever relieve, release and discharge Bank, and its successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, partners, officers, directors, employees and stockholders, jointly and severally, from any and all claims, debts, liabilities, demands, obligations, promises,

acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of actions, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, including, without limitation, those based upon, arising out of, appertaining to, or in connection with the maters of fact alleged or set forth in Recitals A through S, inclusive, the Credit Facilities, the Loan Documents, or the lending relationship between the Bank on the one hand, and the Matheson Parties, and each of them, on the other hand, and any and all real and personal property collateral (including, without limitation, the Property), jointly and severally.

  b. As to the matters released herein, Releasor, and each of them, expressly waive any and all rights under section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

  c. Releasor, and each of them, expressly waive and release any right or benefit which they have or may have under section 1542 of the Civil Code of the State of California, and any similar statute, code, law and/or regulation of the United States, or any state thereof, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Releasor, and each of them, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Releasor, and each of them, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

  d. In entering into the release provided for in this Agreement, Releasor, and each of them, recognize that no facts or representations are ever absolutely certain; accordingly, they assume the risk of any mistake, and if they should subsequently discover that any understanding of the facts or of the law was incorrect, said party shall not be entitled to set aside this release by reason thereof, regardless of any mistake of fact or law.

  e. Releasor, and each of them, are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not assigned or transferred, or purported to assign or transfer to any person or entity any claims or other matters herein released.  Releasor, individually and jointly, shall and hereby do indemnify, defend and hold Bank harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

f.      For clarity and avoidance of doubt, except for any claims arising from this Agreement, this Release shall not impair or limit any rights, claims, or defenses the Debtors may have against the Bank including any such rights, claims or defenses that arise under Title 11 of the United States Code or that arise in or are related to the Bankruptcy Case, and all of such rights, claims or defenses are expressly preserved.  All defenses the Bank has to any such rights, claims, or defenses of the Debtors are expressly preserved.

11.      <u>Miscellaneous</u>.

a.      This Agreement is not a novation, nor is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan Documents, except as expressly set forth herein.

b.      The execution and delivery by the Matheson Parties, and each of them, of this Agreement and the performance by the Matheson Parties, and each of them, of all of their respective obligations hereunder have been duly authorized by all necessary action and do not and will not:

(a)      Require any consent or approval not heretofore obtained of any other person holding any interest or entitled to receive any interest issued or to be issued by the Matheson Parties, or any of them, or otherwise (except as to the Debtors, which requires an order by the Bankruptcy Court authorizing the Debtors entry into this Agreement);

(b)      Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or any encumbrance of any nature (other than under this Agreement, the Loan Documents or the Additional Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by the Matheson Parties, or any of them;

(c)      Violate any provision of any laws, or of any order, writ, judgment, injunction, decree, determination or award; and

(d)      Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Matheson Parties, or any of them, are a party or by which any of their property is bound or affected.

c.      The Matheson Parties, and each of them, further represent and warrant as follows:

(a)      They have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by the Matheson Parties, their attorneys reviewed this Agreement and discussed the Agreement with them and have made all desired changes;

(b)     Except as expressly stated in this Agreement, neither Bank nor any other person or entity has made any statement or representation to the Matheson Parties, or any of them, regarding facts relied upon by any of them;

(c)     The Matheson Parties, and each of them, do not rely upon any statement, representation or promise of Bank or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(d)     The terms of this Agreement are contractual and not a mere recital;

(e)     This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by the Matheson Parties, and each of them; and

(f)     This Agreement and the releases contained herein are intended to be final and binding against the Matheson Parties, and each of them, and each of them acknowledge that Bank is expressly relying on the finality of this Agreement as a substantial, material factor inducing Bank's execution of this Agreement. The Matheson Parties, and each of them, have the full right and authority to enter into this Agreement, and each officer, agent or other representative executing this Agreement on behalf of any of Matheson Parties has the full right and authority to fully commit and bind it to this Agreement.

d.     <u>Survival of Warranties</u>.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement.

e.     <u>Failure or Indulgence Not Waiver</u>.  No failure or delay on the part of Bank in the exercise of any right, power, or privilege hereunder or under the documents or instruments referred to herein shall operate as a waiver thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

f.     <u>Applicable Law</u>.  This Agreement, the Loan Documents and the Additional Loan Documents, and the rights and obligations of the parties hereto and thereto, shall be governed by and construed in accordance with the laws of the State of California.  The Matheson Parties, and each of them, hereby submit to the jurisdiction of the courts of the State of California, whether state or federal.

g.     <u>Assignability</u>.  This Agreement shall be binding upon and inure to the benefit of Bank and the Matheson Parties, and their respective successors and assigns, except that Borrower's and Guarantor's rights hereunder are not assignable without the prior written consent of Bank, which consent Bank may give or withhold in its sole and absolute opinion and judgment.

h.     <u>Expenses and Fees</u>.

(a)     The Matheson Parties, and each of them, shall reimburse Bank for Bank's reasonable fees, costs, and expenses including, without limitation, attorneys' fees in connection with the negotiation, preparation, and administration of this Agreement, the Loan Documents and the Additional Loan Documents.

(b)  Subject to any limitations that may be imposed under Title 11 of the United States Code and applicable bankruptcy law in respect to the Debtors only, in the event that Bank employs attorneys to remedy, prevent, or obtain relief from a breach or default of this Agreement, any of the Additional Loan Documents, or any of the Loan Documents, arising out of a breach or default of this Agreement, any of the Additional Loan Documents, or any of the Loan Documents or in connection with or contesting the validity of this Agreement, any of the Additional Loan Documents, or any of the Loan Documents, any of the terms, covenants, provisions, and all conditions hereof or thereof, or any of the matters referred to herein or therein or in connection with any Bankruptcy or Judicial Action (as hereinafter defined), Bank shall be entitled to be reimbursed for all of its attorneys' fees, whether or not suit is filed and including, without limitation, those incurred in each and every action, suit, or proceeding, including any and all appeals and petitions therefrom and all fees and costs incurred by Bank. As used in this Section 11.h(2), the term "<u>Bankruptcy or Judicial Action</u>" shall mean any voluntary or involuntary case filed by or against the Matheson Parties, or any of them, under the United States Bankruptcy Code (including the Bankruptcy Cases), or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against the Matheson Parties, or any of them, any action where the Matheson Parties, or any of them, are adjudicated as bankrupt or insolvent, any action for dissolution of the Matheson Parties, or any of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Bank of its rights and remedies under this Agreement, the Loan Documents and/or the Additional Loan Documents.

i.  <u>Modifications and Amendments</u>.  This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

j.  <u>Integration</u>.  This Agreement, the Loan Documents, and the Additional Loan Documents constitute a single, integrated written contract expressing the entire agreement of the parties hereto relative to the subject matter hereof.   No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Agreement, the Loan Documents and the Additional Loan Documents.

k.  <u>Severability</u>.  If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by severance from this Agreement.

l.  <u>Acknowledgment of Waiver</u>.  The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing and with an understanding of their significance and consequence and that they are reasonable.

4877-2964-9453.v3

m.      <u>Time of Essence</u>. The parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

n.      <u>Execution in Counterpart</u>. This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.

o.      <u>Conflict</u>. To the extent that any term, provision or condition of any of the Loan Documents conflict with this Agreement, the term, provision or condition of this Agreement shall control.

p.      <u>Notices</u>. Any notice required to be given hereunder shall be given at the address or facsimile telephone number as set forth in the applicable Loan Document. Any notice given by U.S. mail shall be deemed given no later than five (5) days after placed in the U.S. mail; any notice given by facsimile, messenger or hand delivery, when delivered; and any notice by overnight mail service such as FedEx, the following business day.

q.      Borrower acknowledges and agrees that neither the execution nor the delivery of this Amendment shall (a) be deemed to create a course of dealing or otherwise obligate Bank to execute similar amendments under the same or similar circumstances in the future or (b) be deemed to create any implied waiver of any right or remedy of Bank with respect to any term or provision of the Loan Agreement or of any other of the Loan Documents.

r.      <u>Dispute Resolution Provisions</u>.

(1)      By execution hereof, Borrower confirms that, except to the extent affected by a provision of Title 11 of the United States Code or applicable bankruptcy law, the Dispute Resolution Provision set forth in Section 9.5 of the Loan Agreement remains in full force and effect, without any modification whatsoever.

(2)      By execution hereof, each Guarantor confirms that, except to the extent affected by a provision of Title 11 of the United States Code or applicable bankruptcy law, the Dispute Resolution Provision set forth in Section 24 of each Guaranty remains in full force and effect, without any modification whatsoever.

12.      <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be

governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b) As used in this Section 12, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject

to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**BORROWER**:

MATHESON TRUCKING, INC.,
a California corporation


By: _____
Name:  Mark B. Matheson
Title:   President

**GUARANTOR:**

MATHESON HOLDINGS,
a California general partnership


By: _____
Name:  Mark B. Matheson, as Trustee of
          the Mark and Sherrie Matheson Family Trust
          established December 15, 2009
Its:    General Partner

MATHESON FLIGHT EXTENDERS, INC.,
a California corporation


By: _____
Name:  Mark B. Matheson
Its:    President

MATHESON POSTAL SERVICES, INC.,
a California corporation


By: _____
Name  Mark B. Matheson
Its:    President


[Signatures continue on next page]

**GUARANTOR (cont.)**:

MATHESON MAIL TRANSPORTATION, INC.,
a California corporation

By: _____
Name: Mark B. Matheson
Its:    President

_____
MARK B. MATHESON, an individual

_____
MARK B. MATHESON, as Trustee of THE MARK B. MATHESON
2009 IRREVOCABLE TRUST dated December 29, 2009

MATHESON PROPERTIES LLC,
a California limited liability company

By: _____
Name  Mark B. Matheson
Its:    Manager

**BANK**:

BANK OF AMERICA, N.A.

By: _____
Name: _____
Title: _____

4877-2964-9453.v3

## EXHIBIT "A-1"
## Legal Description (Poplar Property)

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF OAKLAND, IN THE COUNTY O ALAMEDA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel 1:

All of Lot 8 and a portion of Lots 9, 10, 18, 19 and 20 in Block "T" Map of Survey of Northern Extension of Oakland, as surveyed by W. F. Boardman", filed November 6, 1867, Map Book 5, Page 34, Alameda County Records, described as follows:

Beginning at a point on the Eastern line of Poplar Street, formerly Louise Street, distance thereon South 15° 57' 30" West 69.90 feet from the Southern line of 26th Street, as said streets are shown on said Map; thence along the said line of Poplar Street South 15° 57' 30" West 63.60 feet to a point on the Southern line of said Lot 8; thence along the said last mentioned line South 74° 02' 30" East 115 feet to a point on the Eastern line of said Lot 8; thence along the said last mentioned line North 15° 57' 30; East 25 feet; thence South 74° 02' 30" East parallel with the said line of 26th Street 40 feet to a point on a line drawn parallel with the Western line of Union Street as said street is shown on said Map and distance 75 feet Westerly therefrom measured at right angles thereto; thence along the said parallel line so drawn North 15° 57' 30" East 108.50 feet to a point on the said Southern line of 26th Street; thence along the said last mentioned line North 74° 02' 30" West 80 feet; thence Southwesterly along the arc of a curve concave to the Southeast and with a radius of 179.90 feet, as distance of 103.96 feet to the point of beginning.

Excepting therefrom that portion thereof that lies within the parcel of land described in the Deed to The Oakland Terminal Railway, a California corporation, dated August 24, 1959, recorded October 7, 1959 in Book 9172 of Official Records, Page 203, in the Office of the County Recorder of Alameda County.

Parcel 2:

A portion of Block No. 644, "Map of Oakland and Vicinity", filed April 23, 1883, Map Book 17, Page 14, Alameda County Records, described as follows:

Beginning at a point on the Eastern line of Poplar Street, distance thereon North 15° 57' 30" East 190 feet from the point on intersection thereof with the Northern line of 24th Street, as said streets are shown on said Map; thence along the said line of Poplar Street North 15° 57' 30" East 200 feet; thence South 74°02' 30" East 230 feet to a point on the Western line of Union Street, as said street is shown on said Map; thence along the last mentioned line South 15° 47' 30" West 200 feet; thence North 74° 02' 30" West 230 feet to the point of beginning.

Parcel 3:

The Southern 25 feet of Lot 18, Block "T", Map of Survey of Northern Extension of Oakland, filed November 6, 1867, Map Book 5, Page 34, Alameda County Records.

Parcel 4:

A portion of Block 644, "Map of Oakland and Vicinity", filed April 23, 1883, Map Book 17, Page 14, Alameda County Records, described as follows:

## Street Address

2500 Poplar Street, Oakland, California 94607

**EXHIBIT "A-2"**
**Legal Description (East 54th Property)**

Parcel One:
Tracts 16 and 17,
Kemp Subdivision,
County of Adams,
State of Colorado.

Parcel Two:
The East ½ of Tract 18,
Kemp Subdivision,
County of Adams,
State of Colorado.

Parcel Three:
W ½ of Tract 18,
Kemp Subdivision,
County of Adams,
State of Colorado.

<u>Street Address</u>

6875 East 54th Place, Commerce City, CO 80022

4877-2964-9453.v3

**EXHIBIT "A-3"**
**Legal Description (Glen Carran Property)**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF WASHOE, STATE OF NEVADA AND IS DESCRIBED AS FOLLOWS:

All that certain real property situate in the County of Washoe, State of Nevada, described as follows:

Parcel 4A as shown on Parcel Map No. 2981, for Michael C. Dermody, Trustee Under Trust Agreement dated August 10, 1989 & Lash and Guila Gail Turville, according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on December 28, 1995, as File No. 1953592, Official Records.

APN:  034-101-45

Street Address of Property

100 Glen Carran Circle
Sparks, Nevada

4877-2964-9453.v3

## EXHIBIT "A-4"
## Legal Description (Elk Grove Property)

For APN/Parcel ID(s): 134-0050-028-0000 and 134-0580-022-0000

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF ELK GROVE, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

### Parcel One (APN: 134-0050-028-0000, portion):

All of Lot 25 and the South, 130 feet of Lot 24, as shown on the "Plat of Gunter's Addition to Elk Grove", recorded in Book 13 of Maps, Map No. 21, Records of said County, said dimension of South, 130 feet being along the center line of a public road, 50 feet in width on the East and the centerline of a public road, 40 feet in width, on the West of said Lot 24, as said roads are shown on said plat

### Parcel Two (APN: 134-0050-028-0000, portion):

That portion of Lot 26, lying North of the North line of Lot 30 extended Easterly as shown on the "Plat of Gunter's Addition to Elk Grove", recorded in Book 13 of Maps, Map No. 21, Records of said County

### Parcel Three (APN: 134-0580-022-0000):

The parcel of land described in that certain Boundary Line Adjustment recorded July 2, 2004, in Book 20040702 at Page 0410 Sacramento County Official Records, described as follows:

All of Parcel 15 as shown on that certain Parcel Map entitled "JMVZ Industrial Park" filed January 29, 1981, in Book 63 of Parcel Maps, at Page 14, Sacramento County recorder;

Together with all of Parcel 16 as shown on said Map,

The resultant parcel also being more particularly described as follows

Beginning at the Northwesterly corner of said parcel 16, thence, along a Northerly line of said Parcels 16 and 15 South 89° 51' 50" East, 300.96 feet to the Northeasterly corner of said Parcel 15, thence, along the Easterly line of said Parcel 15 South 00° 04' 30" West, 306.56 feet to the Southeasterly corner of said Parcel 15, thence, along Southerly line of said Parcel 15 & 16 North 89° 55' 30" West, 225.76 feet, thence, Northwesterly, 15.00 feet along the arc of a curve, being concave to the Northeast, with a radius of 30.00 feet, a central angle of 28° 39' 34", and chord bearing North 75° 35' 57" West, 14.85 feet to a point of reverse curvature, thence, Northwesterly, 62.90 feet along the arc of a tangent curve, being concave to the Southwest, with a radius of 68.00 feet, a central angle of 52° 59' 50", and a chord bearing North 87° 46' 25" West, 60.68 feet to the Southwesterly corner of said Parcel 126, thence, along the Westerly line of said Parcel 16, North 00° 02' 30" East, 300.93 feet to the point of beginning

### Street Address of Property

9766-9780 Dino Drive
Elk Grove, California

## EXHIBIT "A-5"
### Legal Description (Goethe Property)

The land described herein is situated in the State of California, County of Sacramento, unincorporated area, described as follows:

Parcel 3, as shown on the Parcel Map entitled "Bradville Business Park", recorded in Book 81 of Parcel Maps, at Page 33, Records of said County.

APN:  067-0170-003-0000

Street Address of Property

9785 Goethe Road
Sacramento, California 95827

**EXHIBIT B**

**(THE RACE TO REPLACE LIBOR)**

Skip to Content

# The Race to Replace LIBOR: Understanding SOFR and BSBY

Posted: February 2nd, 2022

**By: Teala Volkamer**

December 31, 2021[1]—the date that had been looming over the financial world for the last few years—has finally come and gone. It was on this day that one-week and two-month U.S. dollar London Inter-Bank Offered Rate[2]s (LIBOR) ceased to be published.

Established in 1984, LIBOR was a daily calculated and globally accepted benchmark interest rate. However, in 2012 an investigation revealed[3] international banks had been manipulating LIBOR for profit, dating back to 2003. Due to the erosion of public trust, LIBOR experienced a decline[4] in its trust as a household benchmark interest rate. As a consequence, two alternative rates stepped into the spotlight: (1) Term Secured Overnight Financing Rate[5] (SOFR) and (2) the Bloomberg Index Services Limited[6] (BSBY).

On July 29, 2021, the Alternative Rates Reference Committee[7] (ARRC) formally recommended[8] the adoption of SOFR term rates and first identified it as a recommended alternative to LIBOR as early as March 2018.[9] As the leading authority on the transition to an alternative reference for U.S. dollars both domestically and internationally, ARRC's recommendation carried a lot of weight. ARRC was slow to recommend SOFR because up until May 2021, SOFR was only available as a daily rate[10], which meant it could not act as a viable replacement rate for U.S. dollar LIBOR. To replace LIBOR with a daily rate would require substantial changes in the way interest rates are calculated and reported. However, Term SOFR[11] came to light as a viable replacement to LIBOR. It functions as an alternative to U.S. dollar LIBOR because it is determined "in advance[12]" and thus requires less of a change for syndicated and bilateral loan facilities than other SOFR rates, such as daily SOFR. An application of the Spread Adjustment[13] is, however, required to obtain an equivalent of an existing LIBOR margin. Other than that, Term SOFR works similarly to that of LIBOR and will serve as a capable replacement.

Another proposed replacement to LIBOR, which launched on January 20, 2021, is Bloomberg Short Term Bank Yield Index (BSBY[14]). BSBY is reported at 8 a.m. EST every business day[15]. It is also available in tenors[16] of overnight, one-month, three-months, six-months, and 12-months. Where BSBY differs from SOFR is that there is no spread adjustment. To explain this, BSBY published a white paper[17] detailing its credit spread and term structure. The benefit of BSBY is that it establishes a benchmark[18] for transactions through incorporated traded rates across a variety of bank issuers. BSBY also tracks closely[19] with the historical rates of U.S. dollar LIBOR at each tenor.

With LIBOR's recent cessation on December 31, 2021[20], as a representative rate of market and economic trends and LIBOR's last publication on June 30, 2023[21], the end is fast approaching. Many LIBOR benchmark settings are now being synthetically produced[22] due to the cessation of some LIBOR publishing. Lenders must figure out the most advantageous replacement rate to plug into existing contracts and what to use in new ones. Loans need to be transitioning away from LIBOR now if they haven't already. With the variety of replacement rates floating around it remains to be seen which will win the race to replace LIBOR.

The tipping point for determining whether SOFR or BSBY wins this race could be whether it is SOFR or BSBY that takes the prominent position held by LIBOR in the millions of existing loans. There is no definitive answer as to which alternative rate will most seamlessly replace LIBOR. The best approach is to understand how both Term SOFR and BSBY work, which will allow for preparedness when one pulls ahead in this race to replace LIBOR.

*Teala Volkamer is a second-year law student at Wake Forest University School of Law. Teala graduated from the University of British Columbia in 2019 with a bachelor's in sociology. Upon graduating from law school, Teala intends to practice transactional law.*

Category: Business, Finance, International