**21 PAGES**
Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Attorneys for MATHESON FLIGHT EXTENDERS, INC. AND MATHESON POSTAL SERVICES, INC. and proposed attorneys for MATHESON TRUCKING, INC.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | Case No.: 22-21148 |
| MATHESON FLIGHT EXTENDERS, INC., | Chapter 11 |
| Debtor. | **NH-23** |
| In re: | Case No.: 22-21149 |
| MATHESON POSTAL SERVICES, INC. | Chapter 11 |
| Debtor. | |
| In re: | Case No.: 22-21758 |
| MATHESON TRUCKING, INC. | Chapter 11 |
| Debtor. | |
| X  Affects All Debtors<br>☐  Affects Matheson Flight Extenders Only<br>☐  Affects Matheson Postal Services Only<br>☐  Affects Matheson Trucking Only | **MOTION TO APPROVE COMPROMISE OF CONTROVERSY WITH 121 WAWARME INVESTMENT PARTNERS LLC**<br><br>*Order Shorting Time Pending*<br>Date:   August 26, 2022 **(requested)**<br>Time:   9:30 a.m.<br>Place:  United States Bankruptcy Court<br>          501 I Street, 6th Flr., Crtrm. 35<br>          Sacramento, CA 95814<br>Judge: Hon. Christopher M. Klein |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

Matheson Flight Extenders, Inc. ("MFE"), Matheson Postal Services, Inc. ("MPS"), and Matheson Trucking, Inc. ("MTI"), the debtors and debtors in possession in the above-captioned cases (collectively, "Debtors"), hereby move the Court (the "Motion"), for entry of an order approving a compromise of controversy ("121 Wawarme Compromise") with 121 Wawarme Investment Partners LLC ("121 Wawarme" or "Landlord"). In pertinent part, the 121 Wawarme Compromise:

1. Allows 121 Wawarme a $45,000.00 administrative claim in the MFE estate payable upon the effective date of a plan;

2. Allows 121 Wawarme a $500,000.00 prepetition unsecured claim in the MFE estate for lease rejection damages;

3. Releases a writ of attachment 121 Wawarme served on MTI prior to the filing of its Chapter 11 case; and

4. Except for claims specifically retained under the agreement, provides for mutual releases of claims between the Debtors and 121 Wawarme.

In support hereof, the Debtors respectfully state as follows:

## I. BACKGROUND

1. On May 5, 2022 ("Petition Date"), MFE and MTI each filed a petition for relief under Chapter 11 of title 11 of the United States Bankruptcy Code ("Bankruptcy Code"). On July 14, 2022, MTI filed its Chapter 11 petition for relief.

2. By orders dated May 13, 2022, and July 22, 022, the Debtors' estates were consolidated for administrative purposes (Doc. No. 42 and MTI Doc. No. 63).

3. On May 25, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors for MFE and MPS("UCC") (Doc. No. 87), and on August 8, 2022, the UST appointed the same members of the UCC to also serve as the Official Committee of Unsecured Creditors for MTI (Doc. No. 297).

4. MFE and MPS are in the business of sorting and transporting large volumes of mail across the United States under contracts with the United States Postal Service ("USPS") and

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

other customers.  MTI provides senior management, legal, accounting, human resources, administrative and other services essential to MFE and MPS's business operations.

5.      121 Wawarme own a certain warehouse facility totaling approximately 154,000 square feet in size commonly known as 121 Wawarme Avenue/132 East Elliot Street, Harford, Connecticut ("Premises").

6.      MFE leased the Premises to use as a warehouse facility on or about August 27, 2021.  Although the Debtor only required access to the Premises on a temporary basis, the Landlord required MFE to commit to an eighteen (18) month term as a condition to the Landlord's entry into the Lease.  The Lease term ran from October 1, 2021, through March 30, 2023.

7.      MFE vacated the premises on or about March 14, 2022.  While the Landlord denies that MFE had vacated, all of MFE's business operations that were performed at the Premises were relocated to a facility in Chicopee, MA by March 14.  MFE's continued occupancy after March 14 was only for the purpose of cleaning out any remaining items, repairing the Premises, and otherwise facilitating efforts to relet the Premises.  MFE contends that as of March/April 2022, the Landlord knew that MFE had relocated its business operations, that MFE was taking steps to facilitate reletting the Premises, and that the Landlord was at the time undertaking its own efforts to secure a new tenant for the Premises.

8.      The repairs and cleanup of the Premises was completed as of late April 2022. MFE believes that all of MFE's property that may have remained on the Premises after the relocation of operations to Chicopee had been removed by April 30, 2022.  The Landlord subsequently disputed this, claiming that personal property remained on site at least until the week of June 13, 2022.  MFE contends that the items 121 Wawarme referred to were *de minimis* and not actually property of MFE.

9.      As noted, MFE filed its Chapter 11 case on May 5, 2022.  On May 13, MFE notified 121 Wawarme's counsel that the Debtor would seek to reject the lease for the Premises. MFE filed and served the Landlord with its motion to reject ("Rejection Motion") the 121 Wawarme lease on May 17, 2022 – twelve (12) days after the petition date.  The Rejection

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

Motion sought to reject the lease retroactive to the petition date under In re At Home Corp., 392 F.3d 1064 (9th Cir. 2004).

10.  121 Wawarme opposed the Rejection Motion in part, arguing in sum that "exceptional circumstances" did not justify making rejection effective as of the Petition Date [Doc. No. 176]. It contended that rejection should be made effective as of the date the order authorizing the rejection is entered.

11.  On June 16, 2022, the Court entered an order authorizing rejection of the Lease, but reserved the question of whether the effective date of rejection should be deemed earlier than the date of entry of the order [Doc. No. 163]. MFE and 121 Wawarme agreed to a schedule for discovery related to disputed factual issues, and the setting of a further status conference on September 13, 2022.

12.  The practical outcome of the dispute related to the effective date of rejection concerns the extent to which 121 Wawarme would be entitled to an administrative claim in MFE's bankruptcy case. If the Court were to agree with the Debtor's position, rejection would be deemed effective on the petition date, and therefore, no administrative claim for post-petition rent could be asserted against the MFE estate. If the Court agreed with the Landlord's position, 121 Wawarme would be entitled to an administrative claim of approximately $141,500.00.

13.  On or about June 24, 2022, 121 Wawarme commenced an action in Connecticut state courts against MTI, who had guaranteed MFE's lease obligations and was not at that time in bankruptcy. In the Connecticut state court action, 121 Wawarme obtained a writ of attachment against MTI's bank accounts, and served the writ on Bank of America, N.A. ("BofA") shortly thereafter ("121 Wawarme Attachment"). As a result of service of the 121 Wawarme Attachment, BofA froze approximately $485,000.00 in MTI's primary operating account, and has been holding said funds in a suspense account pending further orders regarding their disposition. As noted, MTI filed its Chapter 11 case on July 14, 2022.

14.  The parties met and conferred, and after consultation with the Creditors Committee, have agreed to resolve the disputes between them and enter into a Settlement Agreement and Release substantially in the form attached hereto as **Exhibit A**.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

## II.    MATERIAL TERMS OF THE SETTLEMENT

15.    The 121 Wawarme Compromise:

a.    Allows 121 Wawarme a $45,000.00 administrative claim in the MFE estate payable upon the effective date of a plan;

b.    Allows 121 Wawarme a prepetition unsecured claim in the MFE estate for lease rejection damages;

c.    Releases a writ of attachment 121 Wawarme served on MTI prior to the filing of its Chapter 11 case; and

d.    Except for claims specifically retained under the agreement, the parties will exchange mutual releases of claims between the Debtors and 121 Wawarme.

16.    For the reasons discussed below, the Debtors believe that the proposed settlement is fair and reasonable and in the best-interests of the Debtors' estates.

## III.    ARGUMENT

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides:

*On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.*  Fed. R. Bankr. Proc. 9019(a).

"The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." In re A & C Properties, 784 F.2d 1377, 1380-81 (9th Cir. 1986).  The bankruptcy court has great latitude in approving compromise agreements.  In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988).   However, the court's discretion is not unlimited.  The court may approve a compromise only if it is "fair and equitable."  A & C Properties at 1381.  In approving a proposed compromise in bankruptcy proceedings, the court must consider:

(a) The probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Id. at 1381 (citations omitted)*.

"It is not necessary to satisfy each of these factors provided that the factors as a whole favor approving the settlement." In re Pacific Gas & Elec. Co., 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004). Ultimately, the Court has to determine if the settlement is reasonable given the particular circumstances of the case. A & C Properties, 784 F.2d at 1381. The Court's role in considering a proposed compromise is "to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Id. at 417 *citing* In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991). Although a debtor/trustee bears the burden of persuasion, "a court generally gives deference to a debtor/trustee's business judgment in deciding whether to settle a matter." In re Mickey Thompson Entm't Group, Inc., 292 B.R. 415, 420 (9th Cir. BAP 2003). As will be shown, the 121 Wawarme Compromise satisfies all of the *A&C Properties* factors and should be approved.

**Probability of Success – Retractive Date of Rejection**. MFE is confident that if the matter were fully litigated, the Court would conclude that under the facts presented "exceptional circumstances" justified making rejection of the 121 Wawarme Lease retroactive to May 5, 2022. *At Home* and many subsequent cases considering whether rejection should be made retroactive focus on "whether the [debtor has] facilitated or hindered the prompt return of the leased premises to the landlord." At Home, 392 F.3d at 1070; In re Player's Poker Club, Inc., 636 B.R. 811, 823 (Bankr. C.D. Cal. 2022).

The point in time when a landlord: (a) knows that a tenant is vacating, and (b) has physical access to the premises in order to begin the reletting process is the most important factor in determining when rejection should be deemed effective. Duke Realty Ltd. P'ship v. North Metro Mill Work Distribs. Inc. (In re Manis Lumber Co.), 430 B.R. 269, 280 (Bankr. N.D. Ga. 2009); Stonebriar Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC), 297 B.R. 133, 140 (D. Colo. 2003); In re O'Neil Theatres, Inc., 257 BR 806, 808 (Bankr. E.D. La. 2000); In re Amber's Stores, Inc., 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996). As explained in the *Manis Lumber* case:

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

In almost all cases, approval of rejection of an unexpired lease is a *pro forma* matter, especially when a trustee or debtor in possession is liquidating and is no longer occupying the premises. In such a circumstance, rejection occurs as a matter of course. Once the trustee or debtor in possession has communicated an unequivocal decision to reject the lease, the landlord knows that it is highly likely that rejection will occur and that reletting will be necessary. If the premises have been vacated so that the landlord may take possession, the landlord is effectively in the same position as if rejection had already occurred. *It can begin the process of inspecting the property, marketing it to prospective tenants, and negotiating a new lease. Unless a landlord shows that the absence of court approval of the rejection has prejudiced it in some way, the approval of rejection of a lease retroactive to the date that the landlord was effectively in a position to begin the reletting of the property is appropriate.* Manis Lumber, 430 B.R. at 280

Here, 121 Wawarme acknowledges that MFE had ceased using the Premises for business purposes and had removed its property from the Premises by late April 2022. *See* Declaration of Michael Grossman, ¶7 [Doc. No. 177]. The Landlord was notified in writing on May 13, 2022 – eight days after the case was filed – that the lease would be rejected, and MFE proceeded to file and serve the Rejection Motion on 121 Wawarme on May 17, 2022. While 121 Wawarme contends that "property" remained on the Premises through June 13, the key issue is whether the Landlord was "effectively in a position to begin reletting the property." *Id*. Knowing that MFE had vacated, the Landlord clearly was in a position to take steps to relet by the end of April, and MFE would be prepared to prove at trial based on Mr. Grossman's admissions that 121 Wawarme had in fact begun undertaking efforts to secure a new tenant for the Premises *prior* to MFE's bankruptcy filing. *See* Declaration of Tim Noel, ¶7 [Doc. No. 203].

Nevertheless, a number of cases conclude that even if exceptional circumstances are found, the effective date of rejection should be tied to the date that the debtor/trustee filed the motion to reject on the theory that until that occurs, landlords remain in the dark about the debtor/trustee's intentions concerning the lease, and therefore, not really in a position to commence efforts to relet.[1] *See* Player's Poker Club, Inc., 636 B.R. at 830. If the Court were to follow this approach, MFE's potential administrative claim liability would be approximately $40,000.00 (rent and other charges accruing in the 12-day period between the petition date and

---

[1] Other courts disagree on the basis that a landlord who has located a replacement tenant has the option to seek relief from stay and/or expedited rejection of the lease. Adelphia Business Solutions, Inc v. Abnos, 482 F.3d 602, 609 (2d Cir. 2007); Manis Lumber, 430 B.R. at 280.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

the filing of the rejection motion).  While MFE believes that it is less likely, it acknowledges that in light of the Court's broad equitable discretion, there is some uncertainty about whether the Court would entirely refuse 121 Wawarme's request for an administrative rent claim.

**Probability of Success – Lease Rejection Claim.**  Because of the rejection, 121 Wawarme is entitled to assert a claim for lease rejection damages.  MFE timely made regular rent payments throughout the Lease term through April 2022.  Hence, there were no significant prepetition defaults as of the filing of MFE's case.  Consequently, Bankruptcy Code 502(b)(6) is going to limit the claim for lease rejection damages to the greater or 1-year's rent or 15% of the rent reserved over the remaining term of the lease.  11 U.S.C. §502(b)(6).  Here, the Lease had a remaining term of approximately nine and one-half (9 ½) months from the date of rejection, and base rent and other charges were approximately $103,000.00 per month.  Hence, the Landlord's potential maximum rejection damage claim would be approximately $978,500.00.  The rejection claim the Landlord would be allowed under the 121 Wawarme Compromise is being fixed at $500,000.00, roughly 52% of the maximum potential claim.

**Probability of Success – Writ of Attachment**.  Service of the 121 Wawarme Attachment may, at most, have created an inchoate lien on cash collateral in MTI's accounts at BofA.  Capasso v. Midland Funding, LLC (In re Capasso), 618 B.R. 389, 399 (Bankr. D. Conn. 2020).  But any such inchoate interest is of no value, is void, and is otherwise subject to avoidance as a preference.  MTI is highly confident that if the matter were fully litigated, the Court would enter a judgment avoiding the 121 Wawarme Attachment on the grounds that it was preferential under Bankruptcy Code section 547(b), and that because the writ did not attach to anything of value – due to BofA's senior security interest in funds held in MTI's accounts – any security interest was void under Bankruptcy Code section 506(d).

BofA's interest in cash collateral based upon its perfected security interest is superior to any subsequent interest 121 Wawarme may have acquired by the writ of attachment.  BofA is presently owed approximately $7.1 million (excluding the $7 million contingent liability under various the letters of credit).  Hence, BofA's lien encumbers all of MTI's cash, so there is no value in MTI's bank accounts for 121 Wawarme's inchoate lien to attach.  121 Wawarme is

therefore wholly unsecured, making any interest it holds in cash collateral void under

Bankruptcy Code section 506(d) (voiding liens that are not allowed secured claims); Wade v.

Bradford, 39 F.3d 1126, 1129-30 (10th Cir. 1994) (Chapter 11 debtors may strip off or strip

down wholly or partially unsecured liens under 11 U.S.C. § 506(d)).

Alternatively, any inchoate interest 121 Wawarme may have in MTI's bank accounts is

plainly avoidable as a preference under Bankruptcy Code section 547(b). Under section 547(b),

a transfer of an interest in property to or for the benefit of a creditor that occurs within ninety

(90) days prior to a bankruptcy filing is avoidable if the transfer was made while the debtor was

insolvent, and the transfer would enable the creditor to receive more than it would in a

hypothetical Chapter 7 case. 11 U.S.C. § 547(b). Here, any "transfer" that occurred via service

of the writ of attachment was made for the benefit of a creditor and occurred on or about June 24

1, 2022, Capasso, 618 B.R. at 399. MTI filed its bankruptcy case on July 14, 2022, within ninety

(90) days after service of the writ. MTI is presumed to have been insolvent at the time of the

transfer under Bankruptcy Code section 547(f). 11 U.S.C. § 547(f). And finally, the realizable

value of MTI's assets in a hypothetical Chapter 7 is approximately $3.9 million. *See* Declaration

of Charles Mellor, ¶32, Doc. No. 19, Case No. 22-21758. This amount is less than BofA's

secured claim (approximately $7.1 million excluding the contingent liability under the letters of

credit). *Id*. Therefore, 121 Wawarme would be treated as unsecured, and thus the "more than"

test is satisfied.

**Difficulties in the Matter of Collection.** Because the disputes against 121 Wawarme

generally do not seek affirmative recovery against it, the Debtors have not accorded particular

weight in determining to enter into the 121 Wawarme Compromise.

**Cost and Complexity of Litigation**. Given the amount at issue (approximately

$141,500.00), the Debtors have assumed that 121 Wawarme would continue to litigate the issues

surrounding whether it should be allowed an administrative claim. While difficult to predict, in

the absence of a settlement, it is rational to assume that MFE would incur another $25,000 to

$30,000 in administrative expenses seeking to resolve this dispute, and there is no apparent

mechanism to recover those fees from the Landlord. MFE likely would also have to incur fees

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

reviewing, analyzing, and potentially objection to a rejection damages claim. Similarly, MTI likely would have to incur a minimum of $10,000.00 to $15,000.00 in attorney's fees to file a complaint and obtain entry of a judgment avoiding the 121 Wawarme Attachment even if the Landlord did not vigorously contest any of the underlying facts. Hence, avoiding the further accrual of administrative expenses was a material factor the Debtors' considered in entering into the 121 Wawarme Compromise.

**Interests of Creditors.** The Debtors believe that the interests of creditors will be promoted by entry into the 121 Wawarme Compromise. Again, the settlement avoids the accrual of additional litigation costs litigating disputes with the Landlord. Because MTI essentially has no source of income apart from transfers made to it by MFE and MPS, any litigation costs MTI incurs will be effectively borne by MFE and MPS's creditors. Approval of the settlement will also facilitate release of the 121 Wawarme Attachment, which in turn will permit MTI to access those funds to satisfy its operating expenses. It will also put MTI in a position to repay the $150,000.00 advanced by MFE to pay retainers to MTI's bankruptcy professionals. *See* Final Order Approving Stipulation for Interim Use of Cash Collateral, ¶4 [Doc. No. 71, Case No. 22-21758]. Hence, the settlement confers direct benefits to each of the Debtors' estates. Moreover, in the absence of this settlement, it is rational to assume that 121 Wawarme's views with respect to any subsequent settlement might be impacted if it expends more in litigation expenses – meaning that if there were to be a later resolution in advance of trial, the economic terms to the MFE and MTI estates may be less favorable that what is being proposed, a potential result that would be adverse to the interests of all creditors.

The Debtors have conferred with the Creditors Committee about the settlement, and are advised that for the foregoing and other reasons, the Creditors Committee (which consists of creditors of MFE, MPS and MTI) supports approval of the 121 Wawarme Compromise. This is a further factor weighing in favor of finding that the settlement is fair and equitable.

**Conclusion.** Accordingly, the Debtors submit that: (a) the amounts of the administrative ($45,000.00) and lease rejection ($500,000.00) claims being allowed to 121 Wawarme and the other economic terms of the 121 Wawarme Compromise fall within the "range of

reasonableness" given the potential outcomes of the disputes concerning the effective date of rejection (and therefore the amount of the administrative claim), the amount of the Landlord's potential lease rejection claim, and avoidance of the 121 Wawarme Attachment, (b) the compromise would avoid a material amount of administrative expense, and (c) the interests of creditors are enhanced, the Debtors submit that under the particular circumstances of the case, the 121 Wawarme Compromise is fair and reasonable and should be approved.  A & C Properties, 784 F.2d at 1381.

## IV.    NOTICE

The Debtors have served this Motion upon (i) the Office of the United States Trustee for the Eastern District of California; (ii) the UCC; (iii) all secured creditors in these cases, and (v) all parties requesting special notice of motions and other proceedings in these cases.  The Debtors respectfully submits that no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully requests that this Court enter an Order approving the 121 Wawarme Compromise and grant such other and further relief as may be just and proper.

Dated: August 23, 2022

NUTI HART LLP


By:    _/s/ Kevin W. Coleman_
       Kevin W. Coleman
       Attorneys for Matheson Flight Extenders, Inc.
       and Matheson Postal Services, Inc. and
       proposed attorneys for Matheson Trucking,
       Inc.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**EXHIBIT A**

**(PROPOSED FORM OF SETTLEMENT AGREEMENT)**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made and entered into on the last date set forth on the signature pages below ("Execution Date"), by and between Matheson Flight Extenders, Inc. ("MFE"), Matheson Postal Services, Inc. ("MPS") and Matheson Trucking, Inc. ("MTI"), each a debtor and debtor in possession (the "Debtors"), lead case No. 22-21148, U.S. Bankruptcy Court, E.D. Cal. (the "Bankruptcy Cases") on the one hand, and 121 Wawarme Investment Partners, LLC ("Landlord"), on the other hand. For purposes of this Agreement, the Debtors and Landlord may be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

A.      On or about August 27, 2021, MFE entered into a lease ("Lease") with 121 Wawarme Investment Partners, LLC ("Landlord") for a certain warehouse facility commonly known as 121 Wawarme Avenue/132 East Elliot Street, Harford, Connecticut ("Premises").

B.      The Debtors used the Premises as a warehouse facility.

C.      The Lease term commenced on October 1, 2021 and was set to expire on March 30, 2023.

D.      MFE asserts that it vacated the premises on or about March 14, 2022, and notified the Landlord in writing on May 13, 2022, that it would be moving to reject the Lease. Landlord disagrees that MFE vacated the premises on or about March 14, 2022.

E.      Debtors MFE and MPS filed voluntary Chapter 11 bankruptcy petitions on May 5, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division ("Bankruptcy Court"), Case Nos. 22-21148 and 22-21149. Debtor MTI filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on July 14, 2022, Case No. 22-21758. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.      On or about May 17, 2022, the Debtors filed a motion to reject the lease retroactive to the Petition Date (the "Motion").

G.      On or about June 27, 2022, the Landlord filed an opposition (the "Opposition") to the motion arguing, among others, that although it did not oppose rejection of the lease as of the date of the hearing, it should not be made effective retroactively.  Rather, the Lease should be deemed rejected the date of the order. The Landlord asserts an administrative claim pursuant to 11 U.S.C. § 503 for the rent incurred during the post-petition, pre-rejection, time period (the "Administrative Claim").

H.      On or about July 5, 2022, the Official Committee of Unsecured Creditors filed a response to the Opposition.

I.      MTI holds certain bank accounts at Bank of America, N.A. ("BofA"), including account no. x1526.

J.      On or about June 24, 2022, Landlord filed a complaint entitled 121 Wawarme Investment Partners LLC v. Matheson Trucking, Inc. ("Connecticut Litigation"), seeking a judgment in the amount of $1,392,857.04 and with it, served a pre-judgment writ of attachment (the "Writ of Attachment") upon Bank of America ("BofA"), pursuant to which BofA froze inter alia account no. x1526.

K.      BofA transferred the funds subject to 121 Wawarme's writ of attachment to an administrative suspense account at BofA, and said funds remain in the possession of BofA.

L.      No judgment has been entered against MTI in the Connecticut Litigation.

M.      The Debtors and BofA, generally dispute the Landlord's right to the Writ of Attachment.

N.      The Debtors and Landlord have engaged in informal settlement discussions over the Administrative Claim and Writ of Attachment, and now wish to settle those disputes, subject to approval by the Bankruptcy Court upon appropriate notice.

# SETTLEMENT AGREEMENT

In consideration of the promises and the mutual covenants of the Parties stated in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Bankruptcy Court Approval**.  This Agreement is subject to the approval of the Bankruptcy Court.  In connection with obtaining approval of the Bankruptcy Court, following full execution of this Agreement, the Debtors shall file a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure and request a hearing on shortened time.  The Parties agree to cooperate, as required, in obtaining approval of such motion.  This Agreement shall become effective on the date the order of the Bankruptcy Court approving this Agreement ("9019 Order") becomes final (the "Effective Date").  The Parties agree to a waiver of the 14-day stay as set forth in Bankruptcy Rule 6004 with respect to the effectiveness of the 9019 Order.

2. **Terms**.  As full and final settlement of all disputes between the Parties, including without limitation the Administrative Claim and Writ of Attachment for the mutual promises herein recited, the Parties agree as follows:

   2.1. **Allowance of the Administrative Claim**.  The Administrative Claim is allowed in the amount of $45,000.00 upon the Effective Date of this Agreement, the Administrative Claim shall be deemed timely filed, and no portion of it shall be deemed secured.  The Administrative Claim shall be paid upon the effective date of MFE's confirmed plan of reorganization, regardless of whether that plan includes MPS and MTI.

   2.2 **Allowance of Unsecured Claim.**  The Debtors shall agree to an allowed general unsecured claim in the amount of $500,000.00 (the "GUC") in full satisfaction of the Landlord's pre-petition lease rejection claim.

   2.2. **Resolution of the Motion**.  Landlord agrees to withdraw its Objection.

   2.3 **Resolution of the Writ of Attachment**.  The Writ of Attachment shall be deemed released upon entry of the 9019 Order and Landlord waives any right to the funds in account no. x1526.

3. **Release by Debtors.**  Except as otherwise set forth in this Agreement, in consideration of the promises, covenants and agreements set forth herein and for other good and valuable consideration, Debtors hereby waive, remise, release,

acquit, satisfy, and forever discharge Landlord, as well as its agents, representatives, predecessors, successors, spouses, and assigns (the "Landlord Released Parties") of and from all manner of action and actions, cause and causes of action, suits, debts, sums of money, accounts, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or in equity, with the exception of the Parties' obligations under this Agreement related to the Administrative Claim, the GUC, the Connecticut Lawsuit, the Writ of Attachment, and other matters addressed in this Agreement.

4. **Release by Landlord**.  Except as otherwise set forth in this Agreement, in consideration of the promises, covenants and agreements set forth herein and for other good and valuable consideration, Landlord, and its affiliates, successors, and/or assigns hereby waive, remise, release, acquit, satisfy, and forever discharge the Debtors, the Debtors' estates, as well as their agents, professionals, representatives, predecessors, successors, spouses, and assigns (the "Estate Released Parties"), of and from all manner of action and actions, cause and causes of action, suits, debts, sums of money, accounts, covenants, contracts, controversies, agreements, promises, trespasses, damages, judgments, executions, claims, and demands whatsoever, in law or in equity, with the exception of the Parties' obligations under this Agreement related to the Administrative Claim, the GUC, the Connecticut Lawsuit, the Writ of Attachment, and other matters addressed in this Agreement. (collectively "Released Claims").

5. **Release of Unknown Claims.**  The Parties specifically waive and relinquish all rights and benefits afforded by Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Parties' waiver of all rights and benefits afforded by Section 1542 is done with their understanding and acknowledgement of the significance of such a specific waiver of Section 1542.  Notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of each and all the Parties hereto, the Parties expressly acknowledge that this Agreement is intended to include in its effect (without limitation) all claims the Parties know or

suspects to exist in their respective favor, and all claims the Parties do not know or suspect to exist in their respective favor at the time each Party executes this Agreement, which contemplates the extinguishment of any such claims. This waiver also applies to any other relevant re-codification or similar laws implemented hereafter substantially covering the subject matter of Section 1542.

6. **Voluntary Agreement/Attorney Representation**. The Parties represent that in the execution and negotiation of this Agreement, they are represented by counsel of their choice and that said attorneys advised their respective clients with respect to the advisability of making the settlement and release provided herein and of executing this Agreement; or if they are not represented by counsel, that they had the opportunity to consult legal counsel of their own selection and the decision not to be represented by counsel is a decision that the Parties have freely made. The Parties further represent and warrant that they are fully aware of the terms contained in this Agreement, made any desired changes, and have voluntarily and without coercion, duress, or undue influence of any kind, entered into this Agreement and the documents executed in connection with this Agreement.

7. **No Third-Party Beneficiaries.** There are no third-party beneficiaries to this Agreement, and no claims are released other those expressly identified herein.

8. **Entire Agreement**. This Agreement constitutes the sole and entire agreement between the Parties and supersedes all prior and contemporaneous statements, promises, understandings or agreements, whether written or oral.

9. **Amendments**. This Agreement may be amended, modified or altered at any time upon the approval of the Parties; however, any such amendment must be in writing and signed by all Parties in order for such amendment to be of any force and effect.

10. **Partial Invalidity**. In the event that any provision of this Agreement is declared by any court of competent jurisdiction or any administrative judge to be void or otherwise invalid, all of the other terms, conditions and provisions of this Agreement shall remain in full force and effect to the same extent as if that part declared void or invalid had never been incorporated in the Agreement and in such form, the remainder of the Agreement shall continue to be binding upon the Parties.

11. **Survival**. All representations and warranties contained herein shall survive the execution and delivery of this Agreement, and the execution and delivery of any other document or instrument referred to herein.

12. **Applicable Law**.  This Agreement shall be subject to and governed by the laws of the State of California, without regard to conflict of law rules.

13. **Attorneys' Fees and Costs**. In the event of a dispute regarding this Agreement and/or its terms, the prevailing party in such dispute is entitled to reasonable attorneys' fees and costs, upon approval of same by the Bankruptcy Court.  Unless otherwise provided in this Agreement, each of the Parties has agreed to bear his or its own attorneys' fees and costs with respect to the claims and disputes herein at issue, and the preparation of any and all documents necessary to enter into this Agreement.

14. **Counterparts**. This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one Agreement.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or email shall be effective as delivery of an originally executed counterpart of this Agreement.

15. **No Adverse Construction.**   The Parties acknowledge that this Agreement has been prepared by each of them through counsel.  In the event any part of this Agreement is found to be ambiguous, such ambiguity shall not be construed against any Party.

16. **Agreement is Not Evidence**.  This Agreement shall not be used as evidence in any proceeding other than one to enforce this Agreement, or one seeking damages arising from a breach of this Agreement.

17. **Authority**.  The Parties represent and warrant to each other that each is the sole and lawful owner of all right, title, and interest in and to every claim and other matter which each releases in this Agreement.   In the event that such representation is false, and any such claim or matter is asserted against either Party by anyone who is the assignee or transferee of such a claim or matter, then the Party who assigned or transferred such claim or matter shall fully indemnify, defend, and hold harmless the Party against whom such claim or matter is asserted and its successors from and against such claim or matter.

18. **Further Assurances**. The Parties shall perform such further acts and things and execute and deliver such additional agreements, powers and instruments, as may reasonably be required or reasonably deem advisable to carry into effect the purposes of this Agreement.

19.  **<u>Choice of Forum; Personal Jurisdiction</u>**.  Subsequent to the Effective Date, the Parties agree that any claim or dispute between them regarding the enforcement or interpretation of this Agreement must be resolved by the Bankruptcy Court.  The Parties expressly submit to the personal jurisdiction of the Bankruptcy Court for the purpose of litigating all such claims and disputes and consent to entry of final judgment by the Bankruptcy Court with respect to this Agreement and all related matters.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY BLANK. SIGNATURE PAGE(S) TO FOLLOW.]**

BY SIGNING BELOW, THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND EXPRESSLY CONSENT THERETO.

The Parties have executed this Agreement as of the date set forth below.

DATED: _____          Matheson Flight Extenders, Inc.

By: _____
Name:
Title:

DATED: _____          Matheson Postal Services, Inc.

By: _____
Name:
Title:

DATED: _____          Matheson Trucking, Inc.

By: _____
Name:
Title:

DATED: _____          121 Wawarme Investment Partners, LLC

By: _____
Name:
Title:

**APPROVED AS TO FORM**:

DATED: _____          Nuti Hart LLP

By: _____
Name: Christopher H. Hart,
Attorneys for Matheson Flight
Extenders, Inc., Matheson Postal
Services, Inc., and Matheson
Trucking, Inc.

DATED: _____          Nossaman LLP

By: _____
Name: Christopher D. Hughes,
Attorneys for Landlord