**67 PAGES**

Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
6232 La Salle Ave, Suite D
Oakland, CA 94611
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Attorneys for MATHESON FLIGHT EXTENDERS, INC.;
MATHESON POSTAL SERVICES, INC. and
MATHESON TRUCKING, INC.
Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | Case No.: 22-21148 |
| MATHESON FLIGHT EXTENDERS, INC., | Chapter 11 |
| Debtor. | **DCN: NH-82** |
| In re: | Case No.: 22-21149 |
| MATHESON POSTAL SERVICES, INC. | Chapter 11 |
| Debtor. | |
| In re: | Case No.: 22-21758 |
| MATHESON TRUCKING, INC. | Chapter 11 |
| Debtor. | **DECLARATION OF CHARLES MELLOR IN SUPPORT OF MOTION TO REJECT INDUSTRIAL LEASE WITH BRIDGE POINT LONG BEACH LLC DATED AUGUST 6, 2021** (2400 E. Artesia Blvd., Long Beach, CA) |

  Affects All Debtors
X  Affects Matheson Flight Extenders
  Affects Matheson Postal Services Only
X  Affects Matheson Trucking

*Order Shortening Time Pending*
Date:   December 5, 2023 **[requested]**
Time:   11:00 a.m.
Place:  Department C
          501 I Street, 6th Flr., Crtrm. 35
          Sacramento, CA 95814
Judge: Hon. Christopher M. Klein

*NUTI HART LLP*
*6232 La Salle Ave, Suite D*
*Oakland, CA 94611*
*TELEPHONE: 510-506-7152*

1

I, Charles Mellor, hereby declare and state as follows:

1. I am the Chief Restructuring Officer of Matheson Trucking, Inc. ("MTI"),[1] Matheson Flight Extenders, Inc. ("MFE") and Matheson Postal Services, Inc. ("MPS") (each a "Debtor" and collectively, "Debtors"). I have been part of the Matheson Executive Management Team since 2014 and have held the positions of Senior Vice President of Operations, General Counsel, Chief Legal Officer, and most recently, Chief Operations Officer.

2. I submit this declaration in support of MTI and MFE's motion for entry of an order authorizing rejection of a certain Industrial Lease with Bridge Point Long Beach LLC dated August 21, 2023 ("Lease") for premises commonly known as 2400 E. Artesia Blvd., Long Beach, CA 90805 ("Premises") effective as of December 1, 2023. Attached hereto as **Exhibit A** is a true and correct copy of the Lease.

3. Except as otherwise indicated, I know the following of my own personal knowledge and could and would testify competently thereto if called upon to do so.

4. MFE and MPS filed voluntary Chapter 11 bankruptcy petitions on May 5, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division ("Bankruptcy Court"), Case Nos. 22-21148 and 22-21149. MTI filed a voluntary petition under Chapter 11 on July 14, 2022, Case No. 22-21758. The Debtors' cases are currently jointly administered. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. MFE and MPS are in the business of sorting and transporting large volumes of mail across the United States under contracts with the United States Postal Service ("USPS") and other customers. MTI provides senior management, legal, accounting, human resources, administrative and other services essential to MFE and MPS's business operations.

6. MFE has been providing services to the USPS since December 1998. As of the filing of its bankruptcy case, MFE operated six (6) Surface Transfer Centers (STC) for the USPS

NUTI HART LLP
6232 LA SALLE AVE, SUITE D
OAKLAND, CA 94611
TELEPHONE: 510-506-7152

---

[1] Any terms not defined herein shall have the same definition as set forth in the Motion.

located in: Atlanta, Georgia; Brandywine, Maryland; Chicopee, Massachusetts; Kansas City, Missouri; Long Beach, California; and Sacramento, California.

7.    Over the last sixty (60) days, MFE has been in the process of closing down its STC operations.  In connection therewith, services to USPS at the Long Beach, California STC facility terminated on November 13, 2023.

8.    MTI is the lessee under the Lease for the Premises where MFE provided USPS with STC services in Long Beach.  Anticipating the shut-down of operations, the Debtors retained Cushman & Wakefield ("C&W") in mid-September to assist them in finding replacement tenants at various facilities.  *See* Order Approving Application to Retain Cushman & Wakefield as Real Estate Brokers [NH-74] filed September 30, 2023 [Doc. No. 1240].  At that time, the Lease appeared to be under-market, and therefore a potential source of value to the Debtors' estates if the Lease was assumed and assigned to a new tenant.

9.    However, despite diligent efforts over a period of roughly two months, C&W has been unable to locate a suitable replacement tenant for the Long Beach STC facility.  I was informed by C&W on or about November 30, 2023, that due to prevailing conditions in the Long Beach market and other factors, C&W did not believe that it was likely to identify a qualified replacement tenant for the Long Beach facility in the near term.

10.    Rent and other charges under the Lease for the Long Beach STC facility exceed $800,000.00 per month.  As noted, MFE is no longer generating revenue at the Long Beach STC facility.  Due to the uncertainty surrounding the Debtors' ability to find a replacement tenant to take an assignment of the Lease, I have concluded that it is in the best interests of the estates to reject the Lease and surrender possession of the Premises at the earliest possible date in order to minimize the accrual of additional administrative claims.

11.    I am informed and believe that on November 30, 2023, Bridge Point Long Beach LLC ("Lessor") was notified through counsel that the Debtors intended to file their Motion seeking rejection of the Lease retroactive to December 1, 2023.  The Lessor was further informed that the Debtors expected to vacate the Premises and turn over the keys on or before December 5, 2023.

NUTI HART LLP
6232 LA SALLE AVE, SUITE D
OAKLAND, CA 94611
TELEPHONE: 510-506-7152

12.     The Debtors have paid all post-Petition rent and other charges due under the Lease through November 30, 2023.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and belief. Executed this 1st day of December 2023.

_/s/Charles Mellor_
Charles Mellor

NUTI HART LLP
6232 LA SALLE AVE, SUITE D
OAKLAND, CA 94611
TELEPHONE: 510-506-7152

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

NUTI HART LLP
6232 La Salle Ave, Suite D
Oakland, CA 94611
Telephone: 510-506-7152

**INDUSTRIAL LEASE**

BRIDGE POINT LONG BEACH, LLC,

a California limited liability company,

as Landlord,

and

MATHESON TRUCKING, INC.,

a California corporation,

as Tenant.

(PLG v.5)

# INDUSTRIAL LEASE

This Industrial Lease (the "**Lease**"), dated as of the date set forth in <u>Section 1</u> of the Summary of Basic Lease Information (the "**Summary**"), below, is made by and between BRIDGE POINT LONG BEACH, LLC, a California limited liability company ("**Landlord**"), and MATHESON TRUCKING, INC., a California corporation ("**Tenant**").

## SUMMARY OF BASIC LEASE INFORMATION

|  | TERMS OF LEASE | DESCRIPTION |
|---|---|---|
| 1. | Date: | August 6, 2021 |
| 2. | Premises | |
| | 2.1  Premises: | All of that certain warehouse and distribution building located at 2400 E. Artesia Blvd., Long Beach, CA 90805, consisting of approximately 415,312 square feet (the "**Building**"), as depicted on **Exhibit A** attached hereto, together with the land where the Building is located, said land also being depicted on **Exhibit A** and legally described on **Exhibit A-1** (the "**Land**"), and all other improvements and the Tenant's Parking Areas (as defined in <u>Article 28</u>, below) located on the Land. |
| | 2.2  Project: | See <u>Section 1.1.2</u> of this Lease. |
| 3. | Lease Term (<u>Article 2</u>). | |
| | 3.1  Length of Term: | Five (5) years and one (1) month. |
| | 3.2  Lease Commencement Date: | The earlier to occur of: (i) the date upon which Tenant commences business operations from the Premises, and (ii) the date upon which Landlord causes the Substantial Completion of the Phase I Tenant Improvements (defined in Section 2.2 of the Tenant Work Letter, attached hereto as **Exhibit B**) to occur. The anticipated date of the Substantial Completion of the Phase I Tenant Improvements is September 8, 2021. |
| | 3.3  Lease Expiration Date: | If the Lease Commencement Date shall be the first day of a calendar month, then the day immediately preceding the sixty-one (61) month anniversary of the Lease Commencement Date; or if the Lease Commencement Date shall be other than the first day of a calendar month, then the last day of the month in which the sixty-one (61) month anniversary of the Lease Commencement Date occurs. |

4.      Base Rent (<u>Article 3</u>):

| Months During Lease Term | Monthly Installment of Base Rent | Monthly Rental Rate per Square Foot |
|---|---|---|
| 1-12* | $585,589.92 | $1.41 |
| 13-24 | $606,355.52 | $1.46 |
| 25-36 | $627,121.12 | $1.51 |
| 37-48 | $647,886.72 | $1.56 |
| 49-60 | $672,805.44 | $1.62 |
| 61-Lease Expiration Date | $693,571.04 | $1.67 |

*Subject to the terms of <u>Section 3.2</u> of this Lease.

4.2     Rent Payment Address:          Bridge Point Long Beach, LLC
9525 W. Bryn Mawr Ave., Suite 700 Rosemont, IL 60018

5.      Tenant's Share
(<u>Article 4</u>):                                    100%.

6.      Permitted Use
(<u>Article 5</u>):                                    The Premises shall be used only for inbound sorting and outbound delivery of the United States Postal Service mail and packages, and ancillary administrative office use; provided, however, that notwithstanding anything to the contrary set forth hereinabove, Tenant shall be responsible for operating and maintaining the Premises pursuant to, and in no event may Tenant's Permitted Use violate, (A) Landlord's established rules and regulations applicable to the Project, (B) all Applicable Laws (as that term is defined in <u>Article 24</u>), (C) all applicable zoning, building codes and covenants, conditions and restrictions affecting the Project, (D) the first-class character of the Project, and (E) the terms of <u>Section 5.2</u> of this Lease.

7.      Letter of Credit
(<u>Article 21</u>):                                   $500,000.00

8.      Address of Tenant
(<u>Section 29.18</u>):                            Prior to Lease Commencement Date:

Matheson Trucking, Inc.
9785 Goethe Road
Sacramento, CA 95827
Attn: Charles J. Mellor, Chief Operating Officer

Phone:  (916) 504-4758
Email:  CMellor@mathesoninc.com

After Lease Commencement Date:

The Premises

with a copy to:

Matheson Trucking, Inc.
9785 Goethe Road
Sacramento, CA 95827
Attn: Charles J. Mellor, Chief Operating Officer
Phone:  (916) 504-4758
Email:  CMellor@mathesoninc.com

9.     Address of Landlord
(Section 29.18):                 See Section 29.18 of the Lease.

10.    Broker(s)
(Section 29.24):                 Landlord's Broker: Lee and Associates

                                   Tenant's Broker: Cushman & Wakefield

# ARTICLE 1

## PREMISES, BUILDING, PROJECT, AND COMMON AREAS

1.1      **Premises, Building, Project and Common Areas**.

      1.1.1      **The Premises**.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in <u>Section 2.2</u> of the Summary (the "**Premises**").  The outline of the Premises is set forth in **Exhibit A** attached hereto.  The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions herein set forth, and Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of such terms, covenants and conditions by it to be kept and performed and that this Lease is made upon the condition of such performance.  The parties hereto hereby acknowledge that the purpose of **Exhibit A** is to show the approximate location of the Premises and the Building only, and such Exhibit is not meant to constitute an agreement, representation or warranty as to the construction of the Premises, the precise area thereof or the specific location of the "Common Areas," as that term is defined in <u>Section 1.1.3</u>, below, or the elements thereof or of the accessways to the Premises or the "Project," as that term is defined in <u>Section 1.1.2</u>, below.  Except as specifically set forth in this Lease, in the Tenant Work Letter attached hereto as **Exhibit B** (the "**Tenant Work Letter**"), and in the Phase III Work Letter attached hereto as **Exhibit B-1** (the "**Phase III Work Letter**"), Tenant shall accept the Premises in its presently existing "as-is" condition and Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.

      1.1.2      **The Project**.  The term "**Project**," as used in this Lease, shall mean (i) the Building and the Common Areas, (ii) the Land upon which the Building and the Common Areas are located, and (iii) at Landlord's discretion, any additional real property, areas, land, buildings or other improvements added thereto outside of the Project.

      1.1.3      **Common Areas**.  Subject to the terms, covenants, and conditions of this Lease, Tenant shall an exclusive right to use all parking and other areas on the Project, and all easements and rights benefiting the Project, together with a non-exclusive right, in common with others, to use the shared common areas of the Project (the "**Common Areas**").  The manner in which the Common Areas are maintained and operated shall be at the reasonable discretion of Landlord and the use thereof shall be subject to such reasonable rules, regulations and restrictions as Landlord may make from time to time, provided that Landlord shall not make changes to the Common Areas that would adversely affect the Permitted Use or Tenant's operations at or access to the Premises.  Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Common Areas.

      1.2      **Access**.  Except when and where Tenant's right of access is specifically excluded in this Lease, Tenant shall have the right to access to the Premises, the Building, and Tenant's Parking Area at all reasonable times, subject to Landlord's reasonable rules and regulations and Applicable Law.

# ARTICLE 2

## LEASE TERM

      2.1      **In General**.  The terms and provisions of this Lease shall be effective as of the date of this Lease.  The term of this Lease (the "**Lease Term**") shall be as set forth in <u>Section 3.1</u> of the Summary, shall commence on the date set forth in <u>Section 3.2</u> of the Summary (the "**Lease Commencement Date**"), and shall terminate on the date set forth in <u>Section 3.3</u> of the Summary (the "**Lease Expiration Date**") unless this Lease is sooner terminated as hereinafter provided.  For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive twelve (12) month period during the Lease Term; provided, however, that the first Lease Year shall commence on the Lease Commencement Date and end on the last day of the eleventh month thereafter and the second and each succeeding Lease Year shall commence on the first day of the next calendar month; and further provided that the last Lease Year shall end on the Lease Expiration Date.  At any time during the Lease Term, Landlord may deliver to Tenant a notice in the form as set forth in **Exhibit C**, attached hereto, as a confirmation only of the information set forth therein, which Tenant shall execute and return to Landlord within ten (10) days of receipt thereof, provided that if such notice is not factually correct, then Tenant shall make such changes as are necessary to make such notice factually correct and shall

thereafter return such notice to Landlord within said ten (10) day period. Tenant's failure to execute and return such notice to Landlord within such time shall be conclusive upon Tenant that the information set forth in such notice is as specified therein

2.2    **Option Term**.

2.2.1    **Option Right**.  Landlord hereby grants to the tenant originally named in this Lease (the "**Original Tenant**") and a Permitted Transferee Assignee (defined in Section 14.7 below), as the case may be, one (1) option to extend the initial Lease Term for a period of five (5) years (the "**Option Term**"), which option shall be exercisable only by written notice delivered by Tenant to Landlord as provided below, provided that, as of the date of delivery of such notice, Tenant is not in default under this Lease, and has not previously been in default under this Lease more than once.  Upon the proper exercise of the option to extend, and provided that, at Landlord's option, as of the end of the initial Lease Term, Tenant is not in default under this Lease, and Tenant has not previously been in default under this Lease more than once, the Lease Term, as it applies to the entire Premises, shall be extended for a period of five (5) years.  The rights contained in this Section 2.2 shall be personal to the Original Tenant and a Permitted Transferee Assignee, as the case may be, and may only be exercised by the Original Tenant or a Permitted Transferee Assignee, as the case may be (and not any other assignee, sublessee or other transferee of Tenant's interest in this Lease), if the Original Tenant or a Permitted Transferee Assignee, as the case may be, occupies the entire Premises.

2.2.2    **Option Rent**.  The annual rent payable by Tenant for the Option Term (the "**Option Rent**") shall be equal to the Fair Market Rent, as that term is defined below, for the Premises as of the commencement date of the Option Term, provided that in no event (A) shall the base rent component of the Option Rent for the first (1st) year of the Option Term on a monthly, per square foot, basis be less than the Base Rent on a monthly, per square foot, basis attributable to the Premises during the last month of the initial Lease Term and (B) shall the base rent component of the Option Rent be escalated by an amount which is less than three and one half percent (3.5%) on the first anniversary of the commencement date of the Option Term and on each anniversary of such commencement date thereafter (i.e., the base rent component of the Option Rent during the Option Term shall increase by a minimum of three and one half percent (3.5%) every twelve (12) months occurring during the Option Term).  Subject to the foregoing, the "**Fair Market Rent**" shall be equal to the annual rent (including additional rent and considering any "base year" or "expense stop" applicable thereto), taking into account all escalations, at which, as of the commencement of the Option Term, tenants are leasing non-sublease, non-encumbered, non-equity, non-expansion space comparable in size, location and quality to the Premises for a term comparable to the Option Term, in an arm's-length transaction, which comparable space is located in Comparable Buildings (defined below) and which comparable transactions (collectively, the "**Comparable Transactions**") are entered into within the six (6) month period immediately preceding Landlord's delivery of the Option Rent Notice, as that term is defined in Section 2.2.3 below, taking into consideration only the following concessions (the "**Concessions**"):  (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space; and (b) tenant improvements or allowances provided or to be provided for such comparable space, taking into account, and deducting the value of, the existing improvements in the Premises, such value to be based upon the age, condition, design, quality of finishes and layout of the improvements and the extent to which the same can be utilized by Tenant based upon the fact that the precise tenant improvements existing in the Premises are specifically suitable to Tenant; and (c) other reasonable monetary concessions being granted such tenants in connection with such comparable space; provided, however, that in calculating the Option Rent, no consideration shall be given to (i) the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its right to lease the Premises during the Option Term or in connection with the Comparable Transactions or the fact that landlords are or are not paying real estate brokerage commissions in connection with such Comparable Transactions, and (ii) any period of rental abatement, if any, granted to tenants in Comparable Transactions in connection with the design, permitting and construction of tenant improvements in such comparable spaces.  The Fair Market Rent shall additionally include a determination as to whether, and if so to what extent, Tenant must provide Landlord with financial security, such as a letter of credit or guaranty, for Tenant's rent obligations in connection with Tenant's lease of the Premises during the Option Term.  Such determination shall be made by reviewing the extent of financial security then generally being imposed in Comparable Transactions from tenants of comparable financial condition and credit history to the then existing financial condition and credit history of Tenant (with appropriate adjustments to account for differences in the then-existing financial condition of Tenant and such other tenants).  For the purpose of this Lease, "**Comparable Buildings**" shall mean industrial buildings that are comparable to the Building and are

located in the Los Angeles South Bay market place.

2.2.3    **Exercise of Option**.  The option contained in this <u>Section 2.2</u> shall be exercised by Tenant, if at all, only in the following manner: (i) Tenant shall deliver written notice to Landlord not more than fifteen (15) months nor less than fourteen (14) months prior to the expiration of the initial Lease Term, stating that Tenant is interested in exercising its option ("**Tenant's Interest Notice**"); (ii) Landlord, after receipt of Tenant's Interest Notice, shall deliver notice (the "**Option Rent Notice**") to Tenant not less than thirteen (13) months prior to the expiration of the initial Lease Term setting forth the Option Rent; and (iii) if Tenant wishes to exercise such option, Tenant shall, on or before twelve (12) months prior to the expiration of the initial Lease Term, exercise the option by delivering written notice thereof to Landlord, and upon, and concurrent with, such exercise, Tenant may, at its option, object to the Option Rent contained in the Option Rent Notice, in which case the parties shall follow the procedure, and the Option Rent shall be determined, as set forth in Section 2.2.4 below.  Time is of the essence with respect to the delivery of Tenant's Interest Notice and Tenant's exercise of the option (including any objection to the Option Rent set forth in the Option Rent Notice) set forth in this Section 2.2.

2.2.4    **Determination of Option Rent**.  In the event Tenant timely and appropriately objects to the Option Rent set forth in the Option Rent Notice, then Landlord and Tenant shall attempt to agree upon the Option Rent using their best good-faith efforts.  If Landlord and Tenant fail to reach agreement within fifteen (15) days following Tenant's objection to the Option Rent, (the "**Outside Agreement Date**"), then each party shall make a separate determination of the Option Rent within fifteen (15) days following the Outside Agreement Date, and such determinations shall be submitted to arbitration in accordance with Sections 2.2.4.1 through 2.2.4.7 below.

2.2.4.1    Landlord and Tenant shall each appoint one (1) arbitrator who shall by profession be a real estate broker who shall have been active over the five (5) year period ending on the date of such appointment in the leasing of comparable industrial properties in the Los Angeles South Bay marketplace.  The determination of the arbitrators shall be limited solely to the issue area of whether Landlord's or Tenant's submitted Option Rent is the closest to the actual Option Rent as determined by the arbitrators, taking into account the requirements of Section 2.2.2 of this Lease.  Each such arbitrator shall be appointed within fifteen (15) days after the Outside Agreement Date.

2.2.4.2    The two (2) arbitrators so appointed shall within ten (10) days of the date of the appointment of the last appointed arbitrator agree upon and appoint a third (3rd) arbitrator who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two (2) arbitrators.

2.2.4.3    The three (3) arbitrators shall within thirty (30) days of the appointment of the third (3rd) arbitrator reach a decision as to whether the parties shall use Landlord's or Tenant's submitted Option Rent, and shall notify Landlord and Tenant thereof.

2.2.4.4    The decision of the majority of the three (3) arbitrators shall be binding upon Landlord and Tenant.

2.2.4.5    If either Landlord or Tenant fails to appoint an arbitrator within fifteen (15) days after the Outside Agreement Date, the arbitrator appointed by one of them shall reach a decision, notify Landlord and Tenant thereof, and such arbitrator's decision shall be binding upon Landlord and Tenant.

2.2.4.6    If the two (2) arbitrators fail to agree upon and appoint a third (3rd) arbitrator, or both parties fail to appoint an arbitrator, then the appointment of the third (3rd) arbitrator or any arbitrator shall be dismissed and the matter to be decided shall be forthwith submitted to arbitration under the provisions of the American Arbitration Association, but subject to the instruction set forth in this Section 2.2.4.2.

2.2.4.7 The cost of the arbitration shall be paid by Landlord and Tenant equally.

**<u>ARTICLE 3</u>**

**<u>BASE RENT</u>**

3.1 **In General**. Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent at the address set forth in Section 4.2 of the Summary, or, at Landlord's option, at such other place as Landlord may from time to time designate by wire transfer or electronic funds transfer, base rent ("Base Rent") as set forth in Section 4 of the Summary, payable in equal monthly installments as set forth in Section 4 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever. The Base Rent for Premises for the first full month of the Lease Term shall be paid at the time of Tenant's execution of this Lease. If any Rent payment date (including the Lease Commencement Date) falls on a day of the month other than the first day of such month or if any payment of Rent is for a period which is shorter than one month, the Rent for any fractional month shall accrue on a daily basis for the period from the date such payment is due to the end of such calendar month or to the end of the Lease Term at a rate per day which is equal to 1/365 of the applicable annual Rent. All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.

3.2 **Abatement of Rent**. Provided that Tenant is not then in default, beyond any applicable notice and cure periods set forth in this Lease, then Tenant shall not be obligated to pay the Base Rent otherwise attributable to the Premises (the "**Base Rent Abatement Amount**") for the second (2nd) calendar month of the Lease Term (the "**Base Rent Abatement Period**"). Landlord and Tenant acknowledge that Tenant's right (the "**Base Rent Abatement Right**") to receive Base Rent abatement during the Base Rent Abatement Period has been granted to Tenant as additional consideration for Tenant's agreement to enter into this Lease, and comply with the terms and conditions otherwise required under this Lease. If Tenant shall be in default under this Lease, and shall fail to cure such default within the notice and cure period, if any, permitted for cure pursuant to this Lease, or if this Lease is terminated for any reason other than a Landlord default, casualty or condemnation, then Landlord may at its option, elect, in addition to any other remedies Landlord may have under this Lease, one or both of the following remedies: (i) that Tenant shall immediately become obligated to pay to Landlord all Base Rent abated hereunder during the Base Rent Abatement Period, with interest as provided pursuant to this Lease, from the date such Base Rent would have otherwise been due but for the abatement provided herein, or (ii) that the dollar amount of the unapplied portion of the Base Rent Abatement Amount as of such default or termination shall be converted to a credit to be applied to the Base Rent applicable at the end of the Lease Term and Tenant shall immediately be obligated to begin paying Base Rent for the Premises in full. The Base Rent Abatement Right shall be personal to the Original Tenant, and shall not inure to the benefit of any assignee, sublessee or other transferee of the Original Tenant's interest in this Lease.

## ARTICLE 4

## ADDITIONAL RENT

4.1 **General Terms**.

4.1.1 **In General**. In addition to paying the Base Rent specified in Article 3 of this Lease, Tenant shall pay "Tenant's Share" of the annual "Direct Expenses," as those terms are defined in Sections 4.2.5 and 4.2.1 of this Lease. Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the terms of this Lease, are hereinafter collectively referred to as the "**Additional Rent**", and the Base Rent, and the Additional Rent are herein collectively referred to as "**Rent**." All amounts due under this Article 4 as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent. Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 shall survive the expiration of the Lease Term.

4.1.2 **Triple Net Lease**. Landlord and Tenant acknowledge that, except as otherwise provided to the contrary in this Lease, it is the intent and agreement of Landlord and Tenant that this Lease be a "triple net" lease and that as such, the provisions contained in this Lease are intended to pass on to Tenant or reimburse Landlord for all costs and expenses associated with this Lease, and the Project, including, without limitation, all costs and expenses in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation thereof. To the extent such costs and expenses payable by Tenant cannot be charged directly to, and paid by, Tenant, such costs and expenses shall be paid by Landlord but reimbursed by Tenant as Additional Rent

4.2 **Definitions of Key Terms Relating to Additional Rent.** As used in this Article 4, the following terms shall have the meanings hereinafter set forth:

4.2.1    "**Direct Expenses**" shall mean "Operating Expenses" and "Tax Expenses."

4.2.2    "**Expense Year**" shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time to any other twelve (12) consecutive month period, and, in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

4.2.3    "**Operating Expenses**" shall mean all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project, or any portion thereof. Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following: (i) the cost of supplying all utilities, the cost of operating, repairing, maintaining, and renovating the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with a transportation system management program or similar program; (iii) the cost of all insurance carried by Landlord in connection with the Project; (iv) the cost of landscaping, relamping, paving and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof; (v) costs incurred in connection with the parking areas servicing the Project; (vi) fees and other costs, including management fees, consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance and repair of the Project; (vii) payments under any equipment rental agreements and the fair rental value of any management office space; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Project; (ix) costs under any instrument pertaining to the sharing of costs by the Project; (x) operation, repair, maintenance and replacement of all systems and equipment and components thereof of the Building (including, without limitation, the Landlord Repair Obligations); (xi) the cost of janitorial, alarm, security and other services, replacement of wall and floor coverings, ceiling tiles and fixtures in Common Areas, maintenance and replacement of curbs and walkways, repair to roofs and re-roofing; (xii) amortization (including interest on the unamortized cost) of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Project, or any portion thereof; (xiii) the cost of capital improvements or other costs incurred in connection with the Project (A) which are intended to effect economies in the operation or maintenance of the Project, or any portion thereof, (B) that are required to comply with present or anticipated conservation programs, (C) which are replacements or modifications of nonstructural items located in the Common Areas required to keep the Common Areas in good order or condition, or (D) that are required under any governmental law or regulation; provided, however, that any capital expenditure shall be amortized with interest over its useful life as Landlord shall reasonably determine; (xiv) costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in <u>Section 4.2.4</u>, below; (xv) payments under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs by the Building, (xvi) all costs incurred in connection with complying with all requirements and obligations set forth in the Environmental Documents and/or RAP (or as may be required in connection therewith), as may be required by the Board or any other governmental agency with jurisdiction, and (xvii) all costs incurred in connection with complying with all requirements and obligations that may be imposed on the Project by the South Coast Air Quality Management District. Tenant shall not be responsible for any costs or expenses incurred in connection with complying with any modifications to the Environmental Documents or the RAP, which modifications are made after the Lease Commencement Date.

Notwithstanding anything to the contrary in this Lease, the following items shall be excluded from Operating Expenses: (1) costs incurred in connection with the original construction and nonrecurring costs for the repair or replacement of any structural portion of the Building made necessary as a result of defects in the original design, workmanship or materials; (2) real estate brokers' commissions, renovations or tenant improvements, or other costs incurred for attracting tenants or with respect to other rentable area; (3) in connection with the initial Lease Term only, fees payable by Landlord for management of the Project in excess of two percent (2%) of Landlord's gross rental revenues, including Base Rent and Direct Expenses, from the Project for any calendar year or portion thereof; (4) costs of repairs or other work necessitated by fire, windstorm or other casualty or condemnation to the extent Landlord

actually receives proceeds of property and casualty insurance policies or condemnation awards or would have received such proceeds had Landlord maintained the insurance required to be maintained by Landlord under this Lease; and (5) interest, fines or penalties for late payment or violations of Applicable Laws by Landlord, except to the extent incurring such expense is either (i) a reasonable business expense under the circumstances, or (ii) caused by a corresponding late payment or violation of an Applicable Law by Tenant, in which event Tenant shall be responsible for the full amount of such expense.

4.2.4    **Taxes**.

4.2.4.1    "**Tax Expenses**" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary (including, without limitation, real estate taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Project, or any portion thereof), which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the (i) ownership, (ii) leasing, (iii) operation, (iv) construction or improvement, or (v) sale or change of ownership of the Project, or any portion thereof.

4.2.4.2    Tax Expenses shall include, without limitation:  (i) Any tax on the rent, right to rent or other income from the Project, or any portion thereof, or as against the business of leasing the Project, or any portion thereof; (ii) Any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, Tax Expenses shall also include any governmental or private assessments or the Project's contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies; (iii) Any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises, the tenant improvements in the Premises, or the Rent payable hereunder, including, without limitation, any business or gross income tax or excise tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; (iv) Any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises; and (v) All of the real estate taxes and assessments imposed upon or with respect to the Building and all of the real estate taxes and assessments imposed on the land and improvements comprising the Project.

4.2.4.3    Any costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in attempting to protest, reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such expenses are paid.  Except as set forth in Section 4.2.4.4, below, refunds of Tax Expenses shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based on the Expense Year to which the refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Additional Rent under this Article 4 for such Expense Year. If Tax Expenses for any period during the Lease Term or any extension thereof are increased after payment thereof for any reason, including, without limitation, error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Share of any such increased Tax Expenses included by Landlord as Tax Expenses pursuant to the terms of this Lease.  Notwithstanding anything to the contrary contained in this Section 4.2.4 (except as set forth in Section 4.2.4.1, above), there shall be excluded from Tax Expenses (i) all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and state income taxes, and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Project), (ii) any items included as Operating Expenses, and (iii) any items paid by Tenant under Section 4.4 of this Lease.  If the property tax assessment for the Project (or any portion thereof) (or Tax Expenses) for any Expense Year does not reflect an assessment (or Tax Expenses) for a

one hundred percent (100%) leased, completed and occupied project (such that existing or future leasing, tenant improvements and/or occupancy may result in an increased assessment and/or increased Tax Expenses), Tax Expenses shall be adjusted, on a basis consistent with sound real estate accounting principles, to reflect an assessment for (and Tax Expenses for) a one hundred percent (100%) leased, completed and occupied project.

4.2.4.4    Notwithstanding anything to the contrary set forth in this Lease, the amount of Tax Expenses for any Expense Year shall be calculated without taking into account any decreases in real estate taxes obtained in connection with Proposition 8, and, therefore, the Tax Expenses in an Expense Year may be greater than those actually incurred by Landlord, but shall, nonetheless, be the Tax Expenses due under this Lease; provided that (i) any costs and expenses incurred by Landlord in securing any Proposition 8 reduction shall not be deducted from Tax Expenses nor included in Direct Expenses for purposes of this Lease, and (ii) tax refunds under Proposition 8 shall not be deducted from Tax Expenses nor refunded to Tenant, but rather shall be the sole property of Landlord. Landlord and Tenant acknowledge that the preceding sentence is not intended to in any way affect (A) the inclusion in Tax Expenses of the statutory two percent (2.0%) annual increase in Tax Expenses (as such statutory increase may be modified by subsequent legislation), or (B) the inclusion or exclusion of Tax Expenses pursuant to the terms of Proposition 13.

4.2.4.5    Notwithstanding anything to the contrary set forth in this Lease, but subject to the terms of this Section 4.2.4.5, below, only Landlord may institute proceedings to reduce Tax Expenses and the filing of any such proceeding by Tenant without Landlord's consent shall constitute an event of default by Tenant under this Lease. Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Tax Expenses. Notwithstanding the foregoing, if Landlord elects not to contest the Taxes assessed during any Expense Year, then Tenant, by delivery of written notice to Landlord within thirty (30) days after Tenant's receipt of the applicable Statement (time being of the essence), may require Landlord to contest such Taxes, to the extent Landlord is legally permitted to contest such Taxes. If Tenant requires Landlord to contest Taxes as provided in the preceding sentence and the total costs incurred by Landlord in pursuing such contest exceed the savings in Taxes resulting from such contest, then Tenant shall pay Landlord the differential between the total costs incurred by Landlord in pursuing such contest and the amount of such savings in Taxes, if any (which amounts shall be paid by Tenant within thirty (30) days of Landlord's demand therefor, together with reasonable supporting documentation). Except as provided hereinabove, any costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees) incurred in attempting to protest, reduce or minimize Taxes shall be included in Taxes in the Expense Year such expenses are paid. If Landlord receives a refund of Taxes for any Expense Year, Landlord shall credit against subsequent payments of Rent due hereunder, an amount equal to Tenant's Proportionate Share of the refund, net of any expenses incurred by Landlord in achieving such refund, which amount shall not exceed Tenant's Tax Payment paid for such Expense Year. Except as otherwise expressly provided, above, Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Taxes. Except as set forth above, the benefit of any exemption or abatement relating to all or any part of the Project shall accrue solely to the benefit of Landlord and Taxes shall be computed without taking into account any such exemption or abatement.

4.2.5    "**Tenant's Share**" shall mean the percentage set forth in Section 5 of the Summary.

4.3    **Calculation and Payment of Additional Rent.**  During each Expense Year ending or commencing within the Lease Term, Tenant shall pay to Landlord as Additional Rent, Tenant's Share of Common Area Expenses and Tax Expenses for the portion of such Expense Year occurring during the Lease Term, in the manner set forth in Section 4.3.2, below. If for any Expense Year ending or commencing within the Lease Term, Tenant's Share of Direct Expenses for such Expense Year exceeds the Estimated Payment, as that term is defined in Section 4.3.2, then Tenant shall pay to Landlord, in the manner set forth in Section 4.3.1, below, and as Additional Rent, an amount equal to the excess (the "**Excess**").

4.3.1    Statement of Actual Direct Expenses and Payment by Tenant.  Landlord shall endeavor to give to Tenant following the end of each Expense Year, a statement (the "**Statement**") which shall state the Direct Expenses incurred or accrued for such preceding Expense Year and any Excess. Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, if an Excess is present, Tenant shall pay, with its next installment of Base Rent due, the full amount of the Excess for such Expense Year, and if Tenant's Estimated Payment was for more than the actual Excess, Tenant shall receive a credit in the amount of Tenant's overpayment against Rent next due under this Lease. The failure of Landlord to timely furnish the Statement for any

Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this <u>Article 4</u>.  Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if an Excess if present, Tenant shall immediately pay to Landlord such amount, and if Tenant paid more as an Estimated Payment than the actual Excess, Landlord shall, within thirty (30) days, deliver a check payable to Tenant in the amount of the overpayment.  The provisions of this <u>Section 4.3.1</u> shall survive the expiration or earlier termination of the Lease Term.

4.3.2     <u>Statement of Estimated Direct Expenses</u>.  Landlord may give Tenant a yearly expense estimate statement (the "**Estimate Statement**") which Estimate Statement shall set forth Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Operating Expenses and Tax Expenses payable by Tenant for the then-current Expense Year (the "**Estimated Payments**").  The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Payments under this <u>Article 4</u>.  Tenant shall pay, with its next installment of Base Rent, a fraction of the Estimated Payments for the then-current Expense Year (reduced by any amounts paid pursuant to the last sentence of this <u>Section 4.3.2</u>).  Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year to the month of such payment, both months inclusive, and shall have twelve (12) as its denominator.  Until a new Estimate Statement is furnished, Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Payments set forth in the previous Estimate Statement delivered by Landlord to Tenant.

4.4     <u>Taxes and Other Charges for Which Tenant Is Directly Responsible</u>.

4.4.1     Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises.  If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.4.2     If the tenant improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space within the Project are assessed, then the Tax Expenses levied against Landlord or the property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of <u>Section 4.4.1</u>, above.

4.4.3     Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency any (i) rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Project, including the Project parking facilities; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

4.5     <u>Landlord's Books and Records</u>.  Within ninety (90) days after receipt of a Statement by Tenant, if Tenant disputes the amount of Direct Expenses set forth in the Statement, an independent certified public accountant (which accountant is a member of a nationally or regionally recognized accounting firm and which accountant shall not be compensated on a contingency fee or similar basis related to the result of such audit), designated by Tenant, may, after reasonable notice to Landlord and at reasonable times subject to Landlord's reasonable scheduling requirements, inspect Landlord's records at Landlord's offices; provided that Tenant is not then in default under this Lease and Tenant has paid all amounts required to be paid under the applicable Statement; and further provided that such inspection must be completed within ten (10) business days after Landlord's records are made available to Tenant. In connection with such inspection of Landlord's records, Tenant and Tenant's agents must agree in advance to follow Landlord's reasonable rules and procedures regarding an inspection of Landlord's records, and shall execute a commercially reasonable confidentiality agreement regarding the same.  If, within ten (10) days after such inspection,

Tenant notifies Landlord in writing that Tenant still disputes such Direct Expenses included in the Statement, then a certification as to the proper amount shall be made, at Tenant's expense, by an independent certified public accountant selected by Landlord, which certification shall be final and conclusive; provided, however, if the actual amount of Direct Expenses due for that Expense Year, as determined by such certification, is determined to have been overstated by more than five percent (5%), then Landlord shall pay the costs associated with such certification. Tenant's failure (i) to take exception to any Statement within forty-five (45) days after Tenant's receipt of such Statement, (ii) to timely complete its inspection of Landlord's records, or (iii) to timely notify Landlord of any remaining dispute after such inspection shall be deemed to be Tenant's approval of such Statement and Tenant, thereafter, waives the right or ability to dispute the amounts set forth in such Statement, which Statement shall be considered final and binding. Tenant hereby acknowledges that Tenant's sole right to audit Landlord's records and to contest the amount of Direct Expenses payable by Tenant shall be as set forth in this <u>Section 4.5</u>, and Tenant hereby waives any and all other rights pursuant to applicable Laws to audit such records and/or to contest the amount of Direct Expenses payable by Tenant. The rights to inspect Landlord's books and records set forth in this <u>Section 4.5</u> above are personal to the Original Tenant.

**ARTICLE 5**

**USE OF PREMISES**

5.1    **Permitted Use.** Tenant shall use the Premises solely for the Permitted Use set forth in <u>Section 6</u> of the Summary and this <u>Section 5.1</u>, and Tenant shall not use or permit the Premises or the Project to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion. Subject to Applicable Law, Tenant will be permitted to use portions of the Project located outside of the Building for outside storage. Tenant shall be responsible, at its sole cost and expense, for obtaining all operating permits, licenses and governmental approvals necessary for the operation of the Permitted Use from the Premises. Tenant will use the Premises in a safe and proper manner and will not commit waste, overload the floor or structure of the Building or subject the Premises to use that would damage the Premises.

5.2    **Prohibited Uses.** Tenant covenants and agrees that Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to Landlord's reasonable rules and regulations, or in violation of the laws of the United States of America, the State of California, or the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Project) including, without limitation, any such laws, ordinances, regulations or requirements relating to hazardous materials or substances, as those terms are defined by Applicable Laws. Tenant shall not do or permit anything to be done in or about the Premises which will in any way damage the reputation of the Project or use or allow the Premises to be used for any improper, unlawful or objectionable purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises. In connection with the foregoing and notwithstanding any provision to the contrary set forth in this Lease, Tenant shall not store, sell, accept, distribute or display any cannabis or any products containing cannabis at the Project. Tenant shall comply with all recorded covenants, conditions, and restrictions now or hereafter affecting the Project.

5.3    **Environmental Covenant**. This Lease and Tenant's interests and rights hereunder are and shall be subject and subordinate to any Land Use Covenant, Environmental Restriction or other similar document ("**Environmental Covenant**") that is required to be recorded against the Property by the Board as part of or in connection with the RAP; provided, however, that any such Environmental Covenant shall not prohibit Tenant's Permitted Use under this Lease or adversely affect Tenant's operations at, or access to, the Premises. Subject to the foregoing, Tenant shall cooperate with Landlord, as may be reasonably necessary, in finalizing any Environmental Covenant and Tenant shall be bound by, and agrees to comply with, the terms of any such Environmental Covenant, provided that any such Environmental Covenant does not prohibit Tenant's Permitted Use under this Lease or adversely affect Tenant's operations at, or access to, the Premises.

5.4    **Landlord Disclosures**. California Health and Safety Code Section 25359.7 requires any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substance has come to be located on or beneath that real property to, prior to the sale, lease, or rental of the real property by that owner, give written notice of that condition to the buyer, lessee, or renter of the real property. Landlord has provided to Tenant access to environmental reports and documents related to the Project, including, without limitation, the Premises and the Land, in its possession or reasonable control, or in the possession or reasonable control of any affiliate

of Landlord, which reports and documents can be accessed at (i) https://bridgedev.box.com/s/dfhgzvvon3gyff9ki1875swrhypnmw9m, and (ii) https://geotracker.waterboards.ca.gov/profile_report?global_id=SL373442447. The foregoing reports and documents shall collectively be referred to herein as the "**Environmental Documents**". Tenant acknowledges that the Property is an open site under the oversight of the California Regional Water Quality Control Board, Los Angeles Region ("**Board**"), and that remediation is ongoing at the Property and will continue after the Building is constructed. The remediation system is described in that certain Revised Remedial Action Plan Optimization Report dated June 8, 2020 prepared by Leymaster Environmental Consulting, LLC (as may be amended, the "**RAP**"). The RAP includes, among other elements, installation of two remediation treatment compounds on the Premises (i.e., in Tenant's Parking Areas as depicted on **Exhibit A**, attached hereto), the installation of horizontal and vertical wells in the subsurface, a vapor intrusion mitigation system under the Building (see discussion of Methane System below) and the installation of groundwater monitoring wells outside and inside of the Building. The approximate location of all of the monitoring wells are depicted on **Exhibit A-2**, attached hereto. Tenant hereby acknowledges and agrees that the exaction location of the monitoring wells shall be determined in the field and shall be subject to the approval of the Board. In the event that the approximate location of the monitoring wells are changed in the field or based on requirements of the Board, then Landlord shall notify Tenant of the same. The Building will be equipped with a methane mitigation system with alarm system ("**Methane System**"). Tenant shall immediately notify Landlord in the event that such alarm system is activated. Notwithstanding anything contained in this Lease to the contrary, but subject to the terms of Article 4, above, as between Landlord and Tenant only, Landlord shall be responsible for fulfilling all current and future requirements and obligations set forth in the Environmental Documents and/or RAP (or as may now or in the future be required in connection therewith), as may be required by the Board or any other governmental agency with jurisdiction, provided that the foregoing shall not be applicable to any condition exacerbated or caused by Tenant.

      5.5    **Hazardous Substances**.

      5.5.1    **Definitions**. For purposes of this Lease, the following definitions shall apply: "**Hazardous Material(s)**" shall mean any solid, liquid or gaseous substance or material that is described or characterized as a toxic or hazardous substance, waste, material, pollutant, contaminant or infectious waste, or any matter that in certain specified quantities would be injurious to the public health or welfare, or words of similar import, in any of the Environmental Laws (as that term is defined below), or any other words which are intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or reproductive toxicity and includes, without limitation, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture thereof), petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, nuclear or radioactive matter, medical waste, soot, vapors, fumes, acids, alkalis, chemicals, microbial matters (such as molds, fungi or other bacterial matters), biological agents and chemicals which may cause adverse health effects, including but not limited to, cancers and /or toxicity. "**Environmental Laws**" shall mean any and all federal, state, local or quasi-governmental laws (whether under common law, statute or otherwise), ordinances, decrees, codes, rulings, awards, rules, regulations or guidance or policy documents now or hereafter enacted or promulgated and as amended from time to time, in any way relating to (i) the protection of the environment, the health and safety of persons (including employees), property or the public welfare from actual or potential release, discharge, escape or emission (whether past or present) of any Hazardous Materials or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials.

      5.5.2    **Compliance with Environmental Laws**. Tenant shall not sell, use, or store in or around the Premises any Hazardous Materials. In addition, Tenant agrees that it: (i) shall not cause or suffer to occur, the release, discharge, escape or emission of any Hazardous Materials at, upon, under or within the Premises or any contiguous or adjacent premises; (ii) shall not engage in activities at the Premises that could result in, give rise to, or lead to the imposition of liability upon Tenant or Landlord or the creation of a lien upon the building or land upon which the Premises is located; (iii) shall notify Landlord promptly following receipt of any knowledge with respect to any actual release, discharge, escape or emission (whether past or present) of any Hazardous Materials at, upon, under or within the Premises; and (iv) shall promptly forward to Landlord copies of all orders, notices, permits, applications and other communications and reports in connection with any release, discharge, escape or emission of any Hazardous Materials at, upon, under or within the Premises or any contiguous or adjacent premises.

5.5.3 **Landlord's Right of Environmental Audit.** Landlord may, upon reasonable notice to Tenant, be granted access to and enter the Premises to perform or cause to have performed an environmental inspection, site assessment or audit. Such environmental inspector or auditor may be chosen by Landlord, in its sole discretion, and be performed at Landlord's sole expense. To the extent that the report prepared upon such inspection, assessment or audit, indicates the presence of Hazardous Materials in violation of Environmental Laws, or provides recommendations or suggestions to prohibit the release, discharge, escape or emission of any Hazardous Materials at, upon, under or within the Premises, or to comply with any Environmental Laws, Tenant shall promptly, at Tenant's sole expense, comply with such recommendations or suggestions, including, but not limited to performing such additional investigative or subsurface investigations or remediation(s) as recommended by such inspector or auditor. Notwithstanding the above, if at any time, Landlord has actual notice or reasonable cause to believe that Tenant has violated, or permitted any violations of any Environmental Law, then Landlord will be entitled to perform its environmental inspection, assessment or audit at any time and Tenant must reimburse Landlord for the cost or fees incurred for such as Additional Rent.

5.5.4 **Indemnification**. Tenant agrees to indemnify, defend, protect and hold harmless the Landlord Parties (as defined in Section 10.1) from and against any liability, obligation, damage or costs, including without limitation, attorneys' fees and costs, resulting directly or indirectly from any use, presence, removal or disposal of any Hazardous Materials or breach of any provision of this section, to the extent such liability, obligation, damage or costs was a result of actions caused or permitted by Tenant or a Tenant Party.

5.5.5 **Survival**. The terms of this Section 5.5 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 6

## SERVICES AND UTILITIES

6.1 **Standard Tenant Services**. Landlord shall provide, and Tenant shall accept, the utility systems (electricity, gas, sewer and water) serving the Premises in the condition required under the Tenant Work Letter, and Tenant shall pay the cost of all utility services supplied to the Premises in accordance with Section 6 below. Tenant shall, at Tenant's sole cost and expense, contract for and cause the normal and customary utility services (electricity, gas, sewer and water) to be provided to the Premises, and, in connection therewith, during the Lease Term, Tenant shall pay directly to the applicable service provider for all water, gas, electricity, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used at the Premises by Tenant, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like on such utility charges pertaining to Tenant's use of the Premises. Additionally, Tenant shall provide its own janitorial and security services for the Building. In connection with the foregoing, Tenant shall be solely responsible, at Tenant's sole cost and expense, for keeping all loading docks in a neat and clean condition, and for performing all janitorial services and other cleaning of the Premises and Tenant's Parking Areas appropriate to maintain the Premises and Tenant's Parking Areas in a manner consistent with a first-class building. All utility shall be paid directly by Tenant prior to the date on which the same are due to the utility provider janitorial company and/or security company, as applicable. Landlord shall not be obligated to provide any utilities or services to the Premises.

6.2 **Tenant Maintained Security**. Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project. Any such security measures for the benefit of the Premises, the Building or the Project shall be provided by Tenant, at Tenant's sole cost and expense. Tenant hereby assumes all responsibility for the protection of Tenant and each Tenant Party, and the property thereof, from acts of third parties, including keeping doors locked and other means of entry to the Premises closed.

6.3 **Interruption of Use.** Except as set forth in Section 6.4, below, Tenant agrees that Landlord shall not be liable for damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service (including telephone and telecommunication services), or for any diminution in the quality or quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by breakage, repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, or other fuel

at the Building or Project after reasonable effort to do so, by any riot or other dangerous condition, emergency, accident or casualty whatsoever, by act or default of Tenant or other parties, or by any other cause; and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease. Furthermore, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this Article 6. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease, provided that the Premises are not thereby rendered untenantable.

6.4    **Abatement Event**.  In the event that Tenant is prevented from using, and does not use, the Premises or any portion thereof, as a result of any failure to provide access to the Premises as required by this Lease (an "**Abatement Event**"), then Tenant shall give Landlord notice of such Abatement Event, and if such Abatement Event continues for seven (7) consecutive business days after Landlord's receipt of any such notice (the "**Eligibility Period**") and Landlord does not diligently commence and pursue to completion the remedy of such Abatement Event, then the Base Rent shall be abated or reduced after expiration of the Eligibility Period for such time that Tenant continues to be so prevented from using, and does not use for the normal conduct of Tenant's business, the Premises or a portion thereof, in the proportion that the rentable area of the portion of the Premises that Tenant is prevented from using, and does not use, bears to the total rentable area of the Premises; provided, however, in the event that Tenant is prevented from using, and does not use, a portion of the Premises for a period of time in excess of the Eligibility Period and the remaining portion of the Premises is not sufficient to allow Tenant to effectively conduct its business therein, and if Tenant does not conduct its business from such remaining portion, then for such time after expiration of the Eligibility Period during which Tenant is so prevented from effectively conducting its business therein, the Base Rent for the entire Premises shall be abated for such time as Tenant continues to be so prevented from using, and does not use, the Premises.  If, however, Tenant reoccupies any portion of the Premises during such period, the Base Rent allocable to such reoccupied portion, based on the proportion that the rentable area of such reoccupied portion of the Premises bears to the total rentable area of the Premises, shall be payable by Tenant from the date Tenant reoccupies such portion of the Premises.  To the extent an Abatement Event is caused by an event covered by Articles 11 or 13 of this Lease, then Tenant's right to abate rent shall be governed by the terms of such Article 11 or 13, as applicable, and the Eligibility Period shall not be applicable thereto.  Such right to abate Base Rent shall be Tenant's sole and exclusive remedy for rent abatement at law or in equity for an Abatement Event.  Except as provided in this Section 6.4, nothing contained herein shall be interpreted to mean that Tenant is excused from paying Rent due hereunder.

## ARTICLE 7

## REPAIRS

7.1    **Tenant Repair Obligations**.  Tenant shall, throughout the Term, at its sole cost and expense, maintain, repair, replace and improve as required, the Premises, the Building and Tenant's Parking Areas and every part thereof in a good standard of maintenance, repair and replacement as required, and in good and sanitary condition, all in accordance with the standards of comparable industrial projects, except for Landlord Repair Obligations, whether or not such maintenance, repair, replacement or improvement is required in order to comply with Applicable Laws ("**Tenant's Repair Obligations**"), including, without limitation, the following: (1) glass, plate glass, windows, window frames, and window casements (including the repairing, resealing, cleaning and replacing of both interior and exterior windows); (2) interior and exterior doors, door frames and door closers; (3) interior lighting (including, without limitation, light bulbs and ballasts); (4) the plumbing, drainage, electrical, fire protection, life safety and security systems and equipment, heating, ventilation and air-conditioning systems (collectively, the "**HVAC Systems**") and all other mechanical, electrical and communications systems and equipment (collectively, the "**Building Systems**"), including without limitation (i) any specialty or supplemental Building Systems installed by or for Tenant, and (ii) all electrical facilities and equipment, including lighting fixtures, lamps, fans and any exhaust equipment and systems, electrical motors and all other appliances and equipment of every kind and nature located in, upon or about the Premises; (5) all communications systems serving the Premises; (6) all of Tenant's security systems in or about or serving the Premises; (7) Tenant's signage; (8) interior demising walls and partitions (including painting and wall coverings), equipment, floors, and any roll-up doors, ramps and dock equipment, including dock bumpers,

dock plates or dock levelers; and (9) the non-structural portions of the roof of the Building, including roof coverings, roof membrane, and skylights. Tenant's Repair Obligations also include (i) the routine maintenance of the non-structural portion of load bearing and exterior walls of the Building, including, without limitation, any painting, sealing, patching and waterproofing of such walls, and (ii) the maintenance and monitoring of all fire alarm systems serving the Premises. Tenant shall additionally be responsible, at Tenant's sole cost and expense, to furnish all expendables, including light bulbs, paper goods and soaps, used in the Premises.

7.2    **Service Contracts**. All Building Systems, including main electrical, plumbing and fire/life-safety systems, shall be maintained, monitored, repaired and replaced by Tenant (i) in a commercially reasonable condition, (ii) in accordance with any applicable manufacturer specifications relating to any particular component of such Building Systems, (iii) in accordance with Applicable Laws. Tenant shall contract with qualified, experienced professional third-party service companies (a "**Service Contract**"), subject to Landlord's reasonable approval, for the maintenance of the Building Systems and the HVAC Systems. The Service Contract shall require that maintenance of the HVAC Systems is performed on a quarterly basis. Tenant shall regularly, in accordance with commercially reasonable standards, generate and maintain preventive maintenance records relating to each Building's mechanical and main electrical systems, including life safety ("**Preventative Maintenance Records**"). In addition, upon Landlord's request, Tenant shall deliver a copy of all current Service Contracts to Landlord and/or a copy of the Preventative Maintenance Records.

7.3    **Landlord's Right to Perform Tenant's Repair Obligations**. Tenant shall notify Landlord in writing at least thirty (30) days prior to performing any material Tenant's Repair Obligations, including without limitation, any Tenant's Repair Obligation which affect the Base Building (defined in Section 8.2, below) or which is reasonably anticipated to cost more than $100,000.00. Upon receipt of such notice from Tenant, Landlord shall have the right to either (i) perform such material Tenant's Repair Obligation by delivering notice of such election to Tenant within thirty (30) days following receipt of Tenant's notice, and Tenant shall pay Landlord the cost thereof (including Landlord's reasonable supervision fee) within thirty (30) days after receipt of an invoice therefor, or (ii) require Tenant to perform such Tenant's Repair Obligation at Tenant's sole cost and expense. If Tenant fails to perform any Tenant's Repair Obligation within a reasonable time period, as reasonably determined by Landlord, then Landlord may, but need not, following delivery of notice to Tenant of such election, make such Tenant Repair Obligation, and Tenant shall pay Landlord the cost thereof, (including Landlord's reasonable supervision fee) within thirty (30) days after receipt of an invoice therefor.

7.4    **Landlord Repair Obligations**. Landlord shall be responsible for repairs to and maintenance (the "**Landlord Repair Obligations**") of only the Building Structure (defined below), provided, if such damage is caused by an act or omission of Tenant or the Tenant Parties, then such repairs shall be at Tenant's sole expense. "**Building Structure**" shall mean (i) the structural components of the (a) exterior walls, and (b) Building foundation, and (ii) the structural portion of the roof (but excluding roof membrane and any skylights). Building Structure shall not include windows, glass, plate glass, doors or overhead doors, dock bumpers, dock plate or levelers, or office entries. Landlord shall not be required to make any repair resulting from (i) any alteration or modification to the Building or to mechanical equipment within the Building performed by, for or because of Tenant or to special equipment or systems installed by, for or because of Tenant, (ii) the installation, use or operation of Tenant's property, fixtures and equipment, (iii) the moving of Tenant's property in or out of the Building or in and about the Premises, (iv) Tenant's use or occupancy of the Premises in violation of Article 5 of this Lease or in the manner not contemplated by the parties at the time of the execution of this Lease, (v) the acts or omissions of Tenant or the Tenant Parties, (vi) fire and other casualty, except as provided by Article 11 of this Lease or (vii) condemnation, except as provided in Article 13 of this Lease. Landlord shall have no obligation to make repairs under this Section 7.4 until a reasonable time after receipt of written notice from Tenant of the need for such repairs. There shall be no abatement of Rent during the performance of such work. Landlord shall not be liable to Tenant for injury or damage that may result from any defect in the construction or condition of the Premises, nor for any damage that may result from interruption of Tenant's use of the Premises during any repairs by Landlord. Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code or under any similar law, statute, or ordinance now or hereafter in effect. The cost of such Landlord Repair Obligations shall be included in Operating Expenses.

## ARTICLE 8

## ADDITIONS AND ALTERATIONS

8.1    **Landlord's Consent to Alterations.**    Tenant may not make any improvements, alterations, additions or changes to the Premises or any mechanical, plumbing or HVAC Systems pertaining to the Premises (collectively, the "**Alterations**") without first procuring the prior written consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than thirty (30) days prior to the commencement thereof, and which consent shall not be unreasonably withheld by Landlord, provided it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which adversely affects the Base Building (or is visible from the exterior of the Building.  The construction of the Tenant Improvements and the Phase III Improvements shall be governed by the terms of the Tenant Work Letter and the Phase III Work Letter, as applicable, and not the terms of this Article 8.  For the purpose of this Article 8, Tenant hereby acknowledges and agrees that any Alteration that in any way affects the Methane System, the Building ventilation or the vapor or groundwater wells at the Project shall be deemed an Alteration that adversely affects the Base Building.

8.2    **Manner of Construction.**  Prior to the commencement of construction of any Alterations or repairs, Tenant shall submit to Landlord, for Landlord's review and approval in its reasonable discretion, four (4) copies signed by Tenant of all plans, specifications and working drawings relating thereto.  Tenant, at its sole cost and expense, shall retain an architect/space planner from a list provided by Landlord, to prepare such plans, specifications and working drawings; provided that, Tenant shall also retain the engineering consultants from a list provided by Landlord to prepare all plans and engineering working drawings, if any, relating to the structural, mechanical, electrical, plumbing, HVAC, lifesafety and sprinkler work of the Alterations.  Tenant shall be required to include in its contracts with the architect and the engineers a provision which requires ownership of all architectural and engineering drawings to be transferred to Tenant upon the substantial completion of the Alteration and Tenant hereby grants to Landlord a non-exclusive right to use such drawings, including, without limitation, a right to make copies thereof.  Tenant shall cause each architect/space planner and engineer retained by Tenant to follow Landlord's reasonable and non-discriminatory construction administration procedures and to utilize the standard specifications and details for the Building, all as promulgated by Landlord from time to time.  Tenant and Tenant's architect/space planner shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the "Base Building" plans, and Tenant and Tenant's architect/space planner shall be solely responsible for the same, and Landlord shall have no responsibility in connection therewith.  In addition, at Landlord's option, Landlord may submit Tenant's plans, specifications and working drawings to a third-party architect and/or engineer, selected by Landlord, for their review, at Tenant's sole cost and expense.  Landlord's review of plans, specifications and working drawings as set forth in this Section 8.2, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, compliance with applicable building codes or other like matters.    Accordingly, notwithstanding that any plans, specifications or working drawings are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the plans, specifications and working drawings for the Alterations, and Tenant's waiver and indemnity set forth in Section 10.1 of this Lease, below, shall specifically apply to the plans, specifications and working drawings for the Alterations.  Following Landlord's approval in its reasonable discretion of all plans, specifications and working drawings for the Alterations, a contractor to construct the Alterations shall be selected by Tenant from the list of contractors provided by Landlord.  If such Alterations will involve the use of or disturb hazardous materials or substances existing in the Premises, Tenant shall comply with Landlord's rules and regulations concerning such hazardous materials or substances.  Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county or municipal laws, rules and regulations and pursuant to a valid building permit, issued by the City of Long Beach, all in conformance with Landlord's construction rules and regulations.   In the event Tenant performs any Alterations in the Premises which require or give rise to governmentally required changes to the Base Building or any other portion of the Building or Project, then Landlord shall, at Tenant's expense, make such changes to the Base Building.  The "**Base Building**" shall include the Building Structure and the Building Systems.  In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Project or any portion thereof.  Tenant shall not use (and upon notice from Landlord shall cease using) contractors, services, workmen, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with the workforce or trades engaged in performing

other work, labor or services in or about the Building or the Common Areas. In addition to Tenant's obligations under Article 9 of this Lease, upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded in the office of the Recorder of the County of Los Angeles in accordance with Section 8182 of the Civil Code of the State of California or any successor statute, and Tenant shall deliver to the Project management office a reproducible copy of the "as built" drawings of the Alterations as well as all permits, approvals and other documents issued by any governmental agency in connection with the Alterations.

8.3    **Payment for Improvements.** If payment is made directly to contractors, Tenant shall comply with Landlord's requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors. Whether or not Tenant orders any work directly from Landlord, Tenant shall pay to Landlord a percentage of the cost of such work sufficient to compensate Landlord for all overhead, general conditions, fees and other costs and expenses arising from Landlord's involvement with such work.

8.4    **Construction Insurance.** In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant carries "**Builder's All Risk**" insurance in an amount approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to Article 10 of this Lease immediately upon completion thereof. In addition, Landlord may, in its discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee.

8.5    **Landlord's Property**. All Alterations, improvements, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises, from time to time, shall be at the sole cost of Tenant and shall be and become the property of Landlord, except that Tenant may remove any Alterations, improvements, fixtures and/or equipment which Tenant can substantiate to Landlord have not been paid for with any Tenant improvement allowance funds provided to Tenant by Landlord, provided Tenant repairs any damage to the Premises and Building caused by such removal and returns the affected portion of the Premises to a building standard tenant improved condition as determined by Landlord. Furthermore, Landlord may, by written notice to Tenant prior to the end of the Lease Term, or given following any earlier termination of this Lease, require Tenant, at Tenant's expense, to remove any Alterations or improvements, including any cabling, in the Premises, and to repair any damage to the Premises and Building caused by such removal and returns the affected portion of the Premises to the condition existing as of the Lease Commencement Date. If Tenant fails to complete such removal and/or to repair any damage caused by the removal of any Alterations or improvements in the Premises, and returns the affected portion of the Premises to a building standard tenant improved condition as determined by Landlord, then at Landlord's option, either (A) Tenant shall be deemed to be holding over in the Premises and Rent shall continue to accrue in accordance with the terms of Article 16, below, until such work shall be completed, or (B) Landlord may do so and may charge the cost thereof to Tenant. Tenant hereby protects, defends, indemnifies and holds Landlord harmless from any liability, cost, obligation, expense or claim of lien in any manner relating to the installation, placement, removal or financing of any such Alterations, improvements, fixtures and/or equipment in, on or about the Premises, which obligations of Tenant shall survive the expiration or earlier termination of this Lease. Notwithstanding any provision to the contrary set forth in this Lease, in no evet shall Tenant be obligated to remove the Tenant Improvements upon the expiration or earlier termination of this Lease.

## ARTICLE 9

## COVENANT AGAINST LIENS

Tenant shall keep the Project and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall give Landlord notice at least thirty (30) days prior to the commencement of any such work on the Premises (or such additional time as may be necessary under Applicable Laws) to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within five (5) days after notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such

lien or encumbrance, without being responsible for investigating the validity thereof.  The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease.  Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Building or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract.  Any claim to a lien or encumbrance upon the Building or Premises arising in connection with any such work or respecting the Premises not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Project, Building and Premises.

## ARTICLE 10

### INDEMNIFICATION; INSURANCE

10.1    **Indemnification and Waiver.**  Except to the extent caused by Landlord's negligence or willful misconduct, Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, directors, members, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**" and each, a "**Landlord Party**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant.  Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from any cause in, on or about the Premises, any violation of any of the requirements, ordinances, statutes, regulations or other laws, including, without limitation, any Environmental Laws, any acts, omissions or negligence of Tenant or of any person claiming by, through or under Tenant, or of the officers, directors, members, contractors, agents, servants, employees, invitees, guests or licensees of Tenant or any such person (collectively, "**Tenant Parties**" and each, a "**Tenant Party**"), in, on or about the Project or any breach of the terms of this Lease, either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the negligence or willful misconduct of Landlord.  Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including without limitation, its actual professional fees such as appraisers', accountants' and attorneys' fees.  Further, Tenant's agreement to indemnify Landlord pursuant to this Section 10.1 is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease, to the extent such policies cover the matters subject to Tenant's indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease.  The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

10.2    **Tenant's Compliance With Landlord's Fire and Casualty Insurance.**  Tenant shall, at Tenant's expense, comply with all insurance company requirements pertaining to the use of the Premises.  If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies then Tenant shall reimburse Landlord for any such increase. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

10.3    **Tenant's Insurance.**  Tenant shall maintain the following coverages in the following amounts.

10.3.1    Commercial General Liability Insurance covering the insured against claims of bodily injury, personal injury and property damage (including loss of use thereof) arising out of Tenant's operations, and contractual liabilities (covering the performance by Tenant of its indemnity agreements) including a Broad Form endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in Section 10.1 of this Lease, for limits of liability not less than:

| | |
|---|---|
| Bodily Injury and | $10,000,000 each occurrence |
| Property Damage Liability | $10,000,000 annual aggregate |

| Personal Injury Liability | $10,000,000 each occurrence |
| | $10,000,000 annual aggregate |
| | 0% Insured's participation |

       10.3.2    Physical Damage Insurance covering (i) all business and trade fixtures, industrial and manufacturing equipment, storage and distribution equipment and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, (ii) the "Tenant Improvements," as that term is defined in Section 2.1 of the Tenant Work Letter, the Phase III Tenant Improvements, as that term is defined in Section 2 of the Phase III Work Letter, and any other improvements which exist in the Premises as of the Lease Commencement Date (excluding the Base Building) (the "**Original Improvements**"), and (iii) all other improvements, alterations and additions to the Premises.  Such insurance shall be written on an "all risks" of physical loss or damage basis, for the full replacement cost value (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include coverage for damage or other loss caused by fire or other peril including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

       10.3.3    Worker's Compensation and Employer's Liability or other similar insurance pursuant to all applicable state and local statutes and regulations.

       10.4    **Form of Policies**.  The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease.  Such insurance shall (i) name Landlord, Landlord's lender, and any other party the Landlord so specifies, as an additional insured, including Landlord's managing agent, if any; (ii) specifically cover the liability assumed by Tenant under this Lease, including, but not limited to, Tenant's obligations under Section 10.1 of this Lease; (iii) be issued by an insurance company having a rating of not less than A-X in Best's Insurance Guide or which is otherwise acceptable to Landlord and licensed to do business in the State of California; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is non-contributing with any insurance requirement of Tenant; (v) be in form and content reasonably acceptable to Landlord; and (vi) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord.  Tenant shall deliver said policy or policies or certificates thereof to Landlord on or before the Lease Commencement Date and at least thirty (30) days before the expiration dates thereof.  In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate, Landlord may, at its option, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord within five (5) days after delivery to Tenant of bills therefor.

       10.5    **Subrogation.**  Landlord and Tenant intend that their respective property loss risks shall be borne by reasonable insurance carriers to the extent above provided, and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder.  The parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers, provided such waiver of subrogation shall not affect the right to the insured to recover thereunder.  The parties agree that their respective insurance policies are now, or shall be, endorsed such that the waiver of subrogation shall not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

       10.6    **Additional Insurance Obligations.**  Tenant shall carry and maintain during the entire Lease Term, at Tenant's sole cost and expense, increased amounts of the insurance required to be carried by Tenant pursuant to this Article 10 and such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord.

## ARTICLE 11

## DAMAGE AND DESTRUCTION

11.1    **Repair of Damage to Premises by Landlord.**  Tenant shall promptly notify Landlord of any damage to the Premises resulting from fire or any other casualty.  If the Premises or any Common Areas serving or providing access to the Premises shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the Base Building and such Common Areas.  Such restoration shall be to substantially the same condition of the Base Building and the Common Areas prior to the casualty, except for modifications required by zoning and building codes and other laws or by the holder of a mortgage on the Building or Project or any other modifications to the Common Areas deemed desirable by Landlord, provided that access to the Premises and any common restrooms serving the Premises shall not be materially impaired.  Upon the occurrence of any damage to the Premises, upon notice (the "**Landlord Repair Notice**") to Tenant from Landlord, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 of this Lease, and Landlord shall repair any injury or damage to the Base Building and Original Improvements.  Tenant shall be solely responsible for repairing any damage to the Tenant Improvements and shall return such Tenant Improvements to their original condition; provided that if the cost of such repair of the Base Building and Original Improvements as reasonably estimated by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier pertaining to such items, as assigned by Tenant, the cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's commencement of repair of the damage.  In the event that Landlord does not deliver the Landlord Repair Notice within sixty (60) days following the date the casualty becomes known to Landlord, Tenant shall, at its sole cost and expense, repair any injury or damage to the Tenant Improvements and the Original Improvements installed in the Premises and shall return such Tenant Improvements and Original Improvements to their original condition.  Whether or not Landlord delivers a Landlord Repair Notice, prior to the commencement of construction, Tenant shall submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto, and Landlord shall select the contractors to perform such improvement work.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or Common Areas necessary to Tenant's occupancy, Landlord shall allow Tenant a proportionate abatement of Rent to the extent Landlord is reimbursed from the proceeds of any rental interruption insurance purchased by Landlord as part of Operating Expenses, during the time and to the extent the Premises are unfit for occupancy for the purposes permitted under this Lease, and not occupied by Tenant as a result thereof; provided, further, however, that if the damage or destruction is due to the negligence or willful misconduct of Tenant or any of its agents, employees, contractors, invitees or guests, Tenant shall be responsible for any reasonable, applicable insurance deductible (which shall be payable to Landlord upon demand) and there shall be no rent abatement.  In the event that Landlord shall not deliver the Landlord Repair Notice, Tenant's right to rent abatement pursuant to the preceding sentence shall terminate as of the date which is reasonably determined by Landlord to be the date Tenant should have completed repairs to the Premises assuming Tenant used reasonable due diligence in connection therewith.

11.2    **Landlord's Option to Repair**.  Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises, Building and/or Project, and instead terminate this Lease, by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of the damage, such notice to include a termination date giving Tenant sixty (60) days to vacate the Premises, but Landlord may so elect only if the Building or Project shall be damaged by fire or other casualty or cause, whether or not the Premises are affected, and one or more of the following conditions is present: (i) in Landlord's reasonable judgment, repairs cannot reasonably be completed within ninety (90) days after the date of discovery of the damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building or Project or ground lessor with respect to the Building or Project shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt, or shall terminate the ground lease, as the case may be; (iii) the damage is not fully covered by Landlord's insurance policies; or (iv) Landlord decides to rebuild the Building or Common Areas so that they will be substantially different structurally or architecturally; or (v) the damage occurs during the last twelve (12) months of the Lease Term.

11.3    **Waiver of Statutory Provisions.**  The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or the Project, and any statute or regulation of the State of California, including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code, with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute

or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or the Project.

**ARTICLE 12**

**NONWAIVER**

No provision of this Lease shall be deemed waived by either party hereto unless expressly waived in a writing signed thereby. The waiver by either party hereto of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No acceptance of a lesser amount than the Rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder, or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

**ARTICLE 13**

**CONDEMNATION**

If the whole or any part of the Premises, Building or Project shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises, Building or Project, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. If more than twenty-five percent (25%) of the rentable square feet of the Premises is taken, or if access to the Premises is substantially impaired, in each case for a period in excess of one hundred eighty (180) days, Tenant shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, so long as such claims do not diminish the award available to Landlord, its ground lessor with respect to the Building or Project or its mortgagee, and such claim is payable separately to Tenant. All Rent shall be apportioned as of the date of such termination. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated. Tenant hereby waives any and all rights it might otherwise have pursuant to Section 1265.130 of the California Code of Civil Procedure. Notwithstanding anything to the contrary contained in this Article 13, in the event of a temporary taking of all or any portion of the Premises for a period of one hundred and eighty (180) days or less, then this Lease shall not terminate but the Base Rent and the Additional Rent shall be abated for the period of such taking in proportion to the ratio that the amount of rentable square feet of the Premises taken bears to the total rentable square feet of the Premises. Landlord shall be entitled to receive the entire award made in connection with any such temporary taking.

**ARTICLE 14**

**ASSIGNMENT AND SUBLETTING**

14.1  **Transfers.**  Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers**" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**").  If Tenant desires Landlord's consent to any Transfer, Tenant shall notify Landlord in writing, which notice (the "**Transfer Notice**") shall include (i) the proposed effective date of the Transfer, which shall not be less than thirty (30) days nor more than one hundred eighty (180) days after the date of delivery of the Transfer Notice, (ii) a description of the portion of the Premises to be transferred (the "**Subject Space**"), (iii) all of the terms of the proposed Transfer and the consideration therefor, including calculation of the Transfer Premium, as that term is defined in Section 14.3 below, in connection with such Transfer, the name and address of the proposed Transferee, and a draft copy of all documentation effectuating the proposed Transfer, including all operative documents to evidence such Transfer and all agreements incidental or related to such Transfer, provided that Landlord shall have the right to require Tenant to utilize Landlord's standard Transfer documents in connection with the documentation of such Transfer, (iv) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof, business credit and personal references and history of the proposed Transferee and any other information required by Landlord which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space and (v) an executed estoppel certificate from Tenant in the form attached hereto as **Exhibit D**.  Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease.  Whether or not Landlord consents to any proposed Transfer, Tenant shall pay Landlord's review and processing fees, as well as any reasonable professional fees (including, without limitation, attorneys', accountants', architects', engineers' and consultants' fees) incurred by Landlord within thirty (30) days after written request by Landlord.

14.2  **Landlord's Consent.**  Landlord shall have the right to withhold its consent to a proposed Transfer in its sole and absolute discretion.  If Landlord consents to any Transfer pursuant to the terms of this Section 14.2 (and does not exercise any recapture rights Landlord may have under Section 14.4 of this Lease), Tenant may within six (6) months after Landlord's consent, but not later than the expiration of said six-month period, enter into such Transfer of the Premises or portion thereof, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 14.1 of this Lease, provided that if there are any changes in the terms and conditions from those specified in the Transfer Notice (i) such that Landlord would initially have been entitled to refuse its consent to such Transfer under this Section 14.2, or (ii) which would cause the proposed Transfer to be more favorable to the Transferee than the terms set forth in Tenant's original Transfer Notice, Tenant shall again submit the Transfer to Landlord for its approval and other action under this Article 14 (including Landlord's right of recapture, if any, under Section 14.4 of this Lease).  Notwithstanding anything to the contrary in this Lease, if Tenant or any proposed Transferee claims that Landlord has breached this Article 14, their sole remedies shall be a declaratory judgment and an injunction for the relief sought without any monetary damages, and Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under Applicable Laws, on behalf of the proposed Transferee.  Tenant shall indemnify, defend and hold harmless Landlord from any and all liability, losses, claims, damages, costs, expenses, causes of action and proceedings involving any third party or parties (including without limitation Tenant's proposed subtenant or assignee) who claim they were damaged by Landlord's wrongful withholding or conditioning of Landlord's consent.

14.3  **Transfer Premium.**  If Landlord consents to a Transfer, Tenant be entitled to fifty percent (50%) of any Transfer Premium (as that term is defined below), received by Tenant from such Transferee in any particular calendar month.  "**Transfer Premium**" shall mean all rent, additional rent or other consideration payable by such Transferee in connection with the Transfer in excess of the Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer on a per rentable square foot basis if less than all of the Premises is transferred. "Transfer Premium" shall also include, but not be limited to, key money, bonus money or other cash consideration paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer.

14.4    **Effect of Transfer.**  If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space.  Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof.  If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than two percent (2%), Tenant shall pay Landlord's costs of such audit.

14.5    **Additional Transfers.**  For purposes of this Lease, the term "**Transfer**" shall also include (i) if Tenant is a partnership or limited liability company, the withdrawal or change, voluntary, involuntary or by operation of law, of twenty-five percent (25%) or more of the partners or members, or transfer of twenty-five percent (25%) or more of partnership or membership interests, within a twelve (12)-month period, or the dissolution of the partnership or limited liability company without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (*i.e.*, whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant or (B) the sale or other transfer of an aggregate of twenty-five percent (25%) or more of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of an aggregate of twenty-five percent (25%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period.

14.6    **Occurrence of Default.**  Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to: (i) treat such Transfer as cancelled and repossess the Subject Space by any lawful means, or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer.  If Tenant shall be in default under this Lease, Landlord is hereby irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured.  Such Transferee shall rely on any representation by Landlord that Tenant is in default hereunder, without any need for confirmation thereof by Tenant.  Upon any assignment, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease.  No collection or acceptance of rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Article 14 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing.  In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person.  If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

14.7    **Deemed Consent Transfers.**  Notwithstanding anything to the contrary contained in this Lease, an assignment or subletting of all or a portion of the Premises to an affiliate of Tenant (an entity which is controlled by, controls, or is under common control with, Tenant as of the date of this Lease) shall be subject to Landlord's reasonable consent (any such assignee or sublessee shall be referred to as a "**Permitted Transferee**"), provided that (i) Tenant notifies Landlord at least thirty (30) days prior to the effective date of any such assignment or sublease and promptly supplies Landlord with any documents or information reasonably requested by Landlord regarding such transfer or transferee as set forth above, (ii) Tenant is not in default, beyond any applicable notice and cure period, and such assignment or sublease is not a subterfuge by Tenant to avoid its obligations under this Lease, (iii) such Permitted Transferee shall have a tangible net worth (not including goodwill as an asset) computed in accordance with generally accepted accounting principles ("**Net Worth**") at least equal to the greater of (1) the Net Worth of Original Tenant on the date of this Lease, and (2) the Net Worth of Tenant on the day immediately preceding the effective date of such assignment or sublease, and (v) no assignment relating to this Lease, whether with or without Landlord's consent, shall relieve Tenant from any liability under this Lease, and, in the event of an assignment of Tenant's entire interest in this Lease, the liability of Tenant and such transferee shall be joint and several.  An assignee of Tenant's entire interest in

this Lease who qualifies as a Permitted Transferee may also be referred to herein as a "**Permitted Transferee Assignee**." "Control," as used in this Section 14.7, shall mean the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, of at least fifty-one percent (51%) of the voting interest in, any person or entity.  If any parent, affiliate or subsidiary of Tenant to which this Lease is assigned or the Premises sublet (in whole or in part) shall cease to be such a parent, affiliate or subsidiary, such cessation shall be considered an assignment or subletting requiring Landlord's consent.

## ARTICLE 15

## SURRENDER OF PREMISES; OWNERSHIP AND REMOVAL OF TRADE FIXTURES

15.1     **Surrender of Premises.**  No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in writing by Landlord.  The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated.  The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such sublessees or subtenancies.

15.2     **Removal of Tenant Property by Tenant.**  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear, and repairs which are specifically made the responsibility of Landlord hereunder excepted.  Upon such expiration or termination, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all improvements made to the Premises unless Landlord specifically agrees in writing that such improvements shall not be removed, all debris and rubbish, and such items of furniture, equipment, business and trade fixtures and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal.  If Tenant fails to surrender possession of the Premises to Landlord in the above-prescribed condition, Landlord shall be entitled to cause the Premises to comply with the requirements of this Section 15.2 and deduct any costs thereof from Tenant's Security Deposit.  In the event the costs of such restoration exceed the Security Deposit or remaining balance thereof at the expiration or termination of the Lease, Tenant shall pay to Landlord all such additional costs within ten (10) days of Landlord's written demand.  Notwithstanding any provision to the contrary set forth in this Lease, in no evet shall Tenant be obligated to remove the Tenant Improvements upon the expiration or earlier termination of this Lease.

15.3     **Condition of the Building and Premises Upon Surrender**.  In addition to the above requirements of this Article 15, upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall surrender the Premises and Building such that the same are in compliance with all Applicable Laws and with Tenant having complied with all of Tenant's obligations under this Lease, including those relating to improvement, repair, maintenance, compliance with law, testing and other related obligations of Tenant set forth in Article 7 of this Lease.  In the event that the Building and Premises shall be surrendered in a condition which does not comply with the terms of this Section 15.3, because Tenant failed to comply with its obligations set forth in this Lease, then following thirty (30) days after notice to Tenant, during which thirty (30) day period Tenant shall have the right to cure such noncompliance, Landlord shall be entitled to expend all reasonable costs in order to cause the same to comply with the required condition upon surrender and Tenant shall immediately reimburse Landlord for all such costs upon notice and Tenant shall be deemed during the period that Tenant or Landlord, as the case may be, perform obligations relating to the Surrender Improvements to be in holdover under Article 16 of this Lease.

## ARTICLE 16

## HOLDING OVER

Tenant shall not have the right to hold over in the Premises after the expiration of the Lease Term or earlier termination thereof. If Tenants holds over after the expiration of the Lease Term or earlier termination thereof, such tenancy shall be a tenancy at sufferance, and shall not constitute a renewal hereof or an extension for any further term, and in such case, Rent shall be payable at a monthly rate equal to the product of 200% of the Rent applicable during the last rental period of the Lease Term under this Lease. For purposes of this Article 16, a holding over shall include (i) Tenant's remaining in the Premises after the expiration or earlier termination of the Lease Term, and/or (ii) as required pursuant to the terms of Section 8.5 of this Lease, Tenant's failure to remove any Alterations located within the Premises and return the affected portion of the Premises to a Building standard tenant improved condition. Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease. If Tenant holds over without Landlord's express written consent, and tenders payment of rent for any period beyond the expiration of the Lease Term by way of check (whether directly to Landlord, its agents, or to a lock box) or wire transfer, Tenant acknowledges and agrees that the cashing of such check or acceptance of such wire shall be considered inadvertent and not be construed as creating a month-to-month tenancy, provided Landlord refunds such payment to Tenant promptly upon learning that such check has been cashed or wire transfer received. The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any lost profits to Landlord resulting therefrom. Tenant agrees that any proceedings necessary to recover possession of the Premises, whether before or after expiration of the Lease Term, shall be considered an action to enforce the terms of this Lease for purposes of the awarding of any attorney's fees in connection therewith.

## ARTICLE 17

## ESTOPPEL CERTIFICATES

Within ten (10) days following a request in writing by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an estoppel certificate, which, as submitted by Landlord, shall be substantially in the form of **Exhibit D**, attached hereto (or such other form as may be required by any prospective mortgagee or purchaser of the Project, or any portion thereof), indicating therein any exceptions thereto that may exist at that time, and shall also contain any other information reasonably requested by Landlord or Landlord's mortgagee or prospective mortgagee. Any such certificate may be relied upon by any prospective mortgagee or purchaser of all or any portion of the Project. Tenant shall execute and deliver whatever other instruments may be reasonably required for such purposes. At any time during the Lease Term, Landlord may require Tenant to provide Landlord with a current financial statement and financial statements of the two (2) years prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. Failure of Tenant to timely execute, acknowledge and deliver such estoppel certificate or other instruments shall constitute an acceptance of the Premises and an acknowledgment by Tenant that statements included in the estoppel certificate are true and correct, without exception.

## ARTICLE 18

## SUBORDINATION

18.1    **In General**. This Lease shall be subject and subordinate to all present and future ground or underlying leases of the Building or Project and to the lien of any mortgage, trust deed or other encumbrances now or hereafter in force against the Building or Project or any part thereof, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages, trust deeds or other encumbrances, or

the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or deed in lieu thereof (or if any ground lease is terminated), to attorn, without any deductions or set-offs whatsoever, to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the ground lessor), if so requested to do so by such purchaser or lienholder or ground lessor, and to recognize such purchaser or lienholder or ground lessor as the lessor under this Lease, provided such lienholder or purchaser or ground lessor shall agree to accept this Lease and not disturb Tenant's occupancy, so long as Tenant timely pays the rent and observes and performs the terms, covenants and conditions of this Lease to be observed and performed by Tenant. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant shall, within five (5) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases or underlying leases. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

       18.2    **SNDA from Current Lender**. Landlord hereby agrees that, following the full execution and unconditional delivery of this Lease by Landlord and Tenant, Landlord shall use commercially reasonable efforts to cause Landlord's lender that holds a first mortgage or first deed of trust with respect to the Building to execute a subordination, nondisturbance and attornment agreement in favor of Tenant on such lender's standard form (provided that failure to obtain any such agreement shall not be a default by Landlord).

**ARTICLE 19**

**DEFAULTS; REMEDIES**

       19.1    **Events of Default.** The occurrence of any of the following shall constitute a default of this Lease by Tenant:

       19.1.1    Any failure by Tenant to pay any (i) Base Rent within five (5) days of the date such payment is due, or (ii) any Additional Rent or any other charge required to be paid under this Lease, or any part thereof, when due unless such failure is cured within three (3) days after notice; or

       19.1.2    Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be a default by Tenant under this Section 19.1.2, any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for ten (10) days after written notice thereof from Landlord to Tenant; provided that if the nature of such default is such that the same cannot reasonably be cured within a ten (10) day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default, but in no event exceeding a period of time in excess of thirty (30) days after written notice thereof from Landlord to Tenant; or

       19.1.3    To the extent permitted by law, a general assignment by Tenant or any guarantor of this Lease for the benefit of creditors, or the taking of any corporate action in furtherance of bankruptcy or dissolution whether or not there exists any proceeding under an insolvency or bankruptcy law, or the filing by or against Tenant or any guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of an involuntary proceeding filed against Tenant or any guarantor the same is dismissed within sixty (60) days, or the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any guarantor, unless possession is restored to Tenant or such guarantor within thirty (30) days, or any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within thirty (30) days; or

       19.1.4    Abandonment or vacation of all or a substantial portion of the Premises by Tenant; or

       19.1.5    The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease where such failure continues for more than two (2) business days after notice from Landlord; or

19.1.6    Tenant's failure to occupy the Premises within ten (10) business days after the Lease Commencement Date.

The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by law.

19.2    **Remedies Upon Default.**    Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

19.2.1.1    The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

19.2.1.2    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

19.2.1.3    The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

19.2.1.4    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

19.2.1.5    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by Applicable Laws.

The term "**rent**" as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 19.2.1.1 and 19.2.1.2, above, the "worth at the time of award" shall be computed by allowing interest at the rate set forth in Article 25 of this Lease, but in no case greater than the maximum amount of such interest permitted by law. As used in Paragraph 19.2.1.3 above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

19.2.2    Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any law or other provision of this Lease), without prior demand or notice except as required by Applicable Laws, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3     **Subleases of Tenant**.  Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Article 19, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements.  In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

19.4     **Form of Payment After Default.**  Following the occurrence of an event of default by Tenant, Landlord shall have the right to require that any or all subsequent amounts paid by Tenant to Landlord hereunder, whether to cure the default in question or otherwise, be paid in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, or by other means approved by Landlord, notwithstanding any prior practice of accepting payments in any different form.

19.5     **Landlord Actions.**  No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant.  Tenant hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease.

19.6     **Landlord Default**.  Notwithstanding anything to the contrary set forth in this Lease, Landlord shall not be in default in the performance of any obligation required to be performed by Landlord pursuant to this Lease unless Landlord fails to perform such obligation within thirty (30) days after the receipt of notice from Tenant specifying in detail Landlord's failure to perform; provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be in default under this Lease if it shall commence such performance within such thirty (30) day period and thereafter diligently pursue the same to completion.  Upon any such default by Landlord under this Lease, Tenant may, except as otherwise specifically provided in this Lease to the contrary, exercise any of its rights provided at law or in equity.

## ARTICLE 20

## COVENANT OF QUIET ENJOYMENT

Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other terms, covenants, conditions, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the terms, covenants, conditions, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord.  The foregoing covenant is in lieu of any other covenant express or implied.

## ARTICLE 21

## LETTER OF CREDIT

21.1     **Delivery of Letter of Credit**.  Tenant shall deliver to Landlord, concurrently with Tenant's execution of this Lease, an unconditional, clean, irrevocable letter of credit (the "**L-C**") in the Letter of Credit amount set forth in Section 7 of the Summary (the "**L-C Amount**"), which L-C shall be issued by a money-center, solvent and nationally recognized bank (a bank which accepts deposits, maintains accounts, has a Long Beach, California office which will negotiate a letter of credit, and whose deposits are insured by the FDIC) reasonably acceptable to Landlord (such approved, issuing bank being referred to herein as the "**Bank**"), which Bank must have a short term Fitch Rating which is not less than "F1", and a long term Fitch Rating which is not less than "A"(or in the event such Fitch Ratings are no longer available, a comparable rating from Standard and Poor's Professional Rating Service or Moody's Professional Rating Service) (collectively, the "**Bank's Credit Rating Threshold**"), and which L-C shall be in the form of **Exhibit E**, attached hereto.  Tenant shall pay all expenses, points and/or fees incurred by Tenant in obtaining the L-C.  The L-C shall (i) be "callable" at sight, irrevocable and unconditional, (ii) be maintained in effect, whether

through renewal or extension, for the period commencing on the date of this Lease and continuing until the date (the "**L-C Expiration Date**") that is no less than one hundred twenty (120) days after the expiration of the Term, and Tenant shall deliver a new L-C or certificate of renewal or extension to Landlord at least sixty (60) days prior to the expiration of the L-C then held by Landlord, without any action whatsoever on the part of Landlord, (iii) be fully assignable by Landlord, its successors and assigns, (iv) permit partial draws and multiple presentations and drawings, and (v) be otherwise subject to the International Standby Practices-ISP 98, International Chamber of Commerce Publication #590. Landlord, or its then managing agent, shall have the right to draw down an amount up to the face amount of the L-C if any of the following shall have occurred or be applicable: (A) such amount is due to Landlord under the terms and conditions of this Lease, or (B) Tenant has filed a voluntary petition under the U. S. Bankruptcy Code or any state bankruptcy code (collectively, "**Bankruptcy Code**"), or (C) an involuntary petition has been filed against Tenant under the Bankruptcy Code, or (D) the Lease has been rejected, or is deemed rejected, under Section 365 of the U.S. Bankruptcy Code, following the filing of a voluntary petition by Tenant under the Bankruptcy Code, or the filing of an involuntary petition against Tenant under the Bankruptcy Code, or (E) the Bank has notified Landlord that the L-C will not be renewed or extended through the L-C Expiration Date, or (F) Tenant is placed into receivership or conservatorship, or becomes subject to similar proceedings under Federal or State Laws, or (G) Tenant executes an assignment for the benefit of creditors, or (H) if (1) any of the Bank's Fitch Ratings (or other comparable ratings to the extent the Fitch Ratings are no longer available) have been reduced below the Bank's Credit Rating Threshold, or (2) there is otherwise a material adverse change in the financial condition of the Bank, and Tenant has failed to provide Landlord with a replacement letter of credit, conforming in all respects to the requirements of this Article 21 (including, but not limited to, the requirements placed on the issuing Bank more particularly set forth in this Section 21.1 above), in the amount of the applicable L-C Amount, within ten (10) days following Landlord's written demand therefor (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary) (each of the foregoing being an "**L-C Draw Event**"). The L-C shall be honored by the Bank regardless of whether Tenant disputes Landlord's right to draw upon the L-C. In addition, in the event the Bank is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation or any successor or similar entity, then, effective as of the date such receivership or conservatorship occurs, said L-C shall be deemed to fail to meet the requirements of this Article 21, and, within ten (10) days following Landlord's notice to Tenant of such receivership or conservatorship (the "**L-C FDIC Replacement Notice**"), Tenant shall replace such L-C with a substitute letter of credit from a different issuer (which issuer shall meet or exceed the Bank's Credit Rating Threshold and shall otherwise be acceptable to Landlord in its reasonable discretion) and that complies in all respects with the requirements of this Article 21. If Tenant fails to replace such L-C with such conforming, substitute letter of credit pursuant to the terms and conditions of this Section 21.1, then, notwithstanding anything in this Lease to the contrary, Landlord shall have the right to declare Tenant to have committed a default under this Lease for which there shall be no notice or grace or cure periods being applicable thereto (other than the aforesaid ten (10) day period). Tenant shall be responsible for the payment of any and all costs incurred with the review of any replacement L-C (including, without limitation, Landlord's reasonable attorneys' fees), which replacement is required pursuant to this Section or is otherwise requested by Tenant. In the event of an assignment by Tenant of its interest in this Lease (and irrespective of whether Landlord's consent is required for such assignment), the acceptance of any replacement or substitute letter of credit by Landlord from the assignee shall be subject to Landlord's prior written approval, in Landlord's sole and absolute discretion, and the attorney's fees incurred by Landlord in connection with such determination shall be payable by Tenant to Landlord within ten (10) days of billing.

21.2    **Application of L-C**. Tenant hereby acknowledges and agrees that Landlord is entering into this Lease in material reliance upon the ability of Landlord to draw upon the L-C upon the occurrence of any L-C Draw Event. In the event of any L-C Draw Event, Landlord may, but without obligation to do so, and without notice to Tenant (except in connection with an L-C Draw Event under Section 21.1(H) above), draw upon the L-C, in part or in whole, to cure any such L-C Draw Event and/or to compensate Landlord for any and all damages of any kind or nature sustained or which Landlord reasonably estimates that it will sustain resulting from Tenant's breach of this Lease or a default under this Lease or other L-C Draw Event and/or to compensate Landlord for any and all damages arising out of, or incurred in connection with, the termination of this Lease, including, without limitation, those specifically identified in Section 1951.2 of the California Civil Code. The use, application or retention of the L-C, or any portion thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by any applicable Laws, it being intended that Landlord shall not first be required to proceed against the L-C, and such L-C shall not operate as a limitation on any recovery to which Landlord may otherwise be entitled. Tenant agrees not to interfere in any way with payment to Landlord of the proceeds of the L-C, either prior to or following a "draw" by Landlord of any portion of the L-C, regardless of whether any dispute exists between Tenant

and Landlord as to Landlord's right to draw upon the L-C. No condition or term of this Lease shall be deemed to render the L-C conditional to justify the issuer of the L-C in failing to honor a drawing upon such L-C in a timely manner. Tenant agrees and acknowledges that (i) the L-C constitutes a separate and independent contract between Landlord and the Bank, (ii) Tenant is not a third party beneficiary of such contract, (iii) Tenant has no property interest whatsoever in the L-C or the proceeds thereof, and (iv) in the event Tenant becomes a debtor under any chapter of the Bankruptcy Code, Tenant is placed into receivership or conservatorship, and/or there is an event of a receivership, conservatorship or a bankruptcy filing by, or on behalf of, Tenant, neither Tenant, any trustee, nor Tenant's bankruptcy estate shall have any right to restrict or limit Landlord's claim and/or rights to the L-C and/or the proceeds thereof by application of Section 502(b)(6) of the U. S. Bankruptcy Code or otherwise.

21.3     **L-C Amount; Maintenance of L-C by Tenant; Liquidated Damages**.

21.3.1     **In General**. If, as a result of any drawing by Landlord of all or any portion of the L-C, the amount of the L-C shall be less than the L-C Amount, Tenant shall, within five (5) days thereafter, provide Landlord with additional letter(s) of credit in an amount equal to the deficiency, and any such additional letter(s) of credit shall comply with all of the provisions of this Article 21, and if Tenant fails to comply with the foregoing, the same shall be subject to the terms of Section 21.3.2 below. Tenant further covenants and warrants that it will neither assign nor encumber the L-C or any part thereof and that neither Landlord nor its successors or assigns will be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. Without limiting the generality of the foregoing, if the L-C expires earlier than the L-C Expiration Date, Landlord will accept a renewal thereof (such renewal letter of credit to be in effect and delivered to Landlord, as applicable, not later than sixty (60) days prior to the expiration of the L-C), which shall be irrevocable and automatically renewable as above provided through the L-C Expiration Date upon the same terms as the expiring L-C or such other terms as may be acceptable to Landlord in its sole discretion. However, if the L-C is not timely renewed, or if Tenant fails to maintain the L-C in the amount and in accordance with the terms set forth in this Article 21, Landlord shall have the right to either (x) present the L-C to the Bank in accordance with the terms of this Article 21, and the proceeds of the L-C may be applied by Landlord against any Rent payable by Tenant under this Lease that is not paid when due and/or to pay for all losses and damages that Landlord has suffered or that Landlord reasonably estimates that it will suffer as a result of any breach or any default under this Lease, or (y) pursue its remedy under Section 21.3.2 below. In the event Landlord elects to exercise its rights under the foregoing item (x), (I) any unused proceeds shall constitute the property of Landlord (and not Tenant's property or, in the event of a receivership, conservatorship, or a bankruptcy filing by, or on behalf of, Tenant, property of such receivership, conservatorship or Tenant's bankruptcy estate) and need not be segregated from Landlord's other assets, and (II) Landlord agrees to pay to Tenant within thirty (30) days after the L-C Expiration Date the amount of any proceeds of the L-C received by Landlord and not applied against any Rent payable by Tenant under this Lease that was not paid when due or used to pay for any losses and/or damages suffered by Landlord (or reasonably estimated by Landlord that it will suffer) as a result of any breach or any default under this Lease; provided, however, that if prior to the L-C Expiration Date a voluntary petition is filed by Tenant, or an involuntary petition is filed against Tenant by any of Tenant's creditors, under the Bankruptcy Code, then Landlord shall not be obligated to make such payment in the amount of the unused L-C proceeds until either all preference issues relating to payments under this Lease have been resolved in such bankruptcy or reorganization case or such bankruptcy or reorganization case has been dismissed.

21.3.2     **FAILURE TO MAINTAIN; REPLACE AND/OR REINSTATE L-C; LIQUIDATED DAMAGES**. IN THE EVENT THAT TENANT FAILS, WITHIN (I) THAT PERIOD SET FORTH IN SECTION 21.3.1 ABOVE, OR (II) THAT PERIOD SET FORTH IN THE L-C FDIC REPLACEMENT NOTICE, TO PROVIDE LANDLORD WITH ADDITIONAL L-C(S) IN AN AMOUNT EQUAL TO THE DEFICIENCY OR A REPLACEMENT L-C (AS APPLICABLE), THEN TENANT'S MONTHLY INSTALLMENT OF BASE RENT SHALL BE INCREASED BY ONE HUNDRED FIFTY PERCENT (150%) OF ITS THEN EXISTING LEVEL DURING THE PERIOD COMMENCING ON THE DATE WHICH IS THE LAST DAY OF THE PERIOD IDENTIFIED IN SECTION 21.3.1 OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE), AND ENDING ON THE EARLIER TO OCCUR OF (X) THE DATE TENANT PROVIDES LANDLORD WITH ADDITIONAL L-C(S) IN AN AMOUNT EQUAL TO THE DEFICIENCY AS CONTEMPLATED BY THE TERMS OF SECTION 21.3.1 ABOVE, OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE), OR (Y) THE DATE WHICH IS NINETY (90) DAYS AFTER THE LAST DAY OF THE PERIOD IDENTIFIED IN SECTION 21.3.1 OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE). IN THE EVENT THAT TENANT FAILS, DURING SUCH NINETY (90) DAY PERIOD FOLLOWING THE LAST DAY OF THE

PERIOD IDENTIFIED IN SECTION 21.3.1 OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE), TO PROVIDE LANDLORD WITH ADDITIONAL L-C(S) IN AN AMOUNT EQUAL TO THE DEFICIENCY OR A REPLACEMENT L-C (AS APPLICABLE), THEN TENANT'S MONTHLY INSTALLMENT OF BASE RENT SHALL BE INCREASED BY TWO HUNDRED PERCENT (200%) OF ITS THEN EXISTING LEVEL DURING THE PERIOD COMMENCING ON THE DATE WHICH IS NINETY (90) DAYS AFTER THE LAST DAY OF THE PERIOD IDENTIFIED IN SECTION 21.3.1 OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE) AND ENDING ON THE DATE SUCH ADDITIONAL L-C(S) ARE ISSUED IN AN AMOUNT EQUAL TO THE DEFICIENCY OR SUCH A REPLACEMENT L-C IS ISSUED (AS APPLICABLE) PURSUANT TO THE TERMS OF SECTION 21.3.1 OR THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE). THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL DAMAGES SUFFERED BY LANDLORD AS A RESULT OF TENANT'S FAILURE TO TIMELY PROVIDE LANDLORD WITH ADDITIONAL L-C(S) IN AN AMOUNT EQUAL TO THE DEFICIENCY AS REQUIRED IN SECTION 21.3.1, OR A REPLACEMENT L-C AS CONTEMPLATED BY THE L-C FDIC REPLACEMENT NOTICE (AS APPLICABLE), AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS LEASE, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION 21.3.2 REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH LANDLORD WILL INCUR AS A RESULT OF SUCH FAILURE, PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT WAIVE OR AFFECT LANDLORD'S RIGHTS AND TENANT'S INDEMNITY OBLIGATIONS UNDER OTHER SECTIONS OF THIS LEASE (EXCEPT THAT THE PARTIES SPECIFICALLY AGREE THAT THE FOREGOING PROVISION WAS AGREED TO IN LIEU OF MAKING TENANT'S FAILURE TO PROVIDE LANDLORD WITH ADDITIONAL L-C(S) IN AN AMOUNT EQUAL TO THE DEFICIENCY OR A REPLACEMENT L-C (AS APPLICABLE) A DEFAULT UNDER THIS LEASE). THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO LANDLORD PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1671. THE PARTIES HAVE SET FORTH THEIR INITIALS BELOW TO INDICATE THEIR AGREEMENT WITH THE LIQUIDATED DAMAGES PROVISION CONTAINED IN THIS SECTION 21.3.2.

_____          _____

LANDLORD'S INITIALS                    TENANT'S INITIALS

       21.4    **Transfer and Encumbrance**.  The L-C shall also provide that Landlord may, at any time and without notice to Tenant and without first obtaining Tenant's consent thereto, transfer (one or more times) all or any portion of its interest in and to the L-C to another party, person or entity, regardless of whether or not such transfer is from or as a part of the assignment by Landlord of its rights and interests in and to this Lease.  In the event of a transfer of Landlord's interest in under this Lease, Landlord shall transfer the L-C, in whole or in part, to the transferee and thereupon Landlord shall, without any further agreement between the parties, be released by Tenant from all liability therefor, and it is agreed that the provisions hereof shall apply to every transfer or assignment of the whole of said L-C to a new landlord.  In connection with any such transfer of the L-C by Landlord, Tenant shall, at Tenant's sole cost and expense, execute and submit to the Bank such applications, documents and instruments as may be necessary to effectuate such transfer and, Tenant shall be responsible for paying the Bank's transfer and processing fees in connection therewith; provided that, Landlord shall have the right (in its sole discretion), but not the obligation, to pay such fees on behalf of Tenant, in which case Tenant shall reimburse Landlord within ten (10) days after Tenant's receipt of an invoice from Landlord therefor.

       21.5    **L-C Not a Security Deposit**.  Landlord and Tenant (1) acknowledge and agree that in no event or circumstance shall the L-C or any renewal thereof or substitute therefor or any proceeds thereof be deemed to be or treated as a "security deposit" under any Laws applicable to security deposits in the commercial context, including, but not limited to, Section 1950.7 of the California Civil Code, as such Section now exists or as it may be hereafter amended or succeeded (the "Security Deposit Laws"), (2) acknowledge and agree that the L-C (including any renewal thereof or substitute therefor or any proceeds thereof) is not intended to serve as a security deposit, and the Security Deposit Laws shall have no applicability or relevancy thereto, and (3) waive any and all rights, duties and obligations that any such party may now, or in the future will, have relating to or arising from the Security Deposit Laws.  Tenant hereby irrevocably waives and relinquishes the provisions of Section 1950.7 of the California Civil Code and any successor statute, and all other provisions of law, now or hereafter in effect, which (x) establish the time frame by

which a landlord must refund a security deposit under a lease, and/or (y) provide that a landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by a tenant or to clean the premises, it being agreed that Landlord may, in addition, claim those sums specified in this Article 21 and/or those sums reasonably necessary to (a) compensate Landlord for any loss or damage caused by Tenant's breach of this Lease, including any damages Landlord suffers following termination of this Lease, and/or (b) compensate Landlord for any and all damages arising out of, or incurred in connection with, the termination of this Lease, including, without limitation, those specifically identified in Section 1951.2 of the California Civil Code.

21.6    **Non-Interference By Tenant**.  Tenant agrees not to interfere in any way with any payment to Landlord of the proceeds of the L-C, either prior to or following a "draw" by Landlord of all or any portion of the L-C, regardless of whether any dispute exists between Tenant and Landlord as to Landlord's right to draw down all or any portion of the L-C.  No condition or term of this Lease shall be deemed to render the L-C conditional and thereby afford the Bank a justification for failing to honor a drawing upon such L-C in a timely manner.  Tenant shall not request or instruct the Bank of any L-C to refrain from paying sight draft(s) drawn under such L-C.

21.7    **Waiver of Certain Relief**.  Tenant unconditionally and irrevocably waives (and as an independent covenant hereunder, covenants not to assert) any right to claim or obtain any of the following relief in connection with the L-C:

21.7.1    A temporary restraining order, temporary injunction, permanent injunction, or other order that would prevent, restrain or restrict the presentment of sight drafts drawn under any L-C or the Bank's honoring or payment of sight draft(s); or

21.7.2    Any attachment, garnishment, or levy in any manner upon either the proceeds of any L-C or the obligations of the Bank (either before or after the presentment to the Bank of sight drafts drawn under such L-C) based on any theory whatever.

21.8    **Remedy for Improper Drafts**.  Tenant's sole remedy in connection with the improper presentment or payment of sight drafts drawn under any L-C shall be the right to obtain from Landlord a refund of the amount of any sight draft(s) that were improperly presented or the proceeds of which were misapplied, together with interest at the Interest Rate, as that term is defined in Article 25 below, and reasonable actual out-of-pocket attorneys' fees, provided that at the time of such refund, Tenant increases the amount of such L-C to the amount (if any) then required under the applicable provisions of this Lease.  Tenant acknowledges that the presentment of sight drafts drawn under any L-C, or the Bank's payment of sight drafts drawn under such L-C, could not under any circumstances cause Tenant injury that could not be remedied by an award of money damages, and that the recovery of money damages would be an adequate remedy therefor.  In the event Tenant shall be entitled to a refund as aforesaid and Landlord shall fail to make such payment within ten (10) business days after demand, Tenant shall have the right to deduct the amount thereof together with interest thereon at the Interest Rate from the next installment(s) of Base Rent.

## ARTICLE 22

## INTENTIONALLY OMITTED

## ARTICLE 23

## SIGNS

Tenant may place its standard graphics and signage at the entrance to the Premises, on any monument sign(s) at entrances to the Premises, in one (1) prominent location on the exterior of the Building, and directional signage (collectively, "**Tenant's Signage**"), at Tenant's sole cost and expense, subject to Applicable Law, and subject to Landlord's approval of the plans and specifications related thereto which shall not be unreasonably delayed, conditioned or denied.  Upon surrender or vacation of the Premises, Tenant shall, at its expense, remove all signs and spot repair, paint, and/or replace the Building fascia surface to which its signs are attached.  Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments.  Tenant shall, at its sole cost and expense, maintain Tenant's Signage.  Tenant's Signage rights under this Article 23 shall be personal to the Original Tenant or a Permitted Transferee Assignee, as the case may be, and be may only be exercised as long as the Original

Tenant or a Permitted Transferee Assignee, as the case may be, occupies the entirety of the Premises. Landlord shall have the right to place signage on certain areas of the Project as reasonably determined by Landlord identifying Landlord, Landlord's affiliates, and during the last twelve (12) months of the Lease Term or the Option Term, if applicable, the availability of the Premises for lease in the event that Tenant elects not to extend the term of the Lease in accordance with the terms of Section 2.2 of this Lease.

## ARTICLE 24

## COMPLIANCE WITH LAW

24.1   **In General**. Tenant shall not do anything or suffer anything to be done in or about the Premises or the Project which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated (collectively, "**Applicable Laws**"). At its sole cost and expense, Tenant shall promptly comply with all such Applicable Laws, including, without limitation, the Warehouse Indirect Source Rule (the "**Indirect Source Rule**") adopted by the South Coast Air Quality Management District and all other current or future requirements imposed by the South Coast Air Quality Management District. In connection with the foregoing, Tenant shall, on a timely basis, submit to the South Coast Air Quality Management District any and all required information and/or documentation due under the Indirect Source Rule. A copy of such information and/or documentation shall be provided to Landlord concurrently with Tenant's submittal of any such information and/or documentation to the South Coast Air Quality Management District. Tenant shall be responsible for the full amount of any expenses, including, without limitation, any fines or penalties that are imposed on Landlord as a result of Tenant's failure to comply with the Indirect Source Rule. Tenant hereby acknowledges and agrees that Landlord shall have the right, at its option, and at Tenant's cost, to implement a program to monitor the number of truck and trailer trips at the Premises and Tenant's compliance with the Indirect Source Rule.

Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employees, landlords or tenants, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations. Tenant shall be responsible, at its sole cost and expense, to make all alterations to the Premises as are required to comply with the governmental rules, regulations, requirements or standards described in this Article 24. The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any of said governmental measures, shall be conclusive of that fact as between Landlord and Tenant.

24.2   **CASp**. For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp). As required by Section 1938(e) of the California Civil Code, Landlord hereby states as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of the foregoing, Landlord and Tenant hereby agree as follows: (a) any CASp inspection requested by Tenant shall be conducted, at Tenant's sole cost and expense, by a CASp designated by Landlord; and (b) the parties shall mutually coordinate and reasonably approve of the timing of any such CASp inspection so that Landlord may, at its option, have a representative present during such inspection, and (c) pursuant to Article 24 above, Tenant, at its sole cost and expense, shall be responsible for making any improvements, alterations, modifications and/or repairs within the Premises to correct violations of construction-related accessibility standards disclosed by such CASp inspection; and, if anything done by or for Tenant in its use or occupancy of the Premises shall require any improvements, alterations, modifications and/or repairs to the Project (outside the Premises) to correct violations of construction-related accessibility standards disclosed by such CASp inspection, then Tenant shall, at Landlord's option, either (i) perform such improvements, alterations, modifications and/or repairs at Tenant's sole cost and expense, or (ii) reimburse Landlord upon demand, as Additional Rent, for the out-of-pocket cost to Landlord of performing such improvements, alterations, modifications and/or repairs.

## ARTICLE 25

## LATE CHARGES

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days after said amount is due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay Rent and/or other charges when due hereunder. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner. In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid within ten (10) days after the date they are due shall bear interest from the date when due until paid at a rate per annum equal to the lesser of (i) the annual "**Bank Prime Loan**" rate cited in the Federal Reserve Statistical Release Publication H.15(519), published weekly (or such other comparable index as Landlord and Tenant shall reasonably agree upon if such rate ceases to be published) plus four (4) percentage points, and (ii) the highest rate permitted by Applicable Laws.

## ARTICLE 26

## LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT

26.1    **Landlord's Cure.**  All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent, except to the extent, if any, otherwise expressly provided herein. If Tenant shall fail to perform any obligation under this Lease, and such failure shall continue in excess of the time allowed under Section 19.1.2, above, unless a specific time period is otherwise stated in this Lease, Landlord may, but shall not be obligated to, make any such payment or perform any such act on Tenant's part without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder.

26.2    **Tenant's Reimbursement.**  Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, upon delivery by Landlord to Tenant of statements therefor:  (i) sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of Section 26.1; (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Article 10 of this Lease; and (iii) sums equal to all expenditures made and obligations incurred by Landlord in collecting or attempting to collect the Rent or in enforcing or attempting to enforce any rights of Landlord under this Lease or pursuant to law, including, without limitation, all legal fees and other amounts so expended. Tenant's obligations under this Section 26.2 shall survive the expiration or sooner termination of the Lease Term.

## ARTICLE 27

## ENTRY BY LANDLORD

27.1    **In General**. Landlord reserves the right at all reasonable times and upon reasonable notice to Tenant (except in the case of an emergency) to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees or tenants, or to current or prospective mortgagees, ground or underlying lessors or insurers; (iii) post notices of nonresponsibility; or (iv) alter, improve or repair the Premises or the Building, or for structural alterations, repairs or improvements to the Building or the Building's systems and equipment. Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) perform any services required of Landlord; (B) take possession due to any breach of this Lease in the manner provided herein; and (C) perform any covenants of Tenant which Tenant fails to perform. Except with respect to clause (B), above, Landlord shall use commercially reasonable efforts to minimize interference with the conduct of Tenant's business in connection with such entries into the Premises. Landlord may make any such entries without the abatement of Rent and may take such reasonable steps as required to accomplish the stated purposes. Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby. For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults,

safes and special security areas designated in advance by Tenant.  In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises.  Any entry into the Premises by Landlord in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises.  No provision of this Lease shall be construed as obligating Landlord to perform any repairs, alterations or decorations except as otherwise expressly agreed to be performed by Landlord herein.

27.2    **Other Terms**.  Notwithstanding anything to the contrary in this Lease, Landlord and its contractors and consultants, as well as the Board, shall at all times have the right to access the Premises (subject to the advance notice requirements set forth below), including without limitation, the Tenant Parking Areas, the Common Areas and the Building, as reasonably needed to implement the RAP and any other work required by the Board or any other environmental agency with jurisdiction ("**Remediation Access Rights**").  The Remediation Access Rights shall include, without limitation, the right to conduct periodic indoor air sampling ("**IAQ Sampling**") and to conduct groundwater sampling of all wells at the Project, including, without limitation, the groundwater wells located in the Building ("**Indoor Wells**").  Tenant shall not install any racking or store equipment or materials over the Indoor Wells, which at all times shall remain accessible for inspection and sampling.  The Remediation Access Rights may be exercised upon at least 2 business days prior notice to Tenant.  Landlord shall exercise the Remediation Access Rights in a manner to minimize so far as may be reasonable under the circumstances, any disturbance to Tenant's operations.

## ARTICLE 28

## TENANT PARKING

28.1    **Tenant's Parking Area**.  Tenant shall be entitled to the exclusive use of the parking areas, truck courts, and driveways depicted on **Exhibit A** ("**Tenant's Parking Areas**"), including all stalls located in the Tenant's Parking Areas.  Landlord shall use reasonable efforts to enforce Tenant's parking rights against third parties.  Tenant shall, at its sole cost and expense, operate, maintain and repair Tenant's Parking Area in a first-class manner and in compliance with all Applicable Laws.  Tenant's insurance and indemnity obligations set forth in this Lease shall apply to Tenant's Parking Areas.  Landlord shall have no obligation to operate or maintain Tenant's Parking Areas.

28.2    **Parking Procedures**.  Landlord shall have no obligation to monitor the use of Tenant's Parking Area, nor shall Landlord be responsible for any loss or damage to any vehicle or other property or for any injury to any person.  Tenant shall comply with all reasonable  rules and regulations which may be adopted by Landlord from time to time with respect to use of Tenant's Parking Areas.

## ARTICLE 29

## MISCELLANEOUS PROVISIONS

29.1    **Terms; Captions.**  The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular.  The necessary grammatical changes required to make the provisions hereof apply either to corporations or partnerships or individuals, men or women, as the case may require, shall in all cases be assumed as though in each case fully expressed.  The captions of Articles and Sections are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning of such Articles and Sections.

29.2    **Binding Effect.**  Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

29.3    **No Air Rights.**  No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease.  If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the  Project, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.4    **Modification of Lease.**  Should any current or prospective mortgagee or ground lessor for the Building or Project require a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within ten (10) days following a request therefor.  At the request of Landlord or any mortgagee or ground lessor, Tenant agrees to execute a short form or memorandum of Lease and deliver the same to Landlord within ten (10) days following the request therefor.

29.5    **Transfer of Landlord's Interest.**  Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Project or Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder arising after the date of transfer and such transferee shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord, including the return of any Security Deposit, and Tenant shall attorn to such transferee.  Tenant further acknowledges that Landlord may assign its interest in this Lease to a mortgage lender as additional security and agrees that such an assignment shall not release Landlord from its obligations hereunder and that Tenant shall continue to look to Landlord for the performance of its obligations hereunder.

29.6    **Prohibition Against Recording.**  Except as provided in <u>Section 29.4</u> of this Lease, neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant.

29.7    **Landlord's Title.**  Landlord's title is and always shall be paramount to the title of Tenant.  Nothing herein contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

29.8    **Relationship of Parties.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

29.9    **Application of Payments.**  Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.

29.10    **Time of Essence.**  Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.11    **Partial Invalidity.**  If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.12    **No Warranty.**  In executing and delivering this Lease, Tenant has not relied on any representations, including, but not limited to, any representation as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

29.13    **Landlord Exculpation.**  The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Project or the Premises shall be limited solely and exclusively to an amount which is equal to the interest of Landlord in the Building, provided that in no event shall such liability extend to any sales or insurance proceeds received by Landlord or the Landlord Parties in connection with the Project, Building or Premises.  Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all

persons claiming by, through or under Tenant. The limitations of liability contained in this <u>Section 29.13</u> shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring, or loss to inventory, products, samples, and/or business, accounting and other records of every kind and description kept at the premises and any and all income derived or derivable therefrom.

29.14    **Entire Agreement.**  It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto.

29.15    **Right to Lease.**  Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building or Project. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building or Project.

29.16    **Force Majeure.**  Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, terrorist acts, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease and except as to Tenant's obligations under <u>Articles 5</u> and <u>24</u> of this Lease (collectively, a "**Force Majeure**"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

29.17    **Waiver of Redemption by Tenant.**  Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.18    **Notices.**  All notices, demands, statements, designations, approvals  or other communications (collectively, "**Notices**") given or required to be given by either party to the other hereunder or by law shall be in writing, shall be (A) sent by United States certified or registered mail, postage prepaid, return receipt requested ("**Mail**"), (B) transmitted by email, if such email is promptly followed by a Notice sent by nationally recognized overnight courier, (C) delivered by a nationally recognized overnight courier, or (D) delivered personally or by electronic transmission.  Any Notice shall be sent, transmitted, or delivered, as the case may be, to Tenant at the appropriate address set forth in <u>Section 8</u> of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord, or to Landlord at the addresses set forth below, or to such other places as Landlord may from time to time designate in a Notice to Tenant. Any Notice will be deemed given (i) three (3) days after the date it is posted if sent by Mail, (ii) the date the email is transmitted if followed by nationally recognized overnight courier, (iii) the date the overnight courier delivery is made, or (iv) the date personal delivery is made or attempted to be made. If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, Tenant shall give to such mortgagee or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to Tenant. As of the date of this Lease, any Notices to Landlord must be sent, transmitted, or delivered, as the case may be, to the following address:

Bridge Point Long Beach, LLC
c/o Bridge Development Partners, LLC
11100 Santa Monica Blvd., Suite 700
Los Angeles, CA 90025
Attn: Kevin Finnegan
Telephone: (213) 267-4404
Email: kfinnegan@bridgedev.com


with a copy to:

Perspective Law Group, P.C.
Attn: Sahar Bina
11100 Santa Monica Blvd., Suite 780
Los Angeles, CA 90025
Phone: (424) 230-8221
Email: sahar@perspectivelg.com


29.19    **Joint and Several.**  If there is more than one Tenant, the obligations imposed upon Tenant under this Lease shall be joint and several.

29.20    **Authority.**  If Tenant is a corporation, trust or partnership, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so.  In such event, Tenant shall, within ten (10) days after execution of this Lease, deliver to Landlord satisfactory evidence of such authority and, if a corporation, upon demand by Landlord, also deliver to Landlord satisfactory evidence of (i) good standing in Tenant's state of incorporation and (ii) qualification to do business in California.

29.21    **Attorneys' Fees.**  In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

29.22    **Governing Law; WAIVER OF TRIAL BY JURY.**  This Lease shall be construed and enforced in accordance with the laws of the State of California.  IN ANY ACTION OR PROCEEDING ARISING HEREFROM, LANDLORD AND TENANT HEREBY CONSENT TO (I) THE JURISDICTION OF ANY COMPETENT COURT WITHIN THE STATE OF CALIFORNIA, (II) SERVICE OF PROCESS BY ANY MEANS AUTHORIZED BY CALIFORNIA LAW, AND (III) IN THE INTEREST OF SAVING TIME AND EXPENSE, TRIAL WITHOUT A JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  IN THE EVENT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF BASE RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION (UNLESS SUCH COUNTERCLAIM SHALL BE MANDATORY) IN ANY SUCH PROCEEDING OR ACTION, BUT SHALL BE RELEGATED TO AN INDEPENDENT ACTION AT LAW.

29.23    **Submission of Lease.**  Submission of this instrument for examination or signature by Tenant does not constitute a reservation of, option for or option to lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

29.24    **Brokers.**  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate brokers or agents specified in Section 10 of the Summary (the "**Brokers**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party.

29.25    **Independent Covenants.**  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

29.26    **Project or Building Name and Signage.**  Landlord shall have the right at any time to change the name of the Project or Building and to install, affix and maintain any and all signs on the exterior and on the interior of the Project or Building as Landlord may, in Landlord's sole discretion, desire.  Tenant shall not use the name of the Project or Building or use pictures or illustrations of the Project or Building in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises, without the prior written consent of Landlord.

29.27    **Counterparts; Execution.**  This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document.  Both counterparts shall be construed together and shall constitute a single lease.  Landlord or Tenant may deliver executed signature pages to this Lease by facsimile or PDF transmission to the other party, which facsimile or PDF copy shall be deemed to be an original executed signature page.

29.28    **Confidentiality.**  Tenant acknowledges that the content of this Lease and any related documents are confidential information.  Tenant shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants.

29.29    **Transportation Management**.  Tenant shall fully comply with all present or future programs intended to manage parking, transportation or traffic in and around the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities.

29.30    **Building Renovations.**  It is specifically understood and agreed that Landlord has made no representation or warranty to Tenant and has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, Building, or any part thereof and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant except as specifically set forth herein, in the Tenant Work Letter or the Phase III Work Letter.  However, Tenant hereby acknowledges that Landlord may during the Lease Term renovate, improve, alter, or modify (collectively, the "**Renovations**") the Project, the Building and/or the Premises including without limitation the parking areas, Common Areas, systems and equipment, roof, and structural portions of the same, and in connection with any Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Project, including portions of the Common Areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building.  Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent.  Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Renovations, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the Renovations or Landlord's actions in connection with such Renovations, or for any inconvenience or annoyance occasioned by such Renovations or Landlord's actions.

29.31   **No Violation.**  Tenant hereby warrants and represents that neither its execution of nor performance under this Lease shall cause Tenant to be in violation of any agreement, instrument, contract, law, rule or regulation by which Tenant is bound, and Tenant shall protect, defend, indemnify and hold Landlord harmless against any claims, demands, losses, damages, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees and costs, arising from Tenant's breach of this warranty and representation.

29.32   **Patriot Act and Executive Order 13224**.  As an inducement to Landlord to enter into this Lease, Tenant hereby represents and warrants that:  (i) Tenant is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "**Prohibited Person**"); (ii) Tenant is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) neither Tenant (nor any person, group, entity or nation which owns or controls Tenant, directly or indirectly) has conducted or will conduct business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including without limitation any assignment of this Lease or any subletting of all or any portion of the Premises or the making or receiving of any contribution of funds, goods or services to or for the benefit of a Prohibited Person. In connection with the foregoing, it is expressly understood and agreed that (x) any breach by Tenant of the foregoing representations and warranties shall be deemed a default by Tenant under this Lease and shall be covered by the indemnity provisions of Section 10.1 above, and (y) the representations and warranties contained in this subsection shall be continuing in nature and shall survive the expiration or earlier termination of this Lease.

29.33   **Tenant Representations**.  Tenant hereby represents and warrants to Landlord that Tenant has entered into an agreement (the "**USPS Agreement**") with the United States Postal Service ("**USPS**"), pursuant to which Tenant shall be providing services to the USPS for a period of a minimum of five (5) years following the date of this Lease, (ii) the USPS Agreement is in full force and effect, (iii) Tenant shall not terminate the USPS Agreement or shorten the term of the USPS Agreement without the prior written consent of Landlord, and (iv) all conditions of the USPS Agreement to be performed by Tenant or USPS, as applicable, necessary to the enforceability of the USPS Agreement have been satisfied and neither USPS nor Tenant are in default thereunder.

[Signatures Appear on Following Page]

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

     IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.


**"Landlord":**

BRIDGE POINT LONG BEACH, LLC,
a California limited liability company

By: _Brian Wilson_____
Name: _Brian Wilson_____
Its: _Vice President_____


**"Tenant":**

MATHESON TRUCKING, INC.,
a California corporation

By: _Charles Mellor_____
Name: _Charles Mellor_____
Its: _Chief Operating Officer_____

By: _____
Name: _____
Its: _____

Filed 12/01/23    Case 22-21148    Doc 1330

**EXHIBIT A**

**OUTLINE OF PREMISES**





BRIDGE POINT LONG BEACH
2400 E. ARTESIA BLVD. LONG BEACH, CA

06.15.2021
H·A·D JOB NO: A17-2052

## EXHIBIT A-1

## LEGAL DESCRIPTION OF LAND AS OF THE DATE OF THE LEASE

Real property in the City of Long Beach, County of Los Angeles, State of California, described as follows:

PARCEL 1:

LOTS 31 AND 32, IN BLOCK 27, OF CALIFORNIA CO-OPERATIVE COLONY TRACT, IN THE CITY OF LONG BEACH, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOC 21, PAGE(S) 15 AND 16 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THE WEST 30 FEET THEREOF.

ALSO EXCEPT THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA BY DEED RECORDED

AUGUST 6, 1951 IN BOOK 36938 PAGE 314, OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL 2:

THE NORTHERLY 55 FEET OF LOT 32, THE NORTHERLY LINE OF SAID 55 FEET BEING COINCIDENT WITH THE CENTER LINE OF THAT CERTAIN UNNAMED STREET SHOWN ON SAID MAP AS DIVIDING BLOCKS 21 AND 27 OF SAID TRACT, NOW ARTESIA STREET, 60 FEET WIDE, AND THE EASTERLY LINE THEREOF BEING COINCIDENT WITH THE CENTER LINE OF OCEAN AVENUE, NOW PARAMOUNT BOULEVARD, 100 FEET WIDE.

EXCEPT THE WESTERLY 30 FEET THEREOF.

PARCEL 3:

THAT PORTION OF LOT 32, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERLY LINE OF PARAMOUNT BOULEVARD, 100 FEET WIDE, WITH THE SOUTHERLY LINE OF THE ABOVE DESCRIBED PARCEL 1; THENCE SOUTHERLY ALONG SAID WESTERLY LINE, A DISTANCE OF 20 FEET; THENCE NORTHWESTERLY IN A DIRECT LINE TO A POINT IN SAID SOUTHERLY LINE, DISTANT 20 FEET WESTERLY THEREON FROM SAID POINT OF BEGINNING; THENCE EASTERLY ALONG SAID SOUTHERLY LINE A DISTANCE OF 20 FEET TO SAID POINT OF BEGINNING.

# EXHIBIT A-2

## APPROXIMATE LOCATION OF MONITORING WELLS



EXHIBIT A-2
-1-

## EXHIBIT B

## TENANT WORK LETTER

This Tenant Work Letter shall set forth the terms and conditions relating to the construction of the Tenant Improvements (defined in Section 2.1) in the Premises. This Tenant Work Letter is essentially organized chronologically and addresses the issues of the construction of the Tenant Improvements in the Premises, in sequence, as such issues will arise during the actual construction of the Premises.

## SECTION 1

## DELIVERY OF THE PREMISES AND BASE BUILDING

Landlord has constructed, at its sole cost and expense, the Base Building. For purposes of this Tenant Work Letter, the Base Building shall consist of those portions of the Premises which were in existence prior to the date of the Lease. Except as set forth in the Lease and this Tenant Work Letter, Tenant shall accept the Premises and Base Building from Landlord in their presently existing, "as-is" condition.

## SECTION 2

## TENANT IMPROVEMENTS

2.1     Tenant Improvements. Except as provided below, Landlord shall not be obligated to construct or install or pay for any improvements or facilities of any kind in the Premises, and Tenant shall accept the Premises in its currently-existing, "as-is" condition. The Phase I Tenant Improvements (defined in Section 2.2, below) and the Phase II Tenant Improvements (defined in Section 2.3, below) shall collectively be referred to herein as the "**Tenant Improvements**".

2.2     Phase I Tenant Improvements. Notwithstanding the terms of Section 2.1, above, but subject to the terms of this Tenant Work Letter, Landlord shall (i) install twenty (20) footcandles of light at 36" above finished flooring assuming  non-racket environment in the warehouse portion of the Premises. Warehouse lighting shall be comprised of LED lighting with motion sensors. The location of such lighting shall be mutually agreed upon by Landlord and Tenant, and (ii) install edge of dock lever packages at every dock high position, provided that such packages shall not be provided at dock numbers 2, 26 and 27 (the work referenced in items (i) and (ii) above shall collectively be referred to herein as the "**Phase I Tenant Improvements**"). The Phase I Tenant Improvements shall be completed by Landlord in accordance with Building standard methods, materials and finishes. Tenant shall not have the right to modify or alter the Phase I Tenant Improvements.

2.2.1     Substantial Completion of Premises. For purposes of this Lease, "**Substantial Completion**" of the Premises shall occur upon the completion of construction of the Phase I Tenant Improvements in the Premises, with the exception of any punch list items.

2.2.2     Delay of the Substantial Completion of the Premises. Except as provided in this Section 2.2.2, the Lease Commencement Date shall occur as set forth in the Lease and Section 2.2.1, above. If there shall be a delay or there are delays in the Substantial Completion of the Premises or in the occurrence of any of the other conditions precedent to the Lease Commencement Date, as set forth in the Lease, as a direct, indirect, partial, or total result of:

(a)     Tenant's failure to timely approve any matter requiring Tenant's approval;

(b)     A breach by Tenant of the terms of this Tenant Work Letter or the Lease;

(c)     Tenant's requirement for materials, components, finishes or improvements which are not available in a commercially reasonable time given the anticipated date of Substantial Completion of the Premises, as set forth in the Lease;

(d)     Tenant's failure to timely pay to Landlord the Over-Allowance Amount (defined in Section 2.4.1, below); or

(e)     Any other acts or omissions of Tenant, or its agents, or employees,

then, notwithstanding anything to the contrary set forth in the Lease or this Tenant Work Letter and regardless of the actual date of the Substantial Completion of the Premises, the Substantial Completion of the Premises shall be deemed to be the date the Substantial Completion of the Premises would have occurred if no Tenant delay or delays, as set forth above, had occurred.

2.3     Phase II Tenant Improvements.  Subject to the terms of this Section 2.3, Landlord shall, following the Lease Commencement Date, complete the following work: (i) construct a warehouse breakroom in the office portion of the Premises of approx. 60' x 35' in the location which shall be designated on the Final Space Plan (defined in Section 2.3.3.2).  Such warehouse breakroom shall include power for two vending machines and/or refrigerators, one microwave, a sink and 12' linear feet of lower plastic laminated cabinets with 4" backsplash. The walls of the breakroom will be painted with one (1) coat of Building standard color selected by Tenant within two (2) business days following Landlord's request.  The flooring of the breakroom shall either be VCT or sealed concrete, as determined by Landlord.  The breakroom will have 4' x 2' ceiling grid and tile, (ii) install a Building standard door from the main office area to the warehouse breakroom.  The approximate location of such door shall be designated on the Final Space Plan, (iii) construct a Postal Inspector office located in approximately the southwest corner of the office buildout area.  The exact location of the Postal Inspector office shall be designated on the Final Space Plan.  Such office shall be approximately 5'x'7, shall include VCT or sealed concrete, at Landlord's discretion, and shall have 4' x 2' ceiling grid and tile, (iv) install power in the warehouse portion of the Premises near door #2 sufficient for a trash compactor.  The specifications of the trash compactor shall be provided to Landlord within two (2) business days following Landlord's request, (v) install 3 Big Ass fans, which fans shall be located within the first column line on the south side of the Building in the truck speed bay zone.  The exact location of such fans shall be designated on the Final Space Plan, (vi) install 16 electric forklift chargers along the internal northern wall near the electrical room.  The exact location of such chargers shall be designated on the Final Space Plan, (vii) install power and dock lights at every dock high loading position except docks numbers 2, 26, and 27.  The specifications for such power and dock lights shall be determined by Landlord, and (viii) install 8' wrought iron fence at employee parking areas on north and east street frontage.  The exact location of such fence shall be designated on the Final Space Plan.  Gates, electrical, motors, card readers, and data shall not be provided by Landlord and shall be Tenant's responsibility.  The work referenced in items (i) through (viii) shall collectively be referred to herein as the "**Phase II Tenant Improvements**".  The Phase II Tenant Improvements shall be completed by Landlord in accordance with Building standard methods, materials and finishes.  Tenant shall not have the right to modify or alter the Phase II Tenant Improvements.

Tenant hereby acknowledges and agrees that, notwithstanding any provision to the contrary set forth in this Lease or this Tenant Work Letter, the Lease Commencement Date shall occur upon the Substantial Completion of the Phase I Tenant Improvements, and that Landlord shall have no obligation to cause the completion of the Phase II Tenant Improvements prior to the Lease Commencement Date.

2.3.1     Construction Drawings.

2.3.1.1     Selection of Architect/Construction Drawings.  Tenant hereby acknowledges and agrees that the construction of the Phase II Tenant Improvements shall require the preparation of Construction Drawings (defined below).  In connection with the foregoing, Tenant shall retain the architect/space planner designated by Landlord (the "**Architect**") to prepare the Construction Drawings for the construction of the Phase II Tenant Improvements.  Tenant shall retain the engineering consultants designated by Landlord (the "**Engineers**") to prepare all plans and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, lifesafety, and sprinkler work of the Phase II Tenant Improvements.  The plans and drawings to be prepared by Architect and the Engineers hereunder shall be known collectively as the "**Construction Drawings**." All Construction Drawings shall comply with the drawing format and specifications as determined by Landlord, and shall be subject to

Landlord's approval.  Tenant and Architect shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the base Building plans, and Tenant and Architect shall be solely responsible for the same, and Landlord shall have no responsibility in connection therewith.  Landlord's review of the Construction Drawings as set forth in this Section 2.3.1.1, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, code compliance or other like matters.  Accordingly, notwithstanding that any Construction Drawings are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the Construction Drawings, and Tenant's waiver and indemnity set forth in this Lease shall specifically apply to the Construction Drawings.

     2.3.1.2    Final Space Plan.  On or before a date designated by Landlord, Tenant and the Architect shall prepare the final space plan for the Phase II Tenant Improvements in the Premises (collectively, the "**Final Space Plan**"), which Final Space Plan shall include a layout and designation of all offices, rooms and other partitioning, their intended use, and equipment to be contained therein, and shall deliver the Final Space Plan to Landlord for Landlord's approval.

     2.3.1.3    Final Working Drawings.  On or before a date designated by Landlord, Tenant, the Architect and the Engineers shall complete the architectural and engineering drawings for the Premises, and the final architectural working drawings in a form which is complete to allow subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Final Working Drawings**") and shall submit the same to Landlord for Landlord's approval.

     2.3.1.4    Permits.  The Final Working Drawings shall be approved by Landlord (the "**Approved Working Drawings**") prior to the commencement of the construction of the Phase II Tenant Improvements.  Tenant shall immediately submit the Approved Working Drawings to the appropriate municipal authorities for all applicable building permits necessary to allow Contractor, as that term is defined in Section 2.3.2, below, to commence and fully complete the construction of the Phase II Tenant Improvements (the "**Permits**"), and, in connection therewith, Tenant shall coordinate with Landlord in order to allow Landlord, at its option,  to take part in all phases of the permitting process and shall supply Landlord, as soon as possible, with all plan check numbers and dates of submittal and obtain the Permits on or before a date designated by Landlord.  Notwithstanding anything to the contrary set forth in this Section 2.3.1.4, Tenant hereby agrees that neither Landlord nor Landlord's consultants shall be responsible for obtaining any building permit or certificate of occupancy for the Premises and that the obtaining of the same shall be Tenant's responsibility; provided however that Landlord shall, in any event, cooperate with Tenant in executing permit applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain any such permit or certificate of occupancy.  No changes, modifications or alterations in the Approved Working Drawings may be made without the prior written consent of Landlord.

     2.3.1.5    Time Deadlines.  Tenant shall use its best, good faith, efforts and all due diligence to cooperate with the Architect, the Engineers, and Landlord to complete all phases of the Construction Drawings and the permitting process and to receive the permits, as soon as possible after the execution of the Lease, and, in that regard, shall meet with Landlord on a scheduled basis to be determined by Landlord, to discuss Tenant's progress in connection with the same.

     2.3.2    Contractor.  A contractor designated by Landlord ("**Contractor**") shall construct the Phase II Tenant Improvements.  Landlord shall independently retain Contractor, on behalf of Tenant, to construct the Phase II Tenant Improvements in accordance with the Approved Working Drawings.

     2.3.3    Tenant's Covenants.  Tenant hereby indemnifies Landlord for any loss, claims, damages or delays arising from the actions of Architect on the Premises or in the Building.  Within ten (10) days after completion of construction of the Phase II Tenant Improvements, Tenant shall cause Contractor and Architect to cause a Notice of Completion to be recorded in the office of the County Recorder of the county in which the Building is located in accordance with Section 8182 of the Civil Code of the State of California or any successor statute and furnish a copy thereof to Landlord upon recordation, failing which, Landlord may itself execute and file the same on behalf of Tenant as Tenant's agent for such purpose.

2.4    Tenant Improvement Allowance for Phase I Tenant Improvements and Phase II Tenant Improvements.

2.4.1    In General.  Tenant shall be entitled to an allowance equal to $1,245,936.00 (the "**Tenant Improvement Allowance**") in connection with the construction of the Tenant Improvements.  In the event that the total cost of the Tenant Improvements exceeds the Tenant Improvement Allowance or is estimated to exceed the Tenant Improvement Allowance, Tenant shall pay such excess amount (or estimated excess) (the "**Over-Allowance Amount**") within five (5) days following demand by Landlord.  Landlord shall not be required to commence or complete the Tenant Improvements until Tenant shall have delivered to Landlord the Over-Allowance Amount.  Tenant hereby acknowledges that Landlord shall be entitled to a fee (the "**Landlord Coordination Fee**") in an amount equal to four percent (4%) of all costs incurred in connection with the Tenant Improvements, in consideration for Landlord's supervision of the completion of the Tenant Improvements.  The Landlord Coordination Fee shall be deducted from the Tenant Improvement Allowance.

2.4.2    Disbursement of the Tenant Improvement Allowance.  Except as otherwise set forth in this Tenant Work Letter, the Tenant Improvement Allowance shall be disbursed by Landlord (each of which disbursements shall be made pursuant to Landlord's disbursement process) for costs related to the construction of the Tenant Improvements and for the following items and costs (collectively, the "**Tenant Improvement Allowance Items**"): (i) payment of the fees of the Architect and the Engineers, and payment of the fees incurred by, and the cost of documents and materials supplied by, Landlord and Landlord's consultants in connection with the preparation and review of the Construction Drawings; (ii) the cost of any changes in the Base Building when such changes are required by the Construction Drawings; (iii) the cost of any changes to the Construction Drawings or Tenant Improvements required by any applicable building codes (the "**Code**"); and (iv) the Landlord Coordination Fee.

2.4.3    Tenant Improvement Allowance Limitations.  In no event shall Tenant be entitled to use any portion of the Tenant Improvement as a credit against rent under this Lease or for any other purpose other than the construction of the Phase I Tenant Improvements and the Phase II Tenant Improvements.  Additionally, in no event shall Landlord be obligated to pay for the Phase I Tenant Improvements and the Phase II Tenant Improvements in an aggregate amount that exceeds the Tenant Improvement Allowance.  Notwithstanding anything contained herein to the contrary, in the event that Tenant Improvement Allowance is not fully utilized by Tenant under this Tenant Work Letter for the Phase I Tenant Improvements and the Phase II Tenant Improvements on or before the date that is twelve (12) months following the Lease Commencement Date, then such unused amounts shall revert to Landlord and Tenant shall have no further rights with respect thereto.

2.5.    Warranties and Guaranties.  Landlord hereby assigns to Tenant all warranties and guaranties by the contractor who constructs or installs the Tenant Improvements, and Tenant hereby waives all claims against Landlord relating to, or arising out of the construction or installation of, the Tenant Improvements.

SECTION 3

Landlord's Access to Premises Following Lease Commencement Date

Tenant hereby acknowledges that Tenant may be occupying the Premises during the construction of the Phase II Tenant Improvements.  Tenant hereby acknowledges and agrees that, notwithstanding any provision to the contrary set forth in this Lease, Landlord shall have the right to access the Premises at any time following the Lease Commencement Date in order to construct the Phase II Tenant Improvements.  In connection with the foregoing, Tenant agrees that it shall fully cooperate with Landlord in connection with the scheduling and performance of the Phase II Tenant Improvements, and that Landlord shall be permitted to construct the Phase II Tenant Improvements during normal business hours (without the payment of overtime or other premiums to complete such work), and Tenant shall provide a clear working area for the construction of the Phase II Tenant Improvements (including, but not limited to, the moving of furniture, fixtures and Tenant's property away from the area in which Landlord is performing the Phase II Tenant Improvements).  Tenant hereby further agrees that the construction of the Phase II Tenant Improvements shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent or damages of any kind.  Furthermore, in no event shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the construction of the Phase II Tenant Improvements or Landlord's actions in connection with the

construction of the Phase II Tenant Improvements, or for any inconvenience or annoyance occasioned by the construction of the Phase II Tenant Improvements or Landlord's actions in connection with the construction of the Phase II Tenant Improvements.

SECTION 4

MISCELLANEOUS

4.1     <u>Tenant's Representative</u>.  Tenant has designated Tim Noel as its sole representative with respect to the matters set forth in this Tenant Work Letter, who, until further notice to Landlord, shall have full authority and responsibility to act on behalf of the Tenant as required in this Tenant Work Letter.

4.2     <u>Landlord's Representative</u>.  Landlord has designated Blayke Esparza as its sole representative with respect to the matters set forth in this Tenant Work Letter, who, until further notice to Tenant, shall have full authority and responsibility to act on behalf of the Landlord as required in this Tenant Work Letter.

4.3     <u>Tenant's Lease Default</u>.  Notwithstanding any provision to the contrary contained in this Lease, if an event of default as described in the Lease, or a default by Tenant under this Tenant Work Letter, has occurred at any time on or before the Substantial Completion of the Tenant Improvements, then (i) in addition to all other rights and remedies granted to Landlord pursuant to the Lease, Landlord shall have the right to withhold payment of all or any portion of the Tenant Improvement Allowance and/or Landlord may cease the construction of the Tenant Improvements, and (ii) all other obligations of Landlord under the terms of this Tenant Work Letter shall be forgiven until such time as such default is cured pursuant to the terms of the Lease.

4.4     <u>Time of the Essence in This Tenant Work Letter</u>.  Unless otherwise indicated, all references herein to a "number of days" shall mean and refer to calendar days.  In all instances where Tenant is required to approve or deliver an item, if no written notice of approval is given or the item is not delivered within the stated time period, at Landlord's sole option, at the end of such period the item shall automatically be deemed approved or delivered by Tenant and the next succeeding time period shall commence.

4.5     <u>Cooperation by Tenant</u>.  Tenant acknowledges that the timing of the completion of the Approved Working Drawings and the Tenant Improvements is of the utmost importance to Landlord.  Accordingly, Tenant hereby agrees to fully and diligently cooperate with all reasonable requests by Landlord in connection with or related to the design and construction of the Tenant Improvements, and in connection therewith, shall respond to Landlord's requests for information and/or approvals, except as specifically set forth herein to the contrary, within two (2) business days following request by Landlord.

EXHIBIT B
-5-

**EXHIBIT B-1**

**PHASE III WORK LETTER**

1.      In General.  This Phase III Work Letter shall set forth the terms and conditions relating to the construction of the Phase III Tenant Improvements (defined in Section 2) in the Premises.

2.      Phase III Tenant Improvements.  Subject to the terms of this Section 2., Landlord shall, at Tenant's sole cost and expense, following the substantial completion of the Phase II Tenant Improvements, complete the following work: (i) the installation of an approximate 25' x 32' warehouse office at doors 26 and 27 with internal unisex restroom and external men's and women's restrooms (with appropriate toilets, urinals and sinks pursuant to applicable law), and (ii) the installation of electrical outlets on certain  columns located in the Premises (the work referenced in items (i) and (ii) above shall collectively be referred to herein as the "**Phase III Tenant Improvements**").  The Phase III Tenant Improvements shall be completed by Landlord in accordance with Building standard methods, materials and finishes.  Tenant shall not have the right to modify or alter the Phase III Tenant Improvements.  Tenant hereby acknowledges and agrees that Tenant shall not have the right to use the Tenant Improvement Allowance for the construction of the Phase III Tenant Improvements.

3.      Selection of Architect/Construction Drawings.  Tenant hereby acknowledges and agrees that the construction of the Phase III Tenant Improvements shall require the preparation of the Phase III Construction Drawings (defined below).  In connection with the foregoing, Tenant shall retain the architect/space planner designated by Landlord (the "**Architect**") to prepare the Phase III Construction Drawings for the construction of the Phase III Tenant Improvements.  Tenant shall retain the engineering consultants designated by Landlord (the "**Engineers**") to prepare all plans and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, lifesafety, and sprinkler work of the Phase III Tenant Improvements.  The plans and drawings to be prepared by Architect and the Engineers hereunder for the construction of the Phase III Tenant Improvements shall be known collectively as the "**Phase III Construction Drawings**."  The Phase III Construction Drawings shall comply with the drawing format and specifications as determined by Landlord, and shall be subject to Landlord's approval.  Tenant and Architect shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the base Building plans, and Tenant and Architect shall be solely responsible for the same, and Landlord shall have no responsibility in connection therewith.  Landlord's review of the Phase III Construction Drawings as set forth in this Section 3, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, code compliance or other like matters.  Accordingly, notwithstanding that any Phase III Construction Drawings are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the Phase III Construction Drawings, and Tenant's waiver and indemnity set forth in this Lease shall specifically apply to the Phase III Construction Drawings.

3.1     Phase III Final Space Plan.  On or before a date designated by Landlord, Tenant and the Architect shall prepare the final space plan for the Phase III Tenant Improvements in the Premises (collectively, the "**Phase III Final Space Plan**"), which Phase III Final Space Plan shall include a layout and designation of all offices, rooms and other partitioning, their intended use, and equipment to be contained therein, and shall deliver the Phase III Final Space Plan to Landlord for Landlord's approval.

3.2     Phase III Final Working Drawings.  On or before a date designated by Landlord, Tenant, the Architect and the Engineers shall complete the architectural and engineering drawings for the Phase III Tenant Improvements and the final architectural working drawings in a form which is complete to allow subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Phase III Final Working Drawings**") and shall submit the same to Landlord for Landlord's approval.

3.3     Permits.  The Phase III Final Working Drawings shall be approved by Landlord (the "**Phase III Approved Working Drawings**") prior to the commencement of the construction of the Phase III Tenant Improvements.  Tenant shall immediately submit the Phase III Approved Working Drawings to the appropriate

municipal authorities for all applicable building permits (the "**Permits**") necessary to allow Contractor, as that term is defined in Section 3.5, below, to commence and fully complete the construction of the Phase III Tenant Improvements, and, in connection therewith, Tenant shall coordinate with Landlord in order to allow Landlord, at its option, to take part in all phases of the permitting process and shall supply Landlord, as soon as possible, with all plan check numbers and dates of submittal and obtain the Permits on or before a date designated by Landlord. Notwithstanding anything to the contrary set forth in this Section 3.3, Tenant hereby agrees that neither Landlord nor Landlord's consultants shall be responsible for obtaining any building permit or certificate of occupancy for the Premises and that the obtaining of the same shall be Tenant's responsibility; provided however that Landlord shall, in any event, cooperate with Tenant in executing permit applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain any such permit or certificate of occupancy. No changes, modifications or alterations in the Phase III Approved Working Drawings may be made without the prior written consent of Landlord.

3.4     Time Deadlines.  Tenant shall use its best, good faith, efforts and all due diligence to cooperate with the Architect, the Engineers, and Landlord to complete all phases of the Phase III Construction Drawings and the permitting process and to receive the permits, as soon as possible after the execution of the Lease, and, in that regard, shall meet with Landlord on a scheduled basis to be determined by Landlord, to discuss Tenant's progress in connection with the same.

3.5     Contractor.  A contractor designated by Landlord ("**Contractor**") shall construct the Phase III Tenant Improvements.  Landlord shall independently retain Contractor, on behalf of Tenant, to construct the Phase III Tenant Improvements in accordance with the applicable Approved Working Drawings.  Tenant shall be responsible for all payments to the Contractor in connection with the construction of the Phase III Tenant Improvements.

3.6     Tenant's Covenants.  Tenant hereby indemnifies Landlord for any loss, claims, damages or delays arising from the actions of Architect on the Premises or in the Building.  Within ten (10) days after completion of construction of the Phase III Tenant Improvements Tenant shall cause Contractor and Architect to cause a Notice of Completion to be recorded in the office of the County Recorder of the county in which the Building is located in accordance with Section 8182 of the Civil Code of the State of California or any successor statute and furnish a copy thereof to Landlord upon recordation, failing which, Landlord may itself execute and file the same on behalf of Tenant as Tenant's agent for such purpose.

4.     Cost of Phase III Tenant Improvements.  Tenant shall be responsible for the payment of all costs incurred in connection with the construction of the Phase III Tenant Improvements, including, without limitation, the following: (i) the payment of the fees of the Architect, the Engineers and the Contractor, and payment of the fees incurred by, and the cost of documents and materials supplied by, Landlord and Landlord's consultants in connection with the preparation and review of the Phase III Construction Drawings; (ii) the cost of any changes in the Base Building when such changes are required by the Phase III Construction Drawings; (iii) the cost of any changes to the Phase III Construction Drawings or Phase III Tenant Improvements required by any applicable law; and (iv) the Phase III Landlord Supervision Fee.  In connection with the foregoing, and except as set forth below, with respect to the Cost Proposal (defined below), Tenant shall pay to Landlord the cost for the foregoing items and any other costs incurred in connection with the construction of the Phase III Tenant Improvements within five (5) days following Landlord's request.  Additionally, after the issuance of the Phase III Approved Working Drawings, Landlord shall provide Tenant with a cost proposal (the "**Cost Proposal**") in accordance with the Phase III Approved Working Drawings, which Cost Proposal shall include the cost (the "**Phase III Tenant Improvements Cost**") of the Phase III Tenant Improvements.  Tenant shall approve the Cost Proposal in writing within five (5) business days of the receipt of the same, and concurrently with its approval of the Cost Proposal deliver to Landlord the entirety of the Phase III Tenant Improvements Costs and the Phase III Landlord Supervision Fee (defined below).  Upon Landlord's receipt of Tenant's approval of the Cost Proposal, the Phase III Tenant Improvements Costs and the Phase III Landlord Supervision Fee, Landlord shall be released by Tenant to purchase the items set forth in the Cost Proposal and to commence the construction relating to such items.  In the event that the total cost of the Phase III Tenant Improvements exceeds the Phase III Tenant Improvements Costs, Tenant shall pay such excess amount (the "**Phase III Over-Allowance Amount**") within five (5) days following demand by Landlord.  Landlord shall not be required to commence or complete the Phase III Tenant Improvements until Tenant shall have delivered to Landlord the Phase III Tenant Improvement Costs, the Phase III Over-Allowance Amount, as applicable, and/or any other costs payable to Landlord under this Phase III Work Letter in connection with the construction of the Phase III Tenant Improvements.  Tenant hereby acknowledges that Landlord shall be entitled to a fee (the "**Phase III Landlord**

**Supervision Fee**") in an amount equal to four percent (4%) of all costs incurred in connection with the Phase III Tenant Improvements in consideration for Landlord's supervision of the completion of the Phase III Tenant Improvements. The Phase III Landlord Supervision Fee shall be paid to Landlord concurrently with Tenant's delivery of the Phase III Tenant Improvements Cost set forth in the Cost Proposal and the Phase III Over Allowance Amount, if applicable.

      5.    <u>Warranties and Guaranties</u>. Landlord hereby assigns to Tenant all warranties and guaranties by the contractor who constructs or installs the Phase III Tenant Improvements, and Tenant hereby waives all claims against Landlord relating to, or arising out of the construction or installation of, the Phase III Tenant Improvements.

      6.    <u>Occupancy of Premises During Construction of Phase III Improvements</u>. Tenant hereby acknowledges that Tenant may be occupying the Premises during the construction of the Phase III Tenant Improvements. Tenant hereby acknowledges and agrees that, notwithstanding any provision to the contrary set forth in this Lease, Landlord shall have the right to access the Premises at any time following the Lease Commencement Date in order to construct the Phase III Tenant Improvements. In connection with the foregoing, Tenant agrees that it shall fully cooperate with Landlord in connection with the scheduling and performance of the Phase III Tenant Improvements, and that Landlord shall be permitted to construct the Phase III Tenant Improvements during normal business hours (without the payment of overtime or other premiums to complete such work), and Tenant shall provide a clear working area for the construction of the Phase III Tenant Improvements (including, but not limited to, the moving of furniture, fixtures and Tenant's property away from the area in which Landlord is performing the Phase III Tenant Improvements ). Tenant hereby Tenant hereby agrees that the construction of the Phase III Improvements shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent or damages of any kind. Furthermore, in no event shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the construction of the Phase III Tenant Improvements or Landlord's actions in connection with the construction of the Phase III Tenant Improvements, or for any inconvenience or annoyance occasioned by the construction of the Phase III Tenant Improvements or Landlord's actions in connection with the construction of the Phase III Tenant Improvements.

      7.    <u>Miscellaneous</u>.

      7.1    <u>Tenant's Representative</u>. Tenant has designated Tim Noel as its sole representative with respect to the matters set forth in this Phase III Work Letter, who, until further notice to Landlord, shall have full authority and responsibility to act on behalf of the Tenant as required in this Phase III Work Letter.

      7.2    <u>Landlord's Representative</u>. Landlord has designated Blayke Esparza as its sole representative with respect to the matters set forth in this Phase III Work Letter, who, until further notice to Tenant, shall have full authority and responsibility to act on behalf of the Landlord as required in this Phase III Work Letter.

      7.3    <u>Tenant's Lease Default</u>. Notwithstanding any provision to the contrary contained in this Lease, if an event of default as described in the Lease, or a default by Tenant under this Phase III Work Letter, has occurred at any time on or before the substantial completion of the Phase III Tenant Improvements, then (i) in addition to all other rights and remedies granted to Landlord pursuant to the Lease, Landlord shall have the right to cease the construction of the Phase III Tenant Improvements, and (ii) all other obligations of Landlord under the terms of this Phase III Work Letter shall be forgiven until such time as such default is cured pursuant to the terms of the Lease.

      7.4    <u>Time of the Essence in This Tenant Work Letter</u>. Unless otherwise indicated, all references herein to a "number of days" shall mean and refer to calendar days. In all instances where Tenant is required to approve or deliver an item, if no written notice of approval is given or the item is not delivered within the stated time period, at Landlord's sole option, at the end of such period the item shall automatically be deemed approved or delivered by Tenant and the next succeeding time period shall commence.

      7.5    <u>Cooperation by Tenant</u>. Tenant acknowledges that the timing of the completion of the Phase III Approved Working Drawings and the Phase III Tenant Improvements is of the utmost importance to Landlord. Accordingly, Tenant hereby agrees to fully and diligently cooperate with all reasonable requests by Landlord in connection with or related to the design and construction of the Phase III Tenant Improvements, and in

connection therewith, shall respond to Landlord's requests for information and/or approvals, except as specifically set forth herein to the contrary, within two (2) business days following request by Landlord.

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

## EXHIBIT C

### NOTICE OF LEASE TERM DATES

To:     _____
        _____
        _____
        _____

Re:     Industrial Lease dated _____, 20__ between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant") concerning Suite _____ on floor(s) _____ of the office building located at _____, _____, California.

Ladies and Gentlemen:

In accordance with the Industrial Lease (the "Lease"), we wish to advise you and/or confirm as follows:

1.      The Lease Term shall commence on or has commenced on _____ for a term of _____ ending on _____.

2.      Rent commenced to accrue on _____, in the amount of _____.

3.      If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment.  Each billing thereafter, with the exception of the final billing, shall be for the full amount of the monthly installment as provided for in the Lease.

4.      Your rent checks should be made payable to _____ at _____.

"Landlord":

_____,
a _____

By: _____
    Its: _____

Agreed to and Accepted
as of _____, 20____.

"Tenant":

_____
a _____

By: _____
    Its: _____

EXHIBIT C
-1-
(PLG v.5)

<u>EXHIBIT D</u>

## FORM OF TENANT'S ESTOPPEL CERTIFICATE

The undersigned as Tenant under that certain Industrial Lease (the "Lease") made and entered into as of _____, 20__ by and between _____ as Landlord, and the undersigned as Tenant, for Premises on the _____ floor(s) of the building located at _____, _____, California _____, certifies as follows:

1.      Attached hereto as **Exhibit A** is a true and correct copy of the Lease and all amendments and modifications thereto.  The documents contained in **Exhibit A** represent the entire agreement between the parties as to the Premises.

2.      The undersigned currently occupies the Premises described in the Lease, the Lease Term commenced on _____, and the Lease Term expires on _____, and the undersigned has no option to terminate or cancel the Lease or to purchase all or any part of the Premises, the Building and/or the Project.

3.      Base Rent became payable on _____.

4.      The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in **Exhibit A**.

5.      Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows:

6.              Tenant shall not modify the documents contained in **Exhibit A** without the prior written consent of Landlord's mortgagee.

7.      All monthly installments of Base Rent, all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____.  The current monthly installment of Base Rent is $_____.

8.      All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder.  In addition, the undersigned has not delivered any notice to Landlord regarding a default by Landlord thereunder.

9.      No rental has been paid more than thirty (30) days in advance and no security has been deposited with Landlord except as provided in the Lease.

10.     As of the date hereof, there are no existing defenses or offsets, or, to the undersigned's knowledge, claims or any basis for a claim, that the undersigned has against Landlord.

11.     If Tenant is a corporation or partnership, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity in its state of incorporation or formation and is qualified to do business in California and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

12.     There are no actions pending against the undersigned under the bankruptcy or similar laws of the United States or any state.

13.     Other than in compliance with all Applicable Laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous substances in the Premises.

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

14.    To the undersigned's knowledge, all tenant improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any tenant improvement work have been paid in full.

The undersigned acknowledges that this Estoppel Certificate may be delivered to Landlord or to a prospective mortgagee or prospective purchaser, and acknowledges that said prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in making the loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of making such loan or acquiring such property.

Executed at _____ on the _____ day of _____, 20__.

"Tenant":

_____,
a _____

By: _____
     Its: _____

By: _____
    Its: _____

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

**EXHIBIT E**

**FORM OF LETTER OF CREDIT**

**(Letterhead of a money center bank
acceptable to the Landlord)**

FAX NO. [(___) ___-____]                    [Insert Bank Name And Address]
SWIFT:  [Insert No., if any]

DATE OF ISSUE:  _____

BENEFICIARY:                                        APPLICANT:
[INSERT LANDLORD ADDRESS FOR LETTERS      [INSERT APPLICANT NAME AND ADDRESS:
OF CREDIT:                                           _____
_____          _____
_____          _____
_____          _____]
_____]

LETTER OF CREDIT NO. _____

EXPIRATION DATE:                                    AMOUNT AVAILABLE:
_____ AT OUR COUNTERS          USD[Insert Dollar Amount]
                                                    (U.S. DOLLARS [Insert Dollar Amount])

LADIES AND GENTLEMEN:

WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ IN
YOUR FAVOR FOR THE ACCOUNT OF [Insert Tenant's Name], A [Insert Entity Type], UP TO THE
AGGREGATE AMOUNT OF USD[Insert Dollar Amount] ([Insert Dollar Amount] U.S. DOLLARS) EFFECTIVE
IMMEDIATELY AND EXPIRING ON ___(Expiration Date)___ AVAILABLE BY PAYMENT UPON
PRESENTATION OF YOUR DRAFT AT SIGHT DRAWN ON [Insert Bank Name] WHEN ACCOMPANIED BY
THE FOLLOWING DOCUMENT(S):

　　　　1.　　THE ORIGINAL OF THIS IRREVOCABLE STANDBY LETTER OF CREDIT AND
AMENDMENT(S), IF ANY.

　　　　2.　　BENEFICIARY'S SIGNED STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED
REPRESENTATIVE OF [Insert Landlord's Name], A [Insert Entity Type] ("LANDLORD") STATING THE
FOLLOWING:

　　　　　　　　"THE UNDERSIGNED HEREBY CERTIFIES THAT THE LANDLORD,
EITHER (A) UNDER THE LEASE (DEFINED BELOW), OR (B) AS A
RESULT OF THE TERMINATION OF SUCH LEASE, HAS THE RIGHT TO
DRAW DOWN THE AMOUNT OF USD _____ IN      ACCORDANCE
WITH THE TERMS OF THAT CERTAIN OFFICE LEASE AGREEMENT
DATED [Insert Lease Date], AS THE SAME MAY HAVE BEEN AMENDED
(COLLECTIVELY, THE "LEASE"), OR SUCH AMOUNT CONSTITUTES
DAMAGES OWING BY THE TENANT TO BENEFICIARY RESULTING
FROM THE BREACH OF SUCH LEASE BY THE TENANT THEREUNDER,

EXHIBIT E
-1-

DocuSign Envelope ID: ECF22512-04E6-4EA8-99F3-271D7DD8F865

OR THE TERMINATION OF SUCH LEASE, AND SUCH AMOUNT REMAINS UNPAID AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT WE HAVE RECEIVED A WRITTEN NOTICE OF [Insert Bank Name]'S ELECTION NOT TO EXTEND ITS STANDBY LETTER OF CREDIT NO. _____ AND HAVE NOT RECEIVED A REPLACEMENT LETTER OF CREDIT WITHIN AT LEAST SIXTY (60) DAYS PRIOR TO THE PRESENT EXPIRATION DATE."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW DOWN THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE FILING OF A VOLUNTARY PETITION UNDER THE U.S. BANKRUPTCY CODE OR A STATE BANKRUPTCY CODE BY THE TENANT UNDER THAT CERTAIN OFFICE LEASE AGREEMENT DATED [Insert Lease Date], AS THE SAME MAY HAVE BEEN AMENDED (COLLECTIVELY, THE "LEASE"), WHICH FILING HAS NOT BEEN DISMISSED AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW DOWN THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF AN INVOLUNTARY PETITION HAVING BEEN FILED UNDER THE U.S. BANKRUPTCY CODE OR A STATE BANKRUPTCY CODE AGAINST THE TENANT UNDER THAT CERTAIN OFFICE LEASE AGREEMENT DATED [Insert Lease Date], AS THE SAME MAY HAVE BEEN AMENDED (COLLECTIVELY, THE "LEASE"), WHICH FILING HAS NOT BEEN DISMISSED AT THE TIME OF THIS DRAWING."

OR

"THE UNDERSIGNED HEREBY CERTIFIES THAT BENEFICIARY IS ENTITLED TO DRAW DOWN THE FULL AMOUNT OF LETTER OF CREDIT NO. _____ AS THE RESULT OF THE REJECTION, OR DEEMED REJECTION, OF THAT CERTAIN OFFICE LEASE AGREEMENT DATED [Insert Lease Date], AS THE SAME MAY HAVE BEEN AMENDED, UNDER SECTION 365 OF THE U.S. BANKRUPTCY CODE."

SPECIAL CONDITIONS:

PARTIAL DRAWINGS AND MULTIPLE PRESENTATIONS MAY BE MADE UNDER THIS STANDBY LETTER OF CREDIT, PROVIDED, HOWEVER, THAT EACH SUCH DEMAND THAT IS PAID BY US SHALL REDUCE THE AMOUNT AVAILABLE UNDER THIS STANDBY LETTER OF CREDIT.

ALL INFORMATION REQUIRED WHETHER INDICATED BY BLANKS, BRACKETS OR OTHERWISE, MUST BE COMPLETED AT THE TIME OF DRAWING. [Please Provide The Required Forms For Review, And Attach As Schedules To The Letter Of Credit.]

ALL SIGNATURES MUST BE MANUALLY EXECUTED IN ORIGINALS.

ALL BANKING CHARGES ARE FOR THE APPLICANT'S ACCOUNT.

IT IS A CONDITION OF THIS STANDBY LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR A PERIOD OF ONE YEAR FROM THE PRESENT OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO THE EXPIRATION DATE WE SEND YOU NOTICE BY NATIONALLY RECOGNIZED OVERNIGHT COURIER SERVICE THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT FOR ANY SUCH ADDITIONAL PERIOD.  SAID NOTICE WILL BE SENT TO THE ADDRESS INDICATED ABOVE, UNLESS A CHANGE OF ADDRESS IS OTHERWISE NOTIFIED BY YOU TO US IN WRITING BY RECEIPTED MAIL OR COURIER.  ANY NOTICE TO US WILL BE DEEMED EFFECTIVE ONLY UPON ACTUAL RECEIPT BY US AT OUR DESIGNATED OFFICE.  IN NO EVENT, AND WITHOUT FURTHER NOTICE FROM OURSELVES, SHALL THE EXPIRATION DATE BE EXTENDED BEYOND A FINAL EXPIRATION DATE OF ___(120 days from the Lease Expiration Date)___.

THIS LETTER OF CREDIT MAY BE TRANSFERRED SUCCESSIVELY IN WHOLE OR IN PART ONLY UP TO THE THEN AVAILABLE AMOUNT IN FAVOR OF A NOMINATED TRANSFEREE ("TRANSFEREE"), ASSUMING SUCH TRANSFER TO SUCH TRANSFEREE IS IN COMPLIANCE WITH ALL APPLICABLE U.S. LAWS AND REGULATIONS.  AT THE TIME OF TRANSFER, THE ORIGINAL LETTER OF CREDIT AND ORIGINAL AMENDMENT(S) IF ANY, MUST BE SURRENDERED TO US TOGETHER WITH OUR TRANSFER FORM (AVAILABLE UPON REQUEST) AND PAYMENT OF OUR CUSTOMARY TRANSFER FEES, WHICH FEES SHALL BE PAYABLE BY APPLICANT (PROVIDED THAT BENEFICIARY MAY, BUT SHALL NOT BE OBLIGATED TO, PAY SUCH FEES TO US ON BEHALF OF APPLICANT, AND SEEK REIMBURSEMENT THEREOF FROM APPLICANT).  IN CASE OF ANY TRANSFER UNDER THIS LETTER OF CREDIT, THE DRAFT AND ANY REQUIRED STATEMENT MUST BE EXECUTED BY THE TRANSFEREE AND WHERE THE BENEFICIARY'S NAME APPEARS WITHIN THIS STANDBY LETTER OF CREDIT, THE TRANSFEREE'S NAME IS AUTOMATICALLY SUBSTITUTED THEREFOR.

ALL DRAFTS REQUIRED UNDER THIS STANDBY LETTER OF CREDIT MUST BE MARKED:  "DRAWN UNDER [Insert Bank Name] STANDBY LETTER OF CREDIT NO. _____."

WE HEREBY AGREE WITH YOU THAT IF DRAFTS ARE PRESENTED TO [INSERT BANK NAME] UNDER THIS LETTER OF CREDIT AT OR PRIOR TO 11:00 AM, ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAFTS PRESENTED CONFORM TO THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, PAYMENT SHALL BE INITIATED BY US IN IMMEDIATELY AVAILABLE FUNDS BY OUR CLOSE OF BUSINESS ON THE SUCCEEDING BUSINESS DAY.  IF DRAFTS ARE PRESENTED TO [INSERT BANK NAME] UNDER THIS LETTER OF CREDIT AFTER 11:00 AM, ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAFTS CONFORM WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, PAYMENT SHALL BE INITIATED BY US IN IMMEDIATELY AVAILABLE FUNDS BY OUR CLOSE OF BUSINESS ON THE SECOND SUCCEEDING BUSINESS DAY.  AS USED IN THIS LETTER OF CREDIT, "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY, SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN THE STATE OF CALIFORNIA ARE AUTHORIZED OR REQUIRED BY LAW TO CLOSE.  IF THE EXPIRATION DATE FOR THIS LETTER OF CREDIT SHALL EVER FALL ON A DAY WHICH IS NOT A BUSINESS DAY THEN SUCH EXPIRATION DATE SHALL AUTOMATICALLY BE EXTENDED TO THE DATE WHICH IS THE NEXT BUSINESS DAY.

PRESENTATION OF A DRAWING UNDER THIS LETTER OF CREDIT MAY BE MADE ON OR PRIOR TO THE THEN CURRENT EXPIRATION DATE HEREOF BY HAND DELIVERY, COURIER SERVICE, OVERNIGHT MAIL, OR FACSIMILE.  PRESENTATION BY FACSIMILE TRANSMISSION SHALL BE BY TRANSMISSION OF THE ABOVE REQUIRED SIGHT DRAFT DRAWN ON US TOGETHER WITH THIS LETTER OF CREDIT TO OUR FACSIMILE NUMBER, [INSERT FAX NUMBER – (___) ___-____], ATTENTION:  [INSERT APPROPRIATE RECIPIENT], WITH TELEPHONIC CONFIRMATION OF OUR RECEIPT OF SUCH FACSIMILE TRANSMISSION AT OUR TELEPHONE NUMBER [INSERT TELEPHONE

NUMBER – (___) ___-____] OR TO SUCH OTHER FACSIMILE OR TELEPHONE NUMBERS, AS TO WHICH YOU HAVE RECEIVED WRITTEN NOTICE FROM US AS BEING THE APPLICABLE SUCH NUMBER.  WE AGREE TO NOTIFY YOU IN WRITING, BY NATIONALLY RECOGNIZED OVERNIGHT COURIER SERVICE, OF ANY CHANGE IN SUCH DIRECTION.  ANY FACSIMILE PRESENTATION PURSUANT TO THIS PARAGRAPH SHALL ALSO STATE THEREON THAT THE ORIGINAL OF SUCH SIGHT DRAFT AND LETTER OF CREDIT ARE BEING REMITTED, FOR DELIVERY ON THE NEXT BUSINESS DAY, TO [INSERT BANK NAME] AT THE APPLICABLE ADDRESS FOR PRESENTMENT PURSUANT TO THE PARAGRAPH FOLLOWING THIS ONE.

WE HEREBY ENGAGE WITH YOU THAT ALL DOCUMENT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS STANDBY LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT AT OUR OFFICE LOCATED AT [Insert Bank Name], [Insert Bank Address], ATTN:  [Insert Appropriate Recipient], ON OR BEFORE THE EXPIRATION DATE OF THIS CREDIT,  ___(Expiration Date)___ .

IN THE EVENT THAT THE ORIGINAL OF THIS STANDBY LETTER OF CREDIT IS LOST, STOLEN, MUTILATED, OR OTHERWISE DESTROYED, WE HEREBY AGREE TO ISSUE A DUPLICATE ORIGINAL HEREOF UPON RECEIPT OF A WRITTEN REQUEST FROM YOU AND A CERTIFICATION BY YOU (PURPORTEDLY SIGNED BY YOUR AUTHORIZED REPRESENTATIVE) OF THE LOSS, THEFT, MUTILATION, OR OTHER DESTRUCTION OF THE ORIGINAL HEREOF.

EXCEPT SO FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY LETTER OF CREDIT IS SUBJECT TO THE "INTERNATIONAL STANDBY PRACTICES" (ISP 98) INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 590).

Very truly yours,

(Name of Issuing Bank)

By:  _____