**79 PAGES**

Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
6232 LaSalle Avenue, Suite D
Oakland, CA 94611
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Attorneys for MATHESON FLIGHT EXTENDERS, INC., MATHESON POSTAL SERVICES, INC. and MATHESON TRUCKING, INC.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>MATHESON FLIGHT EXTENDERS, INC.,<br><br>Debtor. | Case No.: 22-21148<br><br>Chapter 11<br><br>**DCN: NH-110** |
| In re:<br><br>MATHESON POSTAL SERVICES, INC.<br><br>Debtor. | Case No.: 22-21149<br><br>Chapter 11 |
| In re:<br><br>MATHESON TRUCKING, INC.<br><br>Debtor. | Case No.: 22-21758<br><br>Chapter 11 |
| ☒ Affects All Debtors<br>☐ Affects Matheson Flight Extenders Only<br>☐ Affects Matheson Postal Services Only<br>☐ Affects Matheson Trucking Only | **ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE DEBTORS AND CREDITORS' COMMITTEE'S JOINT CHAPTER 11 <u>PLAN OF LIQUIDATION</u> (August 22, 2024)**<br><br>Date: October 11, 2024<br>Time: 11:00 a.m.<br>Place: United States Bankruptcy Court<br>501 I Street, 6th Flr., Crtrm. 35<br>Sacramento, CA 95814<br>Judge: Hon. Christopher M. Klein |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

Following appropriate and full notice to creditors and parties in interest [DN 1884 and DN 1908], the Court held a hearing on October 11, 2024, at 11:00 a.m. in connection with confirmation of the Debtors and Creditors Committee's Joint Chapter 11 Plan of Liquidation (August 22, 2024) [DN 1864] ("Plan"). Upon due consideration of the Plan, the objections to confirmation of the Plan filed by Gary Vorce/Sindy Buford [DN 1890] and XL Specialty Insurance Company, XL Insurance America, Inc., Greenwich Insurance Company, and Indian Harbor Insurance Company (collectively, "XL Insurance") [DN 1895], the evidence submitted, the arguments of counsel, and the pleadings and papers on file in this case, the Court rendered its findings of fact and conclusions of law orally on the record. For the reasons set forth on the record, the Court determined that all of the requirements for confirmation of the Plan have been satisfied, including those set forth in 11 U.S.C. § 1129(a), and for good cause appearing,

IT IS HEREBY ORDERED that

1. The Disclosure Statement [DN 1865] conditionally approved by the Court's August 23, 2024, order [DN 1870] is APPROVED on a final basis, including as satisfying the requirements of 11 U.S.C. § 1125.

2. The objections to confirmation of the Plan filed by Gary Vorce/Sindy Buford [DN 1890] and XL Insurance [DN 1895] are OVERRULED.

3. The Plan, in the form attached hereto as **Exhibit A** is CONFIRMED.

4. Hank Spacone is hereby designated pursuant to Articles 5.3 and 5.4 of the Plan to serve as the Plan Administrator. From and after the Effective Date of the Plan, the Plan Administrator is authorized to perform the Debtors' obligations and otherwise take necessary and appropriate steps to implement the Plan in accordance with Article 5 of the Plan.

5. All claims arising from an executory contract or lease rejected pursuant to Article 6.2 of the Plan shall be filed no later than thirty (30) days after the Effective Date.

6. The Administrative Claims Bar Date shall be sixty (60) days after the Effective Date as provided in Section 1.1.2 of the Plan.

//

//

7. All professional fees and expenses incurred prior to the Effective Date by professional persons employed under 11 U.S.C. § 327 or § 328 are payable only to the extent allowed by further order of this Court.

8. This Court shall retain jurisdiction as provided in Article 11 of the Plan.

No objection to form:

UNITED STATES DEPARTMENT OF JUSTICE
ON BEHALF OF THE UNITED STATES POSTAL SERVICE

By: */s/ Dominique Sinesi*
Dominique Sinesi
Louisa A. Soulard
On behalf of the United States Postal Service

Approved as to form:

FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS LLP

By: */s/Jason E. Rios*
Jason E. Rios
Attorneys for the Official Committee of Unsecured Creditors for Matheson Flight Extenders, Inc., Matheson Postal Services, Inc., and Matheson Trucking, Inc.

Dated: October 17, 2024

United States Bankruptcy Judge

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**EXHIBIT A**

**75 PAGES**

Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
6232 La Salle Avenue, Suite D
Oakland, CA 94611
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Attorneys for MATHESON FLIGHT EXTENDERS, INC., MATHESON POSTAL SERVICES, INC. and MATHESON TRUCKING, INC., Debtors-in-Possession

Paul J. Pascuzzi (CSBN 148810
Jason E. Rios (CSBN 190086)
FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS, LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814-4760
Telephone: 916-329-7400
Email: ppascuzzi@ffwplaw.com
jrios@ffwplaw.com

Attorneys for OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>MATHESON FLIGHT EXTENDERS, INC.,<br><br>Debtor. | Case No.: 22-21148<br><br>Chapter 11<br><br>**DCN: NH-110** |
| In re:<br><br>MATHESON POSTAL SERVICES, INC.,<br><br>Debtor. | Case No.: 22-21149<br><br>Chapter 11 |
| In re:<br><br>MATHESON TRUCKING, INC.,<br><br>Debtor. | Case No.: 22-21758<br><br>Chapter 11<br><br>**DEBTORS AND CREDITORS COMMITTEE'S JOINT CHAPTER 11 PLAN OF LIQUIDATION**<br>**(August 22, 2024)** |
| X Affects All Debtors<br>☐ Affects Matheson Flight Extenders<br>☐ Affects Matheson Postal Services<br>☐ Affects Matheson Trucking | Date: October 10, 2024<br>Time: 11:00 a.m.<br>Place: United States Bankruptcy Court<br>501 I Street, 6th Flr., Crtrm. 35<br>Sacramento, CA 95814<br>Judge: Hon. Christopher M. Klein |

## TABLE OF CONTENTS

**Page**


ARTICLE I - DEFINITIONS AND RULES OF INTERPRETATION .......... 1
1.1 Definitions .......... 1
1.2 Rules of Interpretation .......... 14
ARTICLE II - DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS AND SPECIFICATION OF STATUS AS IMPAIRED .......... 14
2.1 Secured Claims (Classes 1, 2, 3 and 4) .......... 14
2.1.1 (Secured Claim of Bank of America, N.A.) .......... 14
2.1.2 (Secured Claim of Banc of America Leasing & Capital LLC) .......... 14
2.1.3 (Secured Claim of PACCAR Financial Corp.) .......... 15
2.1.4 (Secured Claim of BMO Harris Bank, N.A.) .......... 15
2.2 Unsecured Claims (Classes 5, 6, 7, 8, 9, and 10) .......... 15
2.2.1 (Workers Compensation Claims) .......... 15
2.2.2 (Tort Claims) .......... 15
2.2.3 (Unsecured Non-Priority Claims) .......... 15
2.2.4 (USPS Claim) .......... 15
2.2.5 (Insider Unsecured Claims) .......... 16
2.2.6 (XTRA Lease Claims) .......... 16
2.3 Equity Interests (Class 11) .......... 16
ARTICLE III - TREATMENT OF UNCLASSIFIED CLAIMS .......... 16
3.1 Administrative Claims .......... 16
3.1.1 Non-Ordinary Course Administrative Claims .......... 16
3.1.2 Ordinary Course Administrative Claims .......... 17
3.1.3 Administrative Claims of Tolling Insiders .......... 18
3.1.4 Failure to Timely File Motion for Allowance of Administrative Claim .......... 18
3.1.5 Reserves for Disputed Administrative Claims .......... 18
3.2 Priority Tax Claims .......... 19
3.3 United States Trustee Fees .......... 19
3.4 Professional Fees .......... 19
ARTICLE IV - TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS .......... 20
4.1 Class 1 – Bank of America, N.A. Secured Claim .......... 20
4.1.1 Determination of Liens and Secured Amount. .......... 20
4.1.2 Treatment. .......... 21
4.1.3 Option to Surrender Bank of America, N.A Collateral. .......... 24
4.1.4 Rights Upon Default. .......... 24
4.2 Class 2 –Banc of America Leasing & Capital, LLC .......... 25
4.2.1 Determination of Liens and Secured Amount. .......... 25
4.2.2 Treatment. .......... 25

4.2.3 Rights Upon Default. ... 27
4.3 Class 3 –PACCAR Financial Corp. ... 27
4.3.1 Determination of Liens and Secured Amount. ... 27
4.3.2 Treatment. ... 28
4.3.3 Rights Upon Default. ... 29
4.4 Class 4 –BMO Harris Bank, N.A. ... 29
4.5 Class 5 – Workers Compensation Claims ... 29
4.6 Class 6 – Tort Claims ... 31
4.6.1 Participation in Mandatory Alternative Dispute Resolution Program ... 31
4.6.2 Tort Claims Not Resolved Through MADRP ... 35
4.6.3 Limitations on Tort Claimants’ Recourse to Available Insurance ... 35
4.6.4 Distributions to Allowed Class 6 Claims ... 36
4.7 Class 7 – General Unsecured Claims ... 37
4.8 Class 8 – Disputed Claims of United States Postal Service ... 37
4.9 Class 9 – Unsecured Claims of Insiders ... 38
4.10 Class 10 – XTRA Lease ... 38
4.11 Class 11 – Equity Interests ... 39
ARTICLE V - MEANS FOR IMPLEMENTATION OF THE PLAN ... 39
5.1 Revesting of Assets ... 39
5.2 Substantive Consolidation ... 39
5.3 Corporate Organization and Management ... 41
5.4 Plan Administrator and Management ... 41
5.4.1 Primary Authority and Responsibilities ... 42
5.4.2 Authority to Delegate Responsibilities ... 42
5.4.3 Replacement of Plan Administrator ... 42
5.5 Key Employee Incentive Plan for Senior Management ... 42
5.6 Estate Professionals and Post-Confirmation Professionals ... 42
5.7 Plan Administrators Powers, Duties and Obligations ... 43
5.8 Additional Financial Reporting Duties ... 46
5.9 No Impact on Agreements Related to Workers Compensation Insurance ... 46
5.10 Amendment of Pre-Petition Loan Documents ... 48
5.11 Treatment of Disputed Claims ... 48
5.11.1 Deadline for Filing Claim Objections ... 48
5.11.2 Distributions on Allowed Claims/*De Minimis* Distributions. ... 48
5.11.3 Settlement of Disputes and Claims. ... 49
5.11.4 Setoff/Recoupment. ... 49
5.12 Administrative Reserve ... 49
5.13 Reserves for Disputed Claims ... 50
5.14 Tax Reporting and Addresses for Transmitting Payments ... 50

5.15 Unclaimed Distributions ..... 51
5.16 Post-Confirmation Committee of Unsecured Creditors ..... 51
5.17 Duration of Automatic Stay and Pre-Confirmation Injunctions ..... 52
5.18 Payments to Creditors Not Deemed Allowance of Claims ..... 53
5.19 Entry of Final Decree, Reopening ..... 53
5.20 Allocation of XL Collateral Refunds ..... 53
ARTICLE VI - EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 53
6.1 Executory Contracts/Leases Assumed. ..... 53
6.2 Executory Contracts/Leases Rejected. ..... 55
6.3 Non-Disclosure, Common Interest, and Joint Defense Agreements. ..... 55
ARTICLE VII - CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ..... 55
7.1 Conditions to Confirmation. ..... 55
7.2 Conditions to Effectiveness. ..... 55
ARTICLE VIII - EFFECTS OF CONFIRMATION, RE-VESTING OF TITLE, RELEASES, AND RELATED PROVISIONS ..... 56
8.1 Vesting of Property. ..... 56
8.2 Plan Creates New Obligations. ..... 56
8.3 Effect of Conversion to Chapter 7. ..... 56
ARTICLE IX - RETENTION AND ENFORCEMENT OF CLAIMS ..... 57
9.1 Preservation of All Rights of Action. ..... 57
9.2 Extension of Limitations Period for Claims Against Insiders. ..... 57
ARTICLE X - MODIFICATION OF PLAN ..... 58
ARTICLE XI - RETENTION OF JURISDICTION ..... 58
ARTICLE XII - MISCELLANEOUS ..... 59
12.1 Cramdown. ..... 59
12.2 Severability. ..... 59
12.3 Binding Effect. ..... 59
12.4 Captions. ..... 60
12.5 Controlling Effect. ..... 60
12.6 Notices. ..... 60
12.7 Events of Default ..... 60
12.8 Rights in the Event of Default ..... 61
12.9 Exculpation ..... 61

Matheson Flight Extenders, Inc. ("MFE"), Matheson Postal Services, Inc. ("MPS") and Matheson Trucking, Inc. ("MTI" and collectively, "Matheson" or the "Debtors") and the Official Committee of Unsecured Creditors ("Creditors Committee") propose this Joint Chapter 11 Plan of Liquidation (the "Plan") for the liquidation of the Debtors' remaining assets and distribution of assets to creditors. If confirmed, the Plan will bind all creditors provided for in the Plan, whether or not they file a proof of claim or accept the Plan, and whether or not their claims are allowed. All creditors should refer to Articles 2 through 4 of the Plan for information regarding the precise treatment of their claims. The Disclosure Statement that is circulated with the Plan provides additional information about the Debtors' history, business, assets, operations, and events leading up to this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one.**

## ARTICLE I - DEFINITIONS AND RULES OF INTERPRETATION

### 1.1 *Definitions*

Unless the context requires otherwise, the following definitions apply in this Plan:

**1.1.1** "**Administrative Claim**" means a claim for any cost or expense of administration of a kind specified in Section 503(b) of the Bankruptcy Code that is entitled to priority over general unsecured claims under Section 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) any actual or necessary costs and expenses of preserving the bankruptcy estate incurred on or after the Petition Date and through and including the Effective Date of the Plan, (ii) any cure amounts that must be paid in connection with the assumption of any executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (iii) fees payable to the court system or the U.S. Trustee under Section 1930 of Title 28, United States Code ("United States Trustee Fees"), and (iv) allowed compensation for fees and reimbursable expenses for legal and other services under Sections 330 and 331 of the Bankruptcy Code, or otherwise allowed by the Bankruptcy Court under Section 503 of the Bankruptcy Code (defined below as "Professional Fee Claims").

**1.1.2 "Administrative Claim Bar Date"** means the date that is sixty (60) days after the Effective Date, which shall be the deadline for all parties to file with the Court any requests for payment or any other means of preserving and obtaining payment of an Administrative Claim to the extent such Claim (i) arose or was incurred between May 5, 2022 (in the cases of MFE and MPS) or between July 14, 2022 (in the case of MTI) and the Effective Date and (ii) has not been paid, released, or otherwise settled. The Administrative Claims Bar Date shall not apply to (a) United States Trustee Fees, (b) all requests for payment of Professional Fee claims, (c) Ordinary Course Administrative Claims that are allowed and paid by the Plan Administrator in accordance with Article 3.1.2, and (d) any Administrative Claim asserted by a Tolling Insider.

**1.1.3 "Allowed Administrative Claim"** means all or any portion of an Administrative Claim that has either been (i) allowed by a Final Order or (ii) has not been objected to within the time period established by the Plan or by an order of the Bankruptcy Court.

**1.1.4 "Allowed Claim"** means a claim against any of the Debtors, other than an Administrative Claim, as to which:

a. A proof of claim was (i) timely filed not later than the Claims Bar Date, or any other applicable claim filing deadline, or (ii) deemed filed under 11 U.S.C. §1111(a), or (iii) filed late pursuant to an Order of the Bankruptcy Court after notice and an opportunity for hearing appropriate in the circumstances; and

b. Such claim is not a Disputed Claim, or if a Disputed Claim, such claim has been allowed in whole or in part by a Final Order, provided that any such claim shall be an Allowed Claim only to the extent stated in any such Final Order. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, no distributions shall be made under the Plan with respect to the disputed portion of any Disputed Claim until there is a Final Order specifying the allowed amount of such claim.

c. Unless expressly made part of Claim Allowed under the terms of this Plan, no attorneys' fees, default interest, late penalties or any similar charges shall be part of an Allowed Claim, secured or unsecured, until the creditor seeking to recover such fees, interest, penalties or charges from the Estate obtains a Court Order approving such penalties and charges.

Such approval must be made through a motion for recovery of such fees, interest, penalties, or charges filed within thirty (30) days of the Effective Date and on not less than twenty-eight (28) days' notice to the Debtors' Estates, or any such claim for penalties and charges shall be deemed barred.

d. No disputed portion of any claim shall be considered as an Allowed Claim if an objection to the allowance of such claim is made by the Debtors or another party in interest and such objection to claim has not been denied by a Final Order.

**1.1.5** "**Allowed Secured Claim**" means any Allowed Claim that is secured by a lien on assets owned by any of the Debtors, subject to the limitations set forth in 11 U.S.C. § 506(a)(1).

**1.1.6** "**Allowed Unsecured Claim**" means any Allowed Claim that is an unsecured claim not entitled to priority under 11 U.S.C. §§ 503 or 507, including an allowed Rejection Claim, but does not include Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, or Disputed Claims.

**1.1.7** "**Avoidance Actions**" means any rights, claims or causes of action (and any litigation thereon) which a trustee or Debtors in possession is authorized to assert under or based upon the provisions of Bankruptcy Code §§ 542 through 551 and 553.

**1.1.8** "**Ballot**" means the voting form distributed to each holder of a Claim in Class 1, Class, 2, Class 3, Class 4, Class 6, Class 7, Class 8, Class 9, and Class 10 that is eligible to vote to accept or reject this Plan.

**1.1.9** "**Banc of America Leasing & Capital Equipment Loan**" means the Master Loan and Security Agreement No. 31673-70000 dated as of August 22, 2016, by and between Banc of America Leasing & Capital LLC and Matheson Trucking, Inc., as restated pursuant to that certain Restated Addendum to Master Loan and Security Agreement No. 31673-70000 dated as of August 22, 2016 by and between Banc of America Leasing & Capital, LLC, Matheson Flight Extenders, Inc., Matheson Trucking, Inc., and Matheson Postal Services, Inc. and all Equipment Notes issued thereunder.

**1.1.10** "**BALC Perfected Collateral**" means the equipment assets held by the Debtors' Estates on the Effective Date that are referenced in Equipment Note -004 and Equipment Note -

005 issued pursuant to the Banc of America Leasing & Capital Equipment Loan. For the avoidance of doubt, BALC Perfected Collateral does not include any of the equipment assets held by the Debtors' Estates on the Effective Date that are referenced in Equipment Note -006, Equipment Note -007 and Equipment Note -008 issued pursuant to the Banc of America Leasing & Capital Equipment Loan.

**1.1.11** "**Bank of America Loan Agreement**" means the credit facilities granted to MTI under that certain Loan Agreement dated as of November 15, 2016, executed by Matheson Trucking, Inc. and Bank of America, N.A., as subsequently amended and modified, which credit facilities were guaranteed by MPS and MFE pursuant to those certain Continuing and Unconditional Guaranty, each dated November 15, 2016.

**1.1.12** "**Bank of America Letter of Credit Facility**" means any and all letters of credit issued by Bank of America, N.A. for the benefit of MFE, MPS, or MTI pursuant to the Bank of America Loan Agreement.

**1.1.13** "**Bank of America Line of Credit**" means the $2,000,000.00 revolving line of credit issued by Bank of America, N.A. to or for the benefit of MFE, MPS, or MTI pursuant to the Bank of America Loan Agreement.

**1.1.14** "**Bank of America Credit Card Agreement**" means the Commercial Card Account Agreement between Bank of America, N.A., and MTI dated as of October 12, 2016, as modified by the Amendment to Credit Card Agreement dated as of May 10, 2022, signed by the Debtors which authorized Bank of America, N.A. to extend credit on existing credit cards up to the total aggregate amount of $250,000.

**1.1.15** "**Bank of America Credit Card Agreement Approval Order**" means that final order dated June 14, 2022 [Dkt. No. 156 in Case No. 22-21148] approving the Bankruptcy Court's May 11, 2022, Interim Order Authorizing Debtors to (A) Maintain Existing Bank Account and (B) Continue Use of Cash Management System [Dkt. No. 32 in Case No. 22-21148, and Dkt. No. 31 in Case No. 22-21149], which orders approved the Bank of America Credit Card Agreement, ensuring the Debtors would continue to have access to credit cards issued by Bank of America, N.A. with a total credit availability of $250,000.

**1.1.16** "**Bankruptcy Code**" or "**Code**" means Title 11 of the United States Code, as it was in effect on the date of filing of the Plan, as amended by any amendments applicable to this Chapter 11 Case, and also includes Sections 157, 158, 1334, 1408-1412, and 1452 of Title 28 of the United States Code.

**1.1.17** "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, having jurisdiction over the Chapter 11 Cases, and any other courts or panels of courts having competent jurisdiction over the Chapter 11 Cases or appeals from orders entered in the Chapter 11 Case.

**1.1.18** "**Bankruptcy Rules**" means the rules of practice and procedure in cases under Title 11 of the United State Code, as promulgated under 28 U.S.C. §2075.

**1.1.19** "**Cash**" means cash and cash equivalents.

**1.1.20** **"Causes of Action"** means any action, claim, cause of action, cross-claim, third-party claim, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever belonging to the Debtor or its Estate, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertible directly or derivatively (including under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law, and the proceeds thereof. For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 and any and all Avoidance Actions; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state, federal or foreign law; (f) all tort claims and D&O claims; (g) any and all claims under any D&O Liability Insurance Policies; and (h) all Retained Causes of Action, including those enumerated in Section 9.1 of this Plan. The definition of "Causes of Action" shall be construed in accordance

with its broadest possible meaning, and any doubts or ambiguities shall be resolved in favor of inclusiveness. Except as otherwise expressly provided in this Plan or the Confirmation Order, any and all Causes of Action of the Debtor or the Estate (including, but not limited to, tort Claims and D&O Claims), are expressly preserved under the Plan and retained by Debtors as provided in Section 9.1 of the Plan.

**1.1.21** "**Chapter 7**" means Chapter 7 of the Bankruptcy Code.

**1.1.22** "**Chapter 11**" means Chapter 11 of the Bankruptcy Code.

**1.1.23** "**Chapter 11 Case(s)**" means the cases pending in the Bankruptcy Court commenced by MFE and MPS filing voluntary petitions under Chapter 11 of the Bankruptcy Code on May 5, 2022, and MTI filing a voluntary petition under Chapter 11 of the Bankruptcy Code on July 14, 2022.

**1.1.24** "**Claim**" means a Claim against the Debtors or, if the context otherwise requires, against other persons or entities, whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

**1.1.25** "**Claimholder**" means the holder of a Claim.

**1.1.26** "**Claims Bar Date**" means the deadlines for filing proofs of claims or interests, other than Administrative Claims or Rejection Claims, by government and non-government creditors and interest holders against the Debtors. In the Chapter 11 Cases of MFE and MPS, the deadline for non-government creditors and interest holders was September 6, 2022, and November 1, 2022, for government creditors. In the case of MTI, the deadline for non-government creditors and interest holders was November 28, 2022, and January 10, 2023, for government creditors. For Rejection Claims, "Claims Bar Date" means the earlier of: (i) the date specified in the order authorizing rejection of said contract or lease, or (ii) thirty (30) calendar days after the Effective Date.

**1.1.27** "**Confirmation**" means the entry by the Bankruptcy Court of an order (the "Confirmation Order") confirming the Plan.

**1.1.28** "**Debtors**" means Matheson Flight Extenders, Inc., Matheson Postal Services, Inc., and Matheson Trucking, Inc., the Debtors in the Chapter 11 Case.

**1.1.29** "**Debtors' Estates**" means the estates of Matheson Flight Extenders, Inc., Matheson Postal Services, Inc., and Matheson Trucking, Inc. created under Section 541 by the commencement of the Chapter 11 Cases on and after the Effective Date.

**1.1.30** "**Disclosure Statement**" means the Disclosure Statement conditionally approved by the Bankruptcy Court in the Chapter 11 Cases on ____________________.

**1.1.31** **"Disallowed"** means a Claim that has been: (a) determined by the Bankruptcy Court to be unenforceable against the Debtors' Estates or property of the Debtors' Estates, or (b) deemed to be unenforceable against the Debtors' Estates or property of the Debtors' by operation of Article 3.1.4.

**1.1.32** "**Disputed Claim**" means any Claim, proof of which has been filed or deemed filed against the Debtors Estates, as to which an objection or adversary proceeding has been timely filed and has not been withdrawn or disposed of by a Final Order of the Bankruptcy Court, or any claim which is designated as a Disputed Claim in this Plan or the Debtors Schedules filed in the Bankruptcy Case.

**1.1.33** "**Effective Date**" means the business day designated as such by the Debtors which is not later than 30 days following the entry of the Confirmation Order, unless such order is stayed by order of a court with original or appellate jurisdiction over this Chapter 11 Case, in which event such date shall be the first business day on or after the fifteenth calendar day after such stay expires.

**1.1.34** "**Final Order**" means an order of the Bankruptcy Court (i) for which the time to appeal has expired and no appeal was filed, or (ii) if a timely appeal was filed, (A) the order has not been stayed and the appeal is subject to statutory or equitable mootness, or (B) the appeal has been dismissed or denied and the time for further appeal has expired or no right of further appeal exists..

**1.1.35** "**General Unsecured Claims**" means all pre-bankruptcy unsecured non-priority claims against the Debtors other than claims in Class 5 (Workers Compensation Claims) provided however, that General Unsecured Claims shall include any claim by the holder of a

Secured Claim to the extent that the amount owed to such holder exceeds the amount of its Allowed Secured Claim.

**1.1.36** "**General Unsecured Creditors' Fund**" means the funds in the Debtors' Estates on and after the Effective Date that:

(1) remain after payment in full of: (a) all Allowed Administrative Claims against the Debtors' Estates provided for in Article 3.1, (b) all Allowed Priority Claims against the Debtors' Estates provided for in Article 3.2, (c) United States Trustee Fees provided for in Article 3.3, (d) Professional Fees provided for in Article 3.4, (e) payment in full of the secured portion of the Claims in Class 1 (Bank of America, N.A., Class 2 (Banc of America Leasing & Capital LLC), Class 3 (PACCAR Financial), Class 4 (BMO/Harris Bank, N.A.), and Class 5 (Workers Compensation Insurance Claims), and

(2) are not required to be reserved for: (a) all anticipated costs and expenses of the Plan Administrator, any professionals retained by the Plan Administrator, and other costs of administering the Debtors Estates after entry of the Confirmation Order, (b) any Disputed Secured Claim, (c) any Disputed Administrative Claim to the extent required by Article 3.1.5, and (d) any Disputed Claim to the extent required by Article 5.11; and

(3) which funds shall be deposited into a segregated account and used solely to make distributions to holders of Allowed Claims in Class 6 (Tort Claims), Class 7 (Unsecured Non-Priority Claims), Class 8 (USPS Claims), and Class 9 (Insider Unsecured Claims).

**1.1.37** "**Insider**" means any person or entity meeting the definition of 11 U.S.C. § 101(31) with respect to the Debtors.

**1.1.38** "**Insider Administrative Claim Bar Date**" means the date designated by the Plan Administrator not less than forty-five (45) days after written notice of such date is served on the Tolling Insider.

**1.1.39** "**Insurance Policies**" means all insurance policies that have been issued or provide coverage to the Debtors or any of their predecessors, and all agreements relating thereto.

**1.1.40** "**Insurer**" means any company that issued an Insurance Policy and its affiliates, predecessors, successors and assigns.

**1.1.41** "**Interest**" means the equity interests in each of the Debtors.

**1.1.42** "**Initial Deposit**" means the sum of $2,000,000.00 that the Debtors' Estates shall deposit into the General Unsecured Creditors' Fund on the Effective Date.

**1.1.43** "**KEIP**" means the senior management key employee incentive plan described in Article 5.5.

**1.1.44** "**Ordinary Course Administrative Claim**" means an Administrative Claim based on liabilities incurred in the ordinary course of the Debtors' business following the Petition Date and through the Effective Date for amounts less than $100,000.00 held by (i) a current or former employee of the Debtors for wages, benefits, or expense reimbursement, (ii) a utility providing services to the Debtors, (iii) a seller of goods, raw materials, or inventory to the Debtors, and (iv) a provider of services to the Debtors (but excluding any entity that holds a Professional Fee Claim). For the avoidance of doubt, "Ordinary Course Administrative Claims" shall also exclude any Administrative Claim asserted by an Insurer, USPS, a lessor or sublessor of real property to one of the Debtors, a counterparty under an executory contract with the Debtors, or an entity seeking allowance of an Administrative Claim under Bankruptcy Code sections 507(b).

**1.1.45** "**PACCAR Financial Loan Agreements**" means those certain eight (8) Security Agreements and Retail Installment Contracts entered into between PACCAR Financial Corp. and Matheson Postal Services, Inc. dated as of March 23, 2015 (Contract 1, Acct No. -4059); April 19, 2017 (Contract 2, Acct No. -1715); March 29, 2018 (Contract 3, Acct No. -0047); February 11, 2019 (Contract 4, Acct No. -3084); July 25, 2019 (Contract 5, Acct No. -2162); October 2, 2019 (Contract 6, Acct No. -2335); March 26, 2020 (Contract 7, Acct No. -7264); and January 12, 2021 (Contract 8, Acct No. -3584).

**1.1.46** "**PACCAR Perfected Collateral**" means the tractor trailers and all related equipment purchased by Matheson Postal Services, Inc. pursuant to the six (6) Security Agreements and Retail Installment Contracts entered into between PACCAR Financial Corp. and Matheson Postal Services, Inc. dated as of March 23, 2015 (Contract 1, Acct No. -4059); April 19, 2017 (Contract 2, Acct No. -1715); March 29, 2018 (Contract 3, Acct No. -0047); February 11, 2019 (Contract 4, Acct No. -3084); July 25, 2019 (Contract 5, Acct No. -2162); and October 2, 2019 (Contract 6, Acct No. -2335). For the avoidance of doubt, PACCAR Perfected Collateral does not include the tractor trailers or any related equipment purchased by Matheson Postal Services, Inc. pursuant to the Security Agreements and Retail Installment Contracts entered into between PACCAR Financial Corp. and Matheson Postal Services, Inc. dated as of March 26, 2020 (Contract 7, Acct No. -7264); and January 12, 2021 (Contract 8, Acct No. -3584).

**1.1.47** "**Petition Date**" means May 5, 2022, in the cases of MFE and MPS, and July 14, 2022, in the case of MTI, the dates on which the Debtors filed their voluntary petitions commencing the Chapter 11 Case.

**1.1.48** "**Plan**" means the Debtors and Creditors Committee's Joint Chapter 11 Plan of Liquidation Dated August 22, 2024, including any modification(s) or amendment(s) thereto.

**1.1.49** "**Plan Documents**" means this Plan (as it may be amended), the Disclosure Statement, the order confirming the Plan, or any document implementing the Plan.

**1.1.50** "**Plan Administrator**" means Hank Spacone, or such other person or entity designated in orders of the Bankruptcy Court to administer assets of the Debtors' Estate and make distributions to holders of Allowed Claims under this Plan.

**1.1.51** "**Post-Confirmation Committee**" means the committee of creditors identified in Article 5.16.

**1.1.52** "**Post-Confirmation Professionals**" means any and all attorneys, accountants, financial advisors, and other professionals employed or retained by the Plan Administrator or the Post-Confirmation Committee pursuant to the Plan after the Effective Date, including, without limitation, any professionals that were previously retained in the Chapter 11 Cases prior to the

Effective Date. Any and all Post-Confirmation Professionals of the Plan Administrator or Post-Confirmation Committee shall be employed by the Plan Administrator or Post-Confirmation Committee in their discretion and in their respective capacities as such pursuant to this Plan, and their retention shall not be subject to approval by the Bankruptcy Court under Bankruptcy Code sections 327 or 328, and their compensation and expense reimbursement shall not be subject to Bankruptcy Court approval under Bankruptcy Code sections 330 and 331 (except to the extent provided in Article 5.6 hereof).

**1.1.53 Post-Confirmation Reports**" means the reports described in Article 5.8.

**1.1.54** "**Priority Claim**" means any Allowed Claim entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, but not including Administrative Claims.

**1.1.55** "**Priority Tax Claim**" means any Allowed Unsecured Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**1.1.56** "**Professional Fee Claim**" means the Claim of any professional retained under Sections 327 or 1102 of the Bankruptcy Code seeking compensation and expense reimbursement from the assets of the Debtors' estate or Debtors' Estates under Section 330(a) of the Bankruptcy Code.

**1.1.57** "**Pro Rata Share**" means, unless indicated otherwise, (a) the proportion that the amount of an Allowed Claim bears (i) to the aggregate amount of the Allowed Claims in that Class or (ii) to the aggregate amount of the Allowed Claims otherwise specified, as the context requires, or (b) the proportion of the Allowed Claims in a particular Class and other Classes, respectively, entitled to share in the same recovery as such Claim under the Plan (i.e., the proportion of the total Allowed Claims in Classes 6, 7, 8, and 9 to the General Unsecured Creditors' Fund).

**1.1.58** "**Rejection Claim**" means an allowed unsecured claim arising from Debtors' rejection of an unexpired lease or executory contract pursuant to the Plan or pursuant to a prior or subsequent order of the Bankruptcy Court or agreement (?).

**1.1.59** "**Secured Claim**" means any Claim secured by property of the Debtors or the Debtors' Estates.

**1.1.60 "Tolling Insider"** means Insiders Matheson Properties, LLC, Matheson Holdings, a California General Partnership, Matheson Fast Freights, Inc., Matheson Mail Transportation, Inc., Joe Garrett, Inc., Brownie 2006 Trust, Mark Matheson Irrevocable Trust, Mark and Sherrie Matheson Family Trust, Carole Matheson Family Trust, Mark Matheson, Joshua Matheson, and Carole Matheson who are a party to a tolling agreement with the Debtors and/or Creditors Committee as of the Effective Date.

**1.1.61** "**Tort Claim**" means any Unsecured Claim against MFE, MPS, or MTI, principally arising from Debtors alleged act or omission, or the act or omission of a Debtor employee within the course and scope of their employment or agency for a Debtor, that gives rise to alleged injury or harm to the Claimholder where applicable non-bankruptcy law permits such Claimholder to assert a legal claim for relief against the Debtors, on their own behalf, on behalf of those similarly situated, or on behalf of a governmental entity, and such claim remains unliquidated and disputed by the Debtors (i.e., not determined by a final court order, judgment or agreement between the Claimholder and a Debtor) as of the Effective Date. For the avoidance of doubt, Tort Claim shall include wage and hour related claims, but will not include any claim in Class 5 Claims, or any claim solely arising from an alleged breach of contractual obligations by MFE, MPS, or MTI.

**1.1.62** "**Unclaimed Property**" means any distribution that cannot be delivered to, or is not accepted by, the holder of an Allowed Claim, and shall include, without limitation, checks (and the funds represented thereby) that are returned as undeliverable without proper forwarding address, are not cashed, or are not delivered because of the absence of a proper address to which to deliver the distribution.

**1.1.63** "**Unclassified Claims**" means a Claim of a kind specified in Sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code.

**1.1.64** "**Unsecured Claims**" means all unsecured claims against the Debtors, and where the context of a provision of this Plan requires, may include a Tax Claim, and an Administrative Expense Claim.

**1.1.65 "USPS"** means the United States Postal Service, an independent establishment of the Executive Branch of the United States Government.

**1.1.66 "USPS Claim Recovery"** means any net amounts recovered from USPS on account of the pre-petition claims MFE holds or may hold against USPS after deduction of any offsetting claims held by USPS and costs of pursuing such claim.

**1.1.67 "U.S. Trustee"** means the Office of the United States Trustee for Region 17.

**1.1.68 "XL"** means, individually and collectively, AXA XL and its U.S.-based affiliated insurance companies, including without limitation Greenwich Insurance Company, Indian Harbor Insurance Company, XL Specialty Insurance Company and XL Insurance America, Inc., and each of their respective affiliates, predecessors, successors and assigns.

**1.1.69 "XL Collateral"** means the Collateral, as that term is defined in the XL Insurance Motion.

**1.1.70 "XL Insurance Motion"** means Matheson Flight Extenders, Inc., Matheson Postal Services, Inc. and Matheson Trucking, Inc.'s Motion for Entry of Order Authorizing Assumption of Existing Insurance Program and Entry Into New Insurance Program, and Granting Related Relief filed on February 16, 2023 (Doc. No. 762).

**1.1.71 "XL Insurance Order"** means the Order Granting Matheson Flight Extenders, Inc., Matheson Postal Services, Inc. and Matheson Trucking, Inc.'s Motion for Entry of Order Authorizing Assumption of Existing Insurance Program and Entry Into New Insurance Program, and Granting Related Relief entered on February 23, 2023 (Doc. No. 809).

**1.1.72 "XL Insurance Policies"** means all insurance policies that have been issued by XL that provide coverage to the Debtors or any of their predecessors, including without limitation the Existing Insurance Policies (as that term is defined in the XL Insurance Motion), and all agreements relating thereto.

**1.1.73 "XL Insurance Program"** means the Insurance Program Agreement dated effective as of September 1, 2004, between XL and Matheson Trucking, Inc., including any and all amendments, modifications, schedules, plan specifications, notices of election and other agreements relating thereto, and the Existing Insurance Policies issues thereunder, including

those identified as the Existing Insurance Program, as those terms are defined in the XL Insurance Motion.

**1.1.74** "**XL Letter of Credit Proceeds**" means any draws on any letters of credit issued to XL on behalf of the Debtors. For the avoidance of doubt, any such letters of credit and the proceeds of any draws thereon are XL Collateral.

**1.2** ***Rules of Interpretation***

All capitalized terms not otherwise defined herein have the meanings ascribed to them in this Article 1.1 of the Plan. A term used in the Plan that is not defined in the Plan shall have the meaning assigned to such term in the Bankruptcy Code, the Bankruptcy Rules, or the Uniform Commercial Code, if defined therein, unless the context of the Plan clearly requires otherwise.

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

## ARTICLE II - DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS AND SPECIFICATION OF STATUS AS IMPAIRED

The Claims against Debtors and the equity interests in Debtors held as of the Petition Date are designated and classified as follows in this Article 2. Only claims in a class that is designated as impaired are entitled to vote to accept or reject the Plan.

**2.1** ***Secured Claims (Classes 1, 2, 3 and 4)***

**2.1.1 (Secured Claim of Bank of America, N.A.)**

Class 1 consists of the Secured Claim held by Bank of America, N.A. against MFE, MPS, and MTI arising from the Bank of America Loan Agreement, the Bank of America Letter of Credit Facility, and Bank of America Line of Credit. Class 1 is impaired.

**2.1.2 (Secured Claim of Banc of America Leasing & Capital LLC)**

Class 2 consists of the Secured Claim held by Banc of America Leasing & Capital LLC against MFE, MPS, and MTI arising from the Banc of America Leasing & Capital Equipment Loan. Class 2 is impaired.

**2.1.3 (Secured Claim of PACCAR Financial Corp.)**

Class 3 consists of the Secured Claim held by PACCAR Financial Corp. against MPS. Class 3 is impaired.

**2.1.4 (Secured Claim of BMO Harris Bank, N.A.)**

Class 4 consists of the Secured Claim held by BMO Harris Bank, N.A. against MFE. Class 4 is impaired.

**2.2 *Unsecured Claims (Classes 5, 6, 7, 8, 9, and 10)***

**2.2.1 (Workers Compensation Claims)**

Class 5 consists of any Allowed Unsecured Claim held by an employee or former employee of the Debtors arising from work-related illness, disability, injury, or death within the scope of California Labor Code §3200 *et seq.* and comparable laws of other states. Class 5 is unimpaired. For the avoidance of doubt, Workers Compensation Claims as that term is used herein shall include "Workers Compensation Claims" as that term is defined in the XL Insurance Order.

**2.2.2 (Tort Claims)**

Class 6 consists of any Tort Claim, as that term is defined in Article 1.1.61. Class 6 is impaired.

**2.2.3 (Unsecured Non-Priority Claims)**

Class 7 consists of any Allowed Unsecured Claims against, respectively, MFE, MPS, and MTI not entitled to priority under a provision of section 507 of the Bankruptcy Code that are not included in Class 6, Class 8, or Class 9. Without limiting the generality of the foregoing, Class 7 includes any deficiency claims held by a Claimholder in Class 1, Class 2, Class 3, or Class 4. Class 7 is impaired.

**2.2.4 (USPS Claim)**

Class 8 consists of the disputed claim of USPS in the amount of $15 million reflected in section 3.345 of MFE's Schedule F filed on June 2, 2022 [Doc No. 118] and all other claims filed by USPS, including any claims arising from rejection of contracts with USPS. Class 8 is impaired.

**2.2.5 (Insider Unsecured Claims)**

Class 9 consists of any Allowed Unsecured Claims not entitled to priority under a provision of section 507 of the Bankruptcy Code against, respectively, MFE, MPS, and MTI that are held by an Insider. Class 9 is impaired.

**2.2.6 (XTRA Lease Claims)**

Class 10 consists of all pre-petition and post-petition Claims held by XTRA Lease. Class 10 is impaired.

**2.3 *Equity Interests (Class 11)***

Class 11 consists of the shareholder, partnership, and/or member interests (as applicable) in any of the Debtors. Class 11 is impaired. However, because all equity interests in the Debtors are cancelled pursuant to Article 4.11, holders of equity interests in Class 11 will not vote because they are deemed to have rejected the Plan.

## ARTICLE III - TREATMENT OF UNCLASSIFIED CLAIMS

**3.1 *Administrative Claims***

Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and obligations arising under 28 U.S.C. § 1930(a)(6) ("United States Trustee Fees") against the Debtors are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with this Article 3 and the requirements set forth in Section 1129(a)(9) of the Bankruptcy Code.

**3.1.1 Non-Ordinary Course Administrative Claims**

On or before ten (10) days after the Effective Date, the Debtors shall serve notice of the Administrative Claim Bar Date on all creditors and such other parties as the Bankruptcy Court directs. All requests for payment of an Administrative Claim (other than United States Trustee Fees, Professional Fee Claims, Ordinary Course Administrative Claims, and an Administrative Claim asserted by a Tolling Insider) shall comply with 11 U.S.C. §503(b), Federal Rule of Bankruptcy Procedure 9014, and Local Rule 9014-1 ("Motion for Allowance of

Administrative Claim") and be filed in the Bankruptcy Court on or prior to the Administrative Claims Bar Date. No Administrative Claim shall be deemed Allowed unless either: (a) the Bankruptcy Court has entered a Final Order allowing such claim, or (b) the Plan Administrator has stipulated to the validity of such claim (except for Professional Fee Claims, which remain subject to Bankruptcy Court approval in all instances). Each Allowed Administrative Claim (except for Professional Fee Claims which shall be treated as set forth in Section 3.4 of the Plan) shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Debtors' Estates on the latest of: (a) the Effective Date; (b) such date as may be fixed by the Bankruptcy Court; (c) the tenth (l0th) Business Day after such Claim is Allowed; or (d) the date such Claim is otherwise due according to its terms.

**3.1.2 Ordinary Course Administrative Claims**

Notwithstanding anything in Section 3.1.1 to the contrary, holders of Ordinary Course Administrative Claims shall not be required to file a Motion for Allowance of Administrative Claim, but shall instead submit their invoice, billing statement or other evidence of indebtedness to the Plan Administrator on or before the Administrative Claims Bar Date. The Plan Administrator shall be authorized to pay any Ordinary Course Administrative Claim the Plan Administrator determines to qualify for treatment as an Allowed Ordinary Course Administrative Claim on the latest of (a) the Effective Date, (b) thirty (30) days after the claimant delivers proof to the Plan Administrator establishing the validity of the claim to the Plan Administrator's satisfaction, or (c) when the payment is otherwise due under an agreement with the claimant. In the event the Plan Administrator disputes the asserted Ordinary Course Administrative Claim or disputes that such claim qualifies as an Ordinary Course Administrative Claim, the Plan Administrator shall serve written notice of rejection ("Rejection Notice") on the Claimholder of the disputed Ordinary Course Administrative Claim via U.S. Mail or email if the claimant has provided an email address, which notice shall set a date not earlier than forty-five (45) days after service of the Rejection Notice for the Claimholder to file its Motion for Allowance of Administrative Claim with the Bankruptcy Court ("Ordinary Course Administrative Claims Bar Date").

**3.1.3 Administrative Claims of Tolling Insiders**

Notwithstanding anything in Section 3.1.1 to the contrary, any Tolling Insider who is a party to a tolling agreement with the Debtors and/or Creditors Committee as of the Effective Date that seeks allowance of an Administrative Claim shall file its Motion for Allowance of Administrative Claim on or prior to the Insider Administrative Claim Bar Date. For the avoidance of doubt, any Insider who is not a party to a tolling agreement with the Debtors and/or Creditors Committee as of the Effective Date shall be subject to the Administrative Claims Bar Date applicable to holders of Non-Ordinary Course Administrative Claims under Article 3.1.1.

**3.1.4 Failure to Timely File Motion for Allowance of Administrative Claim**

In the event a Claimholder is required by Articles 3.1.1, 3.1.2, or 3.1.3 to file a Motion for Allowance of Administrative Claim but fails to do so by the Administrative Claims Bar Date, the Ordinary Course Administrative Claims Bar Date, or the Insider Administrative Claim Bar Date (as applicable): (a) its Motion for Allowance of Administrative Claim shall be deemed forever barred, (b) the Administrative Claim asserted by said Claimholder shall be deemed unenforceable against the Debtors or the property of the Debtors' Estates, and (c) said Claimholder shall not be entitled to payment on account of its asserted Administrative Claim in any manner from the Debtors or the Debtors' Estates, unless the Plan Administrator agrees otherwise.

**3.1.5 Reserves for Disputed Administrative Claims**

The Plan Administrator shall maintain adequate reserves to pay in full the amount of all asserted Administrative Claims and Ordinary Course Administrative Claims until said Administrative Claims are: (a) paid, compromised, or released, (b) the Bankruptcy Court enters an order determining that the Administrative Claim is Disallowed, or (c) said Administrative Claim is deemed disallowed by operation of Article 3.1.4.

//

//

**3.2 *Priority Tax Claims***

Allowed Priority Tax Claims not previously satisfied shall be paid in full on the later of: (a) ninety (90) calendar days after the Effective Date, or (b) within thirty (30) calendar days after such claim becomes an Allowed Priority Tax Claim.

**3.3 *United States Trustee Fees***

The Debtors' Estates shall file timely quarterly reports in the form prescribed by the U.S. Trustee; such reports shall be filed within 21 days following the end of each calendar quarter until the case has been converted, dismissed or closed by entry of a final decree. The Debtors' Estates shall pay in cash in full when due any statutory fees imposed under section 1930(a)(6) of Title 28, United States Code that remain unpaid as of the Effective Date. After the Effective Date, the Debtors shall pay a quarterly fee to the U.S. Trustee, for deposit into the U.S. Treasury, for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed by entry of a final decree, pursuant to section 1930(a)(6) of Title 28, United States Code.

**3.4 *Professional Fees***

Professionals employed under Bankruptcy Code section 327 shall file applications for compensation and expense reimbursement for all fees and costs incurred between the Petition Date and the Effective Date. Professionals who have had their compensation agreements approved by the Bankruptcy Court under Bankruptcy Code section 328 shall be required to file applications for compensation only to the extent that: (a) such professional seeks reimbursement for costs incurred between the Petition Date and the Effective Date, or (b) such professional is entitled under the terms of the retention agreements approved by the Court to payment of a fee prior to the Plan Effective Date. The Debtors' Estates shall pay the amount awarded by the Bankruptcy Court pursuant to Section 330 of the Bankruptcy Code on account of a Professional Fee Claim promptly after the order approving such payment becomes a Final Order, unless the Debtors' Estates and the applicable professional agree otherwise.

//

## ARTICLE IV -
## TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

The classified claims and interests designated in this Article will receive the following treatment:

**4.1** ***Class 1 – Bank of America, N.A. Secured Claim***

**4.1.1 Determination of Liens and Secured Amount.**

The Class 1 Claim shall be deemed a Secured Claim to the extent of: (a) cash on hand in the Debtors' Estates in the amount of $5,656,067.00,[1] plus (b) the net realizable value of the following assets:

a. A net remaining deposit in the amount of $50,000.00 held by Bank of America, N.A. pursuant to the Bank of America Credit Card Agreement;[2]

b. MTI's remaining inventory assets (estimated value of $75,416.00);

c. MTI's remaining other equipment assets but it shall not include any equipment asset for which a Certificate of Title is issued by a governmental entity and Bank of America, N.A. is not noted as a lienholder on said Certificate of Title. Bank of America shall not retain a lien on any set for which a Certificate of Title is issued by a governmental entity and Bank of America, N.A. is not noted as a lienholder on said Certificate of Title and such assets shall be free and clear of any such uncertificated lien, claim or encumbrance;

d. MTI's member interest in Matheson Air Services, LLC;

e. MTI's member interest in Matheson Mail Transportation, Inc.;

---

[1] This number reflects the transfer to the Debtors of $200,000 from the MTI Cash Deposit as described further in Article 5.7.11 below.

[2] Beginning on the Effective Date through December 31, 2024, Bank of America, N.A. has agreed to continue to allow use of credit cards issued by Bank of America, N.A. on the same terms as approved previously by the Court in the Bank of America Credit Card Agreement Approval Order, as amended by the terms set out in Article 5.7.11 below. These amended terms include an agreement to reduce the MTI Cash Deposit to secure obligations incurred by the Debtors under the company credit cards issued by Bank of America, N.A. to the Debtors to $50,000 from $250,000.

f. MTI's contingent rights to any refund of the proceeds of the drawn standby letter of credit dated as of October 12, 2016 (as amended and extended), issued by Bank of America, N.A. for the benefit of Lumbermens Casualty Company, in Liquidation, American Motorists Insurance Company, in Liquidation, and American Manufacturers Mutual Insurance Company, in Liquidation and/or any collateral resulting from said standby letter of credit.

g. MTI's contingent rights to any refund of the proceeds of the drawn standby letter of credit dated as of October 12, 2016 (as amended and extended), issued by Bank of America, N.A. for the benefit of XL and/or any collateral resulting from said standby letter of credit.

Entry of the Confirmation Order and occurrence of the Effective Date shall be deemed to: (a) avoid Bank of America, N.A.'s security interest in any assets of the Debtors or the Debtors' Estates other than those identified in this Article 4.1.1, and (b) constitute a final resolution of any and all disputes concerning the extent of Bank of America, N.A.'s security interest in assets of the Debtors' Estates or challenges that the Debtors' Estates hold or may hold against Bank of America, N.A. relating to the amount owed to Bank of America, N.A. and/or the validity and extent of its secured claim in the Debtors' cases, including but not limited to any claims arising under Chapter 5 of Title 11 of the United States Code.

**4.1.2 Treatment.**

In full satisfaction, settlement, release, and discharge of, and in exchange for its Allowed Class 1 Claim, Bank of America, N.A. shall receive the following:

**4.1.2.1 Retention of Lien.**

Bank of America, N.A. shall retain a security interest in and lien on the Debtors' Estates' assets to the extent provided in Article 4.1.1 to secure payment of Bank of America's Class 1 Claim. For the avoidance of doubt: (a) the validity and amount of said lien shall not be augmented, diminished, or otherwise affected by substantive consolidation of the Debtors' Estates pursuant to Article 5.2, and (b) said lien shall not attach to MTI's contingent rights to any refund of the proceeds of the drawn standby letter of credit (as amended and extended) in the

amount of $2,821,375.00 issued by Texas Capital Bank for the benefit of XL and/or any collateral resulting from said standby letter of credit, or MTI's contingent rights to any refund of the proceeds of the drawn standby letter of credit (as amended and extended) in the amount of $5,200,000.00 issued by Texas Capital Bank for the benefit of AIU Insurance and its affiliates.

Except as modified by this Plan, such lien shall be governed by the Bank of America Loan Agreement, and Bank of America, N.A. shall have all of the rights of a secured party under Division 9 of the California Commercial Code, Cal. Comm. Code § 9101, *et seq*., except that whenever a provision of Division 9 of the California Commercial Code makes reference to or incorporates an agreement between the secured party and debtor, such agreement shall be deemed to be the agreement between the Debtors and Bank of America, N.A. as modified by this Plan.

**4.1.2.2 Class 1 Payments.**

On the Effective Date, Bank of America, N.A. shall be paid $5,656,067.00 in part satisfaction of its Class 1 Claim. Said payment along with all other payments made to Bank of America, N.A. as adequate protection in these Chapter 11 Cases pursuant to Court orders shall also be deemed full satisfaction of any rights that Bank of America, N.A. may be entitled to assert under 11 U.S.C. §507(b) and any Bankruptcy Court orders authorizing use of cash collateral and/or determining that Bank of America, N.A.'s secured claim in the Chapter 11 Case was adequately protected. In addition, within ten (10) days after the Debtors' Estates or Plan Administrator realizes net cash proceeds from the sale or other recovery on account of the unliquidated assets listed in Article 4.1.1 (i.e., credit card agreement deposit, inventory, other fixed assets, equity interests in Matheson Air Services, LLC and Matheson Mail Transportation, Inc., and contingent refunds of the drawn proceeds of any letters of credit issued by Bank of America, N.A. pursuant to the Bank of America Loan Agreement, including its allocable share of the XL Letter of Credit Proceeds and/or other XL Collateral calculated in accordance with Article 5.20), such proceeds shall be paid to Bank of America, N.A, after deduction for any and all reasonable costs incurred by the Debtors' Estates and/or Plan Administrator to recover such proceeds, including but not limited to: broker/sale commissions, taxes incurred on sale that are

payable by the Debtors' Estates or Plan Administrator, repairs, transportation fees, any applicable permits or transfer fees, and reasonable fees incurred by attorneys or financial advisors that relate directly to the realization of such recoveries. All payments made to Bank of America, N.A. shall be applied first to accrued post-Effective Date interest, and then to principal until the Class 1 Claim is paid in full.

**4.1.2.3 Interest.**

From and after the Effective Date, the Allowed Class 1 Claim shall accrue simple interest at the rate of seven and 75/100ths (7.75%) percent per annum (based on a 365-day year), or such other rate as the Court shall determine is appropriate at the Confirmation Hearing ("Post-Confirmation Interest Rate"). Interest shall begin accruing on the unpaid amount of the Allowed amount of the Class 1 Secured Claim on the Effective Date and continue until the Allowed amount of the Secured Claim is paid in full., as follows To the extent the Class 1 Secured Claim is secured by the equity interests in Matheson Air Services LLC, and Matheson Mail Transportation, Inc., the amount of the interest charge shall be calculated based on the amount of the gross cash proceeds realized by the Debtors' Estates or Plan Administrator from such assets. For purposes of illustration only, if the Plan Administrator realizes $1 million in gross proceeds on account of the member interest in Matheson Air Services LLC, the interest charge would be determined by multiplying the Post-Confirmation Interest Rate by $1 million through the date net proceeds are remitted to Bank of America, N.A. Hence, if the net proceeds of the Matheson Air Services LLC member interest are paid to Bank of America, N.A. ninety (90) days after the Effective Date, the interest charge would be $19,109.59 [$1,000,000 x 7.75% x 90/365 = $19,109.59]. If after costs of sale, the Plan Administrator remits $900,000 to Bank of America, N.A., $19,109.59 will be deemed payment on account of accrued post-Effective Date interest, and $880,890.41 will be applied to reduce the principal amount of the indebtedness owed to Bank of America, N.A.

To the extent the Class 1 Secured Claim is secured by the contingent rights to refund of the proceeds of any letters of credit issued by Bank of America, N.A. pursuant to the Bank of America Loan Agreement, including its allocable share of the XL Letter of Credit

Proceeds and/or other XL Collateral, interest shall begin to accrue on the date(s) such refunds are received by the Plan Administrator and continue until such refund(s) are paid to Bank of America, N.A.

**4.1.2.4 Deficiency Claim.**

Bank of America, N.A.'s total claim against the Debtors' Estates, including its Allowed Class 1 Secured Claim, is $9,190,672.34 as of July 31, 2024. In the event the entire indebtedness owed by the Debtors Estates to Bank of America, N.A. on account of the Allowed Class 1 Secured Claim is not satisfied through payment on account of the Class 1 Secured Claim, Bank of America, N.A. shall be deemed to hold an Allowed Class 7 Claim for any deficiency. The Plan Administrator shall reserve sufficient funds to ensure that any deficiency claim under this Article 4.1.2.4 shall receive its Pro Rata Share. For clarity and the avoidance of doubt, Bank of America, N.A. shall be deemed to hold an Allowed General Unsecured Claim in Class 7 for $3,534,605.34, as of the Effective Date (which sum represents the total claim owed to Bank of America, N.A. minus $5,656,067.00), however, Bank of America, N.A.'s Allowed General Unsecured Claim shall be reduced to the extent Bank of America, N.A. receives subsequent payments on account of its Allowed Class 1 Secured Claim from the Plan Administrator after the Effective Date.

**4.1.2.5 Pre-Payment.**

The Debtors' Estates shall be permitted to pre-pay the Allowed Class 1 Claim at any time without penalty or other premium.

**4.1.3 Option to Surrender Bank of America, N.A Collateral.**

In the event the Plan Administrator determines that sale or other disposition of an item of the Bank of America, N.A Collateral is not cost effective or in the best interests of the Debtors' Estates, the Plan Administrator shall retain the right to abandon and/or surrender said item of Bank of America, N.A Collateral to Bank of America, N.A.

**4.1.4 Rights Upon Default.**

In the event the Debtors' Estates or Plan Administrator fails to make the payments required by Article 4.1.2.2, Bank of America, N.A. shall be entitled to seek a hearing in the

Bankruptcy Court on seven (7) days' notice seeking an order compelling the Plan Administrator to make the payment or granting any other appropriate relief.

**4.2** ***Class 2 –Banc of America Leasing & Capital, LLC***

**4.2.1 Determination of Liens and Secured Amount.**

The Class 2 Claim shall be deemed secured in the amount of $985,213.16, minus any additional adequate protection payments made after the filing of this Plan. Entry of the Confirmation Order and occurrence of the Effective Date shall be deemed to: (a) avoid Banc of America Leasing & Capital, LLC's security interest in any assets of the Debtors or the Debtors' Estates other than the BALC Perfected Collateral, and (b) constitute a final resolution of any and all disputes concerning the extent of Banc of America Leasing & Capital, LLC's security interest in assets of the Debtors' Estates or challenges that the Debtors' Estates hold or may hold against Banc of America Leasing & Capital, LLC relating to the amount owed to Banc of America Leasing & Capital LLC and/or the validity and extent of its secured claim in the Debtors' cases, including but not limited to any claims arising under Chapter 5 of Title 11 of the United States Code.

**4.2.2 Treatment.**

In full satisfaction, settlement, release and discharge of, and in exchange for its Allowed Class 2 Claim, Banc of America Leasing & Capital, LLC shall receive the following:

**4.2.2.1 Retention of Lien.**

Banc of America Leasing & Capital, LLC shall retain a lien on the BALC Perfected Collateral to secure payment of the Class 2 Claim. For the avoidance of doubt, the validity and amount of said lien shall not be augmented, diminished, or otherwise affected by substantive consolidation of the Debtors' Estates pursuant to Article 5.2. Except as modified by this Plan, such lien shall be governed by the Banc of America Leasing & Capital Equipment Loan, and Banc of America Leasing & Capital, LLC shall have all of the rights of a secured party under Division 9 of the California Commercial Code, Cal. Comm. Code § 9101, *et seq*., except that whenever a provision of Division 9 of the California Commercial Code makes reference to or incorporates an agreement between the secured party and debtor, such agreement

shall be deemed to be the agreement between the Debtors and Banc of America Leasing & Capital, LLC as modified by this Plan.

**4.2.2.2 Class 2 Payments.**

Within ten (10) days after the Debtors' Estates or Plan Administrator realizes cash proceeds from the sale of the BALC Perfected Collateral, the net proceeds shall be paid to Banc of America Leasing & Capital LLC, after deduction of any and all reasonable costs incurred by the Debtors' Estates and/or Plan Administrator to recover such proceeds, including but not limited to: broker/sale commissions, taxes incurred on sale that are payable by the Debtors' Estates or Plan Administrator, repairs, transportation fees, any applicable permits or transfer fees, and reasonable fees incurred by attorneys or financial advisors that relate directly to the realization of such recoveries. All payments made to Banc of America Leasing & Capital LLC shall be applied first to accrued post-Effective Date interest, and then to principal. If by October 15, 2024, the net proceeds realized from sale of the BALC Perfected Collateral are not sufficient to pay Banc of America Leasing & Capital LLC $985,213.16 (minus any additional adequate protection payments made after the filing of this Plan) plus accrued interest, the Debtors' Estates or Plan Administrator shall within five (5) business days remit the amount required to fully satisfy the Class 2 Claim plus accrued interest. Payment of such amount shall constitute full and final satisfaction of the Class 2 Claim and any rights that Banc of America Leasing & Capital LLC may be entitled to assert under 11 U.S.C. §507(b) and any Bankruptcy Court orders authorizing use of cash collateral and/or determining that Banc of America Leasing & Capital LLC's secured claim in the Chapter 11 Case was adequately protected. Banc of America Leasing & Capital, LLC shall have no interest in any unsold BALC Perfected Collateral after it receives full payment of the Class 2 Claim.

**4.2.2.3 Interest.**

From an after the Effective Date, the unpaid amount of the Allowed Class 2 Secured Claim shall accrue simple interest at the Post-Confirmation Interest Rate, or such other rate as the Court shall determine is appropriate at the Confirmation Hearing ("") and continue until paid in full.

**4.2.2.4 Deficiency Claim.**

Banc of America Leasing & Capital, LLC's total claim including its Allowed Class 2 Claim is $4,282,158.00 as of July 31, 2024. For clarity and the avoidance of doubt, Banc of America Leasing & Capital, LLC shall have an Allowed General Unsecured Claim for $3,296,944.84 which sum represents the difference between the agreed secured claim and the total claim owed to Banc of America Leasing & Capital, LLC.

**4.2.2.5 Pre-Payment.**

The Debtors' Estates shall be permitted to pre-pay the Allowed Class 2 Claim at any time without penalty or other premium.

**4.2.2.6 Option to Surrender BALC Perfected Collateral.**

In the event the Plan Administrator determines that sale or other disposition of an item of the BALC Perfected Collateral is not cost effective or in the best interests of the Debtors' Estates, the Plan Administrator shall retain the right to abandon and/or surrender said item of BALC Perfected Collateral to Banc of America Leasing & Capital, LLC.

**4.2.3 Rights Upon Default.**

In the event the Debtors' Estates or Plan Administrator fails to make the payments required by Article 4.2.2.2, Banc of America Leasing & Capital, LLC shall be entitled to seek a hearing in the Bankruptcy Court on seven (7) days' notice seeking an order compelling the Plan Administrator to make the payment or granting any other appropriate relief.

**4.3** ***Class 3 –PACCAR Financial Corp.***

**4.3.1 Determination of Liens and Secured Amount.**

The Class 3 Claim shall be deemed secured only to the extent that the Debtors' Estate or Plan Administrator realizes gross proceeds through the sale or other disposition of the PACCAR Perfected Collateral (which gross proceeds are currently estimated to be approximately $169,155.00). Entry of the Confirmation Order and occurrence of the Effective Date shall be deemed to: (a) avoid PACCAR Financial Corp.'s security interest in any assets of the Debtors or the Debtors' Estates other than the PACCAR Perfected Collateral, and (b) constitute a final resolution of any and all disputes concerning the extent of PACCAR Financial

Corp.'s security interest in assets of the Debtors' Estates or challenges that the Debtors' Estates hold or may hold against PACCAR Financial Corp. relating to the amount owed to PACCAR Financial Corp. and/or the validity and extent of its secured claim in the Debtors' cases, including but not limited to any claims arising under Chapter 5 of Title 11 of the United States Code.

**4.3.2 Treatment.**

In full satisfaction, settlement, release and discharge of, and in exchange for its Allowed Class 3 Claim, PACCAR Financial Corp. shall receive the following:

**4.3.2.1 Retention of Lien.**

PACCAR Financial Corp. shall retain its lien on the PACCAR Perfected Collateral to secure payment of its Class 3 Claim.

**4.3.2.2 Class 3 Payments.**

Within ten (10) days after the Debtors' Estates or Plan Administrator realizes cash proceeds from the sale of the PACCAR Perfected Collateral, such net proceeds shall be paid to PACCAR Financial Corp., after deduction for any and all reasonable costs incurred by the Debtors' Estates and/or Plan Administrator to recover such proceeds, including but not limited to: broker/sale commissions, taxes incurred on sale that are payable by the Debtors' Estates or Plan Administrator, repairs, transportation fees, and any applicable permits or transfer fees. All payments made to PACCAR Financial Corp. shall be applied first to accrued post-Effective Date interest, and then to principal.

**4.3.2.3 Interest.**

From an after the Effective Date, the unpaid amount of the Allowed Class Secured 3 Claim shall accrue simple interest at the rate of seven and 75/100ths (7.75%) percent, or such other rate as the Court shall determine is appropriate at the Confirmation Hearing ("Post-Confirmation Interest Rate") until paid in full.

**4.3.2.4 Deficiency Claim.**

In the event the entire indebtedness owed by the Debtors Estates to PACCAR Financial Corp. is not satisfied through payment on account of the PACCAR Perfected

Collateral, the Class 3 Claimant shall be deemed to hold an Allowed Class 7 Claim for any deficiency.

**4.3.2.5 Pre-Payment.**

The Debtors' Estates shall be permitted to pre-pay the Allowed Class 3 Secured Claim at any time without penalty or other premium.

**4.3.2.6 Option to Surrender PACCAR Perfected Collateral.**

In the event the Plan Administrator determines that sale or other disposition of an item of the PACCAR Perfected Collateral is not cost effective or in the best interests of the Debtors' Estates, the Plan Administrator shall retain the right to abandon and/or surrender said item of PACCAR Perfected Collateral to PACCAR Financial Corp.

**4.3.3 Rights Upon Default.**

In the event the Debtors' Estates or Plan Administrator fails to make the payments required by Article 4.3.2.2, PACCAR Financial Corp. shall be entitled to seek a hearing in the Bankruptcy Court on seven (7) days' notice seeking an order compelling the Plan Administrator to make the payment or granting any other appropriate relief.

**4.4** ***Class 4 –BMO Harris Bank, N.A.***

The Class 4 Claim held by BMO Harris Bank, N.A. shall be deemed satisfied in full pursuant to payments made by the Debtors prior to the Effective Date. No distributions shall be made to the Class 4 Claimholder under this Plan. Confirmation of the Plan and the occurrence of the Effective Date shall be deemed a complete release and discharge of any liens or security interests held by BMO Harris Bank, N.A. in any assets of the Debtors' Estates held as of the Effective Date.

**4.5** ***Class 5 – Workers Compensation Claims***

After the Effective Date, each holder of a Workers' Compensation Claim shall be entitled to pursue its Claim against the Debtors' Estates/Plan Administrator as if the Chapter 11 Cases had not been commenced and, in connection therewith, Workers Compensation Claims covered by any XL Insurance Policies shall continue to be administered, handled, defended, settled and paid as provided in the XL Insurance Order. The Debtors' Estates/Plan Administrator shall

continue to administer their existing programs for workers compensation insurance as if the Chapter 11 Cases had not been commenced and, in connection therewith, the Debtors' Estates/Plan Administrator shall satisfy all administrative costs associated with their workers compensation insurance programs, all costs of defense, and all claims or losses up to the amount of any applicable deductible or self-insured retention relating to any Class 5 claim and otherwise pay all obligations and perform all duties of the insured as required under any applicable XL Insurance Policies providing coverage for Workers Compensation Claims (as that term is defined in the XL Insurance Policies and XL Insurance Program). Neither this Section 4.5 nor any other provision of the Plan or Plan Documents shall be deemed to expand, diminish, alter, impair or affect any rights that any Class 5 Claimholder has or may have to seek recovery from the Debtors Estates or any Insurer under an Insurance Policy or applicable law, nor shall any provision of the Plan or the Plan Documents be deemed to expand, diminish, alter, impair or affect any obligations that the Debtors Estates or an Insurer has or may have to a Class 5 Claimholder or the Debtors' Estates under an Insurance Policy or applicable law.

To the extent that one or more of the Debtors' Estates, Plan Administrator, or an Insurer agrees to satisfy in full a Class 5 claim (whether adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, the applicable portion of the Class 5 Claimholder's claim against the Debtors' Estates shall be deemed disallowed without the Plan Administrator or Debtors' Estates having to file an objection to such claim, and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent that one or more of the Debtors' Estates, Plan Administrator, or an Insurer agrees to satisfy in part a Class 5 claim (whether adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, the applicable portion of the Class 5 Claimholder's claim against the Debtors' Estates shall be deemed reduced by the amount of such payment without the Plan Administrator or Debtors' Estates having to file an objection to such claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

//

**4.6 *Class 6 – Tort Claims***

Except to the extent that a Holder of an Allowed Tort Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Tort Claim, each such holder of an Allowed Tort Claim in Class 6 shall receive distributions in accordance with Article 4.6.4. Each and every Tort Claim arising prior to the commencement of the Bankruptcy Cases shall be deemed disputed and may become an Allowed Claim against the Debtors estates entitled to a distribution pursuant to this Plan only if the conditions for allowance specified in either Articles 4.6.1 or 4.6.2 occur:

**4.6.1 Participation in Mandatory Alternative Dispute Resolution Program**

The Plan Administrator and all holders of a Tort Claim must participate in good faith and complete the Mandatory Alternative Dispute Resolution Program ("MADRP") provided for in this Article 4.6.1 which is intended to facilitate an agreement between the Plan Administrator and the Tort Claimholder determining: (a) whether to Allow the holder's Tort Claim, (b) the amount of any such Allowed Tort Claim, and (c) the extent to which the Claimholder will receive distributions on account of such Allowed Tort Claim in accordance with Article 4.6.4. Notwithstanding any provision of this Plan to the contrary, the holder of a Tort Claim may not seek to modify or lift the stay imposed by 11 U.S.C. §362(a) and continued in effect by Article 5.17 prior to the conclusion of the MADRP proceeding relating to its claim.

*Allocation of MADRP Costs.* The Plan Administrator and holders of a Tort Claim shall be responsible for their own attorneys' fees and costs associated with participating in the MADRP and unless otherwise agreed shall share equally in the cost, if any, of a mediator.

*Selection of Mediator*. The Plan Administrator and holder of a Tort Claim shall meet and confer to identify the individual to serve as the mediator. The mediator may be any individual acceptable to both parties that is willing to act as mediator, and who would not be disqualified under the standards set forth in 28 U.S.C. §455(b). In the event the Plan Administrator and the claim holder cannot agree on an individual to serve as mediator within twenty-one (21) days after the initiation of the meet and confer process, the Bankruptcy Court

shall select the mediator on the parties' behalf. In such cases, the Plan Administrator and holder of the Tort Claim shall submit a joint statement *in camera* to the Bankruptcy Court that: (a) briefly summarizes the basis for the holder's Tort Claim and the Debtors' defenses thereto, (b) nominates no more than two candidates from each party (for a total of no more than four) to serve as mediator, and (c) briefly summarizes the reasons why each party recommends their proposed mediator candidate(s) and opposes the mediator candidate(s) recommended by the other party. The Bankruptcy Court may select one of the candidates proposed by the parties to serve as mediator or may determine to appoint an individual not recommended by either party. A hearing on the appointment of a mediator shall be held only at the Bankruptcy Court's discretion. The Bankruptcy Court's selection of a mediator shall be deemed final and not subject to any further appeal or reconsideration.

*Procedures Governing the Conduct of the Mediation*. The initial mediation conference shall take place not later than thirty (30) calendar days following the selection of the mediator at a location convenient to the parties and the mediator, unless the mediator determines otherwise. The mediation conference may be conducted either in person or by video conference, provided however, that if during the course of the mediation the mediator determines in his/her sole discretion that in-person attendance by the parties at the mediation is better suited to achieving a consensual resolution of the dispute, the mediator shall provide written notice of the time and place for the in-person MADRP conference. The mediator may direct the parties to participate in subsequent mediation conferences if the mediator determines in his/her sole discretion that additional mediation conferences are likely to result in a consensual resolution of the dispute.

Unless modified by the mediator, no later than fifteen (15) calendar days after the selection of the mediator each party shall submit directly to the mediator a written MADRP statement, who shall keep such statements confidential. Such statements shall not exceed fifteen (15) pages (not counting exhibits and attachments). While such statements may include any information that a party deems useful, they must:

a. Identify the person(s), in addition to counsel, who will attend the session as representative of the party with decision making authority;

b. Describe briefly the substance of the dispute;

c. Set forth the history of past settlement discussions, including disclosure of prior and any presently outstanding offers and demands;

d. Estimate the cost and time to be expended for further discovery, pretrial motions, expert witnesses, and trial if the matter were litigated; and

e. Include an offer the mediator is authorized to share during the mediation with the other party, along with an explanation for why if such offer was accepted it would constitute a fair resolution of the dispute.

*Insurer Participation*. Any Insurer may, but is not required, to participate as a third-party in the mediation conference. The Plan Administrator shall take commercially reasonable steps to (i) provide notice to Insurers of the mediation conference and opportunity to participate as a third party and (ii) obtain an Insurer's participation in the mediation conference and consent to any settlement where: (a) the holder's Tort Claim is of a kind where insurance coverage is potentially available under one of the Debtors' Insurance Policies, (b) the likely Allowed amount of the holder's Tort Claim is in excess of the Debtors' remaining self-insured retention obligations related to such claim, and (c) the Debtors have not exhausted available coverage under the applicable Insurance Policies for such claim.

*Participation of Other Interested Parties*. Any person or entity alleged by a Tort Claim holder to be jointly liable with the Debtors on account of a Tort Claim may, but is not required, to participate as a third-party in the MADRP mediation conference. The Plan Administrator shall take commercially reasonable efforts to provide reasonable notice to any such potentially interested third parties of a MADRP mediation conference and opportunity to participate as a third party.

*Conclusion of the Mediation*. The mediation shall continue until the parties have reached a consensual resolution of the dispute, or the mediator determines, in his/her sole discretion, that further proceedings in the mediation are unlikely to facilitate the parties' ability

to reach a consensual resolution of the dispute. Within ten (10) calendar days after the conclusion of the mediation, the mediator shall file a notice with the Bankruptcy Court stating solely whether: (a) the parties have complied with their obligations under the MADRP and instructions of the mediator, and (b) a settlement has been or has not been reached (as the case may be).

*Allowance of Tort Claim*. If the MADRP mediation results in a consensual resolution of the dispute, the holder's Tort Claim shall be deemed allowed as an unsecured non-priority claim in the amount agreed to between the Plan Administrator and the holder of the Tort Claim, and the holder shall thereafter be entitled to receive distributions on account of such Allowed Tort Claim in accordance with Article 4.6.4.

*Sanctions for Violation of MADRP Obligations*. The willful failure to attend the initial or any subsequent MADRP conference, any willful violation of the parties' obligations under this Article 4.6.1, or willful violation of the mediator's instructions to the parties during the course of the mediation shall be reported to the Bankruptcy Court and may result in the imposition of sanctions by the Bankruptcy Court. If the Bankruptcy Court determines after notice and a hearing that a willful violation has occurred, the Bankruptcy Court may in its discretion impose appropriate sanctions upon the offending party which may include: (a) injunctive orders compelling the offending party to perform its MADRP obligation or mediator instruction, (b) imposition of fees and costs to compensate the non-offending party or mediator for any costs or expenses resulting from the offending party's violation, (c) a monetary penalty, (d) disallowance of the Tort Claim (if the claim holder is the offending party), or (e) allowance of the Tort Claim in an amount determined as appropriate by the Bankruptcy Court (if the Plan Administrator/Debtors' Estates is the offending party).

*Relief from Mediation Requirements*. Nothing in this Plan shall be deemed to preclude the Plan Administrator or holder of a Tort Claim from seeking relief in the Bankruptcy Court from the obligations of the MADRP created by this Plan or any requirements or instructions that are imposed by the mediator. Any such request for relief shall be initiated within seven (7) calendar days after the party has become subject to the obligation from which

relief is sought. (For example, if the party is directed by the mediator to appear at an in-person mediation conference, the seven-day time-period begins to run from the date the mediator gives notice of the direction to appear, not the date the in-person mediation conference was scheduled to occur.) Any request for relief under this Article shall be initiated by filing a motion with the Bankruptcy Court on notice to the opposing party and the mediator. Pending resolution of such motion for relief, the party initiating the motion shall not be deemed in willful violation of its obligations under the MADRP or any requirements or instructions imposed by the mediator.

*Confidentiality*. All written and oral communications made in connection with or during any MADRP conference, including the MADRP statements referred to above, shall be subject to all the protections afforded by Fed. R. Evid. 408 and by Fed. R. Bankr. P. 7068.

**4.6.2 Tort Claims Not Resolved Through MADRP**

If the Plan Administrator and holder of a Tort Claim do not reach an agreement to allow the holder's Tort Claim in accordance with Article 4.6.1, said claim shall be deemed a disputed claim for purposes of Article 5.11 of this Plan, provided however, that the deadline for filing an objection to the Tort Claim under Article 5.11.1 shall be the later of: (a) the deadline imposed by Article 5.11.1 (as may be extended by the Bankruptcy Court), or (b) sixty (60) days after the mediator has filed the notice stating that the mediation has concluded under Article 4.6.1. All such Tort Claim(s) shall be allowable only in the amount and to the extent that the Bankruptcy Court enters a Final Order allowing the Tort Claim, unless such claim was previously estimated in a lower amount as provided in Article 5.13.

**4.6.3 Limitations on Tort Claimants' Recourse to Available Insurance**

Notwithstanding any applicable law to the contrary, no holder of a Tort Claim that has been Disallowed, and all holders of Tort Claims that are Allowed pursuant to this Plan shall be barred from asserting any claim against or otherwise recovering from the Debtors' Insurers to the extent that: (a) no applicable or available Insurance Policies provide coverage for the Tort Claim, (b) the Allowed amount of the Tort Claim as determined by the Bankruptcy Court or agreement with the Plan Administrator reached in connection with an MADRP conference is less than the Debtors' remaining self-insured retention obligations under the applicable and available

Insurance Policies providing coverage for said claim, (c) the proceeds from the applicable and available Insurance Policies providing coverage for said claim have been exhausted or are otherwise insufficient to pay in full the Allowed amount of said Claim, or (d) recovery is not permitted under the terms of the applicable and available Insurance Policies.

In the event that a holder of a Tort Claim asserts a claim against XL or any other Insurer in violation of this Article 4.6.3 and such action results in XL or such other Insurers to incur costs or pay amounts that the Debtors otherwise were obligated to incur or pay, and such action causes XL or the such other Insurer to offset such costs and expenses against the XL Collateral or collateral held by such other Insurer, as applicable, the Plan Administrator shall have a claim against the holder of the Tort Claim for reimbursement of the amount by which the XL Collateral or other collateral, as applicable, was diminished. The Plan Administrator may assert such claim against the holder of the Tort Claim through an action in the Bankruptcy Court, and/or by withholding and offsetting any distributions to which the holder of the Tort Claim may be entitled to receive under the terms of this Plan.

In the event an Allowed Tort Claim holder receives distributions pursuant to this Plan and from applicable and available Insurance Policies, such holder shall not be entitled to receive more than one hundred (100%) percent of the Allowed amount of its Allowed Tort Claim calculated in accordance with the provisions of this Plan and the Bankruptcy Code. The Plan Administrator may assert a claim against the holder of the Tort Claim to recover any excess payment through an action in the Bankruptcy Court, and/or by withholding and offsetting any distributions to which the holder of the Tort Claim may be entitled to receive under the terms of this Plan.

**4.6.4 Distributions to Allowed Class 6 Claims**

The holder of an Allowed Tort Claim shall be entitled to receive payment from an Insurer only to the extent that such Insurer is required under an applicable Insurance Policy to pay such Allowed Tort Claim. (For the avoidance of doubt, the holder of an Allowed Tort Claim shall not be entitled to receive payment from an Insurer to the extent that the Allowed Tort Claim is less than the self-insured retention under the Insurance Policy applicable to such Claim, or the

amount of the Allowed Tort Claim exceeds the policy limits under the Insurance Policy applicable to such Claim. Provided that the Claimholder has not violated Article 4.6.3, in the event that there are no available proceeds of an Insurance Policy for such claim or the amount paid by an Insurer to the holder of an Allowed Tort Claim results in a recovery on account of such Allowed Tort Claim that is less than the Pro Rata Share paid to Allowed Class 7 Claimholders, the Claimholder shall be entitled to receive an additional payment from the General Unsecured Creditors' Fund sufficient to result in a recovery on account of such Allowed Tort Claim that is equal to the Pro Rata Share paid to Allowed Class 7 Claimholders. Notwithstanding the foregoing, the Plan Administrator may, but is not required to, consent to an additional payment to the holder of an Allowed Tort Claim as part of any settlement reached in a MDRAP mediation. Until such time as the Class 6 Claim becomes an Allowed Tort Claim, the Plan Administrator shall reserve sufficient funds for such Class 6 Claim as required by Article 5.13.

**4.7** ***Class 7 – General Unsecured Claims***

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such Holder of an Allowed General Unsecured Claim in Class 7 shall receive its Pro Rata share (along with Allowed Claims in Classes 6, 8 and 9) of the amounts deposited into and distributed from the General Unsecured Creditors' Fund. After reserving funds as required by Article 3.1.5 and Article 5.13, the Plan Administrator shall make payments to each Allowed Class 7 Claimholder of its Pro-Rata Share of the funds on hand in the General Unsecured Creditors' Fund consistent with the terms of the KEIP as set forth in Article 5.5.

**4.8** ***Class 8 – Disputed Claims of United States Postal Service***

All Claims asserted or held by the USPS that have been filed against the Debtors' Estates or that are deemed filed against the Debtors' Estates shall be treated as disputed Claims and resolved in accordance with the claims resolution procedures of Article 5.11. In the event Claim(s) asserted by USPS become Allowed Claim(s), in full and final satisfaction, settlement,

release, and discharge of and in exchange for each such Allowed Claim, USPS shall receive its Pro Rata share (along with Allowed Claims in Classes 6, 7, 9 and 10) of the amounts deposited into and distributed from the General Unsecured Creditors' Fund.

**4.9 *Class 9 – Unsecured Claims of Insiders***

All Unsecured Claims asserted or held by an Insider that have been filed against the Debtors' Estates or that are deemed filed against the Debtors' Estates shall be treated as disputed Claims and resolved in accordance with the claims resolution procedures of Article 5.11, or such other manner as may be agreed between the Plan Administrator and the Class 9 Claimholder. In the event Claim(s) asserted by an Insider becomes Allowed Claim(s) not subject to subordination under Bankruptcy Code section 510 or other applicable law, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Allowed Claim, said Insider Claimholder shall receive its Pro Rata share (along with Allowed Claims in Classes 6, 7 and 8 to the extent provided in this Plan) of the amounts deposited into and distributed from the General Unsecured Creditors' Fund.

**4.10 *Class 10 – XTRA Lease***

All Claims of XTRA Lease, whether asserted or unasserted, known or unknown, including all pre-petition claims and all post-bankruptcy Administrative Claims asserted against the Debtors shall be treated as follows in accordance with the parties' agreement to setoff and fully and finally compromise and resolve all XTRA Lease of pre-petition and post-petition Claims:

1. XTRA Lease shall be permitted to offset pre-petition credits due to the Debtors in the amount of $17,954.97 against the amount of $24,014.22 owed by the Debtors to XTRA Lease for unpaid pre-petition charges, and after applying such setoff, XTRA Lease shall hold an Allowed General Unsecured Claim in the net amount of $6,059.25 which shall be paid in the same manner and the same amount as other Allowed General Unsecured Claims in Class 7.

2. XTRA Lease shall be permitted to offset the post-petition credits due to the Debtors in the amount of $10,739.41 against the amount of $12,897.29 owed by the Debtors to XTRA Lease for unpaid post-petition charges, and after applying such setoff, XTRA Lease shall

hold an Allowed Administrative Claim in the net amount of $2,157.88 which shall be paid on the Effective Date in accordance with Article 3.1.2.

**4.11 *Class 11 – Equity Interests***

All equity interests in MFE, MPS, and MTI shall be deemed cancelled on the Effective Date.

## ARTICLE V - MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1 *Revesting of Assets***

Notwithstanding Bankruptcy Code section 1141(b), no property of Debtors' Estates shall revest in the Debtors as of the Effective Date. The estates created by operation of Section 541(a) shall continue, and all assets of the Debtors and/or their respective Estates shall be deemed to be property of the consolidated bankruptcy estates until distributed in accordance with this Plan. The provisions of Section 362(a) shall continue in full force and effect following entry of the Confirmation Order, and stay any person from taking any act, commencing any suit, or enforcing any right, which has the effect of asserting, liquidating, or enforcing any claim against any property of the Estates that arose prior to entry of the Confirmation Order. The sole recourse of a creditor holding a claim that arose prior to entry of the Confirmation Order shall be an action in the Bankruptcy Court seeking to enforce its rights under this Plan.

Without limiting the generality of the foregoing, all funds in the General Unsecured Creditors' Fund shall be deemed held in trust for the benefit of Allowed Claim Holders in Classes 6, 7, 8, 9, and 10 to the extent provided in this Plan and shall be free and clear of any liens, claims, or interests of any pre-or post-bankruptcy creditor of the Debtors or the Debtors' Estates notwithstanding any agreement with the Debtors' Estates, any act of a creditor, or any other order, judgment, or process issued by a court other than the Bankruptcy Court.

**5.2 *Substantive Consolidation***

Each of the Debtors shall continue to maintain its separate corporate existence after the Effective Date for all purposes other than the treatment of Claims under this Plan. Except as expressly provided in this Plan (or as otherwise ordered by the Bankruptcy Court), on

the Effective Date: (a) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed pooled or treated as though they were merged into and with the assets and liabilities of each other, (b) no distributions shall be made under this Plan on account of intercompany claims among the Debtors and all such Claims shall be eliminated and extinguished, (c) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor, and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors' Estates, (d) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors' Estates and shall be treated one Claim against and obligation of the consolidated Debtors' Estates, and (e) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors' Estates shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. For the avoidance of doubt, the substantive consolidation provided for in this Section 5.2 shall not expand, diminish, alter, impair or affect the rights and obligations of the Debtors' Estates/Plan Administrator and any Insurer, respectively, under any Insurance Policy or applicable law.

**Schedule 5.2** attached hereto sets forth the Claims identified to date where more than one Debtor is alleged to be liable on the same underlying indebtedness that shall be deemed to be one obligation of the consolidated Debtors' Estates. The amount of each of those Claims are identified therein under the heading "Surviving Claim." The Plan Administrator shall not be required to file an objection to any guarantee, joint, joint and several liability, or other Claim against multiple Debtors in order to affect the consolidation of such claims into one, however, the identification of a Claim as the "Surviving Claim" in Schedule 5.2 shall not be deemed allowance of such Claim. The Plan Administrator shall retain all rights and defenses to any such Claims and may file objections to any of the Claims identified as a Surviving Claim in accordance with Article 5.11.

Substantive consolidation shall not (other than for purposes relating to this Plan)

affect the legal and corporate structures of the Debtors' Estates. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Debtors' Estates to seek to have any Claim or Interest subordinated in accordance with any contractual rights or equitable principles.

Notwithstanding anything in this section to the contrary, all post-Effective Date fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, if any, shall be calculated on a consolidated basis as if the Debtors' Estates were one debtor.

**5.3 *Corporate Organization and Management***

As of the Effective Date, all equity interests in the Debtors are cancelled pursuant to Article 4.11 of the Plan. On the Effective Date all corporate authority and management of the Debtors' estates shall be vested in the Plan Administrator. The Plan Administrator, to the extent required to perform its duties and responsibilities, is hereby granted a power of attorney by each of the Debtors, revocable only upon entry of an order of the Bankruptcy Court so directing, to execute such documents and perform such acts on behalf of the Debtors and the Debtors' Estates provided for by this Plan and the Plan Documents.

**5.4 *Plan Administrator and Management***

Hank Spacone shall act as the Plan Administrator from and after the Effective Date. The Plan Administrator shall serve without bond and shall be compensated for his services on an hourly basis of $350.00 payable in accordance with the procedures for payment of Post-Confirmation Professionals set forth in Article 5.6 and participate in the Key Employee Incentive Plan for Senior Management ("KEIP") as set forth in Article 5.5 below. The Plan Administrator shall be authorized to retain and employ at the same rate of compensation and other terms and conditions that exist immediately prior to the Effective Date and provide participation in the KEIP for the following members of the Debtors' current management ("Current Management"):

a. Charles Mellor, Chief Restructuring Officer;

b. Marcos Kropf, General Counsel; and

c. Mark Simmons, Chief Financial Officer.

**5.4.1 *Primary Authority and Responsibilities***

The Plan Administrator shall take responsibility for the administration of:

a. Insider Claims, objections and related litigation;

b. USPS claims and related litigation, including but not limited to actions seeking to realize the USPS Claim Recovery;

c. Reporting, distributions, case closing.

**5.4.2 *Authority to Delegate Responsibilities***

The Plan Administrator may delegate to Current Management responsibility for:

a. Continued winddown of operations;

b. Liquidation of remaining assets;

c. Claim review and objections;

d. Other non-insider litigation.

The Plan Administrator may adjust, modify, or alter the scope of responsibilities and compensation in his sole discretion and business judgment; provided, however, that the Plan Administrator may not adjust, modify, or alter the terms of the KEIP.

**5.4.3 *Replacement of Plan Administrator***

If Mr. Spacone resigns or should otherwise become unable to continue in the performance of his duties as Plan Administrator, a successor Plan Administrator shall be appointed by order of the Bankruptcy Court with input from parties in interest in the Chapter 11 Cases, including the Post-Confirmation Committee.

**5.5 *Key Employee Incentive Plan for Senior Management***

Entry of the Confirmation Order and occurrence of the Effective Date shall be deemed approval for the Key Employee Incentive Plan for Senior Management attached hereto as **Schedule 5.5**.

**5.6 *Estate Professionals and Post-Confirmation Professionals***

The Plan Administrator shall be authorized to retain, employ, utilize, and compensate such Post-Confirmation Professionals (e.g., attorneys, accountants, etc.) as may be necessary after Confirmation without further action or approval by the Bankruptcy Court.

Confirmation or the effectiveness of the Plan shall not affect any retention agreements between the Debtors and any current professional retained under 11 U.S.C. §§ 327 or 328. Except as provided in this Article 5.6, no Post-Confirmation Professionals shall be required to seek approval from the Bankruptcy Court for compensation or expense reimbursement incurred after the Effective Date. For periods on or after the Effective Date the Plan Administrator shall serve a monthly compensation report upon: (a) Post-Confirmation Committee, (b) each Post-Confirmation Professional, and (c) any other party in interest in the Chapter 11 Cases who within sixty (60) days after the Effective Date submits a request to receive such reports in writing to the Plan Administrator ("Professional Fee Notice Parties"). The monthly compensation reports shall detail the total compensation and expense reimbursements to be paid to each of the Post-Confirmation Professionals for the prior month, but such report shall not be required to include detailed time records for the Post-Confirmation Professionals. The Plan Administrator and Professional Fee Notice Parties shall have seven (7) Business Days after service of notice of the monthly compensation report to object to the the amount of compensation/expense reimbursement requested by a Post-Confirmation Professional. Absent any such objection, all compensation and expense reimbursements owed to the Post-Confirmation Professional as set forth on such monthly compensation report shall constitute plan expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan, without further notice or order of the Bankruptcy Court. In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Post-Confirmation Professional with respect to such monthly compensation report. For purposes of any such determination, the standard for approval and payment shall be whether such request is reasonable under the circumstances.

**5.7 *Plan Administrators Powers, Duties and Obligations***

The Plan Administrator shall be vested with all of the powers of a trustee appointed in a case under Section 1106 of the Bankruptcy Code and/or a debtor in possession pursuant to Section 1107 of the Bankruptcy Code. Without limitation to the general corporate authority conferred pursuant to Article 5.3 above:

5.7.1 The Plan Administrator is authorized to exercise the rights and powers of corporate governance and take other corporate actions on behalf of the Debtors, including but not limited to all actions necessary operate, windup and dissolve the Debtors' corporate entities under applicable state law, provided that all such powers and actions are exercised in all respects in compliance with the provisions of the Plan and the Confirmation Order.

5.7.2 The Plan Administrator is authorized to do and/or cause to be done all things necessary and appropriate to administer and execute the Plan, consistent with the terms of the Plan, the Confirmation Order, and the Bankruptcy Code and the Bankruptcy Rules to the extent applicable.

5.7.3 The Plan Administrator shall have full power and authority to execute, deliver and perform any and all contracts, agreements, or other documents necessary or appropriate to carry out the Plan, and to sell, convey, or assign any asset in the exercise of its business judgment.

5.7.4 Subject to Article 5.11.3, the Plan Administrator is authorized to review and object to claims, enter into compromises to allow and satisfy disputed claims.

5.7.5 The Plan Administrator shall act as disbursing agent under the Plan with regard to all payments and distributions to be made to creditors or other parties in interest hereunder.

5.7.6 The Plan Administrator is authorized to sell, liquidate, or abandon substantially all of the Debtors' assets in its business judgment without further Court order or notice to claim holders.

5.7.7 The Plan Administrator is authorized to sell, liquidate, or abandon any claim or Cause of Action of the Debtor against any third party; provided, however, that settlement of disputes or claims shall be governed by Article 5.11.3;

5.7.8 Subject to the other express provisions of the Plan, the Plan Administrator:

a. is authorized to determine whether the Estates will pursue any Litigation Claims or Causes of Action available under applicable law, including but not limited to actions seeking to realize the USPS Claim Recovery and any other action subject to a tolling agreement with the Debtors; and

b. if it determines that any such claim or Cause of Action should be pursued, to commence, prosecute, and/or compromise such claim subject to Article 5.11.3. Any recovery on such claim or cause of action shall be considered property of the Estate, and treated as other assets under the terms of the Plan;

5.7.9 The Plan Administrator is authorized to file all reports as may be required by and pay all fees due under 28 U.S.C. §1930(a)(6).

5.7.10 At such time as the Plan Administrator deems appropriate, consistent with applicable law and rules, and whether or not all of the payments required under the Plan have been completed, the Plan Administrator shall file an application for entry of a final decree in this chapter 11 case, and shall serve the application on the U.S. Trustee, together with a proposed final decree.

5.7.11 Commencing on the Effective Date through December 31, 2024, the Debtors and the Plan Administrator are authorized to perform the Debtors' obligations under the Bank of America Credit Card Agreement and Bank of America, N.A. is authorized to extend credit on existing credit cards under the terms approved by the Court in the Bank of America Credit Card Agreement Approval Order as modified by this paragraph 5.7.11.

a. The aggregate limit for all credit cards issued to the Debtors will be $50,000.00;

b. The current seven-day billing cycle with a three-day grace period shall continue to apply (i.e. a statement issued July 12, 2024, will be due July 15, 2024);

c. Bank of America, N.A. shall apply $200,000 from the $250,000 MTI Cash Deposit (as defined in the Bank of America Credit Card Agreement) to reduce the balance existing under the Bank of America Credit Card Agreement as of the Effective Date;

d. The $50,000 MTI Cash Deposit shall be held by Bank of America, N.A. to secure the obligations incurred under the Bank of America Credit Card Agreement;

e. All issued credit cards will be cancelled and terminated on December 31, 2024, and all amounts outstanding as of that date shall be due and payable on January 3, 2025;

f. On January 4, 2025, all amounts remaining in the MTI Cash Deposit will be applied to reduce the Class 1 Claim.

5.7.12 The Plan Administrator shall deposit all funds available for distribution to Allowed Claims in Class 6, Class 7, Class 8, Class 9, or Class 10 into the General Unsecured Creditors' Fund.

**5.8** ***Additional Financial Reporting Duties***

The Plan Administrator shall serve the Post Confirmation Committee with Post Confirmation Reports on a quarterly basis until the Chapter 11 Case closes that contains:

i. Administrative costs budgeted and actual for the period;

ii. Summary of receipts and disbursements described by category for the prior period;

iii. A report of funds deposited into and disbursements from the General Unsecured Creditors' Fund during the prior period;

iv. A report identifying the current status of the dispute with USPS and any other litigation considered by the Plan Administrator to be material; and

v. An updated projection of final distributions to Allowed Class 7 Claim Holders ("Post-Confirmation Reports").

**5.9** ***No Impact on Agreements Related to Workers Compensation Insurance***

Payments of insurance proceeds to Allowed Class 5 Claimholders shall be in accordance with the provisions of any applicable Insurance Policy and, without limiting the generality of the foregoing, holders of Workers Compensation Claims covered by any XL Insurance Policies shall be administered, handled, defended, settled and paid as provided in the XL Insurance Order. No provision of the Plan Documents shall constitute or be deemed a waiver of any claim for relief that the Debtors, the Debtors' Estates, or any other entity may hold against any other entity, including any Insurer under an Insurance Policy, nor shall any provision

of the Plan Documents: (a) constitute or be deemed a waiver by any Insurer under any Insurance Policy of any rights or defenses, including coverage defenses, held by such Insurer, (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any such Insurer, or (c) alter, impair or affect the rights and obligations of any Insurer under any Insurance Policy, which shall be determined pursuant to the terms of the applicable Insurance Policy and applicable law.

With respect to Class 5 Claims, the XL Insurance Order, is fully incorporated into, is not altered, amended, modified or affected in any way by the Plan Documents or any other order of the Court, and is and shall remain binding on the Debtors, the Estates, the Debtors' Estates, and their respective successors and assigns, including but not limited to the Plan Administrator. In addition to the modification of the automatic stay of section 362 of the Bankruptcy Code provided for in paragraphs 5, 13 and 19 of the XL Insurance Order, any injunctions or stays provided for in this Plan, to the extent applicable, are hereby modified to allow:

a. claimants with valid Workers Compensation Claims that are covered by XL Insurance Policies to continue to pursue such claims, whenever arising;

b. XL to continue to administer, handle, defend, settle and/or pay Workers Compensation Claims where (i) the claimant asserts a direct claim against XL or (ii) with respect to which an order has been entered by the Court granting a claimant relief from the automatic stay and/or any injunction or stay provided for in this Plan to proceed with its claim, to pay costs and expenses in relation thereto in accordance with the XL Insurance Policies, and in the event the Debtors, Debtors' Estates, or Plan Administrator fail to pay or reimburse XL therefor to draw on and apply the XL Letter of Credit Proceeds and/or any other XL Collateral in accordance with the terms of the XL Insurance Policies and XL Insurance Program.

**5.10** ***Amendment of Pre-Petition Loan Documents***

On the Effective Date, all agreements between the Debtors on the one hand, and Bank of America, N.A., Banc of America Leasing & Capital LLC, and PACCAR Financial Corp., on the other shall be deemed amended in accordance with the terms of this Plan to change the applicable rate of interest accruing on the Class 1, Class 2, and Class 3 Claims, and the schedule for payments to be made on account of such claims. Nothing in this Article 5.10 however, shall be deemed to expand, diminish, alter, or affect any rights, obligations, or defenses of the foregoing entities any other person or entity that is not a Debtor in the Chapter 11 Cases. Notwithstanding the preceding sentence, any person or entity that guaranteed the obligations owed by the Debtors to Bank of America, N.A. and/or Banc of America Leasing & Capital, LLC pursuant to the Bank of America Loan Agreement and/or the Banc of America Leasing & Capital Equipment Loan (collectively, the "Bank Loan Agreements") may not use any provision of this Plan, the Plan's treatment of the secured and unsecured claims asserted against the Debtors' Estates by Bank of America, N.A. and Banc of America Leasing & Capital, LLC, or the order confirming the Plan, to assert that they are not liable to Bank of America, N.A. and/or Banc of America Leasing & Capital, LLC under any such guaranty for all amounts owed under the Bank Loan Agreements, including without limitation all unpaid legal and financial advisory fees and expenses.

**5.11** ***Treatment of Disputed Claims***

**5.11.1 Deadline for Filing Claim Objections**

Any objections to Claims in Class 7 must be filed within one-hundred (180) days after the Effective Date, unless the Bankruptcy Court for cause extends such deadline. Any objections to Claims in Class 6 shall be filed at the time prescribed by Article 4.6.2.

**5.11.2 Distributions on Allowed Claims/*De Minimis* Distributions.**

The Plan Administrator shall make distributions only on account of Allowed Claims. No distributions will be made to holders of Disputed Claims, except on account of any portion of their claims which are undisputed. In the event that a distribution to an Allowed Claimholder (other than a final distribution) is less than One Hundred ($100.00) Dollars, the Plan

Administrator may withhold such distribution until the amount of the distribution to such Allowed Claimholder exceeds $100.00.

**5.11.3 Settlement of Disputes and Claims.**

Except with respect to the Class 8 claim (USPS) and claims or litigation involving disputes of more than $1.0 million, the Plan Administrator is authorized to settle and compromise the Allowable amount of a Disputed Claim or other litigation (including Avoidance Actions pending prior to the Effective Date) without court approval or notice to other Claimholders. Notwithstanding the foregoing, the Plan Administrator may seek court approval at his discretion for any claim settlement regardless of amount.

**5.11.4 Setoff/Recoupment.**

No provision of this Plan shall constitute a waiver or release of any right of setoff or recoupment that the Debtors and/or Debtors' Estates have or may have against any creditor, and the Debtors' Estates may setoff or recoup against any payments to a creditor due under this Plan. In addition, neither the allowance of any claim nor the failure of the Debtors' Estates to effect a right of setoff or recoupment shall be deemed a waiver of such rights by the Debtors' Estates. After the Effective Date, the Debtors' Estates may enter into stipulations with creditors asserting a right of setoff or recoupment against the Debtors or the Debtors' Estates without notice to creditors or approval of the Bankruptcy Court.

**5.12 *Administrative Reserve***

Within sixty (60) days after the Effective Date, the Plan Administrator shall establish a reserve for the payment of the projected costs and expenses of the Plan Administrator, any professionals retained by the Plan Administrator, and all other costs of administering the Debtors' Estates after entry of the Confirmation Order ("Administrative Reserve"). The Plan Administrator shall review the adequacy of the Administrative Reserve in connection with preparing the reports required by Article 5.8 and have the right to increase the amount of the Administrative Reserve as necessary.

**5.13 *Reserves for Disputed Claims***

Until such time as a Disputed Claim is Disallowed, the Plan Administrator shall retain in the General Unsecured Creditor Fund for the benefit of each holder of such Disputed Claim in Classes 6, 7, 8, and 9 an amount equal to the distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in such Class in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim was estimated by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code, which constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.

**5.14 *Tax Reporting and Addresses for Transmitting Payments***

The Plan Administrator shall not be required to make any distribution to any Claimholder under the Plan unless such creditor has provided the Plan Administrator with a properly completed and executed IRS Form W-9, IRS Form W-4, or any similar document required to enable the Plan Administrator to accurately report distributions and/or withholdings to any relevant federal or state taxing authority. The Plan Administrator may, but is not required, to rely upon tax identification documentation previously provided by the Claimholder to the Debtors.

Claimholders shall be solely responsible for notifying the Plan Administrator of any changes in the address where their distribution check(s) should be sent. Except as otherwise agreed with the holder of an Allowed Claim in respect thereof or as provided in this Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail, upon compliance by the holder with the provisions of this Plan, to ( a) the latest mailing address filed for the holder of an Allowed Claim entitled to a distribution under the Plan, (b) the latest mailing address filed for a holder of a filed power of attorney designated by the holder of such Claim to receive distributions, (c) the latest mailing address filed for the holder's transferee as identified in a filed notice served on the Debtors pursuant to Bankruptcy Rule 3001(e), or (d) if no such

mailing address has been filed, the mailing address reflected on the Schedules or in the Debtors' books and records.

**5.15 *Unclaimed Distributions***

The Debtors' Estates shall make commercially reasonable efforts to contact by telephone or email any creditor which has failed to negotiate any distribution within one hundred twenty (120) days from the date upon which such distribution is made to verify that it has received the distribution and determine if a replacement distribution should be made. If the Debtors' Estates are unable to contact such creditor because it has moved and not provided the Debtors' Estates with a forwarding address, the Debtors' Estates' efforts shall be deemed commercially reasonable if it diligently searches publicly available information (including internet searches), in order to locate the creditor. The Debtors' Estates, however, shall not be required to incur costs for outside vendors or investigators to ascertain current contact information for the creditor. If the Debtors' Estates are unable to contact such creditor after making commercially reasonable efforts, the creditor shall forfeit all rights to any distribution under the Plan and the Debtors' Estates will be authorized to cancel any distribution that is not timely claimed. Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such cash (including interest thereon, if any) will revert to the Debtors' Estates, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Notwithstanding any federal or state escheat laws to the contrary, upon forfeiture, the claim of any creditor with respect to such funds will be discharged and forever barred, and neither such creditors or any other entity will have any claim whatsoever with respect to such forfeited distribution against the Debtors and the Debtors' Estates or any holder of an Allowed Claim to whom distributions are made by the Reorganized Debtor.

**5.16 *Post-Confirmation Committee of Unsecured Creditors***

On the Effective Date, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case shall be deemed dissolved all members of the Official Committee of Unsecured Creditors shall be deemed released from any further obligations, responsibilities, liabilities, or authority arising out of or related to the Chapter 11 Case. The Post-Confirmation

Committee shall be formed comprised of three (3) creditors holding Class 7 General Unsecured Claims. The members of the Post-Confirmation Committee shall be:

- ProLogistix by Gearoid Moore, Esq., Chief Legal Officer, EmployBridge Holding Company
- Lohf Shaiman Jacobs, P.C. by Brian Moore, attorney for Lohf Shaiman
- TRC Staffing Services by David Suever, Vice President, Credit & Collections

The Post-Confirmation Committee may retain and employ Post-Confirmation Professionals previously retained by the Official Committee of Unsecured Creditors in the Chapter 11 Cases at the same rate of compensation and other terms and conditions that exist immediately prior to the Effective Date. The Plan Administrator shall serve the Post Confirmation Committee with the Post-Confirmation Reports as required by Article 5.8 and provide up to $25,000 per quarter to the Post Confirmation Committee for its actual and reasonably necessary administrative costs, including payment of professionals to assist the Post Confirmation Committee to carry out its duties under the Plan. In the event the Post Confirmation Committee incurs less than $25,000 in administrative costs in a given quarter, the difference shall be carried forward and may be utilized in subsequent quarters. Any disputes between the Plan Administrator and the Post Confirmation Committee relating to the administrative costs incurred by the Post Confirmation Committee shall be resolved by the Bankruptcy Court.

The Plan Administrator may consult with Post Confirmation Committee with respect to the administration of the Estates, but the Post Confirmation Committee shall not limit or diminish the Plan Administrator's authority as set forth in the Plan. In the event that a member of the Post-Confirmation Committee resigns, that member's position may be replaced by a creditor who has served on the Official Committee of Unsecured Creditors.

**5.17 *Duration of Automatic Stay and Pre-Confirmation Injunctions***

Any injunction or stay arising under sections 105 or 362 of the Bankruptcy Code prior to Confirmation of this Plan shall remain in full force and effect until the Chapter 11 Case closes.

**5.18** ***Payments to Creditors Not Deemed Allowance of Claims***

Notwithstanding any provision of applicable law, entry of the Confirmation Order and payment to any Claimholder under this Plan shall not be deemed a determination that the Claimholder holds an Allowed claim, and the Debtors' Estates shall retain all rights to assert any Avoidance Actions or other claims arising under bankruptcy or non-bankruptcy law against such Claimholder.

**5.19** ***Entry of Final Decree, Reopening***

Notwithstanding the Bankruptcy Court's entry of a final decree pursuant to Article 5.7.9, the Debtors' Estates, the U.S. Trustee, any Claimholder, or any other interested party shall retain the right to reopen the Chapter 11 Case for any reason specified in section 350(b) of the Bankruptcy Code, to permit the Plan Administrator to seek Bankruptcy Court approval for any matter described in Article 5.7, to reconsider the allowance or disallowance of a claim under section 502(j) and Bankruptcy Rule 9024, or for other appropriate cause to grant relief in aid of execution of the Plan.

**5.20** ***Allocation of XL Collateral Refunds***

In the event the Plan Administrator receives a refund of the XL Letter of Credit Proceeds, seventy (70%) percent of such refunded amount shall be deemed received on account of the proceeds drawn under the standby letter of credit issued by Bank of America, N.A. in favor of XL and be allocated to Bank of America, N.A. and paid as provided in Article 4.1.2.2, and thirty (30%) percent of such refunded amount shall be deemed received on account of the proceeds drawn under the standby letter of credit issued by Texas Capital Bank in favor of XL and be allocated to the Debtors' Estates and distributed to other creditors in accordance with this Plan.

## ARTICLE VI -
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1** ***Executory Contracts/Leases Assumed.***

The Debtors Estates shall assume and/or assume and assign the executory contracts (including any modifications and amendments thereto) appearing on **<u>Schedule 6.1</u>**

effective as of the Effective Date, and Confirmation of this Plan shall be deemed authorization for the Debtors to assume and/or assign the contracts appearing on Schedule 6.1. The Debtors, however, shall retain the right through the hearing on Confirmation of the Plan to amend Schedule 6.1 to add, delete, clarify the terms of any modifications/amendments to a listed executory contract or lease, and to correct any amounts indicated as necessary to cure defaults under such executory contracts or leases. Entry of the Bankruptcy Court's order confirming the Plan shall also be deemed approval (if required) of any modifications/amendments to an assumed executory contract referenced in Schedule 6.1.

Unless the Bankruptcy Court orders otherwise, the amounts listed by the Debtors as the "Cure Amount" for a contract or lease in Schedule 6.1 shall be deemed the full amount that the Debtors must pay to cure defaults under 11 U.S.C. § 365(b) existing as of the Effective Date for all purposes, and all rights that a lessor or counter-party may have to assert additional defaults and/or seek a larger sum to satisfy any such defaults will be forever barred. Any disputes by a counterparty or lessor under an executory contract or unexpired lease related to the assumption and/or assignment of an executory contract or lease (including any disputed concerning Cure Amounts) shall be resolved in the manner provided for in the Bankruptcy Court's order(s) scheduling a hearing on Confirmation of the Plan.

From and after the Effective Date, the Plan Administrator shall perform all obligations thereunder, both pre-confirmation and post-confirmation. Post-confirmation obligations will be paid as they come due.

For the avoidance of doubt, the XL Insurance Program has been assumed by the Debtors' Estates pursuant to the XL Insurance Order, entry by the Bankruptcy Court of an order confirming the Plan shall be deemed approval of the modifications to the XL Insurance Program and XL Insurance Order provided for herein, and the Plan Administrator shall pay all obligations and perform all duties of the Insured (as that term is defined in the XL Insurance Policies and XL Insurance Program) thereunder to the extent provided in the Plan.

//

**6.2 *Executory Contracts/Leases Rejected.***

Pursuant to section 365 of the Bankruptcy Code, Confirmation of this Plan shall be deemed entry of an order rejecting all executory contracts and unexpired leases to which the Debtors are parties as of the Effective Date unless: (a) such contract or lease was previously assumed pursuant to an order of the Bankruptcy Court, or (b) such contract or lease is listed in Schedule 6.1 (as such schedule may be amended through the hearing on Confirmation of the Plan). The Debtors shall thereafter surrender any interest in property to which the Debtors had rights under a rejected executory contracts or unexpired lease, unless agreed-to otherwise between the counterparty or lessor of a rejected contract or lease.

All claims arising from an executory contract or lease rejected pursuant to this Article 6.2 shall be filed no later than thirty (30) days after the Effective Date.

**6.3 *Non-Disclosure, Common Interest, and Joint Defense Agreements.***

Notwithstanding anything to the contrary in this Article 6, on the Effective Date, each Non-Disclosure Agreement and Common Interest and Joint Defense Agreement that exists between the Debtors and any person, to the extent that it constitutes an executory contract, is assumed pursuant to this Plan. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code.

## ARTICLE VII - CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**7.1 *Conditions to Confirmation.***

The following are conditions precedent to confirmation of this Plan:

(a) The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to this Plan in form and substance satisfactory to the Debtors;

(b) The Bankruptcy Court shall have entered the Confirmation Order that *inter alia*, approves the assumption or rejection of executory contracts and unexpired leases pursuant to Article 6.

**7.2 *Conditions to Effectiveness.***

The following are conditions precedent to the occurrence of the Effective Date:

(a) The Bankruptcy Court shall have conducted the hearing on Confirmation of this Plan;

(b) The Confirmation Order shall have been entered and not subject to any stay on the effectiveness of the Confirmation Order.

## ARTICLE VIII - EFFECTS OF CONFIRMATION, RE-VESTING OF TITLE, RELEASES, AND RELATED PROVISIONS

**8.1** ***Vesting of Property.***

On the Effective Date, all property of the estate will vest in the Debtors' Estates pursuant to Section 1141(b) of the Bankruptcy Code free and clear of all claims and interests except as provided in this Plan.

**8.2** ***Plan Creates New Obligations.***

The obligations to creditors that Debtors undertake in the confirmed Plan replace those obligations to creditors that existed prior to the Effective Date of the Plan. Debtors' obligations under the confirmed Plan constitute binding contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law.

**8.3** ***Effect of Conversion to Chapter 7.***

If the case is at any time converted to one under chapter 7:

(i) All property of the Debtors as of the date of conversion, whether acquired pre-confirmation or post-confirmation, shall vest in the chapter 7 bankruptcy estate and such remaining property shall be administered by the chapter 7 trustee as prescribed in chapter 7 of the Bankruptcy Code.; and

(ii) All creditors, whether their claims arose pre-confirmation or post-confirmation, are prohibited from taking action against the chapter 7 bankruptcy estate or property of the estate by Section 362 of the Bankruptcy Code.

//

//

## ARTICLE IX -
## RETENTION AND ENFORCEMENT OF CLAIMS

**9.1 *Preservation of All Rights of Action.***

Subject to the terms of this Article 9.1, the Plan Administrator and the Debtors' Estates shall retain, and may seek to enforce, all claims or Causes of Action that they hold or may hold against all persons or entities, including claims arising under non-bankruptcy law and claims arising under Chapter 5 of the Bankruptcy Code notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date, nor tender of any distributions made to a Claimholder under this Plan. Without limiting the generality of the foregoing, the Plan Administrator shall retain the right to prosecute any Avoidance Actions, all claims and Causes of Action referenced in any tolling agreement with an person or entity as of the Effective Date, and any other claim for relief against any other person or entity. In addition to the foregoing, the Plan Administrator shall retain, and may seek to prosecute, any objections to the allowance of any Administrative Claim and any Claim in Class 6, Class 7, Class 8, or Class 9 on any ground, including that such claim should be subject to subordination under Bankruptcy Code section 510 or other applicable law. However, the Plan Administrator shall not retain nor shall have the right to pursue any affirmative claims for relief that the Debtors Estates hold or may hold as of the Effective Date, including Avoidance Actions, against Bank of America, N.A., Banc of America Leasing and Capital, LLC, or PACCAR Financial Corp, or to object to any claims held by Bank of America, N.A., Banc of America Leasing and Capital, LLC, or PACCAR Financial Corp. allowed by previous Bankruptcy Court orders or pursuant to this Plan.

**9.2 *Extension of Limitations Period for Claims Against Insiders.***

Notwithstanding any provision of the Bankruptcy Code or applicable law, the period in which the Debtors' Estates, the Plan Administrator, or any Chapter 11 or Chapter 7 trustee that may subsequently be appointed in these cases may commence an action seeking the recovery of money or property from an entity that qualifies as an Insider shall be extended as provided in any agreement with an Insider.

## ARTICLE X - MODIFICATION OF PLAN

The Debtors and Creditors Committee, as Plan proponents, may jointly modify the Plan prior to Confirmation if the Plan, as modified, meets the requirements of section 1127 of the Bankruptcy Code. Such modification shall be deemed accepted or rejected by a holder of a Claim that has previously accepted or rejected the Plan.

## ARTICLE XI - RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction notwithstanding Confirmation of this Plan or the occurrence of the Effective Date, over proceedings including, without limitation:

a. To resolve controversies and disputes regarding interpretation of the Plan or the Confirmation Order, including whether the Debtors has defaulted in performance of any Plan obligation and whether the time for performing any Plan obligation should be extended;

b. To implement the provisions of the Plan and Confirmation Order, and to enter orders in aid of Confirmation, including orders designed to protect the Plan Administrator, the Debtors or the Debtors' Estates, and to facilitate distributions to creditors;

c. To determine the allowability and classification of Claims upon objection to such claims, including claims asserted by USPS in Class 8;

d. To modify the Plan pursuant to section 1127 of the Bankruptcy Code;

e. To resolve any disputes concerning rights of setoff or recoupment between the Debtors/Debtors' Estates and any Claimholder, including claims asserted by USPS in Class 8;

f. To adjudicate any causes of action, including Avoidance Actions, brought by the Debtors, the Debtors' Estates, or the Plan Administrator, or any party-in-interest designated to do so;

g. To enter orders appointing a successor Plan Administrator or replacement members of the Post-Confirmation Committee;

h. To determine whether a trustee should be appointed or the case should be converted to one under chapter 7 (and proceedings following any such conversion);

i. To enter orders as may be necessary to permit the Plan Administrator to monitor XL's use of the XL Letter of Credit Proceeds and/or other XL Collateral and determine the extent to which the Debtors' Estates are entitled to refunds from the XL Collateral;

j. To enter orders in aid of implementation of this Plan, including resolution of any disputes between the Plan Administrator and the Post Confirmation Committee relating to administrative costs incurred by the Post Confirmation Committee or otherwise under this Plan; and

k. To preside over such other matters for which jurisdiction is provided under the Bankruptcy Code, the Plan the Confirmation Order, or other applicable law.

In addition, to the fullest extent permitted by applicable law, the Bankruptcy Court shall retain jurisdiction notwithstanding Confirmation of this Plan or the occurrence of the Effective Date, over any proceedings seeking to realize value from the USPS Claim Recovery.

## ARTICLE XII - MISCELLANEOUS

### 12.1 *Cramdown.*

Pursuant to section 1129(b) of the Bankruptcy Code, Debtors reserve the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors.

### 12.2 *Severability.*

If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### 12.3 *Binding Effect.*

The rights and obligations of any entity named or referred to in the Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**12.4 *Captions.***

The headings contained in the Plan are for reference and convenience only and do not affect the meaning or interpretation of the Plan.

**12.5 *Controlling Effect.***

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan.

**12.6 *Notices.***

Any notice to the Plan Administrator, Debtors, Debtors' Estates or Post Confirmation Committee shall be in writing and mailed, and will be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

| | |
|---|---|
| Attorneys for the Debtors:<br>NUTI HART LLP<br>Gregory Nuti/<br>Kevin W. Coleman<br>6232 La Salle Ave. Suite D<br>Oakland, CA 94611<br>(Tel.) 510 506-7152<br>Email: gnuti@nutihart.com<br>kcoleman@nutihart.com | Plan Administrator:<br>Hank M. Spacone<br>P.O. Box 255808<br>Sacramento, California 95865<br>(916) 489-6250<br>hspacone@thg-sac.com |
| Debtors:<br>Matheson Flight Extenders, Inc.,<br>Matheson Postal Services, Inc., and<br>Matheson Trucking, Inc.<br>Charles Mellor<br>9785 Goethe Road<br>Sacramento, CA 95827<br>Email: CMellor@mathesoninc.com | Attorneys for Post Confirmation Committee:<br>FELDERSTEIN FITZGERALD<br>WILLOUGHBY PASCUZZI & RIOS LLP<br>Attn: Jason E. Rios<br>500 Capitol Mall, Suite 2250<br>Sacramento, CA 95814<br>Tel: 916-329-7400, Ext. 233<br>Email: jrios@ffwplaw.com |

**12.7 *Events of Default***

The Debtors' Estates shall be deemed in default of their obligations under this Plan if the Debtors' Estates:

i. Fail to make payments to creditors required under the Plan;

ii. Fail to timely prepare and serve the Post Confirmation Reports required by Article 5.8;

vi. Materially misrepresent any information contained in the Post Confirmation Reports required by Article 5.8; and

vii. Cause or permit any of the circumstances described in 11 U.S.C. §1112(b)(4) to occur.

**12.8 *Rights in the Event of Default***

In the event of a material default in the performance of the obligations under this Plan, any creditor shall be entitled to enforce its rights in any action at law in a court that may properly exercise personal jurisdiction over the Reorganized Debtor. In addition, any creditor and the U.S. Trustee may:

i. seek appointment of a Chapter 11 trustee;

ii. seek conversion of the Chapter 11 Case to a proceeding under chapter 7 of the Bankruptcy Code; or

iii. request that the Bankruptcy Court grant any other appropriate order to enforce the terms of the Plan.

**12.9 *Exculpation***

From the Petition Date through the Effective Date, the Debtors, all members of the Official Committee of Unsecured Creditors, all professionals employed under sections 327 or 328 of the Bankruptcy Code to advise or assist the Debtors or Official Committee of Unsecured Creditors in the Chapter 11 Case, including their respective directors, officers, attorneys, financial advisors, agents, and employees shall not have any liability to the Debtors, or any other claimants or creditors, or other parties in interest in the Chapter 11 Case for any act or omission in connection with or arising out of the Chapter 11 Case, any contract, instrument, release or other agreement or document entered into during the Chapter 11 Case or otherwise created in connection with this Plan, including, without limitation, prosecuting confirmation of the Plan, confirmation of the Plan, and the administration of the Estates, the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects, such persons will be entitled to rely on the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case and the Plan.

Dated: August 22, 2024

MATHESON FLIGHT EXTENDERS, INC.
MATHESON POSTAL SERVICES, INC.
MATHESON TRUCKING, INC.

By: *<u>/s/ Charles Mellor</u>*
Charles Mellor, CRO

Dated: August 22, 2024

OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE CASES OF MATHESON FLIGHT EXTENDERS, INC., MATHESON POSTAL SERVICES, INC., AND MATHESON TRUCKING, INC.

By: *<u>/s/ •Gearoid Moore</u>*
Gearoid Moore, Committee Chair

Dated: August 22, 2024

NUTI HART LLP

By: /s/ *Kevin W. Coleman*
Kevin W. Coleman
Attorneys for Matheson Flight Extenders, Inc., Matheson Postal Services, Inc., and Matheson Trucking, Inc. Debtors-in-Possession

Dated August 22, 2024

FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS LLP

By: *<u>/s/Jason E. Rios</u>*
Jason E. Rios
Attorneys for the Official Committee of Unsecured Creditors

**Schedule 5.2**

# Schedule of Duplicate Claims Merged Through Substantive Consolidation

**Matheson, et al.**
**Duplicate Claim Exhibit**

| General Unsecured - Duplicate Claims | Duplicate Claims | | | | | | Surviving Claim | | |
|---|---|---|---|---|---|---|---|---|---|
| Claimant | Matheson Flight Extenders, Inc. (MFE) | | Matheson Postal Services, Inc. (MPS) | | Matheson Trucking, Inc. (MTI) | | Consolidated | | |
| | Claim Number | Claim Amount | Claim Number | Claim Amount | Claim Number | Claim Amount | Claim Number | Claim Amount | |
| Andre De Oliveira | 177 | 156,250.00 | | | | | | | |
| | | | | | 10035 | 541,964.43 | 10035 | 541,964.43 | |
| Anytime Logistics, Inc. | | | Scheduled | 92,525.00 | | | | | |
| | 43 | 92,525.00 | | | | | 43 | 92,525.00 | |
| Ardith L Duke | 173 | 156,250.00 | | | | | | | |
| | | | | | 10038 | 541,964.43 | 10038 | 541,964.43 | |
| BANC OF AMERICA LEASING AND CAPITAL LLC | | | | | 10077 | 4,925,887.25 | | | |
| | | | 221 | Undetermined | | | | | |
| | 212 | Undetermined | | | | | 212 | Undetermined | |
| Bank of America NA | 213 | Undetermined | | | | | | | |
| | | | | | 10078 | Undetermined | 10078 | Undetermined | |
| Bankers Standard Insurance Co. | | | | | 10116 | 84,817.68 | | | |
| | | | 255 | 84,817.68 | | | 255 | 84,817.68 | |
| Bemba Diallo | 180 | 93,750.02 | | | | | | | |
| | | | | | 10039 | 541,964.43 | 10039 | 541,964.43 | |
| BMO HARRIS BANK NA | | | | | 10005 | 202,625.75 | | | |
| | | | 120 | 195,901.70 | | | 120 | 195,901.70 | |
| BMO HARRIS BANK NA | | | | | 10006 | 124,120.10 | | | |
| | | | 121 | 120,002.87 | | | 121 | 120,002.87 | |
| BROOMALL TRUCK & AUTO | | | | | Scheduled | 8,298.08 | | | |
| | 101 | 8,298.08 | | | | | 101 | 8,298.08 | |
| CA - State Water Resources Control Board | | | 246 | 1,738.00 | | | | | |
| | | | 247 | 1,738.00 | | | | | |
| | | | 248 | 1,738.00 | | | 248 | 1,738.00 | |
| CINTAS | | | 232 | 1,281.66 | | | | | |
| | | | 236 | 1,281.66 | | | 236 | 1,281.66 | |
| CORE Transport Technologies, Inc. | Scheduled | 130,016.87 | | | | | | | |
| Descartes Systems (USA), LLC | 127 | 130,016.87 | | | | | 127 | 130,016.87 | (a) |
| DCT Freeport West Phase II LLC | 208 | 45,853.96 | | | | | | | |
| | 207 | 45,853.96 | | | | | 207 | 45,853.96 | |
| Dean Patricelli | 175 | 156,250.00 | | | | | | | |
| | | | | | 10040 | 541,964.43 | 10040 | 541,964.43 | |
| Earnest Williams | | | | | 10041 | 8,181.68 | | | |
| | 174 | 8,181.68 | | | | | 174 | 8,181.68 | |
| Elite HR Logistics Inc. | | | 10 | 40,775.45 | | | | | |
| | | | | | 10119 | 40,775.45 | | | |
| | | | 11 | 40,775.45 | | | 11 | 40,775.45 | |
| ESPINOZA*LETICIA | | | | | 10031 | 113,466.00 | | | |
| | | | 164 | 113,466.00 | | | 164 | 113,466.00 | |
| Gary Vorce | 215 | 9,140,000.00 | | | | | | | |
| | | | 224 | 9,140,000.00 | | | | | |
| | | | | | 10049 | 9,140,000.00 | 10049 | 9,140,000.00 | |
| ZARAN SAYRE & ASSOCIATES, INC | | | Scheduled | 15,610.79 | | | | | |
| HERBERT & ANITA RENDEL LLC | | | 231 | 15,610.79 | | | 231 | 15,610.79 | |
| Jubitz Travel Center | | | 4 | 14,465.39 | | | | | |
| | | | 5 | 14,465.39 | | | 5 | 14,465.39 | |
| LES SCHWAB TIRE CENTERS OF WASHINGTON INC | | | | | Scheduled | 961.94 | | | |
| | 126 | 961.94 | | | | | 126 | 961.94 | |
| Levy Wilson | Scheduled | Undetermined | | | | | | | |
| | | | | | Scheduled | Undetermined | Scheduled | Undetermined | |
| LITTLER MENDELSON PC | | | | | Scheduled | 100,026.43 | | | |
| | Scheduled | 100,026.43 | | | | | Scheduled | 100,026.43 | |
| LOHF SHAIMAN JACOBS HYMAN & FEIGER PC | 178 | 453,860.83 | | | | | | | |
| | | | | | 10042 | 1,533,863.75 | 10042 | 1,533,863.75 | |
| Macire Diarra | 181 | 156,250.00 | | | | | | | |
| | | | | | 10034 | 541,964.43 | 10034 | 541,964.43 | |
| Mahamet Camara | 182 | 156,250.00 | | | | | | | |
| | | | | | 10037 | 541,964.43 | 10037 | 541,964.43 | |
| Juan Martinez | | | 163 | 113,466.00 | | | | | |
| | | | | | 10030 | 113,466.00 | 10030 | 113,466.00 | |
| MH Equipment Co | Scheduled | 269.85 | | | | | | | |
| | | | | | 10125 | 269.85 | 10125 | 269.85 | |
| Moussa Dembele | | | | | 10043 | 8,181.68 | | | |
| | 176 | 8,181.68 | | | | | 176 | 8,181.68 | |
| Motor Truck Equipment Co | | | | | 10054 | 10,508.76 | | | |
| Motor Truck Equipment Co | | | | | 10056 | 10,508.76 | 10056 | 10,508.76 | |
| NATIONAL UNION FIRE INSURANCE CO OF | 206 | Unliquidated | | | | | | | |
| | | | 220 | Unliquidated | | | | | |
| | | | | | 10046 | Unliquidated | 10046 | Unliquidated | |
| PACCAR FINANCIAL CORP | | | | | 10069 | 6,954,862.81 | | | |
| | | | 160 | 2,945,806.08 | | | 160 | 2,945,806.08 | |
| Peterbuilt of Utah | | | | | Scheduled | 30,028.23 | | | |
| Jackson Group Peterbuilt | | | | | 10080 | 28,200.33 | 10080 | 28,200.33 | |
| Prem Parmar | | | | | 10117 | 100,000.00 | | | |
| | | | 256 | 100,000.00 | | | 256 | 100,000.00 | |
| Premier Employee Solutions LLC | 83 | 214,247.59 | | | | | | | |
| | | | 90 | 214,247.59 | | | 90 | 214,247.59 | |

**Matheson, et al.**
**Duplicate Claim Exhibit**

| General Unsecured - Duplicate Claims | Duplicate Claims | | | | | | Surviving Claim | |
|---|---|---|---|---|---|---|---|---|
| Claimant | Matheson Flight Extenders, Inc. (MFE) | | Matheson Postal Services, Inc. (MPS) | | Matheson Trucking, Inc. (MTI) | | Consolidated | |
| | Claim Number | Claim Amount | Claim Number | Claim Amount | Claim Number | Claim Amount | Claim Number | Claim Amount |
| Primo Water | 253 | 4,600.32 | | | | | | |
| Alhambra and Sierra Springs | | | 262 | 4,600.32 | | | 262 | 4,600.32 |
| Quick-Set Auto Glass | | | | | 10067 | 1,972.01 | | |
| | | | | | 10072 | 1,972.01 | 10072 | 1,972.01 |
| R and S Overhead Garage Door Inc | Scheduled | 2,223.60 | | | | | | |
| | | | | | 10088 | 2,223.60 | 10088 | 2,223.60 |
| Salif Diallo | 183 | 156,250.00 | | | | | | |
| | | | | | 10036 | 541,964.43 | 10036 | 541,964.43 |
| Securitas Security SVC USA, Inc. | Scheduled | 56,496.00 | | | | | | |
| | | | | | 10044 | 56,800.50 | 10044 | 56,800.50 |
| Sindy Buford | 214 | 9,385,000.00 | | | | | | |
| | | | 225 | 9,385,000.00 | | | | |
| | | | | | 10048 | 9,385,000.00 | 10048 | 9,385,000.00 |
| SONITROL OF SACRAMENTO LLC | | | | | Scheduled | 832.12 | | |
| | 154 | 832.12 | | | | | 154 | 832.12 |
| Southwest Airport SVC Inc. | 245 | 5,039.72 | | | | | | |
| | | | | | Scheduled | 5,039.72 | Scheduled | 5,039.72 |
| Staffmark Investment LLC | | | Scheduled | 1,203.53 | | | | |
| | 71 | 9,223.47 | | | | | 71 | 9,223.47 |
| Transportation Commodities Inc. | | | Scheduled | 4,773.19 | | | | |
| | 116 | 4,773.19 | | | | | 116 | 4,773.19 |
| Transwest | | | | | 10024 | 1,810.39 | | |
| | | | | | 10025 | 1,810.39 | 10025 | 1,810.39 |
| Western Exterminator Co | 147 | 210.90 | | | | | | |
| | | | | | 10026 | 210.90 | 10026 | 210.90 |
| XL Insurance | 150 | 564,823.00 | | | | | | |
| | | | | | 10027 | - | 10027 | - |

**Priority - Duplicate Claims**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Labormax Staffing | 110 | 19,905.54 | | | | | | |
| Labormax Staffing | | | 114 | 19,905.54 | | | 114 | 19,905.54 |
| Premier Employee Solutions LLC | 83 | 15,150.00 | | | | | | |
| | | | 90 | 15,150.00 | | | 90 | 15,150.00 |

**Secured - Duplicate Claims**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Bank of America NA | 213 | Undetermined | | | | | | |
| | | | 222 | 2,481,809.32 | | | | |
| | | | | | 10078 | Undetermined | 10078 | Undetermined |
| BMO HARRIS BANK NA | 29 | 195,901.70 | | | | | | |
| | 30 | 195,901.70 | | | | | | |
| | 31 | 195,901.70 | | | | | | |
| | 62 | 195,901.70 | | | | | | |
| | | | 120 | - | | | 120 | - |
| BMO HARRIS BANK NA | 32 | 120,002.87 | | | | | | |
| | | | 121 | - | | | 121 | - |
| GOLDEN 1 CREDIT UNION | 58 | 79,012.36 | | | | | | |
| | | | 17 | 79,012.36 | | | | |
| | | | | | 10004 | 75,741.87 | 10004 | 75,741.87 |
| PACCAR FINANCIAL CORP | | | | | 10069 | - | | |
| | | | 160 | 4,214,175.00 | | | 160 | 4,214,175.00 |
| XL Insurance | | | 161 | 564,823.00 | | | | |
| | | | | | 10027 | 564,823.00 | 10027 | 564,823.00 |

(a) CORE Transport Technologies was acquired by Descartes Systems (USA), Inc.

**Schedule 5.5**

# Senior Management Key Employee Retention Plan

Senior Management Key Employee Incentive Program

The following individuals (each a "Participant" and collectively the "Participants") shall participate in the Senior Management Key Employee Incentive Program ("KEIP"):

1. Charles Mellor, Chief Structuring Officer
2. Marcos Kropf, General Counsel
3. Mark Simmons, Chief Financial Officer, and
4. Hank Spacone, Plan Administrator

Participants shall be entitled to distributions under the KEIP based upon the timing ("Discount Rate"), the amount of a GUC Distribution, and the Percentage of Recovery of GUC Distributions. A "GUC Distribution" is made upon the Plan Administrator mailing or otherwise transferring (e.g. checks, ACH or wire) funds to Claimholders of an Allowed General Unsecured Claim in Classes 6, 7, 8 and 9 from the General Unsecured Creditors Fund. Funds held in or transferred into the General Unsecured Creditors' Fund do not constitute a GUC Distribution. The amounts owed to Participants under the KEIP shall be calculated as set forth herein based on the gross amount of the GUC Distribution without regard to unnegotiated or returned checks. The Plan Administrator shall make payment under the KEIP to Participants within seven (7) days of a GUC Distribution unless otherwise agreed by a Participant ("KEIP Payment"). Participants shall share equally in each KEIP Payment unless unanimously agreed otherwise by the Participants. Participants shall retain their rights under the KEIP unless a Participant terminates or materially changes their employment status without the consent of the Plan Administrator.

Participants shall be entitled to a KEIP Payment calculated as follows:

1. Discount Rate

The GUC Distribution shall be subject to a discount of 2.5% every 180 days ("Discount Schedule") after the Target Date. The Target Date shall be the earlier of March 17, 2025, or within 180 days from Effective Date. In the event the Target Date is not the 1st day of a month, the Discount Rate shall begin to apply on the 1st day of the following month. The Discount Rate shall apply as follows:

| **Time Period** | **GUC Distribution Date** | **Percentage Recovery** | **Discount** |
|---|---|---|---|
| | On or Before Target Date | 100% | 0% |
| 1st | On or Before 180 days after Target Date | 97.5% | 2.5% |
| 2nd | On or Before 360 days after Target Date | 95.0% | 5.0% |
| 3rd | On or Before 540 days after Target Date | 92.5% | 7.5% |
| 4th | On or Before 720 days after Target Date | 90.0% | 10.0% |
| 5th | On or Before 900 days after Target Date | 87.5% | 12.5% |
| 6th | On or Before 1080 days after Target Date | 85.0% | 15.0% |
| | And so forth….. | | |

2. Distributed Funds Component

| GUC Distribution Range | GUC Distribution Timing | Incentive Percentage of GUC Distribution |
|---|---|---|
| All Funds Distributed | On or before the Target Date | 7.50% |
| $0-$19,920,000 | After Target Date | 3.8325% |
| $19,920,001-$23,920,000 | After Target Date | 10.0% |
| Over $23,920,000 | After Target Date | 12.67% |

3. Percentage Recovery Component

In addition to the Distributed Funds Component, Participants shall be entitled to compensation based on the percentage recovery realized by Classes 6, 7, 8 and 9 from the General Unsecured Creditors Fund. The following formula represents the Percentage of Recovery portion of the KEIP:

| Distribution Recovery Percentage | Incentive Percentage of GUC Distribution |
|---|---|
| 0%-20% | 0.0% |
| 20%-40% | 4.0% |
| 40%-60% | 8.0% |
| 60%-100% | 12.0% |

**1. Hypothetical Examples**

**Hypothetical #1**. The Plan Administrator distributes $7,000,000 on or before the Target Date. The Plan Administrator bases this distribution on an anticipated Percentage Recovery of less than 20%. The calculated KEIP Payment based on the funds distributed to creditors is $525,000 ($7,000,000 x 7.5%) on account of the Distributed Funds Component. The Percentage Recovery Component is $0. There is no Discount. The total KEIP Payment amount is $525,000.

| GUC Distribution Amount | Applicable Incentive Percentage | Distributed Funds Component | Percentage Recovery Component | KEIP Payment |
|---|---|---|---|---|
| $7,000,000 | 7.5% | $525,000 | $0 | $525,000 |

**Hypothetical #2**. The Plan Administrator distributes $6,000,000 on or before the Target Date and an additional $1,500,000 within 180-days after the Target Date both based on an

anticipated Percentage Recovery of less than 20%. The second GUC distribution of $1,500,000 during the first period after the target date yields a discount of 2.5%.

The KEIP Payment on account of the first GUC Distribution yields a KEIP Distributed Funds Component of $450,000 ($6,000,000 x 7.5%). The Percentage Recovery Component is $0. There is no Discount.

The second GUC Distribution of $1,500,000 yields a KEIP Distributed Funds Component of $56,050 ($1,500,000 x 3.8325% x 97.5%). The Percentage Recovery Component is $0. The KEIP payment on the second GUC distribution is $56,050.

The total KEIP payment in Hypothetical #2 is $506,050.

| GUC Distribution Amount | Applicable Incentive Percentage | Distributed Funds Component | Percentage Recovery Component | KEIP Payment |
|---|---|---|---|---|
| $6,000,000 | 7.5% | $450,000 | $0 | $450,000 |
| $1,500,000 | 3.8325% | $57,487 | $0 | $56,050 |

**Hypothetical #3**. The Plan Administrator distributes $3,000,000 during the fourth 180-day period on the Discount Schedule (i.e. 10.0%). Together with prior interim distributions, the total amount distributed to GUCs is now $19,000,000. The Plan Administrator bases this KEIP payment on a Percentage Recovery of 25%. This is the first time in the case, the anticipated Percentage Recovery exceeds 20%. The KEIP Funds Distributed Component is $103,478 ($3,000,000 x 3.8325% x 90.0%).

Assuming the previous distribution of $16,000,000 had no discount applied and the new distribution of $3,000,000 is discounted at 10.0%, the KEIP basis is $18,700,000 ($16,000,000 + ($3,000,000 x 90.0%)) and KEIP Percentage Recovery Component is $187,000 ($18,700,000 x 4.0%/4). The total KEIP payment is $290,478.

| GUC Distribution Amount | Applicable Incentive Percentage | Distributed Funds Component | Percentage Recovery Component | Total KEIP Payment |
|---|---|---|---|---|
| $3,000,000 | 3.8325% | $103,478 | $187,000 | $290,478 |

Filed 08/22/24 Case 22-21148 Doc 1865

Schedule 6.1

# Schedule of Assumed Executory Contracts/Leases

| Counter-Party | Contract Title / Description | Modification | Cure Amount |
|---|---|---|---|
| Ceridian HCM | Payroll Processor | n/a | $ 39,410.90 |
| Trimble Transportation | Vehicle Tracking and Maintenance | n/a | $ 9,598.45 |
| Dell USA LP | Office equipment and computers | n/a | $ - |