**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

In re:                                    )
                                          )
Matheson Flight Extenders, Inc.,          ) Case No. 22-21148-C-11
Matheson Postal Services, Inc.,           ) Case No. 22-21149-C-11
Matheson Trucking, Inc.,                  ) Case No. 22-21758-C-11
                                          )
    Substantively Consolidated            ) DCN: NH-132
    Debtors.                              )
_____   )

### <u>OPINION SUBORDINATING PUNITIVE DAMAGES</u>

This Chapter 22 adventure includes a ride down the
bankruptcy liquidation waterfall. The issue is: can a prior
Chapter 11 plan cleanse debt of the taint of punitive damage
status in a later case for purposes of distributions pursuant to
Bankruptcy Code § 726(a)(4)? The answer is no.

The Plan Administrator under the liquidating Chapter 11 plan
for the consolidated cases of Matheson Flight Extenders, Inc.
("MFE"), Matheson Postal Services, Inc. ("MPS"), and Matheson
Trucking, Inc. ("MTI"), seeks an order determining that seven
claims are mandatorily subordinated to other unsecured claims as
having originated in a punitive damages award.

The claimants contend that their treatment in a prior
chapter 11 case eliminated punitive damage status.

### <u>2015 Chapter 11 Case</u>

Chapter 22 rears its head because MFE used a Chapter 11 case
in 2015 to settle a $14 million punitive damages award before
post-trial motions were decided. The award imperiled lifeblood

contracts with the U.S. Postal Service, threatening collapse of the business.

The judgment was entered February 27, 2015, in U.S. District Court, District of Colorado, in <u>Camara, et al. v. Matheson Flight Extenders, Inc. & Matheson Trucking, Inc.</u>, No. 12-CV-03040-CMA-CBS, on a jury verdict for unlawful discrimination practices.

The $14,968,100 Final Judgment in favor of the seven plaintiffs was for back pay and compensatory damages (total $968,000) and punitive damages ($14,000,000).

MFE filed an immediate Chapter 11 case in the District of Nevada to forestall post-trial motions and appeals in Colorado while negotiating a settlement. <u>In re Matheson Flight Extenders, Inc.</u>, No. 15-50541-btb (Bankr. D. Nevada 2015) ("MFE Ch. 11").

The ensuing $8,000,000 settlement was baked into a Chapter 11 plan in a deal providing for withdrawal of post-trial motions, no appeal, and dismissal of the civil action with prejudice.

The dollar terms of the settlement were: (1) payment of $328,571 to each of the seven plaintiffs (total $3,000,000) before the effective date of plan; (2) payment by MFE of $714,286 to each plaintiff (total $5,000,000) in 32 equal quarterly installments commencing April 1, 2016; and (3) stipulated judgment against MTI for $2,700,000 for any payment default. The choice of law in the settlement agreement and in Article 7.4 of the Second Amended Plan is Nevada law.

The Second Amended Plan implementing the settlement was confirmed December 28, 2015, and went effective January 19, 2016.

The $3,000,000 paid before the effective date exceeded the cumulative $968,100 back pay and compensatory damage liabilities

1  (with all taxes paid on the back pay), leaving only punitive

2  damages to be paid in the 32 scheduled installments.

3      MFE timely made 25 of the 32 scheduled installments (78%),

4  amounting to $558,036 of the $714,286 due each plaintiff (total

5  $3,906,252). Each plaintiff was owed $156,250 as of the payment

6  suspension triggered by the new Chapter 11 filings.

7

8                        2022 Chapter 11 Cases

9      MFE and MPS filed Chapter 11 cases May 5, 2022. MTI added

10 its case on July 14, 2022. The cases were administratively

11 consolidated and eventually substantively consolidated.

12     When filed, prospects for enterprise reorganization seemed

13 promising. But, the U.S. Postal Service's recalcitrance and then

14 termination of the Matheson contracts in 2024 spelled doom.

15     The ensuing Debtors and Creditors' Committee Joint Plan of

16 Liquidation confirmed with a Plan Administrator appointed to

17 liquidate and assemble whatever value can be salvaged from the

18 wreckage for distribution in accordance with the bankruptcy

19 waterfall specified by 11 U.S.C. § 726(a).

20     The Disclosure Statement in support of the Joint Plan

21 estimated that non-priority unsecured claim holders would receive

22 about 26 percent of the allowed claims under the Bankruptcy

23 Code's distribution scheme.

24     The Joint Plan was confirmed with a finding under the "best

25 interest" test that each holder of an unsecured claim would

26 receive not less than the value, as of the plan effective date,

27 that such holder would receive if the debtor were liquidated

28 under chapter 7 on such date. 11 U.S.C. § 1129(a)(7)(A)(ii).

1                          Chapter 22

2          Consecutive Chapter 11 cases for the same debtor invite

3     scrutiny for the bona fides of the second case.

4          While there is no per se prohibition of serial Chapter 11

5     filings, there must be a good reason for another case. Elmwood

6     Dev. Co. v. Gen'l Electr. Pension Trust (In re Elmwood Dev. Co.),

7     964 F.2d 508, 511-12 (5th Cir.1992); Fruehauf Corp. v. Jartran

8     Inc. (In re Jartran, Inc.), 886 F.2d 859, 867 (7th Cir. 1989).

9          Filings made to circumvent the binding effect of § 1141(a)

10    in the prior case or to renege on earlier agreements are

11    vulnerable to dismissal, either for bad faith or as a collateral

12    attack on the first order of confirmation. The analysis of any

13    given situation includes how the two cases are related in time

14    and substance. E.g., Lincoln Nat'l Life Ins. Co. v. Bouy, Hall &

15    Howard & Assocs., 208 B.R. 737, 744 (Bankr. S.D. Ga. 1995).

16         The Ninth Circuit BAP applies a two-part inquiry to assess

17    whether a chapter 22 case passes scrutiny: (1) the case must not

18    have been filed in bad faith; and (2) there must be unforeseeable

19    and extraordinary changed circumstances that substantially impair

20    performance under the confirmed plan. Caviata Attached Homes, LLC

21    v. U.S. Bank, N.A. (In re Caviata Attached Homes, LLC), 481 B.R.

22    34, 48-50 n.12 (9th Cir. BAP 2012).

23         Here, the two MFE cases are fundamentally different in

24    scale, purpose, and circumstance. The first MFE case in 2015 was

25    for the limited purpose of resolving a single judgment against

26    MFE and MTI. The second MFE case in 2022 is part of an enterprise

27    group reorganization effort dictated by changed economic and

28    operating conditions that were not foreseeable in 2015.

In the second case, the debtors did not question the allowability of claims based on the settlement in the first case. There was no intent to circumvent the effect of § 1141. Nor was it foreseen that the new case would collapse into liquidation.

When the second MFE case imploded following the U.S. Postal Service's termination of Matheson contracts, the status of the remaining 2015 debt for purposes of liquidation became relevant for the first time.

The matrix for analysis is the "bankruptcy waterfall" necessitating making precise distinctions among various debts.

<u>Bankruptcy Waterfall</u>

Congress prescribed the "bankruptcy waterfall" (or "ladder") as the order of distribution in Bankruptcy Code § 726(a).

There are six tiers of distribution for property of the estate:

> (1) § 507 priority claims and expenses (with sub-tiers);
> (2) timely filed allowed unsecured claims + tardily filed claims by creditors without notice or actual knowledge of the case whose proofs of claim arrive in time to permit payment;
> (3) allowed unsecured claims tardily filed;
> (4) allowed claims, whether secured or unsecured for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;
> (5) payment of interest at the legal rate from the date of the filing of the petition on any claim paid under tiers (1) through (4); and
> (6) to the debtor.

11 U.S.C. § 726(a).

Distribution must be made in the order Congress prescribed. Payment is pro rata within each tier. 11 U.S.C. § 726(b).

If funds are not adequate to pay in full all claims within a particular tier, then all claims in that tier are paid pro rata.

A corollary of the § 726(b) pro rata rule is that where the pro rata share of a particular tier is less than 100%, then all inferior tiers receive zero.

A so-called "surplus" case means that after full payment of § 726(a) tiers (1) through (5), funds remain for a § 726(a)(6) distribution to the debtor.

The waterfall is a mandatory subordination scheme fixing the order of distributions.

In other words, in § 726(a)(4) Congress subordinated to timely and tardily filed allowed unsecured claims under §§ 726(a)(2) and (3) all allowed secured and unsecured punitive damage claims that are not compensation for actual pecuniary loss suffered by the holder.

The Congressional enactment materials for the 1978 Bankruptcy Code were explicit that both §§ 726(a)(3) and 726(a)(4) are "subordination provisions." H.R. Rep. No. 595, 95th Cong., 1st Sess. 412-413 ("subordination provisions")(1977); 7 R. Levin & H. Sommers, eds., COLLIER ON BANKRUPTCY ¶ 1129.02[7][c] (16th ed. 2009) ("7 COLLIER").

Three other forms of subordination are recognized at § 510 and are affixed to the § 726(a) distribution scheme by the preambular language of § 726(a): "Except as provided in section 510 of this title..." 11 U.S.C. § 726(a).

Subordination under § 510 is on a claim-by-claim basis. It may be contractual subordination. 11 U.S.C. § 510(a). It may be mandatory subordination. 11 U.S.C. § 510(b). Or, it may be

equitable subordination. 11 U.S.C. § 510(c).

Subordination of a claim should be distinguished from disallowance of a claim. Subordination entails adjusting an allowed claim's position in the waterfall queue. Disallowance formally entails rejecting a claim on the merits, but colloquially is sometimes used to include lack of funds to pay.

### Bankruptcy Waterfall in Chapter 11

The bankruptcy waterfall pertains to chapter 11 cases primarily by way of the "best interest" test for plan confirmation.

A fundamental economic justification for reorganization in chapter 11 is that a plan provides for greater return to creditors than what would result from a chapter 7 liquidation.

The best interest test is an essential element for confirmation of a chapter 11 plan with respect to holders of impaired claims that have not accepted the plan. Such holders must receive under the plan value at least, or greater than, what they would receive in a hypothetical chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A)(ii).

The hypothetical chapter 7 liquidation analysis for chapter 11 confirmation that is required when not all holders of impaired claims have accepted the plan necessarily focuses on the hierarchy of the bankruptcy waterfall.

The House Committee Report on the 1978 Bankruptcy Code explained the § 1129(a)(7)(A)(ii) confirmation requirement regarding the hypothetical chapter 7 liquidation:

> In order to determine the hypothetical distribution in a
> liquidation, the court will have to consider the various

- 7 -

subordination provisions of proposed 11 U.S.C. 510,
726(a)(3), 726(a)(4), and the postponement provisions of
proposed 11 U.S.C. 724.

H.R. Rep. No. 595, at 412-413; 7 COLLIER ¶ 1129.02[7][c]. The
Senate ultimately acquiesced in the House version.[1]

The net effect of § 726(a)(4) is that punitive damages
claims that are not compensation for actual pecuniary loss are
mandatorily subordinated and cannot be paid as § 726(a)(2)
unsecured claims.

If a chapter 11 plan provides for liquidation, then the
subordinations inherent in the chapter 7 bankruptcy waterfall
become mandatory.

Although it is possible to sidestep § 726 when all holders
of impaired claims have accepted a chapter 11 plan, a plan of
liquidation ordinarily plunges everybody down the waterfall.

In short, there not having been universal acceptance by all
impaired claimants, honoring the § 726(a)(4) subordination of
punitive damages under the "best interest" test was an essential
element for this Court's confirmation of the Joint Plan.

---

[1]The Senate Subcommittee Chair explained:

Section 1129(a)(7) adopts the position taken in the House
Bill in order to insure that the dissenting members of an
accepting class will receive at least what they would
otherwise receive under the best interest of creditors test;
it also requires that even the members of class that has
rejected the plan be protected by the best interest of
creditors test for those rare cramdown cases where a class
of creditors would receive more on liquidation than under
reorganization of the debtor.

Statement by Hon. Dennis DeConcini, Subcommittee Chairman Upon
Introduction of Senate Amendment to House Amendment to H.R. 8200.
124 Cong. Rec. S 17406 (Daily Ed. October 6, 1978).

- 8 -

1              Plan Administrator's Arguments

2          The Plan Administrator objects that the bankruptcy waterfall

3     requires that the claims based on the 2015 judgment against MFE

4     and MTI, together with the $2,700,000 payment default provision,

5     be treated under § 726(a)(4) as being on account of punitive

6     damages that were not compensation for actual pecuniary loss by

7     the holders of the claims.

8          In addition, the objection questions allowability on the

9     merits of the $2,700,000 payment default provision as being an

10    unenforceable penalty under governing Nevada law.

11

12              Claimants' Arguments

13         Claimants argue that the 2015 plan implementing the

14    settlement of the 2015 judgment transformed the debt from status

15    as punitive damages to status as garden-variety contract debt.

16    The theory is, first, that the settlement was a contract that

17    extinguished the judgment by way of dismissing the Complaint and,

18    second, that the $2,700,000 payment default provision was part of

19    the bargained-for consideration in 2015.

20         Claimants further urge that the order confirming the plan in

21    the 2015 Chapter 11 case is binding as to the status of the debt.

22

23                      Analysis

24         Straightforward analysis leads to the conclusion that the

25    Plan Administrator's objections prevail.

26

27         Punitive Damages Mandatorily Subordinated: § 726(a)(4)

28         It is beyond dispute that § 726(a)(4) requires mandatory

subordination wherever it applies.

The claimants' argument that the confirmation of the 2015 plan transformed the punitive damages into a garden-variety contract runs counter to Supreme Court precedent.

The Supreme Court decisions in <u>Archer v. Warner</u>, 538 U.S. 314, 318-22 (2003), and in <u>Brown v. Felsen</u>, 442 U.S. 127, 131-38 (1979), settle the proposition that neither a consent decree, nor the settlement of a fraud debt by way of contract, prevents a Bankruptcy Court from looking behind a decree or settlement contract to ascertain proper treatment of a debt in bankruptcy.

Those precedents permit this Court to look behind the 2015 plan confirmation order and the attendant settlement agreement to determine the position of the debt in the § 726(a) waterfall.

The origin of the debt thereby compromised was the 2015 judgment for punitive damages.

As the § 726(a)(4) exception to categorical subordination of punitive damages is limited to the extent to which such "damages are not compensation for actual pecuniary loss suffered by the holder of such claim," an allocation among § 726 tiers sometimes is needed.

The exception being a creature of federal statute without nonbankruptcy counterpart, the burden is on the claimant to demonstrate the extent, if any, of compensation for actual pecuniary loss that may be embedded in a punitive damages award. Here, the claimants have proffered no evidence to suggest that an allocation is needed in this case.

The awards of "back pay" and "other compensatory damages" totaling $968,000 were extinguished by the payment of $3,000,000

1  before the effective date of the plan on January 19, 2016,

2  leaving only punitive damages to be paid by way of the remaining

3  32 plan payments.

4      From the payments of all awarded "back pay" (including taxes

5  thereon) and "other compensatory damages" before the January 19,

6  2016, plan effective date, it follows that no "compensation for

7  actual pecuniary loss suffered by the holder of such claim" is

8  allocable to the punitive damages remaining for each of the seven

9  claimants for purposes of § 726(a)(4).

10      To the extent nonbankruptcy law may affect an allocation of

11  the original judgment debt, the conclusion that the remaining

12  debt solely consists of punitive damages is consistent with

13  Nevada law, which provides that when there is partial payment on

14  a judgment as to which neither the judgment creditor nor judgment

15  debtor designates allocations, the court determines the

16  allocation guided by basic principles of "justice and equity" so

17  a fair result can be achieved. 9352 Cranesbill Trust v. Wells

18  Fargo Bank, N.A., 136 Nev. 76, 80-81 (2020); Able Elec., Inc. v.

19  Kaufman, 104 Nev. 29, 32 (1988).

20      Justice and equity favor allocation of punitive damages to

21  the inferior position.

22      The procedural facts underlying the confirmation of the 2015

23  plan do not suggest a contrary conclusion. The 2015 chapter 11

24  plan could not have been confirmed without a "best interest"

25  finding under § 1129(a)(7)(A)(ii) applying the bankruptcy

26  waterfall. The evidence probative of the "best interest" facet of

27  plan confirmation included the unchallenged opinion of a

28  valuation expert that in a hypothetical chapter 7 liquidation,

1   "there would be no cash available to the unsecured creditors."

2   Expert Opinion, MFE Ch. 11, Dkt. #341 p.5 & Dkt. #482 p.127.

3        In other words, the 2015 bankruptcy court ruled there would

4   be no distribution to general unsecured creditors under

5   § 726(a)(2) or to any creditor downstream from that tier.

6        It follows that the "best interest" test for the 2015 plan

7   confirmation required mandatory subordination of the punitive

8   damages claims pursuant to § 726(a)(4). The status of the debt as

9   punitive damages was not relevant to any question being decided

10  in the course of confirming the 2015 chapter 11 plan.

11       It warrants repetition that mandatory subordination does not

12  necessarily lead to disallowance.  An allowed punitive damages

13  claim retains its status as an "allowed" claim and will be paid

14  to the extent funds remain available at the § 726(a)(4) tier.

15       Accordingly, the 2015 plan provided for paying the remaining

16  allowed punitive damage claims still remaining after the

17  effective date of the plan.

18       The claimants' issue preclusion argument that plan

19  confirmation in the prior chapter 11 case established a new

20  status under the bankruptcy waterfall in the later chapter 11

21  case fails because the claim status of punitive damages in the

22  bankruptcy waterfall was not actually and necessarily litigated.

23       The conclusion that mandatory subordination under

24  § 726(a)(4), which is a form of categorical subordination,

25  applies to the challenged punitive damage claims makes it

26  unnecessary to rule on the Plan Administrator's argument that

27  § 510(c) equitable subordination is also applicable here.

28       The Supreme Court has disapproved categorical § 510(c)

equitable subordination, approved fact-based equitable
subordination, and left open the question whether creditor
misbehavior is essential to equitable subordination. <u>United
States v. Noland</u>, 517 U.S. 535, 542-43 (1996). The question
remains for another day.

### Stipulated Judgment for Payment Default

The objection to the claim for $3,793,751 subdivides into
two components. First, there is no objection to the $1,093,750
remaining unpaid under the settlement agreement. Second, there is
the claim for $2,700,000 based on the stipulated judgment for
payment default. It is objected that this sum is an unenforceable
penalty under governing Nevada law. This is a merits-based
disallowance issue, rather than a subordination issue.

Nevada law refuses to enforce contractual damage clauses as
contrary to state public policy where the clause is not designed
to compensate the injured party for breach, but instead requires
payment of a sum grossly disproportionate to actual damages.
E.g., <u>Mason v. Fakhimi</u>, 109 Nev. 1153, 1157 (1993).

Under the terms of the settlement contract, the $2,700,000
would be payable even if the only payment default was not making
the 32nd of the 32 required payments. In other words, it is a
fixed charge of $2,700,000 regardless of the actual amount of the
payment default. That is "grossly disproportionate" to actual
damages and hence, a "penalty" under Nevada law.

The fact that a penalty unenforceable under the chosen state
law was embodied in the 2015 confirmed chapter 11 plan and
settlement agreement does not now insulate it from attack. This

1   Court has the power to determine in a claim objection the

2   enforceability of the penalty under applicable nonbankruptcy law.

3     To be sure, it may seem odd that the parties agreed to an

4   unenforceable penalty in the 2015 settlement agreement and

5   chapter 11 plan, but the choice of law provisions in the

6   settlement and plan to apply Nevada law are not ambiguous.

7     Accordingly, the objection to $2,700,000 of the $3,793,751

8   claim will be sustained and that portion of the claim disallowed

9   as unenforceable under governing state law.

10     An appropriate separate order will issue.

11

12   Dated: July 28, 2025

13

14

15        United States Bankruptcy Judge

16

17

18

19

20

21

22

23

24

25

26

27

28